# Exhibit
# 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 14-CR-00674 |
| v. | ) | |
| | ) | |
| ALDO BROWN | ) | Judge Virginia M. Kendall |
| | ) | |
| Defendant. | ) | |

## NOTICE OF FILING

Please take notice that on, **Tuesday, July 14, 2015** I caused to be filed with counsel, Jessica Romero, of the United States Attorney's Office, the attached **Expert Report**.

Respectfully submitted

/s/ Daniel Q. Herbert_____
Daniel Q. Herbert
Law Offices of Daniel Q. Herbert
and Associates
206 S. Jefferson, Suite 100
Chicago, IL 60661
312-655-7660
Attorney No. 6273940

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on Tuesday, July 14, 2015, before the hour of 5:30 p.m., he caused a copy of the following **EXPERT REPORT** to be filed electronically and via U.S. Mail, to counsel Jessica Romero of the United States Attorney's Office.

/s/ Daniel Q. Herbert____
Daniel Q. Herbert

July 11, 2015

Daniel Q. Herbert
Attorney At Law
206 S. Jefferson Street
Chicago, Il. 60661

Attention: Mr. Herbert,

This report is being submitted in response to your request that I review all available evidence, documentation, and videos relative to the Case of the United States v. Aldo Brown (14-CR-674). I was asked to review and give an opinion on the actions and force used by defendant Aldo Brown during this incident, which took place at the                              Convenient Store        E. 76th Street, Chicago, Illinois on 27 September 2012.  I am being compensated for my work at the rate of $50.00/hr.

## BACKROUND

My background and qualifications are as follows. I served 42 years as a Chicago Police Officer including 31 years as a supervisor. In my capacity as a supervisor I reviewed well in excess of one thousand use of force incidents.

I presently work as a Field Representative for the Fraternal Order of Police, Chicago Lodge 7. I serve in an on-call status and respond to officer involved shootings in this capacity. My job is to provide support, advice, and representation to the involved officer during the investigation. I have worked in this capacity for four years.

I also presently work as an instructor for the Street Crimes Training Program. I conduct three day training seminars for police departments across the United States on street related police topics. Use of force is one of the topics discussed. This program is certified for training purposes in all fifty states. I have been working as an instructor for the Street Crimes Program for six years.

I also serve as a guest instructor for the State of Illinois mandated Lead Detective Training at the Chicago Police Academy. I have been serving in this capacity since September 2013. Use of force is one of the topics covered in my training segment.

I am certified as an analyst in the use of force through the Force Science Institute, Minnesota State University, Mankato, Minnesota. I received this certification on 17May 2013 following training through the Force Science Institute.

Additional background information, including previous expert witness testimony, is available through my resume which accompanies this report.

I was afforded the opportunity to review evidence prior to issuing a response relative to this incident. This evidence consisted of video recordings from cameras located inside and outside of the                              Convenience Store        E.76th Street, Chicago, Illinois. These recordings were dated 27 and 28 September 2012. I also reviewed the Chicago Police Case Report under Records Division Number HV494025 , and Chicago Police Arrest Reports under Central Booking Numbers

18504078 and 18504127 . I also reviewed Tactical Response Reports submitted by Police Officers Aldo Brown and George Stacker relative to this incident. I also had the opportunity to interview the defendant, Police Officer Aldo Brown, on 9 July 2015.

As a basis for my response I used the Use of Force Model which is widely used by law enforcement agencies throughout the United States. This model is the basis for the Use of Force Policy adapted by the Chicago Police Department. It is also the basis for both recruit and in service training of police officers at the Chicago Police Academy.

This Use of Force Model was authored by John C. Desmedt in 1983. This model has been updated a number of times since 1983. I used the May 2012 update for this report as that was the model in effect at the time of this incident.

I am aware that the defendant in this case, Police Officer Aldo Brown, was appointed to the Chicago Police Department on 2 December 2002 and attended the basic recruit training including use of force instruction based on this model.

The Use of Force Model defines reasonable and appropriate guidelines to be used in choosing force options in response to the actions of the subject. Force options are as follows.

**COOPERATIVE SUBJECT**
This is a subject who is compliant without the need for physical force. In the case of a cooperative subject, presence and verbal direction results in compliance.

**RESISTER**
A resister is a person who is uncooperative. Resisters are subdivided into two categories.

PASSIVE RESISTER
A passive resister is a person who fails to comply (non-movement) with verbal or other direction. Appropriate response options when dealing with a passive resister are holding techniques, pain compliance techniques, control instruments, and the use of oleoresin capsicum (OC) spray. These responses are listed in order with holding techniques being the least aggressive and OC spray being the most aggressive.

Police Officers are taught to use the least aggressive options necessary to bring about conformity on the part of the subject. It should be noted that holding techniques consist of a firm grip, grabbing an arm, wrist locks, and come along or escort holds.

ACTIVE RESISTER
An active resister is a subject whose actions attempt to create distance between that subject and the police officer involved. This type of resistance includes gestures ranging from evasive movements of the arms, flailing arms, and fleeing by running. Appropriate response options include those listed under passive resister plus stunning and the use of a taser. Stunning consists of striking or slapping in an attempt to increase control by disorienting a subject.

**ASSAILANT**
An assailant is a subject who is using, or threatening, the imminent use of force against himself, herself, or another. Assailants are divided into three categories.

ASSAILANT WHOSE ACTIONS ARE AGGRESSIVELY OFFENSIVE WITHOUT WEAPONS
This type of assailant places a police officer in fear of receiving a battery and includes advancing on the officer in a threatening manner or closing the distance between the assailant and the officer, thereby reducing the officer's reaction time. Appropriate responses to this type of action include hard striking movements such as punching and kicking, Also appropriate are powerful locks and pressures. These techniques are appropriately combined with take downs and pins against the ground or other objects. Also appropriate for this type of assailant is the use of an impact weapon including a baton or an asp. Also appropriate are impact (non-lethal) munitions.

ASSAILANT WHOSE ACTIONS ARE LIKELY TO CAUSE PHYSICAL INJURY
This type of assailant may or may not be armed. The responses are the same as listed for the above unarmed assailant.

ASSAILANT WHOSE ACTIONS ARE LIKELY TO CAUSE SERIOUS PHYSICAL INJURY OR DEATH
This type of assailant is not relevant to the incident under review.

The Use of Force Model is utilized to provide guidance as to the appropriate amount of force to be used to affect a lawful purpose. The Use of Force Model employs the reasonable and progressive escalation and de-escalation of force in proportional response to the actions and level of resistance presented by the subject.
The primary objective of the use of force is to ensure control of a subject using the reasonable force necessary. Officers are taught to increase force as the subject increases resistance and lessen force as the subject lessens resistance.
Chapter 720, Article 5, Section 7-5 of the Illinois Compiled Statutes states that a peace officer need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance. It further states that a peace officer is justified in the use of any force which he reasonably believes to be necessary to defend himself, or another, from bodily harm while making an arrest.
The United States Supreme Court in Graham v. Connor, 490 US 386 (1989) stated that the central inquiry in every use of force is whether the amount of force used by the officer was objectively reasonable in light of the particular circumstances faced by the officer. Reasonableness is not capable of precise definition or mechanical application. Circumstances that may govern the reasonableness of a particular force option include, but are not limited to, the severity of the crime, whether the subject

poses an immediate threat to the safety of officers or others, and whether the subject is actively resisting arrest or attempting to evade arrest by fleeing. The reasonableness of a particular use of force will be judged under the totality of the circumstances viewed from the perspective of a reasonable officer on the scene.

The defendant Police Officer Aldo Brown, and his partner, Police Officer George Stacker, went to the                    Convenient Store at        E. 76th Street, Chicago, Illinois on 27 September 2012. Their purpose was to conduct a narcotics investigation based on prior information they had received relative to narcotic sales at that location.

Police Officers Brown and Stacker were aware that it was not uncommon for drugs to be sold in and around small convenient stores in high crime areas of Chicago. Drugs may be sold inside, outside, or in both locations at these stores.

These types of locations are preferred by drug dealers because the normal flow of customers in and out of the store shields the drug activity from police officers on patrol. The owners and employees of these stores usually are aware of the activity and may, or may not, be involved. If involved, they may actually supply the drugs or get a kickback from the dealers.

The store owners and employees can also profit in other ways. They may sell drug paraphernalia. They also can profit from the fact that many of the drug customers will also make a purchase from the store when they are buying drugs.

It is common for the drug dealers, if working outside the store, to go inside when police officers approach. They will hide their drugs, and weapons, on the store shelves if police officers come inside

The drug dealers, especially if they are gang members, have the ability to intimidate the store owners and employees. They will frequent both the interior and exterior of the store and refuse to go elsewhere.

I personally observed these situations during my years as a Chicago Police Officer working in high crime areas on the west and south sides of the city. I also am aware that the store owners and employees at times will protect the drug dealers due to the profit or fear motives.

The                    convenient store is located on the border of areas controlled by two rival gangs. These gangs are the Black P Stones and the Gangster Disciples. In 2012 the Black P Stones frequented the area west of this location, and the Gangster Disciples frequented the area to the east. As a source for this information I used the Chicago Police Department 004th district Gang Territorial Boundary Map published in 2011.

As Police Officers Brown and Stacker entered this store they detained five subjects and handcuffed them for safety purposes. Video evidence showed that these five subjects initially appeared to be compliant. They appeared to be cooperative subjects as defined by the Use of Force Model in that they followed the verbal direction given by Police Officers Brown and Stacker. Police Officer Brown frisks four of the five subjects that are handcuffed. He does not frisk subject            at that time. The entry by the two officers, along with the handcuffing and frisking, takes place between 2 minutes/24 seconds and 3 minutes/50 seconds on the videos. This can be seen most clearly on the camera 5 video.

Police Officers Brown and Stacker alternately walk through the store looking at the shelves while the other remains in the front aisle of the store near the handcuffed individuals.

At 7 minutes/7 seconds on the video Police Officer Aldo Brown returns to the front aisle of the store and he and                    appear to be talking to each other.                    appears to be the only one of the five handcuffed subjects that is talking..          is also observed to be laughing  and moving his free arm in an animated fashion. This continues until 8 minutes/45 seconds into the video.

Police Officer George Stacker starts moving from the front door area of the store toward          and is talking to          as he approaches. Police Officer Stacker stands directly in front of          and continues to talk to him. Police Officer Stacker then removes the handcuffs from          . This conversation and removal of handcuffs takes place between 10 minutes/48 seconds and 11 minutes/37 seconds on the video. Camera 5 gives the best view of this activity.

Police Officer Stacker stands directly in front of          , who is now un-handcuffed, and talks to him in an animated fashion pointing his finger at          .          is also talking to Police Officer Stacker This occurs between 11 minutes/54 seconds and 12 minutes/34 seconds on the video.

Police Officer Brown was, at this time, looking around in the store aisle closest to the front door. This is the aisle that runs from the front to rear of the store and contains multiple coolers. Police Officer Brown is observed to move quickly up the aisle to the front of the store where Police Officer Stacker and          are conversing.

During my in person interview with Police Officer Brown on 9 July 2015 I asked him what caused him to move to the front of the store at that time. He stated, in summary, that the conversation between Police Officer Stacker and          had become loud and heated. He stated that it was apparent to him that Police Officer Stacker was having a problem with          and he went to assist him. Police Officer Brown stated that one remark he heard          make was "fuck you, I got something for your ass".

Based on the video and the interview of Police Officer Brown, it is my opinion  that          had changed from a cooperative subject to that of an uncooperative subject or resister as defined by the Use of Force Model.

At this point he would best be described as a passive resister. Force options available to get compliance from a passive resister would be holding techniques, pain compliance techniques, control instruments, and the use of oleoresin capsicum OC) spray

Police Officer Aldo Brown is observed to step in front of          and start frisking          's front waistband area.          uses both his hands to show his waist area and lift the lower front of his shirt.          is talking during this frisk. At this time both          's arms are horizontal, bent at the elbow, and at abdomen level.          raises his shirt with both hand and looks down. This occurs between 13 minutes/00 seconds and 13 minutes/03 seconds on the video          then raises his head toward Police Officer Brown and moves his hands toward each other at the upper abdomen level. He then moves both arms out

toward Police Officer Brown. It is my opinion that this action on the part of
                    changed his status to that of an active resister.

The Use of Force Model defines active resistance as movement to avoid physical control and/or variable dynamics. The Use of Force Model directs the reader to refer to the Chicago Police General Order entitled Use of Force Guidelines G.O. 03-02. It specifically directs the reader to refer to the Force Option addendum G.O. 03-02-02)

The Force Options addendum states that active resistance includes gestures ranging from evasive movement of the arms, through flailing arms, to full flight by running.

During my interview of Police Officer Brown on 9 July 2015 I learned that
            , at this point, made threatening remarks and swore at Pol;ice Officer Brown several times and stated something to the effect of "I have something for you". Police Officer Brown further stated that he saw a gun when              was raising his shirt. He thought that the gun was in            's rear waistband. Police Officer Brown stated that he asked            "what do you have, you got a weapon?". Police Officer Brown stated that              replied that he had some weed.              positioned himself with his rear toward the shelves and Police Officer Brown stated that he was unable to reach            's rear waist area. Police Officer Brown stated that he was unable to see the gun at that time.

**OPINION**

It is my opinion that                    had escalated his actions to the point where a reasonable officer would be placed in fear of receiving a battery. This would classify            as an assailant.

According to the Use of Force Model, this action places an officer in fear of receiving a battery and includes advancing on the officer in a threatening manner, and/or closing the distance between the assailant and the officer thereby reducing the officer's reaction time.

In this situation additional force options become available to the officer. The officer has available stunning and the use of a taser. Stunning consists of striking or slapping in an attempt to increase control by disorienting a subject. The officer also has available hard striking movements such as punching or kicking, powerful locks and pressures which can be combined with take downs and pins against the ground or other objects. Also suitable in this situation are impact weapons such as an asp or baton, and non-lethal impact munitions.

Police Officer Aldo Brown used the least aggressive of the available responses for dealing with an assailant and stunned              by striking him one time in the left face area with his right hand. It should be noted that it appeared his fist was closed in the video as he swung but it is not clear as to whether it was open or closed hand when it struck              . It should also be noted that this appeared to be a glancing blow and did not knock              down or cause any visible injury. This strike occurred at 13 minutes/06 seconds on the video with camera 5 showing the best view.

            then backs up on his own toward store shelves. Police Officer Brown follows with no contact being made.              's right hand is raised to

about shoulder level in a horizontal position as if he is about to punch or push Police Officer Brown.                    's right hand goes down and both his hands and arms start moving and he appears to touch or grab Police Officer Brown.                    's left hand comes up twice touching or grabbing Police Officer Brown.

During my interview of Police Officer Brown on 9 July 2015 he stated that he told                    to turn around and put his hands on the cooler. He did this with the intent of getting to                    's rear waistband and taking control of the gun. He stated that                    did not comply. He stated that he struck                    at that time to stun him and get him turned around.

This strike, in my opinion, was the least aggressive of the available options. The videos views are not clear enough to determine whether it was an open or closed hand strike. This occurs at 13 minutes/31 seconds on the video with camera 3 giving the best view.

                   does not fall down. Police Officer Brown grabs                    by the collar or shoulder of his shirt with both hands and moves him down the aisle toward the rear of the store. At this point he puts                    on the floor. He uses his hands to push                    to the floor and positions him laying on his back.. This occurs at 13 minutes/42 seconds on the video.

Police Officer Brown, during his 9 July 2015 interview, stated that he was able to see                    's rear waistband area at this time and did not see the gun. Police Officer Brown stated that he was doubting himself and wondered if the object he saw was actually a gun.

Police Officer Brown attempts to handcuff                    who is still on his back moving around. Police Officer Brown is unsuccessful at handcuffing                    at this point as                    is not compliant.                    attempts to get up and Police Officer Brown strikes                    with an open right hand in a slapping motion to his face. This was a light slap appearing to have no effect on                    other than forcing him back down and enabling Police Officer Brown to get                    rolled over onto his stomach for handcuffing and search purposes.  This stun was the least aggressive of the options available to Police Officer Brown as                    still fit the definition of an assailant. This occurs at 14 minutes/31 seconds on the video and is clearest on camera 2.

Police Officer Brown straddles                    and handcuffs him. Police Officer Brown starts searching                    and recovers a gun from the rear pants pocket. He then walks toward the front section of the store and makes Police Officer Stacker aware that a gun was recovered.

Police Officer Brown places the recovered gun on a store shelf in order to continue his search of                    . Police Officer Brown approaches                    who is lying on the floor on his stomach. Police Officer Brown kicks                    one time in the upper right leg thigh area and continues his search.                    rolls to his right side in compliance after the stun enabling Police Officer Brown to search the front pants area of
                   .

At the time of this kick                    still fit the definition of an active resister in that he was not complying with Police Officer Brown's desire to complete a thorough search. The kick was not a hard striking movement as would be appropriate for an assailant. It was meant to disorient him in order to get him to turn to a position where Police Officer Brown could continue the search. This kick was not meant to,

and did not, injure        . It was a stunning technique to gain compliance. This kick occurred at 15 minutes/06 seconds on the video and is clearest on camera 2.

In continuing the search Police Officer Brown removed another item from the person of        . The video is not clear enough to determine what this item was. This occurred at 15 minutes/32 seconds on the video.

Police Officer Brown takes possession of the gun from the store shelf, unloads it, and places it in his pocket. He makes a call and uses the police radio. Tactical Sergeant Senora Ben arrives on the scene.

Police Officer Brown escorts        out of the store when a transport vehicle arrives. This occurs at 34 minutes/30 seconds on the video.

Police Officers Aldo Brown and George Stacker are both assigned to the 004th district tactical team. As tactical team members they work with a partner and are required to be proactive. They work in a high crime area and concentrate on murders, shootings, guns, drugs, and gang related crime. Tactical team members are not tied to radio calls as beat patrol officers are. They have the freedom to do investigations, conduct surveillances, work with informants, and address drug related activity. They have to be able to do this as a two person team without requiring assistance. They have to be able to take control of a situation even when out numbered by offenders. I feel that Police Officers Aldo Brown and George Stacker demonstrated that they have the ability to do this.

My opinion, based on my review of this incident, is that Police Officer Aldo Brown acted in compliance with the Chicago Police Department Policy relative to the use of force. His actions were reasonable and appropriate in response to the actions of        . The escalation of the resistance on the part of        required the escalation of the response on the part of Police Officer Brown. Police Officer Brown consistently used a response that was among the less aggressive of those available.

I also think that it important to note that it is easy for me to go through the video of this incident frame by frame to assist in forming an opinion. Police Officer Aldo Brown did not have that luxury. He was involved in a dynamic and escalating situation where he had to evaluate and make decisions in split seconds.

John Farrell

**ATTACHMENTS;**
Chicago Police Use Of Force Model (Rev May 2012)
Chicago Police Department General Order 03-02
Chicago Police Department General Order 03-02-02
Chicago Police Department Gang Territorial Map

# ATTACHMENT 1

*Chicago Police Department*

# 4TH DISTRICT GANG TERRITORIAL BOUNDARY





### 4th District Gang Territorial Boundary

Rahm Emanuel, Mayor
Garry McCarthy, Superintendent

**Folks Nation Alliance**
- AMBROSE
- BLACK DISCIPLES
- GANGSTER DISCIPLES

**People Nation Alliance**
- BLACK P STONE
- CONSERVATIVE VICE LORDS
- FOUR CORNER HUSTLERS
- LATIN COUNTS
- LATIN DRAGONS
- LATIN KINGS
- MAFIA INSANE VICE LORDS
- SPANISH VICE LORDS
- ★ Police District



N

Chicago Police Department
Bureau of Administrative Services
OEMC P&IT GIS
May 2011

# ATTACHMENT 2



| | | |
|---|---|---|
| Chicago Police Department **FORCE OPTIONS** | | **General Order G03-02-02** |

| ISSUE DATE: | 16 May 2012 | EFFECTIVE DATE: | 16 May 2012 |
|---|---|---|---|
| RESCINDS: | 01 October 2002 version | | |
| INDEX CATEGORY: | Field Operations | | |

I.    PURPOSE

This directive explains the various levels of force options in the Use of Force Model that are appropriate for Department members' use when interacting with cooperative subjects, resistive subjects ("resisters"), and assailants.

II.    POLICY

A.    Members will maintain a courteous and professional demeanor when dealing with the public.

B.    Before taking any police action, sworn members will identify themselves as police officers unless identification would jeopardize the safety of the member or others or compromise the integrity of an investigation.

C.    Members will select the appropriate level of force option based on a subject's actions and modify their selection of options as the subject offers less or greater resistance.

III.    LEVEL OF FORCE RESPONSE OPTIONS GUIDELINES

A.    Cooperative Subject: a person who is compliant without the need for physical force. The following response options are appropriate when dealing with a cooperative subject:

1.    Social Control/Police Presence

a.    Social control/police presence is established through identification of authority and proximity to the subject. Police presence may result in conforming behavior.

b.    Social control/police presence, used alone, is the only force option which is appropriate for use with subjects who are cooperative without the need for direction from law enforcement personnel.

2.    Verbal Control

a.    Verbal control consists of persuasion, advice, and warning. It includes instruction or direction from a member in the form of verbal statements or commands. Verbal control may result in conforming behavior.

b.    Whenever practical, members will attempt to de-escalate confrontations by utilizing verbal control techniques prior to, during, and after the use of physical force.

13

B. Resister: a person who is uncooperative. Resisters are further subdivided into two categories:

1. Passive Resister: a person who fails to comply (non-movement) with verbal or other direction. In addition to the response options listed in Item III-A, the following response options are appropriate when dealing with a passive resister:

   a. Holding Techniques
      Holding consists of techniques such as a firm grip, grabbing an arm, wristlocks, and come-along holds (i.e., escort holds that are not elevated to pain compliance techniques), as well as any combination of the above. Holding may result in conforming behavior.

   b. Pain Compliance Techniques
      Pain compliance consists of techniques designed to amplify nonimpact pressure and pain in order to increase the potential for controlling a subject. These techniques consist of:

      (1) applying pressure to pain sensors in the skin covering bone and joints (i.e., armbars and amplified wristlocks) to amplify pain; and

      (2) *using a Long Range Acoustic Device (LRAD) to emit high decibel focused sound waves to cause pain and discomfort; any use of the LRAD requires authorization from the Superintendent or the designee of the Superintendent.*

         NOTE: *The LRAD is not considered a pain compliance technique when used to deliver verbal messages or warnings at a decibel level not intended to cause pain and discomfort.*

   c. Control Instruments
      Control instruments are designed to amplify nonimpact pressure and pain in order to increase the potential for controlling a subject. These instruments are placed mainly on the pain sensors of the skin covering bone.

   d. Oleoresin Capsicum (OC) Spray *and Capsaicin II Powder Agent Deployment*
      Oleoresin capsicum *and Capsaicin II powder* are highly inflammatory agents that occur naturally in cayenne peppers. The use of OC spray *and Capsaicin II powder agent* is intended to increase control by disorienting the subject and interfering with the subject's ability to resist arrest.

      (1) *Oleoresin capsicum is only appropriate to use against the below two types of passive resisters AND only after the required authorization is received. No other use of oleoresin capsicum is authorized against passive resisters.*

         (a) occupant(s) of a motor vehicle who is engaging in passively resisting arrest, only after obtaining authorization from an on-scene supervisor of the rank of sergeant or above.

         (b) unresponsive groups, crowds, *or an individual taking*

14

part in a group or crowd (e.g., demonstrators, sports championship celebrations, New Year's Eve, etc.), only after obtaining authorization from _the Superintendent or the designee of the Superintendent._

(2) Capsaicin II powder agent deployment is an appropriate force option against passive resistors and unresponsive groups or crowds only when used for area saturation and only after obtaining authorization from the Superintendent or the designee of the Superintendent.

NOTE: Only Department-issued Capsaicin II powder agent projectiles and launchers may be used and only after the member has received Department-authorized training in their safe handling and deployment.

2. Active Resister: a person whose actions attempt to create distance between that person and the member's reach _with the intent to avoid physical control and/or defeat the arrest._ This type of resistance includes gestures ranging from evasive movement of the arm, through flailing arms, to full flight by running. In addition to the response options in Items III-A and III-B-1, the following response options are appropriate when dealing with an active resister:

a. Stunning
Stunning is diffused-pressure striking or slapping and is an attempt to increase control by disorienting the subject and interfering with the subject's ability to resist.

b. Oleoresin Capsicum (OC) Spray
Oleoresin capsicum is an appropriate force option against active resisters _only under the following guidelines:_

(1) _If the only resistance is the act of walking or running away, and the resister is:_

(a) _part of a group or crowd, OC spray can be used only after obtaining authorization from the Superintendent or the designee of the Superintendent._

(b) _not part of a group or crowd, the use of OC spray is not authorized._

(2) _If the resistance includes evasive maneuvers of the limbs and body, including the flailing of arms and legs, and the resister is:_

(a) _part of a group or crowd, OC spray can be used only after obtaining authorization from the Superintendent or the designee of the Superintendent._

(b) _not part of a group or crowd, the use of OC spray is authorized without supervisory approval._

c. Capsaicin II Powder Agent Deployment
_Capsaicin II powder agent deployment is an appropriate force option against active resistors only when used for area saturation and only_

after obtaining authorization from the Superintendent or the designee of the Superintendent.

d.    LRAD
The LRAD is an appropriate force option against active resisters only after obtaining authorization from the Superintendent or the designee of the Superintendent.

e.    Canines Used by Canine Handlers
A canine under the control of a canine handler is an appropriate force option when used consistent with the provisions of the Department directive entitled "Canines as a Force Option."

f.    Taser

(1)    The Taser is a device used to control and subdue a subject through the application of electrical impulses that override the central nervous system and cause uncontrollable muscle contractions. Two darts attached by thin wires are fired from a cartridge attached to the hand-held device. When both darts attach to the subject, a timed electrical impulse is applied to the subject at the control of the operator, the electrical impulse immobilizes the subject long enough for restraints to be applied.

(2)    Only Department-issued Tasers may be used and only after the member has received Department-authorized training in their safe handling and deployment.

C.    Assailant: a subject who is using or threatening the imminent use of force against himself/herself or another person. The Use of Force Model categorizes assailants into three categories.

1.    Actions are aggressively offensive without weapons. This type of assailant is one who places a member in fear of a battery and includes advancing on the member in a threatening manner or closing the distance between the assailant and the member, thereby reducing the member's reaction time. In addition to the response options in Items III-A and III-B, the following response options are appropriate when dealing with this type of assailant:

a.    Direct Mechanical
Direct mechanical techniques are hard, concentrating, striking movements such as punching and kicking, or powerful locks and pressures. These techniques can be combined with take-downs or pins against the ground or other objects.

b.    Impact Weapons
The baton is the member's primary impact weapon, which is used for striking. Impact weapons are designed to establish control by means of applying mechanical impact to a subject in order to disable elements of his or her skeletal structure. Members will avoid the use of flashlights, radios, or any item not specifically designed as a defensive weapon if the baton is reasonably available.

c.    Impact Munitions

(1)    Impact munitions are projectiles such as Capsaicin II powder agent projectiles fired from a powder agent deployment system, "drag stabilized sock rounds" fired from shotguns with specially colored yellow or orange stocks, or batons fired from 37mm or 40mm launchers. These projectiles are

16

intended to impact and incapacitate a potentially dangerous subject from a safe distance, thereby reducing resistance and gaining compliance while reducing the probability of serious injury or death.

(2)     Only Department-issued impact munitions may be used and only after the member has received Department-authorized training in their safe handling and deployment.

(3)     *The use of Capsaicin II powder agent projectiles as an impact munition requires authorization from the Superintendent or the designee of the Superintendent.*

2.     Actions will likely cause physical injury. Included in this category of assailant may be a subject who is armed with a deadly weapon and the subject fails to disarm, thereby making the subject's actions likely to cause physical injury. The appropriate response options when dealing with this category of assailant are those listed in Items III-A, III-B, and III-C-1.

3.     Actions will likely cause death or serious physical injury. An assailant in this category is one whose actions will likely cause death or serious physical injury to another person. In addition to the response options in Items III-A, III-B, and III-C-1, firearms and other deadly force are appropriate when dealing with an assailant whose actions will likely cause death or serious physical injury to another.

IV.     POST-USE OF FORCE POSITIONING AND MONITORING

After gaining control of a subject, members will:

A.     avoid sitting, kneeling, or standing on a subject's chest, which may result in chest compression, thereby reducing the subject's ability to breathe.

B.     position the subject in a manner to allow free breathing. Whenever feasible, the subject will not be placed on the subject's stomach.

C.     monitor an arrestee until transported to a secure location.

D.     seek medical attention for an arrestee who has injuries or illnesses consistent with the procedures outlined in the Department directives entitled "Processing Persons Under Department Control" and "Hospitalized Arrestees."

(Items indicated by *italic/double underline* were added or revised)

Garry F. McCarthy
Superintendent of Police

11-205 TRH

# ATTACHMENT 3



| Chicago Police Department | General Order G03-02 |
|---|---|
| **USE OF FORCE GUIDELINES** | |

| ISSUE DATE: | 23 September 2002 | EFFECTIVE DATE: | 01 October 2002 |
|---|---|---|---|
| RESCINDS: | G02-08 | | |
| INDEX CATEGORY: | Field Operations | | |

I. **PURPOSE**

This directive:

A.    states Department policy regarding the use of force.

B.    provides guidelines for the use of force.

Department members will refer to the Special Order titled "**Use of Force**" for procedures to be followed for Use of Force incidents.

II. **GENERAL INFORMATION**

Chapter 720, Article 5, Section 7-5, of the Illinois Compiled Statutes provides in part:

"A peace officer ... need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he reasonably believes to be necessary to effect the arrest and of any force which he reasonably believes to be necessary to defend himself or another from bodily harm while making the arrest."

III. **DEPARTMENT POLICY**

A.    When a Department member engages a member of the public, the member will do so in such a manner which affords that person the respect and dignity to which all persons are entitled. The use of excessive force or unwarranted physical force or unprofessional conduct by a Department member will not be tolerated under any circumstances, and all members will strictly adhere to the provisions of the Department directive entitled "**Prohibition Regarding Racial Profiling and Other Bias Based Policing.**"

B.    Department members will use an amount of force reasonably necessary based on the totality of the circumstances to perform a lawful task, effect an arrest, overcome resistance, control a subject, or protect themselves or others from injury.

C.    As set forth by the United States Supreme Court in Graham v. Connor, 490 U.S. 386 (1989), the central inquiry in every use of force is whether the amount of force used by the officer was objectively reasonable in light of the particular circumstances faced by the officer.

    1.    Reasonableness is not capable of precise definition or mechanical application. Circumstances that may govern the reasonableness of using a particular force option include, but are not limited to:

        a.    the severity of the crime at issue,

        b.    whether the subject poses an immediate threat to the safety of officers or others,

        c.    whether the subject is actively resisting arrest or attempting to evade arrest by flight.

    2.    The reasonableness of a particular use of force will be judged under the totality of the circumstances viewed from the perspective of a reasonable officer on the scene.

D.    The Department has adopted a Use of Force Model in order to provide members guidance on the reasonableness of a particular response option.

E.  All Department members are obligated to ensure compliance with all laws and Department regulations. If a member knows that another Department member is using excessive force against a subject, the member will take appropriate action. The action required by the member will depend upon the circumstances of the incident. However, appropriate actions may include, but are not limited to, verbal or physical intervention, immediate notification to a supervisor, or a direct order by a supervisor to cease the use of excessive force.

F.  Sworn members and detention aides in the performance of their duties will complete a Tactical Response Report as specified in the Department directive entitled "**Incidents Requiring the Completion of a Tactical Response Report**."

G.  The On-Call Incident Commander will be responsible for conducting the investigation into the appropriateness of any use of force that involves:

1.  the discharge of a firearm by or at a Department member.

2.  a member's use of force, by whatever means, that results in the death of any individual.

3.  any lesser use of force by a Department member when that use of force stems from the same incident in which another member used force in Items III-G-1 or III-G-2.

H.  Department members will seek medical assistance for an arrestee who has injuries or illnesses consistent with the procedures outlined in the Department directives entitled "**Processing Persons Under Department Control**" and "**Hospitalized Arrestees**."


Terry G. Hillard
Superintendent of Police

00-148 LMT(PMD)


## GLOSSARY TERMS:

1.  **Deadly Force (720 ILCS 5/7-8)**

    A.  Deadly force is force which is likely to cause death or great bodily harm and includes

        1.  The firing of a firearm in the direction of the person to be arrested, even though no intent exists to kill or inflict great bodily harm; and

        2.  The firing of a firearm at a vehicle in which the person to be arrested is riding.

    B.  A peace officer's discharge of a firearm using ammunition designed to disable or control an individual without creating the likelihood of death or great bodily harm (i.e., impact munitions) shall not be considered force likely to cause death or great bodily harm

2.  **Use of Force to Prevent Escape (720 ILCS 5/7-9)**

    A peace officer or other person who has an arrested person in custody is justified in the use of such force to prevent the escape of the arrested person from custody as he would be justified in using if he were arresting the person.

3.  **Forcible Felony (720 ILCS 5/2-8)**

A forcible felony means any treason, first degree murder, second degree murder, predatory criminal sexual assault of a child, aggravated criminal sexual assault, criminal sexual assault, robbery, burglary, residential burglary, aggravated arson, arson, aggravated kidnapping, kidnapping, aggravated battery resulting in great bodily harm or permanent disability or disfigurement, and any other felony which involves the use or threat of physical force or violence against any individual.

ADDENDA:

1. G03-02-01 - The Use of Force Model
2. G03-02-02 - Force Options
3. G03-02-03 - Deadly Force
4. G03-02-04 - Canines as a Force Option
5. G03-02-05 - Incidents Requiring the Completion of a Tactical Response Report
6. G03-02-06 - Firearms Discharge Incidents Involving Sworn Members
7. G03-02-07 - Other Weapon Discharge Incidents

# ATTACHMENT 4



# USE OF FORCE MODEL
## CHICAGO POLICE DEPARTMENT

**Subject's Actions: Probable Control Difficulty / Danger**

| Assailant | Actions will likely cause death or serious physical injury |
| | Actions will likely cause physical injury |
| | Actions are aggressively offensive without weapons |
| **Resister** | ACTIVE* Movement to avoid physical control Variable Dynamics |
| | PASSIVE Non-movement in response to verbal and other direction Variable Positioning |
| **Cooperative Subject** | Subject(s) cooperative, only in response to direction Variable Risk |
| | Subject(s) cooperative without direction Variable Distance |

Probable Control Ineffective
Probable Excessive Control

**Officer's Reaction: Probable Reversibility / Control / Tissue Damage**

Social Control: Presence of Law Enforcement Representative
Used Alone | Used with means of physical control

Verbal Control: Persuasion /Advice /Warning
Used Alone | Used with means of physical control

**Control Modes without Weapons**

| Holding | Stunning | Direct Mechanical |
| Pain Compliance/ Neuro Muscular | Diffused pressure striking | Direct body mechanics against body structure |

**Control Modes with Weapons**

| Control Instruments | Impact Weapons Impact Munitions |

OC Spray/Chemical Weapons
(Individuals not part of a group or crowd)
See "Force Options" for use of OC guidelines for "Resisters"

OC Spray/Chemical Weapons
(Groups, crowds, and individuals taking part in a group or crowd)
Superintendent or Designee Approval Required

Capsaicin II Powder Agent
Superintendent or Designee Approval Required

LRAD Acoustic Transmission
Superintendent or Designee Approval Required

Taser **

Canine ***

Firearms and Other Lethal Force

**Note:** With permission of the authors, the Use of Force Model has been modified to conform with the Chicago Police Department General Order entitled "Use of Force Guidelines."

\* See addendum entitled "Force Options" for appropriate options and specific guidelines on active resisters.

\*\* See addendum entitled "Force Options" for specific conditions on the use of tasers.

\*\*\* See addendum entitled "Canines as a Force Option" for specific conditions on the use of canines.

© 1983-2002, John C. Desmedt. All rights reserved.
(Rev. MAY 2012)

# ATTACHMENT 5

# John B. Farrell

Telephone: (312) 805-0622
Email:johnfarrell382@att.net

---

**EDUCATION:**

DePaul University Chicago, Illinois | Conferred June 1984
**Master of Science, Public Administration**

DePaul University, Chicago Illinois | Conferred June 1979
**Bachelor of Art, Sociology**

**TRAINING:**

FBI National Academy 122nd Session 1980
U.S. Navy Active Duty 1965-66, Reserve Duty 1966-1971

Force Science Institute, Minnesota State University
Certified as a Use of Force Analyst, May 2013

**CURRENT EMPLOYMENT:**

**FRATERNAL ORDER OF POLICE, CHICAGO LODGE 7** | **May 2011 – present**

Field Representative, police involved shootings

**STREET CRIMES SEMINAR** Chicago, Illinois | **November 2009 – present**

Instructor for street level police training seminars

**PROFESSIONAL EXPERIENCE:**

<u>**CHICAGO POLICE DEPARTMENT,**</u> Chicago, Illinois | **11 September 1967-25 April 2009**

**Captain** | **28 April 2006-25 April 2009**

- Assigned to 002nd District as Captain/Watch Commander
- Commanded all police functions occurring within the 002nd district during assigned watch
- Reported directly to the District Commander

**Lieutenant** | **16 March 1988-28 April 2006**

**Detective Division Area 1 Homicide/Gangs/Sex Unit** | **15 May 2002-28 April 2006**
**Detective Division Area 4 Homicide/Gangs/Sex Unit** | **1 September 1995-15 May 2002**
**Detective Division Area 5 Violent Crimes Unit** | **4 February 1993-1 September 1995**
- Assigned as Lieutenant/Unit Commanding Officer.
- Supervised and coordinated all investigations assigned to unit.
- Investigated homicides, aggravated batteries, sex offenses, kidnappings, weapon violations, and other violent crimes

**013th District** | **1 September 1992-4 February 1993**
- Assigned as Field Lieutenant/Watch Commander

**Gun Task Force West** | **25 April 1991-1 September 1992**
- Assigned as commanding officer of combined Chicago Police and A.T.F. Task Force
- Coordinated and supervised weapon investigations

011th District       30 March 1988-25 April 1991
- Assigned as Field Lieutenant/Watch Commander

**Sergeant**       16 June 1978-16 March 1988

**Detective Division Area 4 Violent Crimes**       25 December 1986-16 March 1988
- Assigned as Sergeant supervising all unit investigations

**011th District**       1 September 1985-25 December 1986
- Assigned as Sergeant supervising police functions on assigned watch

**Detective Division Central Investigations Unit**       3 January 1981-1 September 1985
- Assigned as Sergeant supervising major crime investigations
- Surveillances targeting career criminals

**Detective Division Area 6 Burglary**       5 January 1979-3 January 1981
- Assigned as a Sergeant supervising all unit investigations

**Special Operations Group North**       30 June 1978-5 January 1979
- Assigned as Sergeant supervising mobile unit detailed to high-crime areas

**Detective**       1 March 1970-16 June 1978

**Detective Division Central Investigations Unit**       1 June 1977-16 June 1978
- Assigned as a Detective investigating major crimes
- Surveillances targeting career criminals

**Detective Division Area 6 Burglary**       1 March 1970-1 June 1977
- Assigned as Burglary Detective

**Patrolman**       11 September 1967-1 March 1970

**020th District**       1 December 1967-1 March 1970
- Assigned as District Patrolman
**Police Training Division**       11 September 1967-1 December 1967
- Newly Appointed Patrolman assigned to recruit training

REFERENCES AVAILABLE UPON REQUEST

**EXPERT WITNESS TESTIMONY:**

**8-9 January 2015**
**Village of Lynwood, Illinois Police Board**
**Case of Lynwood, Illinois v. Sgt. Brandin Fredericksen**
**Qualified and testified as an expert witness in the use of force**
**Testimony was in defense of Sgt. Fredericksen**

**29 September 2014**
**Chicago Police Board**
**Case of Chicago Police Department v. Sgt. Jesse Terrazas**
**Qualified and testified as an expert witness in arrest procedure and reporting**
**Testimony was iu defense of Sgt. Terrazas**

12 December 2013
Chicago Police Board
Case of Chicago Police Department v. Police Officers Swarbrick and Vanourek
Qualified and testified as an expert witness in preliminary investigation procedure
Testimony was in defense of Police Officers Swarbrick and Vanourek

20 October 2013
Cook County Civil Case 12 L 6937
Case of Hector Cardenas v. Jetty Security LLC, and Joseph Flood
Hired by Defendant's Attorneys to review all evidence and report on the use of force by defendant Joseph Flood
Joseph Flood was an off duty Cook County Sheriff's Police Officer working for Jetty Security LLC.

10 January 2012
Westchester, Illinois City Board
Westchester Police Department Termination Case
Qualified and testified as an expert on the use of force
Testified in defense of a Westchester Police Officer