```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )   Docket No. 14 CR 674-1
                                      )
 4                  Plaintiff,        )   Chicago, Illinois
                                      )   October 19, 2015
 5            v.                      )   9:28 a.m.
                                      )
 6   ALDO BROWN,                      )
                                      )
 7                  Defendant.        )

 8
                               VOLUME 1
 9            TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
         BEFORE THE HONORABLE VIRGINIA M. KENDALL, and a jury
10

11   APPEARANCES:

12   For the Government:       UNITED STATES ATTORNEY'S OFFICE by
                               MS. LINDSAY JENKINS
13                             MS. JESSICA ROMERO
                               Assistant United States Attorneys
14                             219 South Dearborn Street
                               5th Floor
15                             Chicago, Illinois 60604

16   For the Defendant:       LAW OFFICES OF DANIEL Q. HERBERT by
                               MR. DANIEL Q. HERBERT
17                             206 South Jefferson, Suite 100
                               Chicago, Illinois  60661
18
                               J. RUSSELL LAW LLC by
19                             MS. JENNIFER W. RUSSELL
                               206 South Jefferson, Suite 100
20                             Chicago, Illinois  60661

21

22   Court Reporter:          GAYLE A. McGUIGAN, CSR, RMR, CRR
                               Federal Official Court Reporter
23                             219 South Dearborn, Room 2318-A
                               Chicago, Illinois 60604
24                             (312) 435-6047
                               Gayle_McGuigan@ilnd.uscourts.gov
25
```

1        (Proceedings heard in open court:)

2              THE CLERK:  Case 14 CR 674-1, USA versus Aldo Brown.

3              THE COURT:  Good morning.

4              MS. ROMERO:  Good morning, your Honor.  Jessica Romero

5    and Lindsay Jenkins for the United States.

6              THE COURT:  Good morning.

7              MR. HERBERT:  Good morning, your Honor.  Dan Herbert

8    and Jen Russell for Aldo Brown.

9              THE COURT:  Good morning.

10             MS. RUSSELL:  Good morning, Judge.

11             THE COURT:  This is only one -- oh, here, thanks.

12             All right, folks.  I have a few rulings for you.  But

13   did you get me the videos on the Google -- or the YouTube

14   videos?

15             MR. HERBERT:  We will get those to you immediately.

16             THE COURT:  How can I rule on whether they're

17   admissible if I haven't seen them?

18             MS. ROMERO:  I have a copy.

19             THE COURT:  Okay.  Thank you.

20             How long is it?

21             MS. ROMERO:  There's about 10 or 11 of them.

22             THE COURT:  And how long are they?

23             MS. ROMERO:  Three to four minutes, six minutes

24   sometimes.

25             THE COURT:  Okay.  All right.

1     MS. ROMERO:  And I'm happy to give the Court a little

2     bit of a preview, if that would be helpful --

3     THE COURT:  No.  I want to look at them.  Thanks.  I

4     don't need a preview.  I've got a preview from the briefings.

5     Okay.  So before we impanel the jury this morning, let

6     me just say that I am denying the motion to dismiss Counts 2

7     and 3 of the indictment.

8     I do have a written opinion here that goes through the

9     case law, primarily from our circuit and others, that addresses

10    the vagueness issue.

11    I do not think that there's a problem with the

12    indictment, and, therefore -- I'll get you a copy of this in a

13    moment for you to read through.  It shouldn't -- it's not for

14    discussion.  It's your ruling, and so you just know what it is,

15    though, that my -- my decision pertains to.

16    I also have reviewed the issue regarding the

17    government's request for the hearsay exception.

18    (Tendered.)

19    THE COURT:  Thank you.  When the victim did not

20    respond to the officer's -- is Mr. Brown here, by the way?

21    MR. HERBERT:  Yes, he is.

22    THE COURT:  Oh.

23    MR. HERBERT:  Do you want him up, Judge --

24    THE COURT:  Yes.  Mr. Brown, good morning.  I'm sorry,

25    I didn't see you there.

1          THE DEFENDANT:  Good morning, Judge.

2          THE COURT:  You can sit at the table now since we're

3   going through critical matters for your case.

4          Good morning.

5       (Defendant complies.)

6          THE COURT:  Yes, there you go.

7          So the allegation, as I understand it -- or the

8   representation of the facts, rather, as I understand it, is

9   that Mr. Brown did not conform to -- no, excuse me, the victim

10  did not conform to Mr. Brown's directions, which will be one of

11  the reasons that you will be asserting that Mr. Brown acted the

12  way that he did.

13         The government would like to seek to admit what his --

14  the other officer on the scene said to Mr. Brown which caused

15  him not to conform with those actions, not as a hearsay

16  statement, but as him acting in conformity with that statement.

17         And so I think the problem that I'm having with it is

18  I looked at that *Holly* case I mentioned to you, which was close

19  to the concept, but it had statements in it.  And the *Holly*

20  case is the one where the victim witness does not -- or lies to

21  the FBI, and then that would be inconsistent with what she's

22  going to say on the witness stand, of course, and she's going

23  to say on the witness stand that she lied to the FBI because

24  she was afraid based upon the actions of the defendant in that

25  case.

1        So the way it played out in that case was that the

2   judge said to the defense:  Are you going to cross-examine this

3   victim witness about the fact that she lied?  And they said:

4   Yes.  And then the judge said:  Well, then going to allow the

5   government to front that behavior -- those statements because

6   they're allowed to front them and it would be a prior

7   consistent -- inconsistent statement.

8        The problem is you have conduct and not a statement.

9        And so I looked to see whether I could find cases

10  where there was, like, prior conduct that was in response to

11  the statements.  I didn't find anything directly on point.

12       And so my ruling is going to be this:

13       You can't front it in your case-in-chief.  However, if

14  they do cross-examine -- which I would imagine you would do,

15  but I am not going to be an insight into your strategy -- but

16  if they cross-examine him about him standing there, not

17  complying, not acting in accordance to their client's

18  directions, then on redirect I do think that it is a

19  non-hearsay statement for him to say:  Well, the reason I

20  didn't comply is because his colleague said this to me.

21       Then that statement isn't for the truth but, rather,

22  for why he acted in conformity with.

23       And I think that it takes away the prejudice, too,

24  that might enure if it were fronted in the case-in-chief.

25       So that's the way this will be permitted to come in.

1          And if there is an issue regarding this as it plays

2    out on the witness stand, you can just stop and we'll have a

3    sidebar beforehand, because sometimes these things are

4    difficult to imagine how they'll play and make rulings on how

5    they'll play until we actually hear how they'll play.

6          So that's the way that ruling will come out.

7          As far as the -- the expert ruling, I'm still tweaking

8    a little bit of that.  I have not -- I received last night or

9    early this morning your motion to reconsider Mr. Farrell's

10   testimony, and I'm going to review that since I just received

11   it, but I also am reviewing your concerns about attorney --

12          MS. JENKINS:  Hyfantis.

13          THE COURT:  Right.  Hyfantis.

14          And the way that I will rule on that I think will take

15   into account both of your considerations.  And I hope to be

16   able to do that, depending on how our day goes with jury

17   selection, by the end of today so everybody knows exactly where

18   you're going to be.  All right?

19          Now, what issues do we have for this morning?

20   Anything?

21          I need the *voir dire*, please.

22          Any issues?

23          MS. JENKINS:  Your Honor, just so your Honor is aware,

24   Miss Hyfantis would be the government's second witness today --

25          THE COURT:  Right.

1      MS. JENKINS:  -- following a very short initial

2  witness.

3      THE COURT:  Well, you know, I get these motions to

4  reconsider in the middle of the night.  I get motions to

5  dismiss indictments on Friday.  Not exactly the -- conducive to

6  our weekend.

7      Oh, do we have a problem with our copy machine?  All

8  right.  We need to get some copies to them.  Okay?

9      Okay.  It looks like we're having a little bit of a

10 copy machine problem, so let me get the drafts of the *voir dire*

11 to you so that you can review them.  They just incorporate the

12 ones that we addressed on Friday's conference.  Okay?

13     So anything about this morning's jury selection that

14 is an issue for anyone?

15     MS. ROMERO:  Judge, there is one issue, and I know

16 it's last minute to raise, but I'd rather be safe than sorry.

17     The case does involve the recovery of a firearm --

18     THE COURT:  Right.

19     MS. ROMERO:  -- so I do think it would be prudent to

20 ask the potential jurors if they have any strong feelings on

21 firearms --

22     THE COURT:  Sure.

23     MS. ROMERO:  -- that could affect --

24     THE COURT:  Yeah, that's fine.

25     MS. ROMERO:  -- their ability to be fair and

 1    impartial.

 2              THE COURT:  That's fine.

 3              Why don't you have her put that in there before we

 4    make more copies someplace else, okay?  So strong feelings

 5    about possession or use or what?

 6              MS. ROMERO:  Possession.

 7              THE COURT:  Possession of firearms.  Okay?

 8              MS. ROMERO:  Thank you, your Honor.

 9              THE COURT:  No problem.  All right.  So while the

10    jury -- while my courtroom deputy is getting the jurors, I'm

11    going to look at some YouTube videos.

12              MR. HERBERT:  Thank you.

13              THE COURT:  Thank you.

14              THE CLERK:  All rise.  This Court is in recess.

15         (Recess taken.)

16         (Voir dire proceedings held and reported but not

17         transcribed at this time.)

18         (In open court outside presence of jury at 4:23 p.m.:)

19              THE COURT:  Okay, folks.  That took a little longer

20    than expected.

21              You can be seated.

22              So I didn't want to push into -- I don't know how long

23    your openings were.  I didn't want to push anyone past 5:00.

24    They're probably tired.

25              So let me just look and see what the morning looks

1  like for you all.

2        (Pause in proceedings.)

3        THE COURT:  So very light morning, so we will begin on

4  time at 9:30.  9:15 is when you should be here ready to address

5  the Court with any issues that you have.

6        I am working, as I was at lunch, on a ruling on the

7  motion to reconsider, and I'll put it online within the hour so

8  that you will have it for tomorrow.  You should all have

9  received hard copies of my rulings that I worked on over the

10 weekend.  I had drafted the one on the YouTube, but then I did

11 take the time and watch them.  I drafted it based upon your

12 presentation to me of what they said, but then I watched them

13 afterwards, so you know.  And I will give you the final ruling

14 on this within the hour, like I said.

15       There is a lunch break at noon tomorrow.  I have a

16 meeting in chambers at noon that will last a little over an

17 hour.  And then we're stopping tomorrow at 4:00.  Okay?

18       All right.  Thanks very much.

19       MR. HERBERT:  Judge, one final note.  We have a poster

20 board.  Can we leave that here, by any chance?

21       THE COURT:  You can.  So that coatroom right there,

22 you can put it in there --

23       MR. HERBERT:  Okay.

24       THE COURT:  -- and no one will touch it.

25       MR. HERBERT:  Thank you.

1          THE COURT:  It's no problem at all.  Yeah.

2          The only thing you can't leave here is the weapon that

3    was brought.  Whoever brought that has to bring it home.  Okay?

4    Or bring it -- not home, but back to its home, shall we say.

5          All right.  Thank you.

6          MS. ROMERO:  Thank you.

7          MR. HERBERT:  Thank you.

8          COURT REPORTER:  All rise.

9          THE COURT:  Thank you.

10          COURT REPORTER:  This court is adjourned.

11          THE COURT:  Thank you.  You can relax.  I'm just going

12    to take notes here.

13          MS. JENKINS:  Your Honor, I'm being told by one of the

14    agents that the officer who was responsible for getting the

15    weapon past the court security officers is still having trouble

16    getting that through, despite the Court's order.

17          Were you able to issue the minute entry?

18          THE COURT:  Well, I gave it to Ms. Abraham, as you

19    know, actually typed it up, right before we came back, so let

20    me see what's online.

21          What's our case number, folks?

22          MS. JENKINS:  14 CR 674.

23          THE COURT:  67 what?

24          MS. JENKINS:  4.

25          THE COURT:  I do not see it online.

1          LAW CLERK:  I'll ask Tresa.

2          THE COURT:  Yeah, so don't let her leave yet because

3   they're going to need to get that online, but I thought she

4   would have given them a hard copy as well.  So let's see if we

5   can find her.

6          All right.  I will track it down.  I thought it was

7   entered when I gave it to be entered.  Okay?

8          MS. JENKINS:  Thank you.

9          THE COURT:  Yes.  Anything else?

10         MS. JENKINS:  Nothing from the government.

11         THE COURT:  All right.  Have a nice night.

12         MS. ROMERO:  Thank you.

13         MR. HERBERT:  Good night.

14      (Proceedings concluded at 4:27 p.m.)

15                     C E R T I F I C A T E

16      I certify that the foregoing is a correct transcript of the

17   record of proceedings in the above-entitled matter.

18

19
     /s/ GAYLE A. McGUIGAN_____          April 30, 2016
20   Gayle A. McGuigan, CSR, RMR, CRR              Date
     Official Court Reporter
21
     _____         April 30, 2016
22   Gayle A. McGuigan, CSR, RMR, CRR              Date
     Official Court Reporter
23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   UNITED STATES OF AMERICA,      )  Docket No. 14 CR 674-1
                                    )
 4                 Plaintiff,       )  Chicago, Illinois
                                    )  October 20, 2015
 5            v.                    )  9:16 a.m.
                                    )
 6   ALDO BROWN,                    )
                                    )
 7                 Defendant.       )

 8                             VOLUME 2-A
 9            TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
            BEFORE THE HONORABLE VIRGINIA M. KENDALL
10

11   APPEARANCES:

12   For the Government:       UNITED STATES ATTORNEY'S OFFICE by
                               MS. LINDSAY JENKINS
13                             MS. JESSICA ROMERO
                               Assistant United States Attorneys
14                             219 South Dearborn Street
                               5th Floor
15                             Chicago, Illinois 60604

16   For the Defendant:        LAW OFFICES OF DANIEL Q. HERBERT by
                               MR. DANIEL Q. HERBERT
17                             206 South Jefferson, Suite 100
                               Chicago, Illinois  60661
18
                               J. RUSSELL LAW LLC by
19                             MS. JENNIFER W. RUSSELL
                               206 South Jefferson, Suite 100
20                             Chicago, Illinois  60661

21

22   Court Reporter:           GAYLE A. McGUIGAN, CSR, RMR, CRR
                               Federal Official Court Reporter
23                             219 South Dearborn, Room 2318-A
                               Chicago, Illinois 60604
24                             (312) 435-6047
                               Gayle_McGuigan@ilnd.uscourts.gov
25
```

1          (In open court outside the presence of the jury:)

2               THE CLERK:  Case number 14 CR 674-1, USA versus Aldo

3     Brown.

4               MS. ROMERO:  Good morning.  Jessica Romero and Lindsay

5     Jenkins for the United States.

6               THE COURT:  Good morning.

7               MS. JENKINS:  Good morning.

8               MR. HERBERT:  Good morning, your Honor.

9               THE COURT:  Good morning.

10              MR. HERBERT:  Dan Herbert on behalf of Aldo Brown.

11              THE COURT:  Okay.  Good morning, Mr. Brown.

12              THE DEFENDANT:  Good morning, your Honor.

13              THE COURT:  Good morning, Mr. Herbert.

14              Anything we need to address before today?

15              MS. ROMERO:  Judge, I didn't get to speak to

16    Mr. Herbert before he walked in.

17              I just wanted to raise an issue.

18              In light of the ruling on the gang affiliation, I

19    wanted to make sure -- one of the things that I think is going

20    to come up during the trial is that the defendant was a

21    tactical officer in the 4th District, and my understanding of

22    the responsibilities of tactical officers is they respond to

23    narcotics calls, gun calls, and gang calls.

24              I think in light of the particular circumstances in

25    this case, references to gangs in general is both irrelevant

1    and prejudicial.  And nobody is going to contest that this is a

2    high-crime area, so I don't think there's an issue as to

3    whether the defendant can talk about the fact that he responded

4    to a number of different specific types of instances in the

5    area; but to raise names of gangs, numbers of gangs, and things

6    like that in the 4th District I think would just create

7    confusion, it's got a high risk of prejudice, and it just

8    really doesn't have any relevance to the particular conduct in

9    this case.

10              THE COURT:  Does he have any intention of raising

11   names of gangs or types of gangs that he's responding to within

12   the area, Mr. Herbert?

13              MR. HERBERT:  Do I have intentions --

14              THE COURT:  Of eliciting that from him on direct.

15              MR. HERBERT:  Yes.  And here's why, Judge:

16              I believe it's relevant for a couple of reasons.

17              One, it's proof of impeachment for Mr. Howard.

18              At one point during one of his interviews, he

19   indicated that he was a Gangster Disciple, and he ended his

20   gang affiliation in eighth grade.  And then in a subsequent

21   interview, he indicated that he was a Black P. Stone gang

22   member.

23              THE COURT:  Right, but I already kept that out.

24              MR. HERBERT:  Well --

25              THE COURT:  Right?  During the final pretrial

 1      conference.  It's irrelevant because he -- there was no
 2      telephone call or dispatch that Mr. Brown responded to
 3      regarding the P. Stone, Gangster Disciples, or gang activity at
 4      the store, right?
 5              MR. HERBERT:  Well, there was no -- there was no phone
 6      call, but there was information about gangs selling drugs out
 7      of the store, so that was -- it's completely relevant --
 8              THE COURT:  I think we're revisiting something I ruled
 9      on in the pretrial conference.  Didn't I rule on this?
10              MR. HERBERT:  I don't believe that you ruled on it
11      definitively, Judge.  I truly don't.
12              THE COURT:  I will take a look at it.
13              What else do you intend to elicit?
14              MR. HERBERT:  From Mr. Howard?
15              THE COURT:  Uh-hum.
16              MR. HERBERT:  You know, it really depends on what he
17      says because he's kind of been all over the map.
18              THE COURT:  What the victim says.  Is that what you're
19      saying?
20              MR. HERBERT:  Yes.
21              THE COURT:  Okay.  All right.  Let me tell you this:
22              First of all, if he is a tactical officer that
23      responds to narcotics, gangs, and gun calls, it is not
24      appropriate to exclude gangs because that's highly prejudicial.
25      That's his job.  So if that's what he does, he gets to testify

1     that that's what he does.

2              Any specific activity regarding the gangs of the

3     Gangster Disciples or the Black P. Stones, I'm going to take a

4     look at my final pretrial conference record today, but you

5     shouldn't mention it in the opening statement today.

6              MR. HERBERT:  Yeah.

7              THE COURT:  Okay?

8              MR. HERBERT:  And I was not planning on mentioning it

9     in the opening.

10             THE COURT:  And in my -- my memory of the final

11    pretrial conference was that it wasn't -- it wasn't relevant,

12    but I'll take a look at that, and then we can raise this again.

13             It sounds to me like it's going to come up when your

14    client testifies or in cross-examination of the victim,

15    correct?

16             MR. HERBERT:  Yes.

17             THE COURT:  All right.  So for openings, keep it

18    clean.

19             MR. HERBERT:  I will do that.

20             THE COURT:  Okay?  And then I did receive a

21    communication to my law clerk from Mr. Michael Ferguson.  He's

22    one of our jurors who wanted to talk to me.  So I'm going to

23    talk to him in a moment to find out what is going on, and I'll

24    let you know.

25             Anything else for today?

1          MR. HERBERT:  Yes, Judge.

2          In light of the rulings that were made at the end of

3    the day yesterday, Judge --

4          THE COURT:  Yes.

5          MR. HERBERT:  -- I would just like to make my record

6    for --

7          THE COURT:  Please do.

8          MR. HERBERT:  Judge, we believe that -- respectfully,

9    we disagree with your ruling, we object to it, and from a

10   couple of standpoints.  I'm not going to raise the issues that

11   were already previously raised in which you've ruled upon, but

12   I think there's one very significant factor that the Court

13   needs to be aware of.  And the fact is that with respect to our

14   expert testimony, the government in this case relied on for its

15   indictment a use of force expert who they put in front of the

16   grand jury, who spoke of topics, exactly the same as which the

17   topics that Mr. Farrell would be called upon to speak of here.

18   I think it is a clear violation of Mr. Brown's Fourth Amendment

19   right.  If the government is allowed to elicit information

20   about a particular subject in furtherance of its indictment --

21         THE COURT:  Fourth Amendment right?

22         MR. HERBERT:  Due process.

23         THE COURT:  No, Fourteenth Amendment.

24         MR. HERBERT:  Okay.

25         THE COURT:  Fourth Amendment is illegal search and

1     seizure --

2              MR. HERBERT:  Search and seizure --

3              THE COURT:  Okay.  Fourteenth Amendment.

4              MR. HERBERT:  Thank you.

5              THE COURT:  Okay.

6              MR. HERBERT:  That's not the first mistake I'll make

7     today.

8              THE COURT:  No, that's okay.  I just wanted to make

9     sure I was understanding your argument.  Okay.

10             MR. HERBERT:  Okay.  But I think it's a fundamental

11    right that Mr. Brown -- it's completely unfair and prejudicial

12    if the government is allowed to rely upon information in

13    furtherance of its indictment and the defendant is not allowed

14    to utilize that same information in his defense.  I think that

15    is a clear violation of due process.

16             And just, finally, with respect to the prejudice in

17    this case, Judge, with respect to the significant rulings here,

18    a number of them have been ruled against the defendant, and the

19    reason here has been prejudice to the government.  And I would

20    just state that, your Honor, as you know, we're the defendants

21    in this case.  We are going up against the United States

22    government.  And as the courts have said, when -- the Court's

23    view towards prejudice, when it refers to prejudice to the

24    defendant, they should take a closer look at that prejudice

25    when it's referred to the defendant.

1          So for those reasons, I would just -- I would ask you,

2     respectfully, to reconsider the -- both issues regarding the

3     YouTube video and the expert report of Mr. Farrell.

4          THE COURT:  Okay.  Do you want to say anything on the

5     record in response?

6          MS. ROMERO:  Briefly, Judge, I can.

7          With respect to the last point, both parties are

8     entitled to a fair trial, and the issue is unfair prejudice,

9     and the Court has already decided that.

10         And then with respect to the first, I think the law is

11    clear that there's a lot of information and evidence that can

12    be presented to the grand jury and the rules of evidence don't

13    apply.  And as a result, there's basically no -- no basis to

14    say that just because something was used in the grand jury, the

15    government somehow -- or the Court somehow is stopped from

16    excluding it at a trial.

17         THE COURT:  Okay.  All right.  I'll take a break.

18         THE CLERK:  All rise.

19         THE COURT:  Be ready to proceed at 9:30.

20         THE CLERK:  This court is in recess until 9:30.

21    (Recess taken from 9:23 a.m. to 9:32 a.m.)

22    (Proceedings held in chambers:)

23         THE COURT:  So Mr. Ferguson told me that he forgot to

24    mention something yesterday, and I'm going to let him explain

25    what it was so that we can inquire about it in case either of

1    you would like to inquire further.

2          JUROR FERGUSON:  Sorry about that.  I was kind of

3    confused and a little nervous about the questioning.  I would

4    just like to point out about three years ago in August, my

5    brother and I were in Kenosha.  We got pulled over and I had a

6    pistol in my car, and the police didn't like the way it was

7    stowed, so they took it and went in the courthouse.  The judge

8    gave me a fine, I paid the fine, and that was it.

9          So I just wanted to let you guys know about that

10   before anything started.

11         I went home last night, I was thinking about it, and I

12   was looking at the questions, and I was, like, (indicating), I

13   didn't give enough stuff.  So before this all started, I just

14   wanted to let you guys know because I'm not trying to hide

15   anything and I want to be a good juror or I wanted to give you

16   guys a chance to kick me off if you wanted to kick me off.

17         THE COURT:  Okay.  Do you have a FOID card?

18         JUROR FERGUSON:  I do.

19         THE COURT:  So it was just the way it was not in a

20   container or something?

21         JUROR FERGUSON:  They didn't like the way it was -- it

22   was in an ankle holster, and they didn't like that, and they --

23   they were very nice, they're very nice, I love the Kenosha

24   cops, they're great.  And they were -- I just went to court,

25   paid the fine, and the judge said you're good.

1          THE COURT:  Okay.  Would you like to follow up on

2    anything?

3          MS. ROMERO:  Is there anything about that experience

4    that you think is going to affect your ability to be a juror in

5    this particular case?

6          JUROR FERGUSON:  No, not at all.  Some of the Kenosha

7    cops are some of my best friends.  Like I say, I've got no

8    problem with the police.  They were just doing their job.  So

9    they didn't -- like I say, I fully, when I'm dealing with the

10   police, I fully cooperate with them.  I don't tussle with them.

11   Yes, ma'am, no, ma'am is the way I was brought up, so ... and

12   as far as being impartial, you know, I still can be fair as a

13   juror, but that's up to you guys to decide.  But I wanted to

14   put this out for you so you could get a full idea.  I was

15   feeling bad about it last night when I was thinking about it,

16   so that's why I wanted to come in and mention.

17         THE COURT:  Okay.  Mr. Herbert, anything that you

18   would like to follow up?

19         MR. HERBERT:  No, nothing.  Appreciate it.

20         THE COURT:  Thank you, Mr. Ferguson.  You can join

21   your colleagues back in the jury room now.

22         JUROR FERGUSON:  Thank you very much.  Sorry if I

23   inconvenienced anybody.

24         THE COURT:  Appreciate it.  Thank you.

25         JUROR FERGUSON:  You're welcome.

1              (Exit Juror Ferguson.)

2                   THE COURT:  Okay.  Anything on that?  Anyone?

3                   MS. JENKINS:  No.

4                   MR. HERBERT:  No.  Judge, I'm sorry --

5                   MS. JENKINS:  It's just been brought to the

6      government's attention that counsel intends to use a photograph

7      during his opening.  It's a photograph of Mr. Howard, the

8      victim, at the time -- or following his arrest.  It's the

9      mugshot of Mr. Howard following his arrest.

10                  Ordinarily, the government wouldn't have a whole lot

11     of concern about displaying that in opening if it's a piece of

12     evidence that we're fairly confident would be admitted; but at

13     this point, I'm not entirely clear on how or through whom

14     Mr. Herbert intends to admit that photograph or how he intends

15     to authenticate it.

16                  So at this time, the government would object to

17     displaying it in opening on that ground.

18                  THE COURT:  Okay.  Any response?

19                  MR. HERBERT:  Yes.  First of all, this was an exhibit

20     that we disclosed.  And I agree that I didn't tell you -- I

21     don't believe I told you that I was going to use it in opening.

22     But we absolutely intend to get it into evidence.  We can get

23     it in through Mr. Brown.  We can get it in through Mr. Howard.

24     We can get it in through one of the government's witnesses that

25     were arrested.  I mean, I don't see any problem with --

1          THE COURT:  For ten years I've had the same standing

2    order on exhibits in opening statement.  They are not permitted

3    because they're not in evidence yet unless both parties agree,

4    and you don't both agree, so it's not going to be used in

5    opening.  All right?

6          I'll see you shortly.

7       (Brief recess taken.)

8       (In open court outside the presence of the jury:)

9          THE CLERK:  All rise.  Court resumes session.  Come to

10   order.

11         THE COURT:  Okay.  I'm going to bring the jury out

12   shortly to begin with your opening statements.

13         To the extent that making the record this morning

14   regarding the Court's rulings was a motion to reconsider again,

15   for the second time, the expert -- the scope of the expert

16   testimony, it's denied.

17         The Court has not been ruling in favor of the

18   government because of prejudice to the government.  Not one of

19   the Court's rulings has recommended or stated that there is

20   prejudice to the government.  It's whether there is something

21   relevant.  And the gangs and the drugs and the marijuana and

22   the YouTube videos are not relevant to the case.  And if

23   they're not relevant, then they're unduly prejudicial because

24   they raise issues which are not before the Court.  So it's not

25   a prosecution-minded ruling.  It's a ruling looking at the

1    facts and the law.

2            I did, by the way, narrow the government's expert

3    significantly and their ability to bring in any type of expert

4    or quasi-expert testimony on the Fourth Amendment use of force,

5    and that limitation significantly negates any concern that your

6    expert is not able to testify.

7            So the motion to reconsider, if that is what it was,

8    is denied.

9            And we will now begin with opening statements.

10           Sean, you can bring them in.

11           Oh, and I was able to get a riser so that our two

12   extra jurors can see at the same level as the rest.

13           THE CLERK:  All rise.

14      (Jury in at 9:38 a.m.)

15           THE COURT:  Please be seated, everyone.

16           I was able to get you out of the hole that you were

17   sitting in last night, so now you can be on the same level as

18   your colleagues.

19           We are going to begin this morning with opening

20   statements.

21           Thank you all for diligently being here on time.  I

22   appreciate that very much.

23           We're going to start with the government's opening,

24   and then we'll turn to the defense's opening.

25           And, remember, the opening statements are not

Salah - Direct by Romero

1    evidence.  They are what the lawyers believe the evidence will

2    show.

3            And so I first recognize -- is it Ms. Romero doing the

4    opening?

5            MS. ROMERO:  Yes, your Honor.

6            THE COURT:  Miss Romero.

7            MS. ROMERO:  Thank you.

8        (Opening Statements reported but not transcribed at this

9        time.)

10           THE COURT:  Okay.  Are you ready to call your first

11   witness?

12           MS. ROMERO:  Yes, your Honor.

13           The government calls Mohammad Salah.

14           THE COURT:  Okay.

15       (Witness enters courtroom.)

16           THE COURT:  Up here, sir.

17           Sir, please raise your right hand.

18       (Witness duly sworn and takes the stand.)

19           THE COURT:  Have a seat.

20           And you may proceed, Ms. Romero.

21           MS. ROMERO:  Thank you, your Honor.

22            MOHAMMAD SALAH, GOVERNMENT'S WITNESS, SWORN

23                      DIRECT EXAMINATION

24   BY MS. ROMERO:

25   Q   Good morning, sir.  Please tell us your name --

Salah - Direct by Romero

1    A    Good morning.

2    Q    -- and spell your name for the court reporter.

3    A    Mohammad Salah.  M-O-H-A-M-M-A-D.  S-A-L-A-H.

4    Q    Where do you live?

5    A    South suburb.

6    Q    And how old are you?

7    A    25.

8    Q    How far did you go in school?

9    A    I finished high school.

10   Q    Where did you grow up?

11   A    Jerusalem, Palestine.

12   Q    When did you come to the United States?

13   A    2006.

14   Q    When did you learn to speak English?

15   A    In 2006 and 2007.

16   Q    Are you currently employed?

17   A    Yes.

18   Q    What type of work do you do?

19   A    Delivery.

20   Q    Now, I'd like to direct your attention to September of

21   2012.

22            How old were you then?

23   A    22.

24   Q    And did you have a job?

25   A    Yes.

Salah - Direct by Romero

1    Q    Where did you work?

2    A    I worked at Omar and Salma Grocery.

3    Q    And where was that located?

4    A    2800 East 76th Street, Chicago.

5    Q    What were your responsibilities at the store?

6    A    Cashier.

7    Q    Now, by September of 2012, how long had you been working at

8    the store?

9    A    About two month.

10   Q    And how many hours a week did you work?

11   A    I worked between 50 and 60 hours a week.

12   Q    How much did you get paid?

13   A    Minimum wage.

14   Q    In September of 2012, how many employees did the store

15   have?

16   A    Five.

17   Q    And who were they?

18   A    It was me.  It was Taha.  It was Jecque.  Paul.  And

19   Jecque's mom.

20   Q    Now, can you describe for the jury what type of

21   neighborhood the store was located in?

22   A    It was kind of a bad neighborhood, like a crime-wise bad.

23   Q    And what type of security did the store have, if any?

24   A    Well, we had security cameras.  That's about it.

25   Q    Tell us a little bit, just very briefly, about the security

Salah - Direct by Romero

1   camera system at the store and how it worked in very simple

2   terms.

3   A    Just cameras with a little computer in the back with a

4   little screen that shows everything.

5   Q    Now, did the cameras record video or -- I'm sorry, audio as

6   well as video or just video?

7   A    Just video.

8   Q    Now, I'd like to direct your attention to the screen in

9   front of you to what's been marked as Government Exhibit 3.

10          THE COURT:  It's taking -- I have control over it.

11  It's taking a moment to boot.

12          MS. ROMERO:  No problem, Judge.

13      (Pause in proceedings.)

14          THE COURT:  I have just the witness monitor on.  That

15  should be sufficient, right?

16          Thank you.  I appreciate it, Nate.

17          We have wonderful new equipment, but this is our first

18  maiden voyage.

19      (Pause in proceedings.)

20          THE COURT:  There we go.  Thank you, Nate.

21          We couldn't do our job without Nate.

22  BY MS. ROMERO:

23  Q    Can you see what's been marked as Government Exhibit 3 on

24  the screen in front of you?

25  A    No.

Salah - Direct by Romero

1          THE COURT:  You cannot or you can?

2          THE WITNESS:  No, I can't.

3          THE COURT:  Oh, you can't?  Hang on.  We'll try again.

4     (Pause in proceedings.)

5          THE COURT:  There it is.

6          THE WITNESS:  Yes.

7          THE COURT:  Now he can.

8          MS. ROMERO:  Thank you, your Honor.

9     BY MS. ROMERO:

10    Q   Mr. Salah, does Government Exhibit 3 truly and accurately

11    depict the layout of the store as it was on September 27th of

12    2012?

13    A   Yes, ma'am.

14    Q   And this is just a diagram, correct?

15    A   Yes.

16         MS. ROMERO:  Your Honor, at this time the government

17    seeks to publish Government Exhibit 3 as a demonstrative.

18         THE COURT:  Any objection?

19         MR. HERBERT:  No objection.

20         THE COURT:  Okay.  Let's see if it worked.

21         Do you see it, folks, in the jury?

22         JUROR:  Yes.

23         THE COURT:  Is it on the gallery one, too?

24         MS. ROMERO:  Yes, your Honor.

25         THE COURT:  Wonderful.  Okay.

Salah - Direct by Romero

1    BY MS. ROMERO:

2    Q    Mr. Salah, can you please explain to the jury a little bit

3    the layout of the store as explained in Government Exhibit 3?

4    A    Well, there's the entrance.  On the right side, you got the

5    cashier.  And on the left side, there's some coolers.  And two

6    aisles in the middle.

7    Q    And specifically with respect to the cameras, can you

8    explain a little bit where within the store they were located?

9    A    There was one by the front door.  Two by -- all the way on

10   the right corner.  And then I believe there was one in the

11   back.

12   Q    And were these at foot level or placed higher above the --

13   A    Higher.

14   Q    And specifically when you said you worked cashier, where in

15   the store did you work?

16   A    Behind the cashier, like, where it says "cashier" on the --

17   Q    And that's the front area of the store?

18   A    Yeah.

19   Q    Thank you.

20        Now, prior to September of 2012, did you or other

21   store employees ever call the police?

22   A    Yes, ma'am.

23   Q    Can you explain for what reasons?

24   A    There would be a lot of people hanging out in front of the

25   store, and we would just call the police to kick them out.

Salah - Direct by Romero

1   Q   So when you say in the front of the store, do you mean
2   inside the store or outside the store?
3   A   Like right in front, in the front by the entrance.
4   Q   All right.  Now, I want to direct your attention
5   specifically to September 27th of 2012.
6           Were you working that day?
7   A   Yes, ma'am.
8   Q   And who else was working in the store that day?
9   A   It was Taha and Jecque.
10  Q   Now, let's talk about Taha first.
11          What were Taha's responsibility at the store?
12  A   He was kind of the manager.
13  Q   And how long had he worked at the store?
14  A   He was longer before me.  I'm not sure.
15  Q   During the time you worked there, did you ever observe Taha
16  selling drugs in the store?
17  A   No, ma'am.
18  Q   Did you ever observe Taha with a gun inside the store?
19  A   No, ma'am.
20  Q   All right.  Let's talk about the person you called Jecque.
21  I may call him Mr. Howard, just to keep that clear.
22          What were his responsibilities at the store?
23  A   He was like a clean-up and stock.
24  Q   And how long had he worked at the store?
25  A   He was there before me.

Salah - Direct by Romero

1    Q    Did you ever observe Mr. Howard selling drugs in the store?

2    A    No, ma'am.

3    Q    Did you ever observe Mr. Howard with a gun inside the

4    store?

5    A    No, ma'am.

6    Q    Now, prior to that day, September 27th of 2012, did you

7    ever socialize with Mr. Howard?

8    A    Yes.

9    Q    Approximately how many times would you say you socialized

10   outside of work?

11   A    I'm sorry, could you repeat your question again?

12   Q    Approximately how many times do you remember socializing

13   outside of work?

14   A    Like just couple times, like if we leave late and just hang

15   out for a little bit and leave, but not -- not too much.

16   Q    And if I could ask you to speak into the microphone a

17   little bit.

18        Thank you.

19        Now, what did you do when you socialized with

20   Mr. Howard?

21   A    We would just go out, drink, and smoke marijuana.

22   Q    Approximately how many times did you smoke marijuana with

23   Mr. Howard?

24   A    I can't remember.

25   Q    Now, back to September 27th of 2012, specifically did you

Salah - Direct by Romero

1    see any police officers come into the store that day?

2    A    Yes, ma'am.

3    Q    And approximately what time of the day was it?

4    A    It was around noon.

5    Q    And what part of the store were you in when you first

6    observed police officers that day?

7    A    I was by the cash register.

8    Q    To be clear, were you behind the cash register?

9    A    Yes.

10   Q    And how many police officers did you observe come inside

11   the store?

12   A    Two officers.

13   Q    And what were they wearing?

14   A    Just regular clothes.

15   Q    How did you know they were police officers?

16   A    I -- I guessed.  They had, like, these big guns on their

17   sides, and that's how we ...

18   Q    Now, prior to that, had you called the police that day?

19   A    No, ma'am.

20   Q    To your knowledge, had any of the other employees at the

21   store called the police that day?

22   A    No, ma'am.

23   Q    Now, sitting here today, do you know the names of those

24   police officers?

25   A    Yes, ma'am.

Salah - Direct by Romero

1    Q    Please tell us what they are.

2    A    Officer Aldo Brown and Officer Stacker.

3    Q    Could you please look around the courtroom and see if you

4    see Officer Aldo Brown in the courtroom?

5    A    Yes, ma'am.

6    Q    And can you please identify him by an article of clothing?

7    A    He's the gentleman sitting on the desk over there.

8    (Indicating.)

9    Q    And specifically any particular item of --

10   A    Wearing a suit.

11            MS. ROMERO:  Your Honor, may the record reflect the

12   in-court identification of the defendant?

13            THE COURT:  Unfortunately, not yet, because there's

14   two gentlemen wearing a suit at the table.

15   BY THE WITNESS:

16   A    He's sitting to the right of the lady.

17            THE COURT:  Okay.  It will now reflect so.  Thank you.

18            MS. ROMERO:  Thank you.

19   BY MS. ROMERO:

20   Q    Now, prior to September of 2012, did you know the

21   defendant?

22            MS. RUSSELL:  Objection.

23   BY THE WITNESS:

24   A    No.

25            THE COURT:  Reason?  Basis?

Salah - Direct by Romero

1          MS. RUSSELL:  Not relevant.

2          THE COURT:  Okay.  I think the answer is out.

3    Overruled.  And because there is no background, it's not

4    prejudicial.

5          So go ahead.

6    BY MS. ROMERO:

7    Q   At the time that these officers entered the store, did they

8    identify themselves?

9    A   No, ma'am.

10   Q   What, if anything, did they say?

11   A   Nothing I can remember.

12   Q   At any point did they indicate that they were there for a

13   particular purpose?

14   A   No, ma'am.

15   Q   Did they indicate if they had any warrants?

16   A   No, ma'am.

17   Q   Did any of the police officers interview you or ask you

18   questions about drugs or guns in the store when they walked in?

19   A   No, ma'am.

20   Q   Now, were you present inside the store during the entire

21   time that the defendant was there?

22   A   Yes, ma'am.

23   Q   And were you able to observe the encounter that happened

24   inside the store between the defendant and Mr. Howard?

25   A   Yes, ma'am.

Salah - Direct by Romero

1          MS. ROMERO:  May I approach, your Honor?

2          THE COURT:  You may.

3      (Tendered.)

4  BY MS. ROMERO:

5  Q   Now, I'm going to direct your attention to the disk that's

6  marked Government Exhibit 1.

7          Do you see that?

8  A   Yes, ma'am.

9  Q   Do you recognize that disk?

10  A   Yes, ma'am.

11  Q   Prior to coming to court today, did you have an opportunity

12  to view the video files that are contained on this disk?

13  A   Yes, ma'am.

14  Q   And did you initial and date the disk in order to indicate

15  that you had reviewed it?

16  A   Yes, ma'am.

17  Q   Does the disk contain video files titled Back View, Front

18  Center View, Front Right View, Exterior View, and Evening?

19  A   Yes, ma'am.

20  Q   After reviewing this disk, do you recognize all of those

21  video files?

22  A   Yes, ma'am.

23  Q   And what generally is depicted in the video files?

24  A   Just the incident that happened that day.

25  Q   When did you first observe the video files that are

Salah - Direct by Romero

1    contained on that disk?

2    A    I think it was the day that happened, later on that night.

3    Q    I'm sorry, I couldn't hear you.

4    A    Later on the same night.

5    Q    Of September 27th?

6    A    Yes.

7    Q    And did you observe at any point how those video files were

8    downloaded from the security system?

9    A    Oh, I'm sorry.  It was downloaded the next day, I believe.

10   Q    Okay.

11   A    Yes.  And ...

12   Q    Now, do the video files on Government Exhibit 1 truly and

13   accurately depict the police encounter at the Omar and Salma

14   convenience store which took place on September 27th, 2012?

15   A    Yes, ma'am.

16   Q    In addition, the video file Evening, does it truly and

17   accurately depict the events that took place the following

18   evening at the store?

19   A    Yes, ma'am.

20        MS. ROMERO:  Your Honor, at this time the government

21   moves to admit Government Exhibit 1.

22        THE COURT:  Okay.  Any objection?

23        MR. HERBERT:  No objection.

24        THE COURT:  Okay.  It will be admitted.

25        (Said exhibit received in evidence.)

Salah - Direct by Romero

1  BY MS. ROMERO:

2  Q   Just briefly, Mr. Salah, directing your attention to what's

3  in front of you that's marked Government Exhibit 2 Group, do

4  you recognize that?

5  A   Yes, ma'am.

6  Q   And are they still shots of images depicted on the video

7  files that we just talked about?

8  A   Yes, ma'am.

9  Q   Prior to coming to court today, did you have an opportunity

10  to review them and compare them to the video?

11  A   Yes, ma'am.

12  Q   And does Government Exhibit 2 Group truly and accurately

13  depict still images or still shots of specific times on the

14  video?

15  A   Yes, ma'am.

16          MS. ROMERO:  Your Honor, at this time the government

17  moves to admit Government Exhibit 2 Group.

18          MR. HERBERT:  No objection.

19          THE COURT:  Those will be admitted as well.

20      (Said exhibit received in evidence.)

21  BY MS. ROMERO:

22  Q   Now, I'm going to direct your attention to what's been

23  marked as Government Exhibit 1.

24          MS. ROMERO:  Your Honor, permission to publish --

25          THE COURT:  Yes.

Salah - Direct by Romero

1          MS. ROMERO:  -- certain portions.

2          Mr. Salah, I am going to pause the video early on just

3    to have you identify who is depicted on the video, okay?

4    A    Okay.

5          THE COURT:  Can I just make sure it's on?  Does

6    everyone have it in the jury?

7        (The jury responds affirmatively.)

8          THE COURT:  Okay, great.  Thank you.

9        (Tape played in open court.)

10          MS. ROMERO:  Okay.  Can you please pause?

11   BY MS. ROMERO:

12   Q    Mr. Salah, for the jury, can you please explain what view

13   of the store we're looking at on this shot?

14   A    We're looking at the back view from the back to the front.

15   Q    And specifically what's at the back end of what we're

16   looking at, at the very end of the shot?

17          THE COURT:  You can say top or bottom or right or left

18   maybe.

19          MS. ROMERO:  At the top.

20   BY THE WITNESS:

21   A    Just --

22   BY MS. ROMERO:

23   Q    All right.  Let me ask -- where were you standing --

24   A    Oh.

25   Q    -- as depicted on this video?

Salah - Direct by Romero

1    A    I was standing all the way to the front where there's a

2    glass, behind the glass.

3    Q    Okay.  And so when you say the front, you're referring to

4    the area at the very far end that's depicted, as far away from

5    that bucket as possible, correct?

6    A    Yes.

7    Q    Okay.  And that was the front of the store.

8    A    Yes.

9    Q    Okay.  Now, who is depicted on that aisle?

10   A    Jecque.

11   Q    Okay.

12        MS. ROMERO:  Go ahead.

13      (Tape played in open court.)

14   BY MS. ROMERO:

15   Q    Now, just briefly, who is that -- who is in the front of

16   the store as you can see them now?

17   A    Customers.

18   Q    I can't hear you.

19   A    Customers.

20   Q    Thank you.

21      (Tape played in open court.)

22        MS. ROMERO:  Pause.

23   BY MS. ROMERO:

24   Q    All right.  Mr. Salah, we've now switched vantage points.

25        Can you explain to the jury what part of the store are

Salah - Direct by Romero

1   we looking at in this video?

2   A    We're looking at the front of the store.  If you could see

3   where is the ATM machine next to the fridge, that's where

4   people walk in.  And then where's this guy in the white tee

5   shirt, behind the -- I mean, where he's looking at, that's

6   where the cash register is at.

7   Q    So it's fair to say you were standing across --

8   A    I was -- yes.

9   Q    -- in front of the gentleman with the white shirt?

10  A    Yes, ma'am.

11  Q    And to his right at that corner is the ATM machine that you

12  referred to?

13  A    Yes, ma'am.

14  Q    And that's also the front door to the store; is that

15  correct?

16  A    It's, yeah, right next to it.

17  Q    Okay.  And then can you identify -- before we get started,

18  there's a person at the bottom right-hand corner?

19  A    Yes, ma'am.

20  Q    Do you recognize who that person is?

21  A    That's my brother.

22  Q    And did he work at the store?

23  A    No, ma'am.

24  Q    What was he doing there that day?

25  A    He just dropped me off and he was getting ready to leave.

Salah - Direct by Romero

1   Q    Okay.  And then the other people that are depicted at the
2   front area of the store at this time, were you familiar with
3   them?
4   A    Yeah, they're -- they're customer.
5        (Tape played in open court.)
6   Q    Now, there's another person that's walked up from that
7   aisle on the top right corner.
8            Can you -- do you recognize who that person is?
9   A    In the middle aisle?
10  Q    Yes.
11  A    Yeah, that's Jecque.
12  Q    Thank you.
13       (Tape played in open court.)
14           MS. ROMERO:  Pause for a second.
15  BY MS. ROMERO:
16  Q    The person who is in the middle of the shot right now
17  wearing a hat and a Nike sweatshirt, do you recognize that
18  person?
19  A    Yes, ma'am.
20  Q    And who is that?
21  A    This is Officer Stacker.
22  Q    Thank you.
23       (Tape played in open court.)
24           MS. ROMERO:  Pause.
25  BY MS. ROMERO:

Salah - Direct by Romero

1   Q    And then the man who is directly to the left of Officer

2   Stacker wearing the black jacket, do you recognize who that is?

3   A    Yes, ma'am.

4   Q    And who is that?

5   A    This is Officer Aldo Brown.

6        (Tape played in open court.)

7   BY MS. ROMERO:

8   Q    Just to be clear, the person that's at the far bottom right

9   in handcuffs, that's Mr. Howard, correct?

10  A    Yes, ma'am.

11       (Tape played in open court.)

12  BY MS. ROMERO:

13  Q    Mr. Salah, at this time there's five individuals on the

14  screen who are handcuffed to one another; is that correct?

15  A    Yes, ma'am.

16  Q    Were any of the other employees of the store who are not

17  depicted in the shot handcuffed?

18  A    No, ma'am.

19  Q    Were you handcuffed?

20  A    No, ma'am.

21       (Tape played in open court.)

22  BY MS. ROMERO:

23  Q    Mr. Salah, we just saw the defendant speaking to someone

24  behind the cashier.

25          Sitting here today, do you remember any statements the

Salah - Direct by Romero

1   defendant made at that time?

2   A    No, ma'am.

3   Q    Do you remember specifically why people in the store were

4   laughing?

5           MR. HERBERT:  Objection, Judge.  Speculation.  He

6   doesn't remember the conversation.

7           THE COURT:  If you recall the conversation, you're

8   permitted to answer the question.

9           Overruled.

10  BY THE WITNESS:

11  A    I -- I don't remember what happened.

12  BY MS. ROMERO:

13  Q    At any point at this stage, did anyone threaten verbally

14  Officer Brown?

15          MR. HERBERT:  Objection.

16          THE COURT:  Basis?

17          MR. HERBERT:  Speculation.

18          THE COURT:  Overruled.

19          MR. HERBERT:  Vagueness with regard to "threaten."

20          THE COURT:  Overruled.

21  BY MS. ROMERO:

22  Q    You can answer the question.

23  A    What was the question again?

24  Q    That's fine.

25          At this particular point, did anyone threaten

Salah - Direct by Romero

1   Officer Brown?

2   A    No, ma'am.

3        (Tape played in open court.)

4             MS. ROMERO:  You can pause it.

5   BY MS. ROMERO:

6   Q    Now, at this time we saw the defendant walk towards the

7   back of the store.

8             During this time period, were you able to observe

9   where within the store the defendant's partner Officer Stacker

10  was?

11  A    He was all the way by the -- all the way on the left side,

12  all the way to the end by like there's an ice cream cooler.

13  Q    So the front of the store or the back of the store?

14  A    The back of the store.

15  Q    Okay.

16            MS. ROMERO:  Go ahead.

17       (Tape played in open court.)

18  BY MS. ROMERO:

19  Q    Do you recognize the officer who is at the back, by the

20  front door?

21  A    Yes, ma'am.

22  Q    Who is that?

23  A    Officer Stacker.

24  Q    At this time were you able to see where the defendant went

25  within the store?

Salah - Direct by Romero

1    A    He went by the same cooler, by the same ice cream cooler in

2    the back.

3    Q    So the back of the store?

4    A    Yeah, the back of the store.

5    Q    Okay.  Now, around this time, do you remember any questions

6    being asked about a book bag?

7    A    There was no questions asked.

8    Q    Were there any statements made about a book bag?

9             MR. HERBERT:  Objection, Judge.  Relevance and Rule

10   403, with respect to *Crawford* as well.

11            THE COURT:  That's a new one.  I'll have to have a

12   sidebar if you're going to invoke *Crawford* on that.  It wasn't

13   raised in pretrial.

14            MR. HERBERT:  Well --

15            THE COURT:  No.  Sidebar, please.  Thank you.

16       (At sidebar outside the hearing of the jury:)

17            THE COURT:  Off the record.

18       (Off-the-record discussion.)

19            THE COURT:  Tell me the *Crawford* --

20            MR. HERBERT:  You're going to be angry with this

21   objection.

22            THE COURT:  No, no, not at all.

23            MR. HERBERT:  *Crawford* is basically if the statements

24   are being utilized for somebody that -- who is not subject to

25   cross-examination --

Salah - Direct by Romero

1    THE COURT:  Oh, I'm very familiar.  Sure.  So what are

2    you expecting is going to be elicited that will invoke

3    somebody's -- tell me how you expect this to play.

4    MR. HERBERT:  Okay.  Well, they're going to ask

5    questions about what Stacker said to this individual.  And

6    they've already admitted essentially that the basis for

7    admitting Stacker's statements is relevant to the charge

8    against Aldo Brown because it's going to show a particular

9    defense for Howard that he did not do what Brown asked him to

10   do because of what Stacker said to him.

11   THE COURT:  Is Stacker the other police officer?

12   MS. ROMERO:  Yeah.  And, Judge, actually I think at

13   this point I'm just laying the foundation for what Howard's

14   statements were leading up to the use of force as opposed to

15   Stacker's statements, really, which is that he identified he

16   was an employee of the store and the book bag was his.

17   That was the purpose of that line of questioning.

18   THE COURT:  And how are you intending to get Howard's

19   statements in through this witness?

20   MS. ROMERO:  One, he was present; but, two --

21   THE COURT:  It's hearsay, though.

22   MS. ROMERO:  My point is, again, we're not admitting

23   them for the truth as to whether it was his book bag or not,

24   but the fact that at that time the defendant walked up to the

25   back of the store, you know, whatever caused him to walk up and

Salah - Direct by Romero

1    search Mr. Howard or hit him, essentially there were statements

2    being made, but none of them were threatening or anything to

3    that effect, essentially.

4         THE COURT:  Okay.  So you anticipate asking this

5    particular witness what he heard Howard say to Stacker?

6    Because I've already ruled pretrial about what Stacker is going

7    to say to Howard doesn't come in until his cross.

8         MS. ROMERO:  That's correct.  And, again, it's only

9    the statement of what Howard was saying or discussing at the

10   time the defendant walked up to the front of the store.  It's

11   just to lay the foundation that they were asking questions

12   about the book bag.

13        THE COURT:  So not for the truth of the matter

14   asserted, but for how they were acting.

15        How does that invoke *Crawford*?

16        MR. HERBERT:  I'm sorry.  The questions regarding the

17   book bag only?  I mean -- I think if they're asking about a

18   book bag, I would say it's not relevant because it's not part

19   of the charge, but -- I guess I'm unclear on what exactly your

20   proffer -- I mean your --

21        THE COURT:  Where you're headed with this line of

22   questioning.

23        MR. HERBERT:  Yes, what you're looking to achieve.

24        MS. ROMERO:  We have to describe what the

25   circumstances were at the time that the defendant used force,

Salah - Direct by Romero

1    and what was found in the store is --

2        THE COURT:  I think it would be permissible to say:

3    At this time when you're observing this, do you recall what the

4    officer was saying to, in general terms, what the officer was

5    saying to Mr. Howard.

6        And he's going to say that he heard him say that there

7    was a book bag found in the back of the store, and he was

8    asking Mr. Howard if it was his, which is not being offered --

9    first of all, if it's a question; and, secondly, if it's not

10   being offered for the truth of the matter asserted, it wouldn't

11   be hearsay.

12       And then the reason as to why he acted in not

13   answering your client's questions, I've already ruled on that

14   to say that doesn't really come in until later.

15       MS. ROMERO:  Judge, I'll clarify.

16       He never failed to respond to anything, actually, so

17   it's not even to that point.

18       I think you'll see that the defendant -- Mr. Howard

19   will explain this -- but this witness can in terms of the

20   defendant's admissions, the defendant just walked up to him and

21   said, "Pull down your pants."  It wasn't really a question --

22       THE COURT:  So, anyway, any of those -- the

23   direction -- hold on.

24       The witness on the witness stand who is going to

25   testify that he overheard the other officer confront Mr. Howard

Salah - Direct by Romero

1    to say that he had found the backpack and asked whose it was is

2    not hearsay.  It's not for the truth, and it also is a

3    question, and it goes to show how Mr. Howard responded that it

4    was his.  So no problem.

5            MR. HERBERT:  Judge, just while we're here, just so

6    you don't have to climb down again, with respect to questions

7    about -- we didn't object to them -- but questions pertaining

8    to the seizure, was this person in handcuffs, were you

9    handcuffed, we would object in light of the prosecution

10   dropping the seizure count that none of those questions are

11   permissible.

12           THE COURT:  No, it's relevant to whether or not

13   they're being detained for questioning and whether or not the

14   actions that he engaged in were constitutional, so that's

15   overruled.

16       (Sidebar proceedings concluded.)

17           THE COURT:  You may proceed.

18   BY MS. ROMERO:

19   Q    Just briefly, Mr. Salah, did you observe Mr. Howard -- I'm

20   sorry, did you hear Mr. Howard make any statements about the

21   book bag around this time?

22   A    Yes, ma'am.

23   Q    What did he say to the officer?

24   A    He -- well, the officer asked whose book bag was that in

25   the back of the store.  And then Jecque told him it was his.

Salah - Direct by Romero

1   Q    Did Mr. Howard identify himself as an employee of the
2   store?
3   A    That -- yes, when they first walked in.
4   Q    Okay.
5        (Tape played in open court.)
6   BY MS. ROMERO:
7   Q    And, just briefly, at the bottom right-hand corner when we
8   saw the defendant, can you just explain for the jury -- and
9   we'll have a better view in a minute -- what was in that bottom
10  right-hand corner of that shot?
11  A    It was another fridge.
12  Q    Okay.
13       (Tape played in open court.)
14  BY MS. ROMERO:
15  Q    Just to clarify now, on this shot we see a fan, and then
16  it's placed on some type of item.
17       Can you tell us what that item is?
18  A    It's a fridge.
19  Q    All right.  Just briefly, what did you observe from where
20  you were standing at the cashier at the time that Mr. Howard
21  and the defendant were by this cooler?
22  A    Officer Aldo Brown was choking Howard.
23  Q    And how exactly was Mr. Howard positioned in relation to
24  the cooler?
25  A    His back was on the cooler.

Salah - Direct by Romero

1   Q    And can you describe what the defendant was doing with his

2   hands?

3   A    Choking him.

4   Q    Were you able to observe Mr. Howard's face at the time that

5   the defendant choked him?

6   A    Yes, ma'am.

7   Q    Can you please describe for the jury what it looked like?

8   A    Yellow, like pale.

9        (Tape played in open court.)

10  BY MS. ROMERO:

11  Q    Now, in what we just saw, the defendant walked up to the

12  front of the store.

13       Do you recall seeing that?

14  A    Yes, ma'am.

15  Q    What did the defendant have in his hand?

16  A    He had a gun.

17  Q    What, if anything, did the defendant say or indicate about

18  the gun that was in his hand at that time?

19  A    I believe he said, "Look what I found, found a gun."

20  Q    Prior to that moment, did the defendant at any point yell

21  "Gun" to his partner?

22  A    No.

23       MR. HERBERT:  I'm going to object, Judge.  I don't

24  believe there's enough foundation for this.

25       THE COURT:  Okay.  Overruled.

Salah - Direct by Romero

1        (Tape played in open court.)

2        (Counsel conferring.)

3    BY MS. ROMERO:

4    Q    And just briefly, we're back to the back view of the store.

5    That's correct?

6    A    Yes, ma'am.

7    Q    All right.  Mr. Salah, I'm going to direct your attention

8    to what's been admitted into evidence as Government Exhibit 2

9    Group Stills Numbers 6 through 9.

10        All right.  I'm going to ask you briefly about the

11    times that are depicted on that video still.

12        Once again, to be clear, where were you standing in

13    relation to the defendant and Mr. Howard at the time that this

14    hit took place?

15    A    I was standing right behind the guy with the white shirt,

16    behind the glass.

17    Q    And can you please describe how the defendant hit

18    Mr. Howard?

19        MR. HERBERT:  Objection.  Relevance.

20        THE COURT:  Overruled.

21    BY THE WITNESS:

22    A    He punched him.

23    BY MS. ROMERO:

24    Q    Could you tell if it was open hand or closed fist?

25    A    Closed fist.

Salah - Direct by Romero

1  Q   Were you able to hear anything at the time that the

2  defendant hit Mr. Howard?

3  A   It was just a loud punch.

4  Q   I'm sorry, loud what?

5  A   A loud punch.

6  Q   Punch?

7       Now, after this first hit, did Mr. Howard make any

8  statements to the defendant?

9  A   Yes, ma'am.

10 Q   What did he say?

11      MR. HERBERT:  Objection.

12      THE COURT:  Basis?

13      MR. HERBERT:  Hearsay.

14      THE COURT:  Party opponent admission.

15      MR. HERBERT:  Mr. Howard?

16      THE COURT:  Oh, I'm sorry, it was Mr. Howard -- this

17 is what I already ruled on at sidebar.

18      MS. ROMERO:  Correct.

19      THE COURT:  This is twice I've ruled on this at

20 sidebar.  Sidebar and final pretrial conference.

21      Overruled.

22      MR. HERBERT:  She's asking about Mr. Howard's

23 statement.

24      THE COURT:  I get Mr. Howard.  I ruled on it this

25 morning, and I ruled on it at sidebar.

Salah - Direct by Romero

1          Overruled.

2    BY THE WITNESS:

3    A    He told him that his jaw was broken.

4    BY MS. ROMERO:

5    Q    So specifically Mr. Howard said that to the defendant.

6    A    Yes, Mr. Howard.

7    Q    Now, during this time period, did the defendant tell

8    Mr. Howard to put his hands in the air?

9    A    No, ma'am.

10   Q    Did the defendant tell Mr. Howard to lie down on the

11   ground?

12   A    No, ma'am.

13   Q    Did the defendant try to restrain Mr. Howard's hands in any

14   way?

15          MR. HERBERT:  Objection, Judge.  Foundation for this

16   witness to identify restraining.

17          THE COURT:  Overruled.

18   BY THE WITNESS:

19   A    No, ma'am.

20   BY MS. ROMERO:

21   Q    All right.  Now, after -- I'm going to direct your

22   attention to what's been admitted as Government Exhibit --

23          THE COURT:  We're going to take a short break right

24   now, okay?

25          So, Ladies and Gentlemen, you can get up and go into

Salah - Direct by Romero

1    the jury room.  We're going to take about a ten-minute break,

2    and then we'll continue on till lunch.

3              COURT SECURITY OFFICER:  All rise.

4         (Jury out at 10:54 a.m.)

5              THE COURT:  Sir, you can step down, but you can't

6    talk -- oh, you're on direct.  You can talk with him on direct.

7              All right.  Ten minutes.

8              Mr. Herbert, I know you're not happy with my rulings,

9    but it's not going to help your case to roll your eyes and

10   harumph in front of the jury when -- in dissatisfaction with

11   the Court.

12             MR. HERBERT:  Judge, and I don't mean to be

13   disrespectful at all, but me and co-counsel, we were both of

14   the understanding that the pretrial ruling pertained to what

15   George Stacker said to Mr. Howard, not what Howard said to

16   Stacker.  If we're wrong, we're wrong.  But that's the only

17   point I was trying to make, your Honor.

18             THE COURT:  Okay.  My ruling is made.

19             All right.  Ten minutes.  I'll talk to those students.

20        (Recess taken from 10:55 a.m. to 11:09 a.m.)

21        (In open court in the presence of the jury:)

22             THE COURT:  Okay.  Please be seated.

23             Sir, you're still under oath.  Do you understand that?

24             THE WITNESS:  Yes, ma'am.

25             THE COURT:  Okay.  And you may pick up where you left

Salah - Direct by Romero

1    off.

2          MS. ROMERO:   Thank you.

3    BY MS. ROMERO:

4    Q   Mr. Salah, I'm going to direct your attention briefly to

5    what's been admitted as Government Exhibit 2 Group Still Number

6    19.

7          Now, what's depicted on Still 19 is the hit that

8    happened by the coolers, just for reference point.

9          After this hit, were you able to hear anything that

10   was said between the defendant or Mr. Howard?

11   A   No.

12   Q   Did you remain in the front of the store at that time?

13   A   Yes.

14   Q   Now, after -- approximately how much time passed from the

15   time the officers entered the store until the officers left the

16   store?

17   A   Like about half an hour.

18   Q   Now, after the incident involving Mr. Howard on

19   September 27th, did you see the defendant again?

20   A   Yes.

21   Q   When?

22   A   Next day.

23   Q   Approximately what time of day was it?

24   A   It was around like closing time, so I would say between

25   7:30 and 8:00 o'clock.

Salah - Direct by Romero

1          MS. ROMERO:  Your Honor, at this time permission to
2     publish a portion of Government Exhibit 1.
3          THE COURT:  I think we already did, didn't we?
4          MS. ROMERO:  This is a different clip, your Honor,
5     from September 28th.
6          THE COURT:  But it's already been admitted, so you can
7     publish it.
8          MS. ROMERO:  Thank you, your Honor.
9       (Tape played in open court.)
10    BY MS. ROMERO:
11    Q    Just briefly, what employees were at the store that
12    evening?
13    A    It was me, Paul, and his mom.  Jecque's mom.
14    Q    And I couldn't hear you very well.  Did you say Paul?
15    A    Yeah.
16    Q    Okay.
17       (Tape played in open court.)
18    BY MS. ROMERO:
19    Q    Mr. Salah, do you recognize the person that's on the top
20    left-hand corner of the shot?
21    A    Yes, ma'am.
22    Q    And who is that?
23    A    This is Officer Aldo Brown.
24    Q    At this time, where were you standing?
25    A    Behind the cash register, ma'am.

Salah - Direct by Romero

1   Q    Can you explain for the jury what is located at the far

2   bottom right of that shot in the area where the defendant

3   walked towards?

4   A    It's -- it's the door where you enter behind the cash

5   register.

6   Q    That's the door to the cashier --

7   A    To the cash register, yes.

8   Q    In total, approximately how long were the defendant and his

9   partner inside the store on the evening of September 28th?

10  A    10ish, like 10 to 15 minutes, I believe.

11  Q    And, again, if you could speak into the microphone.

12  A    Like 10 to 15 minutes.

13  Q    During that time, did the defendant say anything to you?

14  A    Yes.

15  Q    What did he say?

16  A    Well, first, when Officer Aldo Brown walked in, he asked me

17  what those people were doing here, referring to Paul and

18  Jecque's mom.  And I told him they're working -- he asked why

19  you still got him right here.  I said the manager wants him

20  here, this is not in my hand.  So then he asked me to move and

21  to come talk to him by the cash door.  And he asked me for

22  the -- about the video camera tape.

23  Q    What did he ask you?

24  A    He asked me if they asked about the tape or if I have the

25  tape.

Salah - Cross by Russell

1    Q    How did you respond?

2    A    I told him no, I don't.

3    Q    Was that true?

4    A    No.

5    Q    Why did you lie?

6    A    I was scared.

7    Q    After that day, did you have any contact with the defendant

8    at the store again?

9    A    No, ma'am.

10   Q    For how long did you continue to work at the store after

11   September of 2012?

12   A    Maybe a week.

13        (Counsel conferring.)

14             MS. ROMERO:  I have no further questions, your Honor.

15             THE COURT:  Okay.  Who is crossing?

16             MS. RUSSELL:  I am, Judge.

17             THE COURT:  Yes, please.

18             You may proceed, Miss Russell.

19             MS. RUSSELL:  Thank you, Judge.

20                          CROSS-EXAMINATION

21   BY MS. RUSSELL:

22   Q    Good morning, Mr. Salah.  My name is Jennifer Russell, and

23   I represent Mr. Brown in this case.

24             I'd like to talk a little bit about the neighborhood

25   where the store was.

Salah - Cross by Russell

1     You testified that it was kind of a bad neighborhood.
2  What do you mean by that?
3  A   There was a lot of crimes going on around the neighborhood,
4  from --
5  Q   In fact, there were shootings --
6  A   From shooting to drugs to like -- just -- it's a bad
7  neighborhood.
8  Q   There were shootings every week almost --
9  A   They were -- yeah.  They were shooting a lot around the
10 neighborhood.
11 Q   And you would frequently call the police to assist you with
12 different things that would happen at the store, wouldn't you?
13 A   Yeah.
14 Q   How often do you think you would call the police?  Every
15 day?
16 A   We would call, let's say, 10 times, and they'd show up
17 once.
18 Q   So there were a lot of people that would be hanging out at
19 your store; is that right?  Or the store you worked at.
20 A   The -- yeah, there would -- yeah, there was a lot of young
21 guys just hanging out in front of the store.  Yes.
22 Q   And any given day, would there be 10 to 15 guys hanging out
23 in front of the store?
24 A   I don't believe it was that many, but let's say about four,
25 five of them.

Salah - Cross by Russell

1   Q   And what would they be doing out there?

2   A   Just hanging out in front of the store.

3   Q   You indicated on your direct that you had a relationship

4   with Mr. Howard; is that right?

5   A   I'm sorry, could you repeat that again?

6   Q   You indicated on your direct that you had a relationship

7   with Mr. Howard; is that right?

8   A   Well, he was my co-worker, so ...

9   Q   But you testified you would also hang out after work and

10  smoke marijuana and drink.

11  A   Yeah, I mean, working 12-hour shift with someone, yeah,

12  after I leave, I mean, all I have is maybe like an hour to do

13  whatever before I go to sleep and get ready to wake up the next

14  morning, so we would just hang out for a little bit, just maybe

15  like have something to drink or like -- like smoke, like I told

16  you, but yeah.

17  Q   Okay.  So -- and you were hanging out with Mr. Howard,

18  drinking and smoking, the night before this incident, right?

19  A   Yes, I was.

20  Q   And describe a little bit about the area where the cashier

21  stands, where you were standing on this day.

22  A   Behind the cash register.

23  Q   So that's a glass-enclosed register, right?

24  A   It's -- yeah, it's a bulletproof, all-around.

25  Q   And up to the ceiling, right?

Salah - Cross by Russell

1   A    Yeah.

2   Q    And there's only one door to get into that glass-enclosed

3   area, right?

4   A    Yes.

5   Q    How would you receive money when you were behind the cash

6   register --

7   A    There's -- there's this little window in the middle, right

8   next to the cash register, and it's like kind of open.

9   Q    Okay.  So there's a small window.

10        And other than that, you're totally behind bulletproof

11  glass behind there.

12  A    Yes.

13  Q    Okay.  Now, you've had a lot of opportunities to tell

14  people about what happened that night.

15        How many times do you think you have been interviewed

16  by the federal government or people from the federal

17  government, attorneys or FBI agents, on what happened?

18  A    Like maybe four times.

19  Q    Four times?

20  A    Well, I --

21  Q    Was it more like six or seven?

22  A    I was interviewed -- I was interviewed like total like --

23  with the federal, I think, yeah, about four times.  Not -- like

24  three or four times.

25  Q    And then were you also interviewed by individuals from the

Salah - Cross by Russell

1   Independent Police Review Board in the presence of some FBI

2   agents?

3   A    Okay.  The first time I was interviewed at Roosevelt, and

4   it was one time, and that was long time ago.

5   Q    What's on Roosevelt?

6   A    The FBI building.

7   Q    Okay.

8   A    And then I testimony in front of the jury.  And then I met

9   with them twice after.

10  Q    So you testified in front of the grand jury.

11  A    Yes.

12  Q    And then when you say "them," who do you mean?

13  A    The FBI building -- the federal agent.

14  Q    The attorneys and FBI, correct?

15  A    Yes.

16  Q    And we've reviewed the video here today.

17       How many times has either the FBI agents or attorneys

18  for the government showed you that video?

19  A    Like two times.

20  Q    Two times?

21  A    Yeah.

22  Q    So your memory is that you only have seen that video two

23  times, is that --

24  A    Oh, no, I seen it a lot, don't get me wrong, because it's

25  all over the internet, so I would just look at it.  With them,

Salah - Cross by Russell

1    I only checked it twice, with the federal agent.

2    Q    So you indicated that the video is all over the internet?

3    A    It was on ABC7 and news, and I would just go on --

4              MS. ROMERO:  Objection to relevance.

5              THE COURT:  Sustained.  It's really the answer that's

6    the sustained -- it's not really your question.

7              Folks, whether or not the video was on the news is

8    really irrelevant.

9              Remember, I told you, we are not deciding this at all

10   based upon anyone else's viewpoint, just the evidence here in

11   this courtroom.

12             So you should disregard that it's been on the news.

13   BY MS. RUSSELL:

14   Q    So the night of the incident, can you talk about where

15   exactly the video itself is housed in the store?

16             MS. ROMERO:  Objection just to foundation, Judge.  We

17   saw the video of two days.

18             THE COURT:  Overruled.

19   BY THE WITNESS:

20   A    What was your question again?

21   BY MS. RUSSELL:

22   Q    My question was we saw the video today.  Can you discuss

23   where in the store this video is located?

24   A    Like you mean the monitor screen?

25   Q    Not the cameras.  We saw that earlier in the government's

Salah - Cross by Russell

1   exhibit.

2          Where -- where is the tape --

3   A   Like, you know, like the computer for the tape and all

4   that, it's behind the cash register right next to me.

5   Q   Okay.  So on the night that this occurred, did you let

6   somebody tape the -- from the monitor --

7   A   Yes.

8   Q   -- what happened?

9   A   Yes.

10  Q   Why did you do that?

11  A   What do you mean?  Why?

12  Q   Why did you do that?

13  A   Just I -- because I felt like they did this guy -- they did

14  Jecque very bad, and -- and it was a crime that just occurred

15  in the store that I work in.  And I felt like, like I got to

16  get it out somehow, and I just didn't know what to do, and I

17  guess I --

18  Q   Did you do the same thing with the crime that Mr. Howard

19  was carrying a loaded gun?  Do you consider that a crime?

20          MS. ROMERO:  Objection.

21          THE COURT:  Okay.  Well, it's a compound question, and

22  it's overruled -- I mean, it's sustained based upon the

23  conclusion of law.

24          Try again if you want to get to the facts of it.

25          MS. RUSSELL:  Thank you, Judge.

Salah - Cross by Russell

1          THE COURT:  Sure.

2     BY MS. RUSSELL:

3     Q    Do you consider it a crime that Mr. Howard was carrying a

4     loaded gun?

5     A    Of course.

6     Q    And did you ask somebody to videotape the monitor when

7     Mr. Howard was carrying the loaded gun?

8     A    Like if I knew about it maybe, yeah.

9     Q    Later that night, after this incident, you didn't know that

10    he had a loaded gun on him?

11    A    No.  After the incident that happened, yeah, I figure -- I

12    found out that there was a gun and ...

13    Q    So let me ask you a little bit differently.

14         So after the incident --

15    A    Yes.

16    Q    -- you let somebody in behind the cash register.

17    A    It was Paul.

18    Q    I'm sorry?

19    A    It was Paul.  It was another co-worker.

20    Q    Well, also Mr. Howard's brother, right?

21    A    Yes.

22    Q    So you let Mr. Howard's brother come in and videotape the

23    monitor that night because you felt like a crime had occurred.

24    A    Yes.

25    Q    But for whatever reason, you don't believe a crime occurs

Salah - Cross by Russell

1    when Mr. Howard has --

2              MS. ROMERO:  Objection.  Misstates the testimony.

3              THE COURT:  Overruled.

4              You can answer the question.

5    BY MS. RUSSELL:

6    Q    -- a loaded gun on him?

7    A    I -- he recorded everything.  So if he had the gun or if he

8    didn't have the gun or whatever happened, I -- I -- he recorded

9    everything.  So ...

10   Q    So how did you download the video?  How is it that the

11   government has this video, if you know?

12   A    I believe the third day or -- it was like a couple of days

13   after, some investigators came into the store and they asked me

14   to download the video for them, and I did.

15   Q    And that's the first time you downloaded the video?

16   A    Downloaded, yes.  That was the first time.

17   Q    But this was after someone already took a --

18   A    Yes.

19   Q    -- camera video of exactly what was on the monitor?

20   A    Yes.

21             MS. RUSSELL:  Can we look at a still?

22             MS. JENKINS:  Sure.

23             MS. RUSSELL:  Number 19.  Government Group 2.

24   BY MS. RUSSELL:

25   Q    Now, you talked about a lot of what you saw on the video

Salah - Cross by Russell

1    and what you saw on the stills and what you heard from behind

2    the glass-encased cashier area.

3            But -- so just looking at Government Exhibit 2 Still

4    19, so do you see Mr. Howard's hand on Mr. Brown's gun?

5            Did you see that?

6    A    No.

7    Q    Do you see where Mr. Howard's hand is in Still 19?

8    A    I see where his hand is, but I don't -- it's not on the

9    gun.

10   Q    Thank you.

11           So a lot of the things that you allege to have seen,

12   are those based on your memory or on the multiple, multiple

13   times that you've seen this video?

14   A    It was based on my memory, yes.  Like I told you, I'm

15   behind a glass and I could see everything kind of.

16   Q    You could see everything?

17   A    Yeah.

18   Q    Okay.  And could you hear everything?

19   A    Yeah, unless they're a little bit far from the window, I

20   can't.  But, like, let's say this whole area in the front of

21   the store, I could hear everything in this area.

22   Q    Through that -- the little hole in the cashier's --

23   A    It's more like -- it's like that big.  (Indicating.)

24   Q    Didn't you just testify earlier that it was a little hole

25   in the front of the --

Salah - Cross by Russell

1   A   Well, this is a little compared to a big box.  It's a

2   little hole for me to be talking to a customer.  They could

3   have made it bigger in the store.  That's why I meant it's a

4   little hole.

5   Q   But you also when you, you know, made your hand gestures

6   earlier, you said a little hole.  Like this.  (Indicating.)

7          And now it's a little hole like this.  (Indicating.)

8   A   Well, it's like this.  (Indicating.)

9   Q   What is it?

10  A   It's a window.

11  Q   No, I understand what it is.

12         Which is it?  Is it a little hole like this or is it a

13  little hole like this?  (Indicating.)

14         You've now testified to both.

15         Which -- which is it?

16  A   I don't remember saying it's -- it was this one, like that.

17  (Indicating.)

18  Q   Okay.  So --

19  A   Yes.

20  Q   -- now it is this one like this.  (Indicating.)

21  A   It's -- yeah.  It's been like that.

22  Q   Do you have posters or other things up on -- like a lotto

23  sign or anything else?

24  A   No.

25  Q   There's nothing on the front of the cashier's window?

Salah - Cross by Russell

1    A    No.  We have no lottery in the store.

2    Q    Okay.  So there's nothing on the front.

3    A    No.

4    Q    Okay.  Nothing that you remember?  Nothing that you

5    remember?

6    A    It was -- it was a clear window for me to see the

7    customers.  I mean, they wouldn't just put us -- a poster

8    for -- I wouldn't be able to see.  It was like a clear window.

9    Q    Okay.  So you also indicated that Officer Brown's partner

10   found a backpack or a book bag.

11         Is that -- was that your testimony?

12   A    He -- yeah.

13   Q    And what was inside that backpack?

14   A    When he -- when Officer Stacker came in to the front and he

15   asked about the book bag, who was it for, so Jecque answered

16   him it's his.  And he's like -- he got liquor in there and he's

17   got empty baggies.

18   Q    And you saw the baggies, right?

19   A    No, I didn't see the baggies.

20   Q    You didn't see the baggies?

21   A    It's -- it's -- this what based on what Officer Stacker

22   said.  He said that he found liquor and baggies.  But I did not

23   see nothing.

24   Q    Okay.  Do you remember your testimony before the grand jury

25   where you testified about the size of the baggies and what the

Salah - Cross by Russell

1    baggies looked like?

2    A    No.

3    Q    So sitting here today, you don't remember testifying -- or

4    you don't remember what the baggies looked like.

5    A    He said empty baggies.

6    Q    Okay.

7        (Counsel conferring.)

8    BY MS. RUSSELL:

9    Q    So do you remember testifying before the grand jury this

10   question and this answer?

11       (Counsel conferring.)

12   BY MS. RUSSELL:

13   Q    (Reading:)  But we don't know what the baggies were, they

14   could have been --

15       MS. ROMERO:  Objection, your Honor.  The testimony has

16   been he does not recall, not that --

17       THE COURT:  I know.  Yeah.  So because you're in a

18   refreshing recollection as opposed to impeachment, I think,

19   because he doesn't recall, you have an opportunity to refresh

20   his recollection.

21       MS. RUSSELL:  Understood, Judge.

22       THE COURT:  Sure.

23   BY MS. RUSSELL:

24   Q    Is there anything that would refresh your recollection as

25   to what your testimony was before the grand jury?

Salah - Cross by Russell

1   A   Say that again.  I'm sorry.  I don't understand.

2   Q   Is there anything that would refresh your recollection as

3   to what your testimony was before the grand jury?

4   A   I can't remember, no.

5            MS. RUSSELL:  Page 44.

6            THE COURT:  You're in the same boat.  You have to --

7   go ahead and lead him on the refreshing.

8            MS. RUSSELL:  Okay.

9   BY MS. RUSSELL:

10  Q   Did you give any --

11           THE COURT:  No, no, no.  Would your grand jury

12  transcript --

13  BY MS. RUSSELL:

14  Q   Would your grand jury testimony of the transcripts refresh

15  your recollection as to what your testimony was?

16  A   Okay.

17  Q   Would a transcript of the grand jury testimony refresh your

18  recollection as to what your testimony was?

19  A   I'm sorry, guys.  I don't understand what you're saying.

20  Q   If you viewed the transcript --

21  A   Yes.

22  Q   -- of your grand jury testimony --

23  A   Okay.

24  Q   -- would that refresh your recollection as to what your

25  testimony was regarding the baggies?

Salah - Cross by Russell

1    A    I mean, yeah.

2    Q    Okay.

3              THE COURT:  Okay.

4         (Tendered.)

5    BY MS. RUSSELL:

6    Q    Handing the witness the grand jury testimony.

7    A    Okay.

8    Q    Can you look at it, read it, and then hand it back to me,

9    please?

10   A    Okay.

11   Q    Thank you.

12             Now, having reviewed your grand jury testimony, do you

13   recall your description of what the plastic baggies looked

14   like?

15   A    No, ma'am.  I can't remember.

16   Q    After having your recollection refreshed with the

17   testimony, do -- you still do not recall what your testimony

18   was?

19             MS. ROMERO:  Objection.  That's a different question.

20             THE COURT:  That is a different question.  That

21   objection is sustained.

22             Try one more time.

23             MS. RUSSELL:  Thank you, Judge.

24   BY MS. RUSSELL:

25   Q    After reviewing the transcript of your grand jury

Salah - Cross by Russell

1   testimony, do you recall describing what the baggies looked
2   like?
3   A    Yeah.
4   Q    What?
5   A    Well, it just said that they looked small, but I don't
6   remember like -- I don't remember seeing them.  It's been like
7   three years.  I can't remember.  I know that's what it says
8   over there, that the baggies were small baggies.  But I just
9   can't remember -- I can't tell you I do remember saying that
10  because I don't.
11  Q    Do you remember whether they were baggies like you put a
12  sandwich in to take your lunch?  Were they those kind of
13  baggies?
14  A    I don't know.
15  Q    Or were they small baggies that, for instance, marijuana
16  would be placed in?
17  A    I don't -- I don't remember.
18  Q    You testified about Mr. Brown returning back to the store.
19  A    Yes, ma'am.
20  Q    When exactly did he return to the store?  Was it the --
21  that night or was it the next day?
22  A    I believe it was the next day.
23  Q    Do you recall what your grand jury testimony was regarding
24  when Mr. Brown returned to the store?
25  A    I don't.

Salah - Cross by Russell

1    Q    Is there anything that would refresh your recollection as
2    to when -- strike that.
3             Is there anything that would refresh your recollection
4    on what your testimony was at the grand jury about when Mr.
5    Brown returned to the store?
6    A    Yes.
7    Q    Would that be the testimony itself?  A transcript?
8    A    Yes.
9             MS. RUSSELL:  Page 24.
10        (Tendered.)
11   BY MS. RUSSELL:
12   Q    Mr. Salah, I'm providing you with a copy of the transcript
13   of your grand jury testimony.
14             Can you please review it?  And when you've had an
15   opportunity to review it, hand it back to me.
16   A    (Witness complying.)
17   Q    Mr. Salah --
18   A    Yes, ma'am.
19   Q    -- has your memory been refreshed as to what your testimony
20   was before the grand jury on when Mr. Brown came back to the
21   store?
22   A    Yes.
23   Q    And when did he return?
24   A    He came the next day.
25             MR. HERBERT:  Your Honor, do you mind if I have a

Salah - Redirect by Romero

1    moment with co-counsel?

2              THE COURT:  Oh, that's fine.  Go ahead.

3              MR. HERBERT:  Thank you.

4         (Counsel conferring.)

5              MR. HERBERT:  Thank you.

6    BY MS. RUSSELL:

7    Q   Mr. Salah, isn't it true that you told the grand jury that

8    Mr. Brown returned three hours later?

9    A   That's -- yeah, that's what it says over there.

10   Q   And now today you've changed your story to reflect that Mr.

11   Brown actually returned the very next day.

12   A   Well, as of -- as of what I remember right now, he did come

13   in the next day, not the same day.

14   Q   So that's different than what you told the grand jury?

15   A   Yeah.

16             MS. RUSSELL:  Excuse me, Judge.

17        (Counsel conferring.)

18             MS. RUSSELL:  Nothing further of this witness, Judge.

19             THE COURT:  Okay.  Miss Romero, any redirect?

20             MS. ROMERO:  Just briefly.

21                  REDIRECT EXAMINATION

22   BY MS. ROMERO:

23   Q   Mr. Salah, you were asked questions about Government

24   Exhibit 2 Group Still 19.

25             During the time that you were standing at the cash

Salah - Recross by Russell

1   register, did you see Mr. Howard reach for the defendant's gun?

2   A    No, ma'am.

3   Q    What, if anything, did you see Mr. Howard do with his hands

4   at the time depicted on the still?

5   A    He was just trying to block the hit.  He wasn't trying to

6   get hit.  That's -- that's all I saw.

7        (Counsel conferring.)

8            MS. ROMERO:  I have nothing further.

9            THE COURT:  Okay.  Do you have anything more?

10           MS. RUSSELL:  One question.

11           THE COURT:  Sure.

12                      RECROSS-EXAMINATION

13   BY MS. RUSSELL:

14   Q    I thought you said earlier that you didn't see his hand at

15   all, but now you say you saw his hand and it was used to block?

16   A    No, you got that wrong, ma'am.  I said I did not see his

17   hand reaching for a gun.

18   Q    Okay.  But you saw his hand and, in fact, it was used to

19   block.  Is that what your testimony is?

20   A    Yes, he wanted to block, yes.

21   Q    Okay.  Thank you.

22           THE COURT:  Is that all?

23           Okay.  Then, sir, you can step down and be excused.

24       (Witness excused.)

25           THE COURT:  And you may call your next witness.

Salah - Recross by Russell

1          MS. JENKINS:  Your Honor, the government would call
2     Tim Moore.
3          MS. ROMERO:  Can we turn off the publishing to the
4     jury at this time?
5          THE COURT:  Oh, sure.
6          MS. ROMERO:  Thank you.
7          THE COURT:  I'm just getting adjusted to this.  Hang
8     on.
9        (Pause in proceedings.)
10          MS. ROMERO:  Your Honor, may I go check?
11          THE COURT:  Sure.
12        (Pause in proceedings.)
13          MS. ROMERO:  Judge, my understanding is the witness
14     may have gone to the second floor and they're going to get him
15     right now.
16          THE COURT:  He's not allowed to eat yet.  We're not
17     eating yet.  Right?
18        (Pause in proceedings.)
19          MS. JENKINS:  Actually, your Honor, just while we're
20     waiting, if the government could read a stipulation to the
21     jury?
22          THE COURT:  That's fine.  Do you have a stipulation?
23          MS. JENKINS:  Yes.
24          THE COURT:  You may proceed.
25          MS. JENKINS:  Stipulation Number 1.

Moore - Direct by Jenkins

1              On or about September 27th, 2012, defendant Aldo Brown

2      was employed as a sworn law enforcement officer with the

3      Chicago Police Department and was acting in his official

4      capacity.

5              Defendant Aldo Brown was hired by the Chicago Police

6      Department in December 2002.

7              So stipulated, Counsel?

8              MR. HERBERT:  So stipulated.

9              THE COURT:  Okay.

10             MS. JENKINS:  Thank you.

11     (Pause in proceedings.)

12             MS. ROMERO:  He's on his way up, Judge.

13     (Pause in proceedings.)

14     (Witness enters courtroom.)

15             THE COURT:  Raise your right hand.

16     (Witness duly sworn and takes the stand.)

17             THE COURT:  Okay.  There's some exhibits on the

18     witness stand.  I don't know if you want them there.

19             MS. JENKINS:  We do not.  Thank you, your Honor.

20             THE COURT:  You may take the stand, sir.

21             THE WITNESS:  Thank you.

22              TIMOTHY MOORE, GOVERNMENT'S WITNESS, SWORN

23                      DIRECT EXAMINATION

24     BY MS. JENKINS:

25     Q   Good morning, sir.

Moore - Direct by Jenkins

1           In a loud, clear voice, can you please state your name

2   and spell your name for the jury.

3   A    It's Timothy Moore.  T-I-M-O-T-H-Y.  M-O-O-R-E.

4   Q    Sir, where are you currently employed?

5   A    City of Chicago.

6   Q    With any particular City of Chicago agency?

7   A    I'm a Chicago police sergeant.

8   Q    How long have you been with the Chicago Police Department?

9   A    23 years.

10  Q    Are you assigned to a particular division within the

11  Chicago Police Department?

12  A    I'm currently assigned to the Bureau of Internal Affairs,

13  detailed to the FBI's Public Corruption Task Force.

14  Q    Let me break that down just a little bit.

15          You are employed with CPD; is that correct?

16  A    That is correct.

17  Q    Okay.  What is the Division of Internal Affairs?

18  A    I work for the Confidential Investigations Section of the

19  Bureau of Internal Affairs.

20  Q    And what does Internal Affairs investigate, generally?

21  A    We investigate allegations of misconduct involving our

22  department members, police officers.

23  Q    Now, you also testified a moment ago that you are currently

24  detailed to another agency; is that correct?

25  A    Correct.  I am detailed to the FBI's Public Corruption Task

Moore - Direct by Jenkins

1   Force.

2   Q    Is that the Federal Bureau of Investigation?

3   A    Yes, it is.

4   Q    How long have you been detailed with the Federal Bureau of

5   Investigation?

6   A    Just a little over two years.

7   Q    As a part of your job responsibilities within the Chicago

8   Police Department, do you have access to the records of CPD

9   officers?

10  A    Yes, I do.

11  Q    And more specifically, do you have access to the training

12  records of Chicago Police Department officers?

13  A    Yes, I do.

14  Q    Prior to testifying here today, did you -- were you asked

15  to conduct a search for the training files for any particular

16  officer?

17  A    Yes.  I was asked to search for Officer Brown's -- Aldo

18  Brown's training records.

19  Q    Do you know Officer Aldo Brown personally?

20  A    No, I do not.

21  Q    Were you able to locate training records for that officer?

22  A    Yes, I was.

23  Q    I'd like to show you on your screen what's been previously

24  marked for identification as Government Exhibit 4.  It's a

25  multi-page document.

Moore - Direct by Jenkins

1        And I'd like to ask you if you recognize that

2   document.

3   A    Yes, I do.

4   Q    And what is it?

5   A    This is page 1 of Officer Aldo Brown's training records.

6   Q    And are these records a true and accurate copy of training

7   records for Officer Brown?

8   A    Yes, they are.

9   Q    Is this record kept, created, and relied upon in the

10  ordinary course of Chicago Police Department's course of

11  business?

12  A    Yes, it is.

13       MS. JENKINS:  At this time, your Honor, the government

14  would move to admit, with permission to publish, Government

15  Exhibit 4.

16       MR. HERBERT:  I would object, subject to

17  cross-examination.

18       THE COURT:  Okay.  I will -- you're going to -- you're

19  going to cross now regarding the admissibility of the business

20  record?  Or wait until your cross-examination?

21       MR. HERBERT:  Oh, until my cross-examination.

22       THE COURT:  Okay.

23       MR. HERBERT:  However you prefer it.

24       THE COURT:  All right.  So I'm going to conditionally

25  admit it based upon the proffer in the pretrial conference.

Moore - Direct by Jenkins

1      (Said exhibit conditionally received in evidence.)

2           THE COURT:  And you may publish.

3    BY MS. JENKINS:

4    Q   Now, sir, with the jury having the benefit of being able to

5    see the Government Exhibit 4, I'd like to talk with you a

6    little bit about this information, the information contained in

7    this record.

8           And starting at the very top of Government Exhibit 4,

9    page 1, I'd like to talk with you about the information that's

10   listed at the top of this report.

11          First, what is the name of the officer whose records

12   these reflect?

13   A   Officer Aldo Brown.

14   Q   And where is that listed on the -- on this report -- on

15   this report?

16   A   It's listed in the middle of this document.

17   Q   And what -- there -- in the left-hand corner of the

18   document, there's a line that indicates appointment date.

19          Can you read the information that's listed after

20   appointment date?

21   A   02 December 2002.

22   Q   And what does that refer to?

23   A   That refers to the date that Officer Aldo Brown started

24   with the police department, and that's actually the date that

25   he entered the police academy.

Moore - Direct by Jenkins

1   Q   I want to come back to the police academy in a moment, but

2   let's go through some of the other information on this page.

3         Starting with the information contained on -- thank

4   you -- contained in the columns listed on the first page of

5   this document, can you just describe the categories of

6   information that are generally described in this document?

7   A   Okay.  Starting with the far left, the top left corner, V

8   as in Victor, 328.  That represents that this particular

9   training module was a video module, and it was dealing with

10  traffic stops that officers will have to deal with.

11        And then after that description, you have a date.  And

12  that would be -- the date of 27 September 2012 is the actual

13  date that the officer took that block of instruction.  And the

14  P to the far right represents that he passed that training

15  course.

16  Q   So let's discuss that just in a little more detail to make

17  sure that the jury understands it.

18        We've gone through the various columns on page 1 of

19  this exhibit; is that right?

20  A   That's correct.

21  Q   Okay.  And for the first example, V328 represents what?

22  A   That it was a video shown to the officer normally during

23  roll call, and it was a training module in the form of a video,

24  and the video dealt with street stops.

25  Q   And when you say "street stops," is that the second column

Moore - Direct by Jenkins

1    of information with the words titled "Street Stops-Supreme

2    Court Guidelines"?

3    A    That's correct.

4    Q    The column to the right of that information represents

5    what?

6    A    That represents the date that the officer took that block

7    of instruction.

8    Q    Okay.  And, finally, in the far right column, I see the

9    letter P.

10            What does that represent?

11   A    That represents that the officer passed that block of

12   training instruction.

13   Q    I'd like to turn to a couple of pages within this document

14   in particular and ask you a few questions about some of the

15   training courses.

16            If we could begin with page 8.  And in front of you,

17   sir, is page 8 of Government Exhibit 4.

18            And I'd like to enlarge, if I could, just some of the

19   courses in the middle.

20            I'd like to direct your attention, a portion of the

21   way down, the top of the screen, to the line that's reflected

22   at V214.

23   A    Okay.

24   Q    What is reflected in terms of the training course that is

25   associated with V214?

Moore - Direct by Jenkins

1   A    Controlling resisters and assailants.

2   Q    And when does this record indicate that Officer Brown would

3   have taken that training course?

4   A    13 July 2006.

5   Q    And what is the result of his having taken that course?

6   A    Officer Brown passed that course.

7   Q    Moving down a few more lines to V211 on the same page.

8        Same question.  What course is associated with V211?

9   A    Use of Force, Part 3.

10  Q    And what does this record reflect in terms of when this

11  officer would have taken this course?

12  A    That will be 27 June 2006.

13  Q    And what was the result of having taken that course?

14  A    Officer Brown passed that course.

15  Q    And finally on this page, V210, what course is associated

16  with that particular record?

17  A    Use of Force-Part 2.

18  Q    When did this officer take that course?

19  A    20 June 2006.

20  Q    And what was the outcome of that course?

21  A    Officer Brown passed that course.

22  Q    Turning now to page 7 of the same record within Government

23  Exhibit 4, focusing again on the course labeled V214.

24       Is that the same V214 that you testified about a

25  moment ago?

Moore - Direct by Jenkins

1    A    Yes, it is.

2    Q    And what is the name of that course?

3    A    Controlling resisters and assailants.

4    Q    And when did the officer take that course?

5    A    That would be 22 February 2007 and also 19 February 2007.

6    Q    And what were the results of having viewed that video?

7    A    Officer Brown passed both courses.

8    Q    And then turning to page 6 of Government Exhibit 4,

9    starting at the entry V211 and V209, what does this record

10   indicate about the courses taken associated with those course

11   numbers?  What's the name of the course?

12   A    V211 was Use of Force-Part 3, and V209 was Use of

13   Force-Part 1.

14   Q    And according to this record, when did this officer take

15   those courses?

16   A    For V211, he took the course on 26 November 2007; and for

17   V209, he took that course 12 November 2007.

18   Q    And, again, what were the results of having viewed that

19   video?

20   A    Officer Brown passed both courses.

21   Q    Stepping down on the same page to the course entitled --

22   I'm sorry, that's all that I wanted to speak about with regard

23   to that page.

24              Now, I think you testified that the "V" that's

25   indicated in the course number represents that the training was

Moore - Direct by Jenkins

1    in a video format; is that correct?

2    A    That is correct.

3    Q    Are you familiar with the general way in which videos are

4    shown to officers as a part of their training?

5    A    Yes.  The videos are shown to the officers during roll call

6    right before their tour of duty, and they're usually showed on

7    an overhead projector or on a desktop computer that's in the

8    corner of the roll call room.  I've seen it done either way.

9    Q    And is it -- is the video that's shown, is it typically

10   shown to just one officer at a time or to all the officers

11   present for roll call?

12   A    It's normally shown to all officers present at roll call at

13   that time.

14   Q    And just to clarify, what is roll call?

15   A    Roll call is a -- it's like a formalized, for lack of a

16   better word, meeting between the officers and the supervisors

17   that basically determines if the officers are present for duty.

18   And any kind of missions that they're supposed to adhere to

19   during the course of the day, they're provided with that

20   information.

21   Q    And so does roll call occur each day at the beginning of an

22   officer's shift?

23   A    Yes, it does.

24   Q    If an officer is late to roll call and a video is shown,

25   what happens?

Moore - Direct by Jenkins

1   A   Normally the officer is informed that during the course of
2   that roll call there was a video shown, and it's up to that
3   officer to watch that video when they have time to watch the
4   video.
5   Q   And I'd just like to ask you a few questions about some of
6   the training courses that we just focused on a moment ago on
7   those particular pages.
8       Are you generally familiar with the subject matter
9   covered by the courses we just discussed?
10  A   Yes, I am.
11  Q   What topics do they generally cover?
12      MR. HERBERT:  I'm going to object.
13      THE COURT:  For what reason?
14      MR. HERBERT:  Foundation.
15      THE COURT:  For relevance?  Oh, for foundation.
16      MR. HERBERT:  And relevance.
17      THE COURT:  Okay.  I will -- I will sustain the
18  relevance objection since we have a big record here and see if
19  you can -- excuse me, I meant to say I'll sustain the
20  foundation objection so that you can get narrower.  Okay?
21      MS. JENKINS:  Certainly.  Thank you, your Honor.
22  BY MS. JENKINS:
23  Q   Sir, we just discussed a series of the specific videos,
24  V214, V209, V210, and V211.
25      Have you viewed those videos?

Moore - Direct by Jenkins

1    A    Yes, I have.

2    Q    When did you view them?

3    A    I actually viewed the videos over the weekend.

4    Q    As a result of having viewed the videos over the weekend,

5    are you able to say generally the topic on which they discuss,

6    what topic is covered by those videos?

7    A    Yes, I am.

8    Q    And what is that topic?

9    A    In general, the videos discuss the police department's use

10   of force policy.

11   Q    Now, earlier you mentioned that you are assigned to the

12   Internal Investigations Department or Division within the

13   Chicago Police Department; is that correct?

14   A    That is correct.

15   Q    Aside from Internal Investigations, are you aware of

16   whether other law enforcement agencies conduct investigations

17   into misconduct by Chicago Police Department officers?

18           MR. HERBERT:  Objection.  Relevance.

19           MS. JENKINS:  Your Honor, it speaks specifically to

20   Counts 2 and 3.

21           THE COURT:  As far as his awareness of the -- for that

22   last element of the count?

23           MS. JENKINS:  Correct.

24           THE COURT:  Okay.

25           MS. JENKINS:  Particularly given his detail.

Moore - Cross by Herbert

1          THE COURT:  Exactly.  Okay.  Overruled.

2    BY THE WITNESS:

3    A    Yes, the Federal Bureau of Investigation also investigates

4    police officer misconduct.

5          (Counsel conferring.)

6          MS. JENKINS:  I would tender the witness for

7    cross-examination.

8          THE COURT:  Okay.  Is it going to be long --

9          MR. HERBERT:  I don't think so.

10          THE COURT:  Okay.  There you go, because I have a

11    meeting that I'm delayed for.

12          Go ahead.

13                    CROSS-EXAMINATION

14    BY MR. HERBERT:

15    Q    Good afternoon, sir.

16    A    Good afternoon.

17    Q    How are you?

18    A    Good.  Thanks.

19    Q    Okay.  With regard to that exhibit, you were not

20    responsible for producing this exhibit, correct?

21          Do you understand that question?

22    A    I'm not understanding the question.

23    Q    It wasn't a real good question.

24          The document, Government Exhibit Number 4, you did not

25    input any of the information contained within the report.  Fair

Moore - Cross by Herbert

1    to say?

2    A    That is correct.  I did not.

3    Q    And that's done by a separate unit, correct?

4    A    That's correct.

5    Q    A unit to which you're not assigned, correct?

6    A    That is correct.

7    Q    Okay.  And fair to say that, as you sit here today, you

8    don't know who specifically inputted that information

9    concerning Aldo Brown.

10   A    That is correct, I do not.

11   Q    And also along those lines, would it be fair to say that

12   you have no independent knowledge of whether or not this

13   training was, in fact, received by Aldo Brown?

14   A    That is correct.

15   Q    And as far as you talked about roll calls and how videos

16   are sometimes shown at roll call, you would agree with me that

17   roll calls are conducted differently depending on what unit of

18   assignment?

19   A    Yes.  Different patrol -- when you're in a patrol district

20   like the 4th District where Officer Brown was assigned, they're

21   all in a sense conducted in the same manner where they take

22   attendance and they go over items that are needed to address

23   during that day.  But when -- there are a lot of units within

24   the police department; but when we're talking about patrol

25   districts, they're all pretty much the same.

Moore - Cross by Herbert

1   Q   Okay.  Pretty much the same.

2           You never worked in the 4th District with Aldo Brown?

3   A   Never.

4   Q   You never attended a roll call that Aldo Brown was at,

5   correct?

6   A   Correct.

7   Q   So you don't know what exactly happened at the roll calls

8   in which Aldo Brown attended, correct?

9   A   That is correct.

10          MR. HERBERT:  Nothing further.

11          THE COURT:  Okay.  Anything on that?

12          MS. JENKINS:  No.  Thank you.

13          THE COURT:  Okay.  Sir, you can step down and be

14   excused.

15      (Witness excused.)

16          THE COURT:  And, folks, it's time for our lunch break.

17   So why don't I give you until 1:15 for lunch.

18          I understand it's really nice out.  It's probably one

19   of our last nice days, so enjoy it, if you can, and we'll start

20   up at 1:15.

21          Don't research, don't go online, don't talk about the

22   case.  That's my court order.

23          Thank you.

24          COURT SECURITY OFFICER:  All rise.

25      (Jury out at 12:09 p.m.)

1    THE COURT:  That's not the way we do business here.  I

2    mean, that's a government witness and it's a law enforcement

3    officer, and we waited 10, 12 minutes for him.  That is not the

4    way we do business here.  Get them lined up.  They had to sit

5    there.  And I'll make them sit and wait, and they're not going

6    to be upset with me.  So you know how that plays.

7    MS. JENKINS:  We'll have them ready.  Thank you.

8    THE COURT:  All right.

9    (Lunch recess taken at 12:09 p.m.)

10                    C E R T I F I C A T E

11    I certify that the foregoing is a correct transcript of the

12    record of proceedings in the above-entitled matter.

13

14
      /s/ GAYLE A. McGUIGAN                    April 30, 2016
15    Gayle A. McGuigan, CSR, RMR, CRR              Date
      Official Court Reporter
16
                                               April 30, 2016
17    _____             Date
      Gayle A. McGuigan, CSR, RMR, CRR
      Official Court Reporter
18

19

20

21

22

23

24

25

```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )   Docket No. 14 CR 674-1
                                      )
 4                    Plaintiff,      )   Chicago, Illinois
                                      )   October 20, 2015
 5             v.                     )   1:23 p.m.
                                      )
 6   ALDO BROWN,                      )
                                      )
 7                    Defendant.      )

 8
                              VOLUME 2-B
 9              TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
              BEFORE THE HONORABLE VIRGINIA M. KENDALL
10

11   APPEARANCES:

12   For the Government:        UNITED STATES ATTORNEY'S OFFICE by
                                MS. LINDSAY JENKINS
13                              MS. JESSICA ROMERO
                                Assistant United States Attorneys
14                              219 South Dearborn Street
                                5th Floor
15                              Chicago, Illinois 60604

16   For the Defendant:        LAW OFFICES OF DANIEL Q. HERBERT by
                                MR. DANIEL Q. HERBERT
17                              206 South Jefferson, Suite 100
                                Chicago, Illinois  60661
18
                                J. RUSSELL LAW LLC by
19                              MS. JENNIFER W. RUSSELL
                                206 South Jefferson, Suite 100
20                              Chicago, Illinois  60661

21

22   Court Reporter:           GAYLE A. McGUIGAN, CSR, RMR, CRR
                                Federal Official Court Reporter
23                              219 South Dearborn, Room 2318-A
                                Chicago, Illinois 60604
24                              (312) 435-6047
                                Gayle_McGuigan@ilnd.uscourts.gov
25
```

Howard - Direct by Romero

1      (In open court in the presence of the jury:)

2           THE COURT:  Okay.  Please be seated, everyone, and get

3      comfortable.

4           Call your next witness, please.

5           MS. ROMERO:  The government calls Jecque Howard.

6      (Witness enters courtroom.)

7           THE COURT:  Up here.

8           Raise your right hand, sir.  To me.

9      (Witness duly sworn and takes the stand.)

10          THE COURT:  Okay.  Have a seat.

11             JECQUE HOWARD, GOVERNMENT'S WITNESS, SWORN

12                        DIRECT EXAMINATION

13     BY MS. ROMERO:

14     Q    Good afternoon, sir.  Please state your name and spell it

15     for the court reporter.

16     A    Jecque Howard.  J-E-C-Q-U-E.  Last name Howard,

17     H-O-W-A-R-D.

18     Q    How old are you?

19     A    26.

20     Q    And how far did you go in school?

21     A    I graduated from high school.

22     Q    Are you employed?

23     A    Yes.

24     Q    What type of work do you do?

25     A    Restaurant work.

Howard - Direct by Romero

1   Q   Now, how old were you in September of 2012?

2   A   I was 23.

3   Q   And what was your height or [sic.] weight at that time?

4   A   About the same it is now.  Nothing has changed.  5' 11",

5   180.

6   Q   And did you have a job in September of 2012?

7   A   Yes.

8   Q   Where did you work?

9   A   At a corner store.

10  Q   And where was it located?

11  A   On 76th and Coles.

12  Q   What were your responsibilities at the store?

13  A   Stocking shelves, cleaning up, security from time to time.

14  Q   What was your work schedule?

15  A   Monday through Sunday, 9:00 to 9:00.

16  Q   How much did you get paid?

17  A   Like 300 once a week.

18  Q   How did you get the job at the convenience store?

19  A   From living in the area so long and me going in and out of

20  the store every day, the guy just told me I should work there,

21  so that's how.

22  Q   Now, who else worked at the store with you in September of

23  2012?

24  A   My mother.

25  Q   Were you familiar with any other employees?

Howard - Direct by Romero

1   A    Yes.  His name was Mohammad.  That was the guy who was

2   working the cash register.

3   Q    And just generally how would you describe the condition of

4   the neighborhood that the store was in back in September of

5   2012?

6   A    Can you, like, elaborate for me?  Like, what do you mean

7   the condition?

8   Q    What type of neighborhood was it?

9   A    It's a very bad neighborhood, I would say.

10  Q    Now, did you ever smoke marijuana in September of 2012?

11  A    Yes.

12  Q    And how often?

13  A    Daily.

14  Q    I want to direct your attention to September 27th of 2012,

15  approximately 1:00 o'clock.

16          Were you working that day?

17  A    Yes.

18  Q    And what, if anything, happened that was unusual at the

19  store that day around that time?

20  A    Around that time, that's when the police entered.  That was

21  the most unusual thing about that day.

22  Q    And specifically do you know the names of the police

23  officers who went into the store at that time?

24  A    One, yes.  Aldo Brown.  The other one, I believe his last

25  name is like Stackers or Stacks.

Howard - Direct by Romero

1   Q   And sitting in court today, do you see Aldo Brown?

2   A   Yes.

3   Q   Can you please identify him by an article of clothing?

4   A   The gentleman with the black suit, and it looks like to be

5   a gray tie or shirt.

6           MS. ROMERO:  May the record reflect the in-court

7   identification of the defendant?

8           THE COURT:  It will.

9   BY MS. ROMERO:

10  Q   Now, at the time that the defendant and his partner came in

11  the store, what, if anything, did they say to you specifically?

12  A   They asked me if I worked there.

13  Q   How did you respond?

14  A   "Yes."

15  Q   Were you told you were under arrest at that point?

16  A   No.

17  Q   What, if anything, happened after the police officers came

18  in the store and you identified yourself as a store employee?

19  A   They still proceeded to grab me and handcuff me with the

20  other people that were in the store.

21          MR. HERBERT:  Judge, I'm sorry.  I would just object

22  to "they."

23          THE COURT:  Okay.  Fair enough.  So foundation.

24  That's sustained.

25  BY MS. ROMERO:

Howard - Direct by Romero

1   Q    Do you remember which police officer handcuffed you on that

2   day?

3   A    Yes.  That would be Stacks, Stackers.

4   Q    Now, do you recall for approximately how long you were in

5   handcuffs?

6   A    Probably about 10 minutes.

7   Q    And during that time period, did you have any conversations

8   with the defendant?

9   A    A little bit.

10  Q    What, if anything, did the defendant say to you

11  specifically during that time period that you were in handcuffs

12  at the front of the store?

13  A    Well, he told me like -- he just asked me to raise up my

14  shirt.  That's it.  And I raised up my shirt.  And, like, that

15  was, like, pretty much all that we had to -- that we had

16  discussed.

17  Q    All right.  Now, I'm going to direct your attention to

18  what's been admitted into evidence as Government Exhibit 1,

19  specifically the file titled "Front Center View" at minute

20  12:45.

21       (Tape played in open court.)

22  BY MS. ROMERO:

23  Q    Mr. Howard, I'm going to refer to that as the first hit.

24  Okay?

25  A    Okay.

Howard - Direct by Romero

1   Q    Prior to the first hit, what, if anything, did you say to
2   the defendant?
3   A    Nothing.
4   Q    What, if anything, did the defendant say to you?
5   A    Nothing.  Once he asked me to lift my shirt, like, I
6   repeated it, like -- he said, "Lift your shirt and pull your
7   pants down."  And I, like, repeated it because I was confused.
8   And I just did so.  And then that was all the words exchanged.
9   Q    Other than instructing you to lift your shirt and lower
10  your pants, did the defendant give you any other instructions
11  at that point?
12  A    No.
13  Q    At that point did the defendant instruct you to raise your
14  hands or get on the ground?
15  A    No.
16  Q    Did you reach for your back pocket prior to this first hit?
17  A    No.
18  Q    Did you make any sudden movements or gestures?
19  A    No.
20  Q    Now, as a result of this first hit -- well, first of all,
21  what type of a hit was it?  What did it feel like?
22  A    It was --
23           MR. HERBERT:  I'm going to object to compound
24  question.
25           THE COURT:  Okay.  It was.  You can ask one at a time.

Howard - Direct by Romero

1   Sustained.

2   BY MS. ROMERO:

3   Q   What type of a hit was it?

4   A   It was a closed-handed hit, a punch to the face.

5   Q   And what did it feel like?

6           MR. HERBERT:  Objection.

7           THE COURT:  For relevance?

8           MR. HERBERT:  Yeah.

9           THE COURT:  It's one of the elements that will need to

10  be proved, so you may answer the question.

11          Overruled.

12  BY THE WITNESS:

13  Q   Well, it was a shot, but it stung, like.  It was a stinging

14  feeling in my face.

15  BY MS. ROMERO:

16  Q   What did you do as a result?

17  A   Nothing, aside from grabbing my face after the hit.

18  Q   Did you feel any physical pain?

19  A   Yes.

20  Q   Now, did you make any statements to the defendant after

21  that first hit?

22  A   No.

23  Q   Now, I'm going to direct your attention to what's been

24  admitted in evidence as Government Exhibit 1, Front Right View,

25  at minute 12:56.

Howard - Direct by Romero

1      (Tape played in open court.)

2   BY MS. ROMERO:

3   Q    Now, during the time period of what we just saw where the

4   defendant and you were by the coolers on the -- in the corner

5   of the store, what, if anything, did the defendant say to you

6   at that time?

7   A    He said to me, "I know you have something, if you have it,

8   give it to me."

9   Q    What did you do as a result?

10  A    Then I went in my pocket and gave him the few bags of

11  marijuana that I did have.

12  Q    And when you say your pocket, which pocket?

13  A    It was like my left back pocket.

14  Q    Did the defendant try to restrain your hands at that point?

15  A    No.

16  Q    Did he ask you to put your hands up in the air?

17  A    No.

18  Q    Other than the instruction to give -- for you to give him

19  what was in your pocket, did the defendant give you any other

20  verbal instructions?

21  A    No.

22  Q    Did he ask you to lie down on the ground or put your hands

23  in the air?

24  A    No.

25  Q    Now, the marijuana that you had in your pocket, why did you

Howard - Direct by Romero

1    have marijuana that day?

2    A    Because I smoke.

3    Q    Now, we saw that the defendant struck you while you were by

4    the coolers.

5         Explain, what type of a hit was that, that second hit?

6    A    That was like in the ribs on my left side.

7    Q    And did you feel any physical pain?

8    A    A little soreness.

9    Q    And prior to that, did the defendant grab your neck?

10   A    Yes.

11   Q    And can you explain what, if anything, you did during the

12   time that the defendant grabbed your neck?

13   A    I didn't do anything.

14   Q    Did you say anything or were you able to speak at that

15   time?

16   A    I'm sure I was able to speak, but I didn't say anything.

17   Q    Now I'm going to direct your attention to what's been

18   admitted as Government Exhibit 1.  File titled Back View at

19   minute 13:30.

20        (Tape played in open court.)

21   BY MS. ROMERO:

22   Q    All right, Mr. Howard.  I'm going to call that the third

23   hit.

24   A    Uh-hum.

25   Q    Around the time of the third hit, you were already on the

Howard - Direct by Romero

1   floor, correct?

2   A    Correct.

3   Q    Why did you take off your earrings at that time?

4   A    Because he told me to.

5   Q    When you say "he," who are you referring to?

6   A    Aldo Brown.

7   Q    After you took off your earrings and the defendant hit you

8   for the third time, did the defendant make any statements to

9   you?

10  A    No.

11  Q    Did you make any statements to the defendant?

12  A    No.

13  Q    Now, you were holding your jaw after that third hit?

14  A    Yes.

15  Q    What did that feel like?

16  A    Well, then at that time it was a lot -- a lot of pain,

17  because that was like the second hit to the face, so I was

18  going through a lot of pain at that point.

19  Q    Did you make any statements to the defendant regarding your

20  jaw?

21  A    No, not that I can recall.

22  Q    Now, after this happened, the defendant searched you again,

23  correct?

24  A    Yes.

25  Q    And at that time the defendant found a gun in your back

Howard - Direct by Romero

1    pocket, correct?

2    A    Correct.

3    Q    Do you recall which pocket?

4    A    That was the right back pocket.

5    Q    Prior to that moment, did the defendant ever make a

6    statement to you, "Give me your gun" or "I can see your gun"?

7    A    No.

8    Q    Did he ever yell to his partner, "I see a gun"?

9    A    No.

10   Q    Now, in September of 2012, why did you own a gun?

11   A    Because it was a dangerous neighborhood, and I didn't get

12   off work until late, so ...

13   Q    And why did you take your gun to work?

14   A    Like I said, because I don't get off until 9:00 o'clock and

15   it started getting dark then around that time, around 6:30,

16   7:00, so ...

17   Q    Is there a reason why you kept your gun loaded?

18   A    Safety reasons.

19   Q    What type of gun was it?

20   A    .22.

21   Q    And how big was it?

22   A    About yay big.  (Indicating.)

23   Q    And how did you get that gun?

24   A    Somebody, a random person, came in the store like about a

25   week before then and said they were selling it, so I bought it.

Howard - Direct by Romero

1  Q   Did you buy it inside the store?

2  A   No.

3  Q   How much did it cost?

4  A   150.

5  Q   And did you get a permit or FOID card for your gun?

6  A   No.

7  Q   Why not?

8  A   I mean, that wasn't like the first thing that was going

9  through my mind.

10 Q   All right.  I'm going to direct your attention to what's

11 been admitted as Government Exhibit 1.  Minute 14:17.

12     (Tape played in open court.)

13 BY MS. ROMERO:

14 Q   Now, prior to when the defendant kicked you as depicted in

15 that shot, did he say anything to you?

16 A   No.

17 Q   Did he give you any instructions to follow?

18 A   No.

19 Q   Did you say anything to him?

20 A   No.

21 Q   At any point during the time that you were with the

22 defendant inside the store on that day, did you verbally

23 threaten the officers?

24 A   No.

25 Q   At any point did you try to flee?

Howard - Cross by Herbert

1    A    No.

2    Q    At any point did you try to attack the officers?

3    A    No.

4    Q    Now, I just want to circle back to one more issue.

5         Earlier before the first hit, were you asked any

6    questions about a book bag?

7    A    Yes.

8    Q    And what, if anything, did you say in response?

9    A    Like, the other officer asked me was -- whose book bag was

10   it?  I told him that it was mine.

11   Q    And what, if anything, did you say about what was inside

12   the book bag?

13   A    I didn't say about what was inside the book bag, but the

14   other officer made a comment to the guy working the cash

15   register.  And he said, "See, this employee has an open bottle

16   of liquor in a public establishment."

17        MS. ROMERO:  I have no further questions, your Honor.

18        THE COURT:  All right.  Proceed on cross, Mr. Herbert.

19        MR. HERBERT:  Thank you.

20                    CROSS-EXAMINATION

21   BY MR. HERBERT:

22   Q    Good afternoon, Mr. Howard.

23   A    Good afternoon.

24   Q    How are you?

25   A    I'm all right.

Howard - Cross by Herbert

1   Q    I just want to make sure I heard some of your testimony

2   correct.

3          You talked about, earlier when you were asked

4   questions, that you worked at the 7600 block of South Coles at

5   the convenience store?

6   A    Correct.

7   Q    And that was the Omar Salah convenience store?

8   A    Correct.

9   Q    And how long did you work at that convenience store?

10  A    Maybe about two months, I believe.

11  Q    Okay.  Do you remember what -- when you started working

12  there?

13  A    Like probably July, sometime in July.  I don't remember for

14  sure.

15  Q    July of what year?

16  A    Of 2012.

17  Q    Okay.  And then when did you stop working there?

18  A    Right after this incident.

19  Q    Okay.

20  A    That was the last day.

21  Q    And this incident obviously took place in the end of

22  September.

23  A    Yes.

24  Q    Okay.  And you never went back there after that to work,

25  correct?

Howard - Cross by Herbert

1   A    No.

2   Q    Just so we're clear, no, you didn't go back there to work.

3   A    No, I didn't go back there to work.

4   Q    Thank you.

5             And you indicated that your mother worked there as

6   well?

7   A    Correct.

8   Q    And did you have any other family members that worked

9   there?

10  A    No.

11  Q    And you indicated that you stocked coolers and you

12  worked -- is that correct?

13  A    Correct.

14  Q    And you worked security?

15  A    Yes.

16  Q    Okay.  Which job did you perform more often?  Or would you

17  do them at the same time?

18  A    I would say I did the stocking of the coolers and shelves

19  more so than security.

20  Q    Okay.  And do you know whether you were working security on

21  September 27th, 2012?

22  A    No, that day I was stocking shelves.

23  Q    Okay.  And how is it that you made the determination which

24  job you were going to do on one particular day?

25  A    They would let me know what they wanted me to do, the

Howard - Cross by Herbert

1   owners of the store.

2   Q   I'm sorry?

3   A   The owners of the store would let me know which one they

4   wanted me to do.

5   Q   Okay.  And they would tell you you're working security

6   today or you're stocking the coolers.

7   A   Correct.

8   Q   Okay.  And by whom were you hired?

9   A   His name was Taha.  I don't remember his last name, but

10  that was, like, the owner of the store at that time.

11  Q   Okay.  And you indicated that you were hired because you

12  went in there so much.

13  A   Yes.

14  Q   Okay.  And what did you go in there for?

15  A   It's right on the corner.  Chips, juice, pop, bread, eggs,

16  milk.

17  Q   Okay.  And after -- do you remember what day this

18  individual said you should work for me?

19  A   No, I don't.

20  Q   Okay.  Do you know when it was in relation to July 2012

21  when you started to work?

22  A   No, I'm not -- I don't remember.

23  Q   But it would have been prior to that day -- that unknown

24  day in July 2012, correct?

25  A   Well, the owner used to always, like, tell me stuff like

Howard - Cross by Herbert

1   that.  I just never took him up on working there.  So it could

2   have been, like, even a few weeks before I actually started

3   working there that he mentioned it.

4   Q   Okay.  And for your employment there, did you fill out a

5   job application?

6   A   No.

7   Q   Were you given some type of a formal document describing

8   your job duties?

9   A   No.

10  Q   You indicated you were paid $300 a week, correct?

11  A   Correct.

12  Q   Would your name appear on a schedule anywhere indicating

13  who was working on what particular day?

14  A   No.

15  Q   Okay.  And that $300 a week, when would you receive that

16  money?

17  A   Every Friday after we would close.

18  Q   Okay.  What time did you close?

19  A   9:00 o'clock.

20  Q   Okay.  How would you receive the money?

21  A   In cash.

22  Q   Okay.  And who would you receive the money from?

23  A   Whoever would be working the register at that time.  They

24  had different people working the register.

25  Q   Okay.  And did you ever receive a paycheck, a formal

Howard - Cross by Herbert

1  paycheck, from --

2  A    No.

3  Q    -- the owners of the store?

4  A    No.

5  Q    Okay.  So fair to say that you weren't paying taxes on this

6  money that you were receiving, correct?

7  A    Correct.

8  Q    It was off the books, correct?

9  A    Right.

10  Q    How about your mother, was it the same type of financial

11  arrangement with her?

12  A    Yes.

13  Q    How long did your mother work there?

14  A    Maybe like -- I worked there like two months, almost three.

15  She worked about a month and a half.  Half the time of me.

16  Q    Okay.  What did your mother do there?

17  A    She did --

18  Q    What was her job?

19  A    She did strictly security.

20  Q    Okay.  Was she -- strike that.

21       The security that you talked about, was this armed

22  security?

23  A    No.

24  Q    You indicated that the store was located in a bad

25  neighborhood.

Howard - Cross by Herbert

1   A    Yes.

2   Q    Why do you consider that neighborhood a bad neighborhood?

3   A    I mean, it's a -- it's a high-crime area.  So, like, I've

4   witnessed things that happened in that area that made me

5   believe that it was a bad area.

6   Q    What types of things?

7   A    Well, like fights, shootings.  Just different kind of

8   things that, you know, I wasn't involved in at that time, so

9   like that -- that's what made me realize it was a bad area.

10  Q    Okay.  When you said that you weren't involved in at that

11  time, you're talking about the shootings that were going on,

12  you weren't involved in those --

13  A    I'm talking about everything.

14  Q    Let me finish my question so we're clear.

15       Was your answer that you weren't involved in the

16  shootings at the time that they were going on?

17       Do you understand my question?

18  A    No.

19  Q    Okay.  I'll ask another question.

20       You indicated that -- your last statement about you --

21  you weren't involved in the things that were going on at the

22  time and you were referring to the various crimes.  Correct?

23  A    Yes.

24  Q    Okay.  And those were shootings you indicated?

25  A    One of them.

Howard - Cross by Herbert

1   Q    Okay.  What else?

2   A    Fights.  Like, you know, big brawls, riots, things of that

3   nature.

4   Q    Okay.  And did you witness these fights, big brawls, and

5   riots?

6   A    Yes.

7   Q    Okay.  And when was the -- you witnessed them prior to

8   starting to work there?

9   A    Yes.

10  Q    Okay.  Did you witness them while you were working there?

11  A    Yes.

12  Q    How many fights, riots, did you witness while you were

13  working there?

14  A    In those two to almost three months, I would say well over

15  ten.

16  Q    Okay.  And when you say riots and big brawls, why do you

17  refer to them in such terms?

18  A    In my mind, that's what it was.  When you have 15 to 25

19  people in the middle of the street and everybody is fighting

20  each other, to me that's a brawl, so that's why I called it as

21  such.

22  Q    Okay.  So -- and that would be the typical type of fights

23  and brawls that were going on, 15 to 25 people in the middle of

24  the street fighting?

25  A    Yes.

Howard - Cross by Herbert

1  Q   Did you know these people that were fighting?

2  A   I knew of them.

3  Q   Okay.  How did you know of them?

4  A   Because I lived in that area for 15 years.

5  Q   Okay.  What did you know of them?

6  A   I see them on a day-to-day basis.

7  Q   Okay.  Did you know any of them by name?

8  A   No.

9  Q   Okay.  What did you know about them other than just that

10 you would see them in the neighborhood?

11 A   I knew that these were the guys who were, like, starting

12 the fights.  These were the bad people in this area.

13 Q   Okay.

14 A   That's the only thing I knew about them.

15 Q   And who were these people, these bad people, starting

16 fights with?

17         MS. ROMERO:  Objection --

18 BY MR. HERBERT:

19 Q   Do you know the victims of this?

20         MS. ROMERO:  Objection to relevance.

21         THE COURT:  I think we -- I think we've got the basis

22 as far as we need to go, and then we're about to encroach upon

23 a ruling, so I will sustain the objection.

24         MR. HERBERT:  Okay.

25 BY MR. HERBERT:

Howard - Cross by Herbert

1   Q   You indicated that you smoked weed every day in 2012.

2   A   Yes.

3   Q   Do you smoke weed currently?

4   A   Yes.

5   Q   How often do you smoke weed currently?

6   A   Couple of times a week.

7   Q   Okay.  Did you smoke marijuana today?

8   A   No.

9   Q   When did you last smoke marijuana?

10  A   Yesterday.

11  Q   Okay.  And at what time?

12  A   Probably about noon.

13  Q   Okay.

14  A   2:00 o'clock in the afternoon.

15  Q   And the marijuana that you smoked yesterday, where did you

16  purchase that from?

17  A   Just, like, somebody that was outside.  I didn't know the

18  individual.

19  Q   Outside where?

20  A   Outside around my house.

21  Q   Okay.  Did you purchase the marijuana last night?

22  A   No.

23          MS. ROMERO:  Objection to relevance.

24          THE COURT:  Okay.  Sustained.

25  BY MR. HERBERT:

Howard - Cross by Herbert

1    Q    And you said that the police entered, and you know that

2    Aldo Brown was one of the police officers that entered.

3    A    Correct.

4    Q    Did you know Aldo Brown at that time?

5    A    No.  I've seen him before.

6    Q    Okay.  Did you have any encounters with Aldo Brown prior to

7    that day?

8    A    No.

9    Q    Never?

10   A    No.

11   Q    Okay.  You said that you were in handcuffs for 10 minutes,

12   correct?

13   A    About 10 minutes.

14   Q    Okay.  And you said that Officer Brown didn't give you any

15   instructions throughout the entire course of your interaction

16   with him on September 27, 2012.

17           MS. ROMERO:  Objection.  Misstates the testimony.

18           MR. HERBERT:  If I did, I apologize.

19           THE COURT:  Sustained.

20   BY MR. HERBERT:

21   Q    Did Mr. Brown give you any instructions on September 27th,

22   2012?

23   A    Yes.

24   Q    What instructions did he give you?

25   A    To raise my shirt and drop my pants.

Howard - Cross by Herbert

1    Q    Okay.  Other than that?

2    A    No.

3    Q    No other instructions?

4    A    No.

5    Q    Okay.  You indicated, I believe, you said that when you

6    were over by the cooler that Officer Brown asked you or said --

7    made a statement to you that, "I know you have something, give

8    it to me," correct?

9    A    Yes.

10   Q    And that's when you handed him a bag of marijuana?

11   A    Yes.

12   Q    Okay.  And how big of this -- how big was this bag of

13   marijuana?

14   A    I don't necessarily recall.

15   Q    Okay.  Why is it that you call or -- excuse me.  Strike

16   that.

17          Why is it that you don't recall?  Is it because of the

18   length of time that has passed since you experienced that

19   incident?

20   A    Correct.

21   Q    Okay.  Fair to say that your memory was better closer to

22   the incident as opposed to it is now?

23   A    I would say.

24   Q    And at that time Brown -- when Brown asked you to give it

25   to you [sic.], you know what he meant.  He was looking for

Howard - Cross by Herbert

1   contraband, he was looking for something illegal, correct?

2   A    Correct.

3   Q    Okay.  And you gave him the marijuana, correct?

4   A    Correct.

5   Q    You didn't give him the gun at that point, right?

6   A    No.

7   Q    But you had the gun on you, right?

8   A    Correct.

9   Q    Okay.

10          MR. HERBERT:  Do you mind if I --

11       (Tendered.)

12          MR. HERBERT:  Thank you.  I guess we can mark this as

13   Defense Exhibit Number 1.

14          THE COURT:  Okay.

15       (Counsel conferring.)

16          MR. HERBERT:  Okay.  May I approach?

17          THE COURT:  You may.

18   BY MR. HERBERT:

19   Q    Mr. Howard, I'm showing you what's been marked Defense

20   Exhibit Number 1.

21          Do you recognize this?

22   A    Yes.

23   Q    Okay.  And how is it that you recognize this?

24   A    That was the gun that I had on September 27th.

25   Q    Okay.  And the gun was loaded, correct?

Howard - Cross by Herbert

1   A   Correct.

2   Q   In other words, it had bullets in there, correct?

3   A   Yes.

4   Q   And they were live bullets, correct?

5   A   Correct.

6   Q   And when you had the gun in your back pocket, it was ready

7   to fire, correct?

8   A   Correct.

9   Q   And, in fact, you were going to fire if you needed to,

10  correct?

11  A   Correct.

12  Q   You said that you were hit in the ribs on the left side.

13  Correct?

14  A   Yes.

15  Q   And then you felt a little soreness.  Correct?

16  A   Yes.

17  Q   Okay.  You were asked about the situation over by the

18  cooler, and the government indicated that you were being

19  choked.

20  A   Correct.

21  Q   And you said that you were able to talk, correct?

22  A   I'm sure I was.

23  Q   Okay.  You were able to breathe, correct?

24  A   Yes.

25  Q   Okay.  So you were not choking, correct?

Howard - Cross by Herbert

1    A    I wasn't choking.

2    Q    Okay.  You talked about how, on direct, you said that you

3    were hit in the jaw and you were in a lot of pain.

4    A    Correct.

5    Q    That's what you said earlier, correct?

6    A    Yes.

7    Q    Okay.  And you had injured your jaw in the past, correct?

8    A    Correct.

9    Q    And you, in fact, had broken your jaw prior to that,

10   correct?

11   A    Correct.

12   Q    And when was that in relation to this incident?

13   A    Like how long ago before?

14   Q    Yeah.

15   A    Probably about three years before this incident.

16   Q    Okay.  And how was it that you broke your jaw?

17        MS. ROMERO:  Objection to relevance.

18        THE COURT:  It's not relevant.  Sustained.

19        MR. HERBERT:  Okay.

20   BY MR. HERBERT:

21   Q    You indicated on direct that my client Aldo Brown found the

22   gun in your right back pocket.

23   A    Correct.

24   Q    Is that what you stated earlier?

25   A    Yes.

Howard - Cross by Herbert

1  Q    Okay.  You indicated that you purchased the gun for safety

2  reasons.

3  A    Correct.

4  Q    And you indicated that you purchased it for $150.

5  A    Correct.

6  Q    From somebody that you had met earlier, correct?

7  A    Correct.

8  Q    Do you know who that person was?

9  A    No.

10  Q    Why is it that you don't know who that person was?  Is it

11  that you had forgotten -- or strike that.  Bad question.

12        Did you ever know who that person was that sold you

13  this gun?

14  A    No.

15  Q    Did you ever know a name or a nickname of this person that

16  sold you that gun?

17        MS. ROMERO:  Objection.  Asked and answered and

18  relevance.

19        THE COURT:  Overruled.

20        You can answer.

21  BY THE WITNESS:

22  A    No.

23  BY MR. HERBERT:

24  Q    How did you pay for this gun?

25  A    Cash.

Howard - Cross by Herbert

1  Q   Did anyone contribute to the price of this gun?

2  A   No.

3  Q   You bought it on your own.

4  A   Yes.

5  Q   You were asked about whether or not you had a permit or an

6  FOID card.

7          Do you remember being asked those questions?

8  A   Yes.

9  Q   And you indicated that you didn't, correct?

10 A   Correct.

11 Q   And I believe you said that -- you were asked why not, and

12 you said it's not the first thing going through my mind at the

13 time.

14 A   Correct.

15 Q   Okay.  Were you planning on getting an FOID card or permit

16 at some point later?

17 A   That hadn't crossed my mind.

18 Q   You realized that it was illegal to possess a firearm

19 without an FOID card or permit, correct?

20 A   Correct.

21 Q   And you knew that it was illegal to buy a gun off the

22 street -- off somebody on the street, not in a gun store,

23 correct?

24 A   Correct.

25 Q   So this was an undocumented transaction, correct?

Howard - Cross by Herbert

1    A    Right.

2    Q    And so you knew that that was illegal, correct?

3    A    Correct.

4    Q    And so you knew you were breaking the law on the situation

5    in which you bought the weapon, correct?

6    A    Correct.

7    Q    And you knew that you were breaking the law every time you

8    carried that gun with you, correct?

9    A    Correct.

10   Q    And you carried this gun on multiple occasions, correct?

11   A    Correct.

12   Q    How many times did you carry it prior to being arrested

13   with this gun?

14   A    I believe, like, six times.

15   Q    Okay.  When was the first time that you carried it?

16   A    The very next day after I purchased it.

17   Q    Okay.  And when was that?

18   A    Let's say September the 20th.

19   Q    Okay.  Do you know where -- do you know what day of the

20   week you purchased it?

21   A    No.

22   Q    Do you know what time of the day it was that you purchased

23   it?

24   A    Nighttime.

25   Q    Do you know more specific than nighttime?

Howard - Cross by Herbert

1   A   9:00, 10:00 o'clock, something like that.

2   Q   Okay.  Do you know where you were when you purchased that?

3   A   Yes.  I was at home.

4   Q   Okay.  How is it that you made the purchase at your house?

5   A   Because --

6           MS. ROMERO:  Objection to relevance, your Honor.

7           THE COURT:  Sustained.

8   BY MR. HERBERT:

9   Q   Well, let's continue on the gun theme here.

10          You bought the gun to protect yourself, right?

11  A   Right.

12  Q   Because things were getting serious outside, correct?

13  A   Correct.

14  Q   And serious, serious threats?

15  A   Yes.

16  Q   Okay.  So would it be fair to say that you were -- that you

17  personally were receiving these serious threats shortly before

18  you purchased the weapon?

19  A   Correct.

20  Q   And you still continued to receive threats after you

21  purchased the weapon, which is why you carried it, correct?

22  A   Correct.

23  Q   Okay.  And were these threats made to you by any specific

24  person?

25          MS. ROMERO:  Objection to relevance.

Howard - Cross by Herbert

1          THE COURT:  We're going to have to have a sidebar,

2     okay?

3          MR. HERBERT:  Okay.

4        (At sidebar outside the hearing of the jury:)

5          THE COURT:  I'll hear the objection first.

6          MS. ROMERO:  Judge, I think the concern is that what

7     the jury has to decide is the reasonableness of the actions

8     based on what the defendant knew at the time of the incident,

9     and I just feel like we've been for a while now asking

10    questions about things that happened weeks prior that there's

11    no basis for the defendant at no point claimed to have known

12    and that would have affected the conduct inside the store.

13         MR. HERBERT:  It's being used to test his ability to

14    recall certain details, because his testimony about the events

15    that occurred on the day in question are absolutely relevant,

16    and I am allowed, I believe, I am allowed to get into questions

17    about his lack of memory or specific memory regarding events

18    concerning him having the gun on that particular day.

19         THE COURT:  It seems like it's being used to get him

20    to say he's a gang-banger and that he got a gun from a

21    gang-banger and that he's having threats because he's a member

22    of a gang and that the guys fighting on the streets are members

23    of gangs, and so it really goes to my pretrial ruling.

24         You are permitted to cross him about the fact that

25    he's purchased a gun outside of the realm of the law, which is

Howard - Cross by Herbert

1    perfectly permissible impeachment for his credibility, his

2    law-abidingness.  And you certainly are able to say that he's

3    possessing the gun and was going to use the gun without a FOID

4    card, which is outside of the ordinance, that he is, therefore,

5    maybe not a law-abiding citizen.  But the details of where he

6    got the gun, other than him saying that he bought it on the

7    street from someone he doesn't know, is sufficient I think for

8    argument other than his -- for his memory, but going any

9    further to me seems like it's being done to get to that gang

10   issue.

11        MR. HERBERT:  And to be clear, there is no indication

12   that he bought this because he was a gang member or he bought

13   it from a gang member, so if he provided that information, it

14   would be news to me.  But I am planning on --

15        THE COURT:  Looks to me like you're fishing for that

16   information.

17        MR. HERBERT:  Not necessarily, Judge.

18        THE COURT:  Okay.  Fair enough.

19        MR. HERBERT:  I am going to ask him for impeachment

20   purposes -- he talks about the person that sold him this gun.

21   Here he says he does not -- he didn't know the name of the

22   person, never knew the name of the person.  I'm going to

23   impeach him on that fact.

24        THE COURT:  Well, it's not really impeaching him on

25   it.  It's crossing him on the fact that he has a lack of memory

Howard - Cross by Herbert

1    about the details of what you are saying is an illegal act, so

2    you have a little bit of leeway to do that, but not to the

3    point where we're going off into an irrelevant frolic and

4    detour about a gun transaction that isn't charged or we don't

5    have any more details about.

6              MR. HERBERT:  Okay.

7              THE COURT:  All right?

8              MR. HERBERT:  While we're here, I'm going to go into

9    several impeachments right now.

10             THE COURT:  Well, go do it.

11             MR. HERBERT:  Just letting you know.

12             THE COURT:  Fine.

13        (Sidebar proceedings concluded.)

14   BY MR. HERBERT:

15   Q   Mr. Howard, you have -- you have given several statements

16   in this case regarding the incident at issue here today,

17   correct?

18   A   Correct.

19   Q   You've given statements to the FBI, correct?

20   A   Correct.

21   Q   You've given statements where the Assistant U.S. Attorneys

22   have been present with the FBI, correct?

23   A   I wouldn't know who that is.

24   Q   These two individuals that are sitting at the table?

25   A   Correct.

Howard - Cross by Herbert

1    Q    You remember giving those statements to them?

2    A    Uh-hum.

3    Q    Yes?

4    A    Yes.

5    Q    Okay.  And you've given statements to the Independent

6    Police Review agency, correct?

7    A    Yes.

8    Q    And those statements were given closer to the date of

9    incident than they are to your testimony today, correct?

10   A    Correct.

11   Q    And you already indicated that your memory was better

12   closer to the time of incident as opposed to right now,

13   correct?

14   A    Correct.

15   Q    Okay.  On December 5th, 2012, you were interviewed by I

16   believe this gentleman back here, Mr. Jackson, from the FBI?

17   A    Correct.

18   Q    Do you remember that?

19   A    Yes.

20   Q    Okay.  And there was other FBI agents there as well,

21   correct?

22   A    Correct.

23   Q    Okay.  And you were asked about from whom you purchased the

24   gun.

25   A    Correct.

Howard - Cross by Herbert

1    Q    Do you remember that?

2    A    Yes.

3    Q    Okay.  Today you said you didn't know the person or know

4    his name, correct?

5    A    Correct.

6    Q    Okay.  Back then you told the agent, though, that you

7    bought it from a guy who was called Kire.  K-I-R-E.

8              Do you remember that?

9    A    Not at all.

10   Q    You don't remember saying that?

11   A    Not at all.

12   Q    Okay.  So if it's contained within that report, that's

13   false?

14   A    That's not what I said.  I don't remember that.

15   Q    Okay.  And you also told him, the agent, on that same day

16   that you bought the gun from Kire for $100, and that you and

17   the clerk from Omar and Salah chipped in to buy that gun.

18             Do you remember saying that?

19   A    No.

20   Q    No, you don't remember?  Or, no, you didn't say that?

21   A    No, I don't remember.

22   Q    Okay.  So is it possible that you said that?

23   A    Could be.

24   Q    Okay.  So it's possible that your testimony today was false

25   regarding you purchasing the gun?

Howard - Cross by Herbert

1      MS. ROMERO:  Objection.

2      THE COURT:  Sustained.

3   BY MR. HERBERT:

4   Q    You were also interviewed by the FBI a second occasion,

5   correct?

6   A    Which occasion would this be?

7   Q    Strike that.

8           How is it that you arrived at court today?

9   A    From the FBI agents.

10  Q    Okay.  FBI agents came and picked you up?

11  A    Correct.

12  Q    They brought you here?

13  A    Yes.

14  Q    Did you guys have a discussion on the way here?

15  A    No.

16  Q    Did you talk about what you were going to testify to?

17  A    No.

18  Q    Well, you did on September 3rd, 2015.

19          Do you remember speaking with Mr. Jackson again?

20  A    What -- what -- what date did you say?

21  Q    September 3rd, 2015.

22  A    September 3rd, 2015?  September 3rd, 2015?  Sounds about

23  right.  Could have been.

24  Q    Could have been?

25  A    Yeah, around that time.

Howard - Cross by Herbert

1  Q    Okay.  And you were asked about the gun again on that day.

2  Do you remember?

3  A    Not off the bat.

4  Q    Okay.  That was only a couple weeks ago.  Is there any

5  reason why you don't remember being asked questions about the

6  gun?

7  A    Been a lot going on in the past couple of weeks.

8  Q    Okay.  Like what?

9  A    Work.

10         MS. ROMERO:  Objection, Judge.  Relevance.

11         THE COURT:  I didn't hear your objection.

12         MS. ROMERO:  Relevance.

13         THE COURT:  Okay.  Overruled.  He gave a reason.

14 BY MR. HERBERT:

15 Q    Were you under the influence of marijuana during any of

16 these statements that you made with the FBI?

17 A    No.

18 Q    Okay.  How do you know that you were not under the

19 influence of marijuana at the time you made these statements?

20 A    Because I know whether or not I partook in any kind of drug

21 activity on those days.

22 Q    Okay.  And is it your testimony that, as you sit here

23 today, you know specifically that you did not use marijuana on

24 September 3rd, 2015?

25 A    Correct.

Howard - Cross by Herbert

1    Q    Okay.  How is it that you know you didn't use it on that

2    day?

3    A    Because I know when I get paid and I know when I can go and

4    get it, and that wasn't around the same time.

5    Q    When do you get paid?  When would you have gotten paid

6    prior to that?

7    A    Couple of days after.

8    Q    Okay.  What day of the week do you get paid on?

9    A    I get paid on Fridays.

10   Q    Okay.  So September 3rd would be a Wednesday, is that

11   correct --

12   A    Uh-hum.

13   Q    -- based upon your testimony?

14   A    Correct.

15   Q    Okay.  And they asked you about that gun and why you didn't

16   give that gun to Howard [sic.] when he asked you, "Give me what

17   you've got."

18        Do you remember being asked questions about that?

19   A    Excuse me.  Why didn't I give the gun to who?

20   Q    To -- I'm sorry, to Brown.

21   A    Oh, okay.

22   Q    To my client.

23   A    Yeah, I remember getting asked that question.

24   Q    Okay.  Because you already testified to that.  He asked you

25   give you [sic.] the contraband, and you gave him just the weed,

Howard - Cross by Herbert

1   correct?

2   A   Correct.

3   Q   Okay.  And specifically that weed, how was that weed

4   contained within this plastic bag?

5        Do you understand the question?

6   A   No.

7   Q   Okay.  I'll be more direct.

8        It wasn't just one plastic bag of marijuana, was it?

9   A   I can't recall.

10   Q   Okay.  Well, in fact, why is it that you can't recall?

11   A   Because it was, like, over three years ago.

12   Q   Okay.  And -- well, I will represent to you that it was

13   multiple bags containing a green leaf substance.

14        Does that sound about right?

15   A   You telling me.  I said I don't remember, so I can't tell

16   you if it sounds about right if I don't remember.

17   Q   Well, have you ever carried marijuana in your -- on your

18   person in your back pocket with multiple bags of marijuana?

19   A   Yes.

20   Q   Okay.  How many times have you done that?

21   A   I can't remember.

22   Q   Okay.  A lot.  Correct?

23   A   I can't say.

24        MS. ROMERO:  Objection.

25        THE COURT:  Sustained.

Howard - Cross by Herbert

BY MR. HERBERT:

Q    And when you carry it in multiple bags, that's for
distributing it, correct?

A    Not all the time.

Q    Okay.  Sometimes then it is for distributing it, correct?

A    Sometimes.  In some people's cases.

Q    Okay.  I'm talking about your case, though.

A    Oh, okay.  In my case, no, not for distributing.

Q    Okay.  But you take marijuana that you purchase illegally
in the street, correct?

A    Uh-hum.  Correct.

Q    Okay.  And you -- and you pull out little plastic bags --
and when we're talking little ones, we're talking about like an
inch, correct?

A    Right.

Q    And you fill up each one of those bags with marijuana,
correct?

A    No.

Q    You've never done that.

A    No.

Q    Okay.  So if you were arrested with mini bags on this day,
why is it that you had these mini bags contained with the
marijuana?

A    Because that's how I bought them.

Q    Okay.  So you've never sold marijuana.

Howard - Cross by Herbert

1   A    That's not what I said.

2   Q    Okay.  Were you selling marijuana on September 27th,

3   2012 --

4   A    No.

5   Q    -- the marijuana that you had on your person?

6   A    No.

7   Q    Let me ask you about -- sticking with that September 5th,

8   2015 interview with the FBI.

9            You testified here today that you never had any

10  experiences with Aldo Brown in the past prior to that day,

11  correct?

12  A    Correct.

13  Q    That's what you've testified to today, correct?

14  A    Absolutely.

15  Q    That's what you told the ladies and gentlemen of the jury,

16  correct?

17  A    That's correct.

18  Q    Well, you gave a different story a couple weeks ago when

19  you spoke to the FBI, though, about Aldo Brown, didn't you?

20  A    No.

21  Q    Okay.  Did you ever tell the FBI that you had a prior

22  experience with Aldo Brown?

23  A    No, not me.

24  Q    Okay.  Did you ever tell anyone from the Independent Police

25  Review agency that you had a prior incident with Aldo Brown?

Howard - Cross by Herbert

1    A    Once again, not me.

2    Q    My question is --

3              MS. ROMERO:  Objection, Judge.

4    BY MR. HERBERT:

5    Q    -- did you tell --

6              THE COURT:  Wait.  Hold on.  There's an objection

7    pending.

8              MS. ROMERO:  May we have a sidebar, please?

9              THE COURT:  Sure.

10             They're going to keep me active, I guess.

11             Feel free to move yourselves while we do this.

12         (At sidebar outside the hearing of the jury:)

13             MS. ROMERO:  Judge, my objection is based on the

14   motion *in limine* filed by the defense in this case where they

15   precluded us from going into any prior incidents between the

16   defendant and Mr. Howard's brother, Paul.

17             My understanding is the victim, the witness, is aware

18   that Mr. Brown beat up his brother on another occasion.  So in

19   that sense, he has indicated to us he was familiar, not

20   personally with Officer Brown, but he knew of him and had been

21   in the area where the incident had happened with his brother.

22   We stayed away from it, instructed the witness to be cautious

23   about providing that information in his testimony.

24             And my concern at this point is that's exactly what

25   defense counsel is eliciting.  And if that comes out, that

Howard - Cross by Herbert

 1  comes out, but I don't want to leave the jury with the

 2  impression that Mr. Howard is being dishonest about statements

 3  made to us or the FBI regarding his prior knowledge of the

 4  defendant.

 5          MR. HERBERT:  He goes into at full length, with -- I

 6  believe you guys were there on September 3rd -- about this

 7  incident with Aldo Brown, and he was absolutely involved with

 8  it.  If you want, I can grab it and show you what it is.

 9          THE COURT:  Well, did you make a motion to keep it

10  out?

11          MR. HERBERT:  Keep --

12          THE COURT:  I mean that -- I don't know --

13          MR. HERBERT:  It's impeachment, Judge.  That's why --

14          THE COURT:  What's the motion that you're referring

15  to?

16          MS. ROMERO:  The defense motion was to bar evidence of

17  prior incidents of excessive force by Mr. Brown, and that's one

18  of them.

19          MR. HERBERT:  Okay, I see what you're getting at.

20          MS. JENKINS:  We're concerned the jury may be left

21  with the misimpression based on the line of questioning as it's

22  now currently being asked that Mr. Howard is being dishonest in

23  his answers either today or before --

24          THE COURT:  Because you've directed him not to go into

25  it.

Howard - Cross by Herbert

1      MS. JENKINS:  Correct.  He's aware that he's not

2   supposed to get into details about his brother's encounter

3   where he may or may not have been present.

4      MR. HERBERT:  I will just state I don't believe

5   that -- we were tendered a couple of complaints made by

6   citizens, but those were not one of them, so it's not like that

7   would have been the subject of our prior bad acts motion.  We

8   would have no idea of knowing this.  I couldn't know what this

9   individual is going to say because he clearly said two weeks

10  ago he was involved with an incident with Aldo Brown, which is

11  exactly the opposite of what he said on the witness stand.

12     THE COURT:  Why would you move to keep out any

13  interactions of -- with him and excessive force?  Are you

14  telling me that there's no --

15     MR. HERBERT:  No, no, no --

16     THE COURT:  Please --

17     MR. HERBERT:  I'm sorry.

18     THE COURT:  -- don't.

19     Why would you move to keep out prior incidents of

20  excessive force committed by your client if you wanted to cross

21  the witness about an incident of excessive force on his

22  brother?

23     MR. HERBERT:  Well, it's an incident involving him.

24  Mr. Howard was present for that.  And the reason I would get it

25  in is because it is directly impeaching to what this witness

Howard - Cross by Herbert

1    just testified to today.

2           I have no reason to think that that is something that

3    is a prior bad act that we are going to get into but ... it's

4    up to you, Judge, obviously.

5           THE COURT:  It's really a mess, because they've

6    instructed him not to go there, and he clearly has knowledge,

7    but he's not going there because you've instructed him not to

8    go there.

9           I'm going to have to look at the motion and make a

10   ruling.

11          MS. ROMERO:  Judge, would you like me to get the

12   motion now?

13          THE COURT:  Yes, please.

14          MR. HERBERT:  My only argument to that would be it

15   could be brought out on redirect.  That probably could be cured

16   on redirect is my position.

17          MS. RUSSELL:  Can we step back for a minute?

18          THE COURT:  Yeah.

19       (Counsel conferring.)

20          LAW CLERK:  Would you like a copy of your ruling?

21          THE COURT:  Yeah, I mean, I don't know if the ruling

22   will help so much as the motion.  I want to see that.

23          MS. ROMERO:  It's Number 8.

24       (Tendered.)

25          THE COURT:  They agreed to this, whether the defendant

Howard - Cross by Herbert

1    had any prior dealings with Jecque Howard or any other

2    government witness has no bearing on the events of

3    September 27th or any subsequent action.  The government should

4    be barred from offering any testimony, evidence, or argument

5    regarding whether defendant knew or had any prior contact, on

6    duty or off duty, with Jecque Howard or any other government

7    witness because such evidence is not relevant, and you agreed

8    to that.

9              MS. ROMERO:  Correct.  And for what it's worth, the

10   witness was instructed unless he's specifically asked about the

11   incident with his brother, he was going to avoid it.  So it's

12   not a situation where we've told him to deny it at any cost,

13   but I think that that's the direction we're headed, and we

14   wanted to raise it.

15             THE COURT:  There's no question that --

16             MR. HERBERT:  I can move on.

17             THE COURT:  -- that the jury is left with the

18   impression that he would be lying about not saying something

19   about this incident, so I don't know how we're going to fix

20   that if this is your motion.

21             MR. HERBERT:  Well, I would respond that when we filed

22   this motion, it wasn't necessarily to bar -- I'm sure we filed

23   this probably before we received this information about this

24   prior incident.

25             THE COURT:  Seriously?

Howard - Cross by Herbert

1      MR. HERBERT:  I don't know, but I know that --

2      THE COURT:  This is the consolidated motions in

3  limine.  It doesn't have a time stamp on it --

4      MS. ROMERO:  I think on the last page.

5      THE COURT:  Thank you.

6      No, it doesn't.  I'll look.

7      MS. ROMERO:  It was definitely after September 3rd,

8  Judge.

9      MR. HERBERT:  It was after?

10     MS. ROMERO:  Yeah.

11   (Counsel conferring.)

12   (Pause in proceedings.)

13     THE COURT:  Okay.  They were filed October 2nd.  And

14  so was all of the information turned over prior to that time?

15     MS. ROMERO:  Judge, I can check the file.  I can't --

16  my instinct is yes, but I can't say that it was turned over

17  before October 3rd.

18     THE COURT:  Okay.  Why don't you check the file.

19     MR. HERBERT:  I'm moving on, just for housekeeping

20  matters, quickly.

21   (Pause in proceedings.)

22     MS. ROMERO:  A letter dated October 2nd, 2015.  And

23  the Jecque Howard 302 from September 3rd.

24     THE COURT:  So it's the same day.  I have no idea what

25  time you sent yours or what time you filed, but you certainly

Howard - Cross by Herbert

1    had the information then at the final pretrial conference when
2    I reviewed each of these individually, right?
3             MR. HERBERT:  I did, yes.
4             MS. ROMERO:  For the record, Judge, in his IPRA
5    statement, which was taken in 2012, he does reference a prior
6    incident with his brother.
7             THE COURT:  Okay.
8             MS. ROMERO:  Very generally.
9             THE COURT:  Because I granted the motion by agreement,
10   you'll have to keep it out and not go there.  All right?
11            MR. HERBERT:  Okay.
12        (Sidebar proceedings concluded.)
13            THE COURT:  Okay.  Mr. Herbert, you can pick up where
14   you left off.
15            MR. HERBERT:  Thank you.
16   BY MR. HERBERT:
17   Q    With respect to the injuries that you received, other than
18   what you've testified to, that your jaw hurt, that you had pain
19   in your side, did you have any other injuries?
20   A    It was just like a, I don't know, like a little cut or like
21   rug burn from I guess like the glove that he had on from the
22   first hit.  That was it.
23   Q    Okay.  And you're indicating -- you were rubbing your left
24   temple area, correct?
25   A    Yes.

Howard - Cross by Herbert

1   Q   Okay.  And do you have a permanent scar from that --

2   A   No.

3   Q   -- incident?

4   A   I don't -- no.

5   Q   How -- I'm sorry.  I didn't mean to cut you off.

6         How long was there an indication that you had a cut on

7   your forehead as a result of this incident?

8   A   Like a few days.

9   Q   Okay.  Three days after the incident, correct?

10   A   Correct.

11   Q   Okay.  And then after that, it wasn't visible?

12   A   No.

13   Q   And today it's not visible, correct?

14   A   No.

15   Q   Okay.  I'm going to direct your attention to the

16   Independent Police Review agency conducted an interview with

17   you on October 2nd, 2012.

18        Do you remember that?

19   A   Yeah.

20   Q   Okay.  And on that day, you told the investigator that you

21   had a scar and you were showing her a scar, correct?

22   A   No, I don't remember.

23        MR. HERBERT:  Page 25, line 20.

24        If I could have one second, your Honor.

25        THE COURT:  No problem.

Howard - Cross by Herbert

1    (Pause in proceedings.)

2    (Counsel conferring.)

3  BY MR. HERBERT:

4  Q   Mr. Howard, I apologize.  It wasn't -- it wasn't regarding

5  the IPRA statement on October 2nd, 2012.

6       I want to direct your attention to the statement that

7  we've already discussed on -- that was given on December 5th,

8  2012, to Agent Jackson.

9  A   Okay.

10 Q   Do you remember talking about that?

11 A   Yes.

12 Q   Okay.  So certainly that would have been months after this

13 incident?

14 A   Correct.

15 Q   You certainly would not have had a scar on that day,

16 correct?

17 A   Right.

18 Q   Okay.  But on that day, you did tell the FBI agent that you

19 still did have a scar from that incident.

20      Do you remember saying that?

21 A   No, I don't remember saying that at all.

22 Q   Is it possible that you said it and you forgot?

23 A   That could be possible.

24 Q   Okay.  But had you said that, that wouldn't have been a

25 truthful statement, correct?

Howard - Cross by Herbert

1   A   Right.  It's a little cut.  A cut don't last for months.

2   Q   Okay.

3   A   A burn even, a rug burn, don't last for weeks, let alone

4   months.

5   Q   Well, actually on that day, you actually pointed out to the

6   agent the scar that you had, correct?

7   A   Well, there's nothing here.  So if anything, I said this is

8   where it was.  (Indicating.)  Nothing was there.

9   Q   Were you bleeding on the night in question?

10  A   No.

11  Q   Okay.  But the scar was present on the night in question?

12  A   Yes.

13          MR. HERBERT:  Your Honor, if I can mark this as

14  Defendant Exhibit Number 2.

15          Can I show it to --

16          THE COURT:  No, you have to have him -- you have to

17  put it in.  You have to show him first to see if he can --

18          MR. HERBERT:  That's what I was going to ask.  Can I

19  show --

20          THE COURT:  Oh, him, yes, but not them.

21          MR. HERBERT:  Right.

22  BY MR. HERBERT:

23  Q   You recognize this picture, correct?

24  A   Correct.

25  Q   And that's your picture, correct?

Howard - Cross by Herbert

1   A   Yes.

2   Q   And that picture was taken after you were arrested on

3   September 27th, 2012?

4   A   Correct.

5   Q   Okay.  And in there you would agree with me that it doesn't

6   show -- strike that.

7         This is a true and accurate depiction of how you

8   looked on September 27th, 2012 when the photo was taken?

9   A   Correct.

10  Q   Okay.

11        MR. HERBERT:  And may I publish to the jury?

12        THE COURT:  You may.

13      (Published.)

14  BY MR. HERBERT:

15  Q   You've seen this photo before, correct?

16  A   Yes.

17  Q   Okay.  You would agree with me that there is no indication

18  of a scar or injury of any type on your face, correct?

19  A   That shows the front of my face, so correct.

20  Q   Okay.  Is there another photo that exists that shows this

21  scar?

22  A   Not unless they took one from the left and the right when I

23  got locked up, so you could see the left side of the face.

24  Q   Well, you didn't tell -- you didn't tell the lock-up keeper

25  that you were injured --

Howard - Redirect by Romero

1    A    No.

2    Q    -- did you?

3    A    No.

4    Q    Okay.  You didn't tell Sergeant Ben, the female sergeant

5    that spoke to you, that you were injured, correct?

6    A    Correct.

7    Q    You didn't tell Sergeant Ben about any of the acts that

8    out -- my client allegedly did to you on that night, correct?

9    A    Excuse me?

10   Q    You didn't tell Sergeant Ben about -- any of these heinous

11   acts that you've testified to, you didn't tell Sergeant Ben

12   about any of those acts committed by Aldo Brown?

13   A    Correct.

14   Q    As a matter of fact, you didn't tell anyone at the police

15   station about any unlawful acts, correct?

16   A    Correct.

17   Q    And that's because you knew you were guilty because you had

18   a gun, correct?

19   A    Not at all.

20        MS. ROMERO:  Objection, Judge.

21        THE COURT:  Okay.  Overruled.

22        MR. HERBERT:  I have nothing else, your Honor.

23        THE COURT:  Okay.  Any redirect?

24        MS. ROMERO:  Just briefly, your Honor.

25                    REDIRECT EXAMINATION

Howard - Redirect by Romero

1    BY MS. ROMERO:

2    Q   Mr. Howard, at the time that the defendant grabbed you by

3    the neck, did you feel like you were able to move around or

4    walk away?

5    A   No, I couldn't move around or walk away.

6    Q   Around that time, were you allowed to reach for your back

7    pocket by defendant?

8    A   I could reach for my back pocket, yes.

9    Q   When you were by the coolers?

10   A   Yes.

11   Q   And, in fact, did you do that?

12   A   Yes.  When he told me that give him whatever I had, yes.

13   Q   Did you try to use your hand to grab the defendant's gun at

14   any point when you were by the coolers?

15   A   No.

16       (Counsel conferring.)

17           MS. ROMERO:  I have nothing further, your Honor.

18           THE COURT:  Okay.  Anything on that?

19           MR. HERBERT:  Nothing.

20           THE COURT:  All right.  You can step down and be

21   excused.

22       (Witness excused.)

23           THE COURT:  And you can call your next witness.

24           MS. JENKINS:  Thank you.

25           The government calls Kristi Lyons.

```
1          (Witness enters courtroom.)
2              COURT SECURITY OFFICER:  Right up here and face the
3     judge.
4              THE COURT:  Please raise your right hand.
5          (Witness duly sworn and takes the stand.)
6              THE COURT:  Have a seat.
7              You may proceed.
8              MS. JENKINS:  Thank you.
9                  KRISTI LYONS, GOVERNMENT'S WITNESS, SWORN
10                          DIRECT EXAMINATION
11    BY MS. JENKINS:
12    Q    Good afternoon, ma'am.
13             In a loud, clear voice, can you please state your name
14    and spell your name for the Ladies and Gentlemen of the grand
15    jury -- of the jury.  Excuse me.
16    A    Kristi Lyons.  K-R-I-S-T-I.  L-Y-O-N-S.
17    Q    And, ma'am, what do you do for a living?
18    A    I'm an investigator with the Office of the Independent
19    Police Review Authority.
20    Q    And what is the Independent Police Review Authority?
21    A    The Independent Police Review Authority is a city agency
22    which investigates police misconduct, including excessive
23    force, police-involved shootings, death in custody, and verbal
24    abuse with bias.
25    Q    How long have you been an investigator with the city
```

Lyons - Direct by Jenkins

1    agency?

2    A    Approximately 16 years.

3    Q    Does your agency regularly work with any other federal

4    agencies in the Chicago area to investigate police misconduct?

5    A    Yes, we do.

6    Q    And which agency is that?

7              MR. HERBERT:  I'm going to object, your Honor.

8              THE COURT:  For relevance grounds?

9              MR. HERBERT:  Yes.

10             THE COURT:  I think that it goes to that third element

11   again, so it's overruled.

12   BY MS. JENKINS:

13   Q    You can answer.

14   A    We work with the Federal Bureau of Investigation.

15   Q    And, generally speaking, what are your responsibilities

16   with the Independent Police Review Authority?

17   A    I'm an Investigator Specialist, which is an

18   Investigator III.  My duties are to conduct investigations.  In

19   addition to that, as an Investigator III, you may be required

20   to run a shift, make notifications.

21   Q    Do you collect evidence as a part of your regular job

22   responsibilities?

23   A    Yes.

24   Q    I'd like to direct your attention, if I might approach the

25   witness, with what's been admitted as Government Exhibit 1.

Lyons - Direct by Jenkins

1    I'm going to hand you the disk and then ask you some

2   questions about it.

3   A   Okay.

4       (Tendered.)

5   BY MS. JENKINS:

6   Q   First, do you recognize that disk?

7   A   Yes.

8   Q   Prior to coming to court today, did you have the

9   opportunity to view the files, the video files, that are

10  contained on that disk?

11  A   Yes.

12  Q   And did you initial the items listed on the outside of that

13  disk -- or did you initial the outside of the disk?  Excuse me.

14  A   The outside of the disk?  Yes.

15  Q   And did you make those initials after you reviewed what was

16  contained on the disk?

17  A   Yes.

18  Q   What is depicted on the video files in Government Exhibit

19  1?

20  A   Video footage obtained from the Omar and Salma convenience

21  store.

22  Q   And where is that store located?  Just in what city?

23  A   Chicago.

24  Q   When did you first view the files on that video?

25  A   It would have --

Lyons - Direct by Jenkins

1   Q    Approximately.

2   A    The 29th of September, 2012.

3   Q    Okay.  And could you explain how you went about obtaining

4   those video files?

5   A    The files were obtained and downloaded onto a zip drive at

6   the store.

7   Q    Which was going to be my next question.  Where did that

8   downloading take place?

9   A    At the convenience store.

10  Q    As you sit here today, are you familiar with the police

11  officers who are depicted on that video?

12  A    Yes.

13  Q    Do you see any of those officers in the courtroom today?

14  A    Yes.

15  Q    Could you please look around the courtroom and identify any

16  of the officers that you see by an article of clothing?

17  A    By a blue striped tie.

18        MS. JENKINS:  And if the record could reflect the

19  in-court identification of the defendant.

20        THE COURT:  It will.  Thank you.  I couldn't see your

21  tie.  Thank you for moving --

22        THE DEFENDANT:  All right.

23        THE COURT:  Yes, it will.

24  BY MS. JENKINS:

25  Q    Now, directing your attention to October 2nd of 2012, did

Lyons - Cross by Herbert

1    you interview an individual by the name of Jecque Howard?

2    A    Yes.

3    Q    And do you remember approximately what time of day you

4    would have interviewed him?

5    A    Approximately 1:30 or 1:40 in the afternoon.

6    Q    During the course of your interview of Mr. Howard, did you

7    observe any injuries on him?

8    A    Yes, I did.

9    Q    Could you please explain or describe for the jury what you

10   observed?

11   A    There was a scab on Mr. Howard's left cheek.

12           MS. JENKINS:  We would tender the witness for

13   cross-examination.

14           THE COURT:  Okay.

15                        CROSS-EXAMINATION

16   BY MR. HERBERT:

17   Q    Good afternoon, Miss Lyons.  How are you?

18   A    Fine.  Thank you.

19   Q    You were asked questions about how your agency works with

20   the FBI.

21           Do you remember being asked those questions?

22   A    Yes.

23   Q    Okay.  And you reviewed some information concerning the

24   investigation of the matter against Aldo Brown?

25   A    Yes.

Lyons - Cross by Herbert

1  Q    Okay.  And are you aware of whether or not there was an FBI

2  investigation involving Aldo Brown on September 27th, 2012?

3  A    Not that I'm aware of.

4  Q    That would have been the day of the incident, the day in

5  which this arrest of Mr. Howard took place by my client.

6         My question to you, based on that, do you believe that

7  the FBI was investigating Officer Brown's actions on that

8  particular day?

9  A    I have no knowledge of that.

10 Q    Okay.  And, in fact, you did become aware of the fact that

11 the FBI started an investigation into Mr. Brown, correct?

12 A    Yes.

13 Q    Okay.  And do you remember when that was in relation to

14 September 27th, 2012?

15 A    Not specifically.

16 Q    Okay.  It would have been after that, correct?

17 A    Correct.

18 Q    Okay.  Likely weeks after that?

19 A    I won't say weeks.

20 Q    Okay.  Likely more than a week after that?

21 A    I can't say specifically.

22 Q    Okay.  Would it be fair to say that it was certainly at

23 least a day after the incident took place?

24 A    To the best of my recollection.  Our office didn't become

25 aware of the incident until after it took place.

Lyons - Cross by Herbert

1    Q    Okay.  And your office notified the FBI, correct?

2    A    Yes.

3    Q    Okay.  So they would have -- the FBI would have found out

4    after your office notified them, correct?

5    A    Correct.

6    Q    And that would have been at least a day after this

7    incident, correct?

8    A    Yes.

9    Q    You talked about that video files that you viewed on

10   September 29th, 2012.  And you viewed them at the store, 7600

11   South Coles?

12   A    Yes.

13   Q    Okay.  And that was the first time that you had seen that

14   video?

15   A    That specific video?  Yes.

16   Q    Okay.  And who was it that showed you the video?  Was it

17   somebody from the store?

18   A    To the best of my recollection, the store owner was

19   present, as well as a technician.

20   Q    Okay.  And you were not present on September 27th, 2012,

21   correct?

22   A    No, I was not.

23   Q    So obviously you don't know if the video accurately depicts

24   the events that happened on September 27th, 2012, correct?

25   A    Correct.

Lyons - Cross by Herbert

1    Q    And how is it that the video -- that the portion of the

2    video that is the government's exhibit, how is it that that

3    portion was chosen to be the selected video?

4            Do you understand that question?

5    A    No, I don't.

6    Q    It was not a good question.

7            When you went to download this video, was there

8    already a starting time and an ending time and you just

9    downloaded that time?

10           Is that any better?

11   A    No.

12   Q    Okay.  This video is about 13 minutes, I believe.

13           Did you see any video of events prior to where you see

14   the video start on the video at issue today?

15   A    I'm not understanding your question.

16   Q    Okay.  There's probably a good reason for that.  I'm not

17   asking a very good question.

18           Did you select -- strike that.

19           When you reviewed the video, was it a video of an

20   entire day's shift, a week's shift, or do you know?

21   A    To the best of my recollection, the video was from time

22   prior, which would -- which would have been prior to the

23   officers entering the store.

24   Q    Okay.  And I guess that was kind of along the lines of my

25   question.

Lyons - Cross by Herbert

1              So did you make the decision -- strike that.

2              Did you download the entire events captured on that

3     day?

4          (No response.)

5     Q    I'll withdraw it.

6              You talked about how there was footage of incidents

7     prior to the police officer -- police officers arriving on the

8     scene, correct?

9     A    Yes.

10    Q    Okay.  Was that information -- that depiction, was that

11    downloaded as well?

12    A    Yes.

13    Q    Okay.  And how much video was downloaded prior to the

14    police officers arriving?

15             When I say how much, time I guess would be the best.

16    A    I can't say specifically.

17    Q    Okay.  And was that video tendered by your office to the

18    FBI?

19    A    Every file that we downloaded was tendered.

20    Q    Okay.  Do you know how long it was that this video -- do

21    you know how long this video that was downloaded, how many

22    minutes it entailed?

23    A    Not specifically.

24    Q    Okay.  And you indicated that you saw a scab on

25    Mr. Howard's left cheek?

Lyons - Redirect by Jenkins

1   A    Correct.

2   Q    Do you remember where on his cheek it was?

3   A    I'm going to say somewhere near the jaw -- the cheekbone

4   area.  (Indicating.)

5   Q    Okay.  But was it in the cheek area as opposed to in the

6   temple area, I guess?

7   A    I can't say specifically.

8   Q    Okay.  Did Mr. Howard complain about any other injuries

9   other than that scab?

10  A    Yes.

11  Q    Okay.  What other injuries did he complain of?

12  A    He complained about pain to his rib area.

13  Q    Anything else?

14  A    Not that I could specifically recall.

15  Q    Okay.  Do you recall seeing any evidence of injury to his

16  rib area?

17  A    No, I don't.

18  Q    Okay.

19          MR. HERBERT:  Nothing further.

20          THE COURT:  Anything else?

21          MS. JENKINS:  Just very briefly.

22                      REDIRECT EXAMINATION

23  BY MS. JENKINS:

24  Q    Ma'am, do you remember on September 29th, 2012, when you

25  went into the store, do you remember meeting an individual

Lyons - Redirect by Jenkins

1   named Mohammad Salah?

2   A    Yes.

3   Q    And did you meet with that individual on September 29th,

4   2012 in relation to the video that you obtained?

5   A    He was present, yes.

6   Q    I'd like to ask you about some of the early questions that

7   counsel asked you about.

8            As a part of your job responsibilities with the

9   Independent Police Review Authority, is it your regular

10  practice or process to obtain police reports and other reports

11  related to incidences that your office is investigating?

12           MR. HERBERT:  I'm going to object.  It's outside the

13  scope of my cross.  I didn't talk about reports.

14           THE COURT:  I think you opened up -- I think you

15  opened up that area, so it's overruled.

16  BY MS. JENKINS:

17  Q    You can answer, if you know.  Or I can repeat the question.

18  A    Can you please repeat the question?

19  Q    Certainly.

20           Is it a part of your regular process or procedure to

21  obtain and review reports, such as arrest reports, connected

22  with matters that your office is investigating?

23  A    Yes.

24  Q    And do you regularly share those reports with other law

25  enforcement agencies?

Lyons - Redirect by Jenkins

1    A    Yes.

2    Q    In this particular instance, did you share the reports and

3    information you learned with the Federal Bureau of

4    Investigation?

5         MR. HERBERT:  I'm going to object.  I'm going to

6    object just to the form of "share."

7         THE COURT:  Okay.  Sustained.

8    BY MS. JENKINS:

9    Q    Did you share the information that you obtained surrounding

10   this particular incident with any other agency?

11        MR. HERBERT:  Objection.

12        THE COURT:  For the same word?

13        MR. HERBERT:  Yes.

14        THE COURT:  "Share"?

15        MR. HERBERT:  Yes.

16        THE COURT:  Okay.  I'll sustain that.  It's kind of an

17   interesting word you're using.  Try another one.

18   BY MS. JENKINS:

19   Q    Did you provide the information that you obtained from the

20   incidents we've been discussing with any other agency?

21   A    Yes.  The Independent Police Review Authority did provide

22   it.

23   Q    Which agency was that?

24   A    The Federal Bureau of Investigation.

25   Q    Thank you.

Lyons - Recross by Herbert

1      MS. JENKINS:  No further questions.

2      THE COURT:  Okay.  Anything on that?

3      MR. HERBERT:  Just very brief.

4      THE COURT:  Sure.

5                    RECROSS-EXAMINATION

6  BY MR. HERBERT:

7  Q   When did the internal -- I'm sorry, the Independent Police

8  Review agency tender these reports to the FBI?

9  A   I can't say specifically.

10 Q   Okay.  Can you say generally?

11 A   No, I can't.

12 Q   Okay.  Would it have been after your involvement with

13 the -- with the September 27th, 2012 incident?

14 A   Yes.

15 Q   Okay.  So -- and you've already testified that your office

16 was not involved in this until at least the day after that, a

17 day after September 27th, 2012, correct?

18 A   Yes.

19 Q   So the time in which these reports would have been tendered

20 to the FBI would have been certainly after -- at least more

21 than a day after the incident in question, correct?

22 A   Yes.

23      MR. HERBERT:  Nothing further.

24      THE COURT:  Anything on that?

25      MS. JENKINS:  No.

Lyons - Recross by Herbert

1          THE COURT:  Okay.  You may step down and be excused.

2      (Witness excused.)

3          THE COURT:  And, folks, you can take your afternoon

4   break until 3:00 o'clock, okay?

5          COURT SECURITY OFFICER:  All rise.

6      (Recess taken from 2:44 p.m. to 3:14 p.m.)

7      (In open court in the presence of the jury:)

8          THE COURT:  Okay.  You can all be seated when you get

9   settled there.

10          So I like to give you a little bit of sugar and maybe

11   a little caffeine in the afternoon to keep you motivated.

12          You should know that while you're serving your civic

13   duty, no calories count.

14      (Laughter.)

15          THE COURT:  That's the rule.  You can tell them

16   Judge Kendall's order said so.

17          All right.  You may proceed.

18          MS. JENKINS:  The government calls Andrea Hyfantis.

19      (Witness enters courtroom.)

20          THE COURT:  Up here, please.

21          COURT SECURITY OFFICER:  All the way up.  Up here.

22   Just step up here, face the judge.

23          THE COURT:  Okay.  Please raise your right hand.

24      (Witness duly sworn and takes the stand.)

25          THE COURT:  Okay.  Have a seat.

Hyfantis - Direct by Jenkins

1      ANDREA HYFANTIS, GOVERNMENT'S WITNESS, SWORN

2                    DIRECT EXAMINATION

3    BY MS. JENKINS:

4    Q   Good afternoon, ma'am.  Can you please state your name and

5    spell your entire name for the jury?

6              COURT SECURITY OFFICER:  Speak into the mic.

7              THE WITNESS:  Can I lower it?

8              THE COURT:  You can move it.

9              COURT SECURITY OFFICER:  It's adjustable.

10             THE WITNESS:  I'm very short.

11   BY THE WITNESS:

12   A   I'm Andrea, A-N-D-R-E-A, Hyfantis, H-Y-F-A-N-T-I-S.

13   BY MS. JENKINS:

14   Q   And, ma'am, where are you currently employed?

15   A   I'm employed with the Chicago Police Department at the

16   Education and Training Division.

17   Q   How long have you been employed with the Chicago Police

18   Department?

19   A   A little over 20 years.

20   Q   What is your current position?

21   A   My position title is attorney.

22   Q   And have you held that same position within the Chicago

23   Police Department during your entire 20 years with CPD?

24   A   Yes.

25   Q   Are you the only person employed in your current position

Hyfantis - Direct by Jenkins

1    as an attorney?

2    A    No.  There is one other person who has the same title code,

3    that does the same job.

4    Q    And what's the highest level of education that you

5    completed?

6    A    Juris Doctor.  An attorney.  I have a law degree and a

7    license.

8    Q    Could you please describe for the jury your basic job

9    responsibilities?

10   A    Primarily I provide legal training to recruits.  I also

11   provide legal training to in-service personnel, but primarily

12   my time is spent training people that want to become police

13   officers that are recruits.

14   Q    I'd like to start by talking with you for a few minutes

15   about the areas in which you train new Chicago Police

16   Department officers.

17        Are you familiar with the Chicago Police Department's

18   police academy?

19   A    Yes.  Police academy is just how commonly the Education and

20   Training Division is referred to.  It's the same thing.

21   Q    What is the police academy?

22   A    The training facility for recruits, where recruits would

23   get the basic training that they would need if they wanted to

24   be successfully hired as sworn police officers.

25   Q    Do you participate in any of the trainings at the police

Hyfantis - Direct by Jenkins

1   academy?

2   A   I provide the legal training.

3   Q   And are you an instructor?

4   A   I am an instructor, yes.

5   Q   Since when have you been an instructor at the police

6   academy?

7   A   My starting date was in June of 1995.

8   Q   And do new Chicago Police Department recruits receive other

9   kinds of training while at the police academy aside from your

10  area?

11  A   Yes.  The legal instruction is just one part of the

12  curriculum, so they would get training in physical skills, in

13  firearms, for example, as well.

14  Q   Approximately how many hours of legal training do you teach

15  at the academy?

16  A   Last count of the hours, 63 hours would be designated

17  towards law classes.

18  Q   And who is required to attend the law classes that you

19  teach?

20  A   All the recruits would be attending the law classes.

21  Q   Are recruits required to take any exams while they attend

22  the police academy?

23  A   Yes.  They're regularly tested on the subject matter that

24  they get while they're at the academy.

25  Q   Do you administer those exams?

Hyfantis - Direct by Jenkins

1   A    No.

2   Q    Which department administers the exams?

3   A    We have a separate unit called the Testing Unit.

4   Q    And are recruits tested on the courses that are covered by

5   your classes?

6   A    Yes.  The law classes are part of what they're tested on in

7   their regular tests.

8   Q    Can a recruit with the Chicago Police Department become a

9   sworn police officer without successfully completing the

10  academy?

11  A    If by "successfully completing" you mean maintain a test

12  average that shows they're successful with the exams?

13  Q    Let me phrase my question a little differently to make sure

14  that the answer is clear.

15        Can a recruit be sworn as a police officer without

16  successfully completing the exams as established by the exam

17  department?

18  A    I think the most accurate answer would be in order to sit

19  for the state test, to go on to qualify with the state to

20  become a sworn police officer, the recruit would have to have

21  an average of 70 percent cumulative from the regular exams.

22  Q    Okay.  Now, without getting into too much detail, I'd like

23  to just talk briefly about the kinds of topics, just generally,

24  that are covered by your law courses for new CPD recruits.

25  A    The subject matter is set by the state, by the State Police

Hyfantis - Direct by Jenkins

1    Board, so we have objectives that are mandatory that have to be

2    part of our curriculum.  The bulk of it would be spent on

3    understanding criminal law and criminal procedure, including

4    use of force, and then there are other subjects that are

5    mandated by the state that we train on.

6    Q    Does your course cover arrests, searches, and seizures?

7    A    There is a 16-hour block of instruction that has the title

8    of "Arrest, Search, and Seizure," which is about understanding

9    the Fourth Amendment and how it applies to police actions.

10   Q    I think you mentioned this, but does your course cover the

11   use of force?

12   A    There's a four-hour block of instruction with the title

13   "Use of Force," which includes the case law and statutes about

14   the justifications for the use of force, primarily deadly force

15   in the law classes, but all justifications for the use of

16   force.

17   Q    Ma'am, have you personally taught new recruits in all of

18   these areas that you've just highlighted since your time began

19   as an attorney for the Chicago Police Department?

20   A    Yes.

21   Q    Now, you mentioned there's another attorney who works with

22   you; is that correct?

23   A    Yes.

24   Q    And do the two of you work together with regard to teaching

25   recruits each and every year?

Hyfantis - Direct by Jenkins

1    A    Yes.  We typically just split the hours of the schedule for
2    the week, just divide it between ourselves.
3    Q    Did you personally teach at the police academy in the areas
4    that we've been discussing in 2002 and 2003?
5    A    Yes.  The core of the curriculum has been the same for the
6    20 years that I've been teaching there.
7    Q    Have the principles that you've taught in those years, are
8    they substantially similar to the courses that you teach today?
9    A    The courses are exactly the same.
10   Q    Do you remember the exact words that you would have used
11   for the training courses in 2002 and 2003?
12   A    I could only say with certainty that certain objectives
13   would be covered by each hour of law.  Those are the objectives
14   that are mandated by the state.  What would vary is potentially
15   how I try to explain the legal standards in more -- in layman's
16   terms.
17   Q    And is it fair to say that, as you sit here today, you
18   remember the general substance of the materials and principles
19   that you would have covered in 2002 and 2003?
20   A    Yes.  Again, the student performance objectives for each
21   hour are the beginning of each hour, and those main objectives
22   have not changed.
23   Q    In 2002 and 2003, were CPD officers trained about the
24   application of the Fourth Amendment to their jobs?
25              MR. HERBERT:  Objection with respect to CPD officers.

Hyfantis - Direct by Jenkins

1    Vague -- or relevance --

2            THE COURT:  Wait, wait, I have to -- I'm not sure I

3    heard you right.

4            Objection with what?  With respect to CPD officers.

5            MR. HERBERT:  Relevance as to other CPD officers --

6            THE COURT:  Fair enough.  All right.  Sustained.

7            You can verify.

8            MS. JENKINS:  I should phrase it --

9            THE COURT:  That's fine.

10           MS. JENKINS:  Thank you.

11   BY MS. JENKINS:

12   Q   In 2002 and 2003, were CPD recruits trained about the

13   application of the Fourth Amendment to their jobs?

14           MR. HERBERT:  Objection, Judge.  Same objection.

15   Relevance.

16           THE COURT:  Okay.  That's overruled, that one.

17           You may continue.

18   BY MS. JENKINS:

19   Q   You can answer.

20   A   Yes.  The block of instruction, the 16-hour block of

21   instruction that is titled "Arrest, Search, and Seizure" is all

22   about the Fourth Amendment and the legal standards in place.

23   Q   And without getting into too much detail, what are recruits

24   taught about who the Fourth Amendment applies to?

25   A   Well, the Fourth Amendment from the Bill of Rights is a

Hyfantis - Direct by Jenkins

1    protection for citizens against government.  Police are part of

2    government.  So the Fourth Amendment dictates basically what

3    authorities -- what police officers have the authority to do

4    and what the restrictions on their police powers are because of

5    the Constitution.

6    Q    Are police recruits and specifically were police recruits

7    in 2002 and 2003 instructed about whether their police power

8    permits them to violate the Fourth Amendment?

9    A    Yes.

10   Q    And how were they instructed on that topic?

11   A    That the Fourth Amendment prohibits them from violating

12   people's Fourth Amendment rights.

13   Q    I'd like to turn to the topic of use of force.

14        And to confirm, that is a topic that you cover over

15   the course of your law courses; is that correct?

16   A    Yes.

17   Q    Are you familiar with the term "use of force"?

18   A    Well, that phrase is the title of the block of instruction.

19   Q    Are recruits taught about the use of force in your course?

20   A    Recruits are taught the relevant case law regarding, and

21   statutes, regarding the justifications for the use of force.

22   Q    Were recruits in 2002 and 2003 taught about when they may

23   use force on a subject?

24   A    Yes.  That's what I mean by justifications, legally how an

25   officer could justify the use of force to accomplish an

Hyfantis - Direct by Jenkins

1    authorized act, defend one's self, resort to deadly force.

2    Q    And is it fair to say that in 2002 and 2003, recruits are

3    taught that they may not use force in all circumstances?

4    A    Recruits are taught that any use of force has to be

5    justified under the law.  So if by "all circumstances" you mean

6    without any justification, that would follow that they're

7    taught they have to justify their use of force.

8    Q    Okay.  Are recruits taught about their ability to use force

9    when a subject uses insulting words only?

10              MR. HERBERT:  Objection.

11              THE COURT:  I'm going to sustain that based upon the

12   jury instructions, okay?  It will be my job.

13              Thank you.

14              MS. JENKINS:  Thank you.

15   BY MS. JENKINS:

16   Q    I'd like to turn to one additional topic, ma'am, to talk

17   with you about.

18              Does your law course recover -- excuse me.

19              Does your law course cover report-writing with respect

20   to CPD recruits?

21   A    Well, we do have a class which has the title "Case

22   Preparation/Courtroom Testimony," which addresses the arrest

23   report and complaints and ties that into the court process.

24   Q    Did you teach -- did you and your partner teach that --

25   cover that course in 2002 and 2003 with recruits?

Hyfantis - Direct by Jenkins

1          MR. HERBERT:  Objection.  With respect to her partner.

2          THE COURT:  With respect to what?

3          MR. HERBERT:  Her partner.

4          THE COURT:  Oh, okay.  Fair enough.  Sustained.

5          MS. JENKINS:  I'll rephrase.

6   BY MS. JENKINS:

7   Q   Did you cover report-writing in 2002 and 2003 with new CPD

8   recruits?

9   A   I guess I couldn't say with certainty that, because we're

10  breaking down the schedule by how many hours have to be taught

11  that week.  It could be possible within that time frame that I

12  just didn't happen to have that class.

13  Q   Well, let me back up and ask you a question about that.

14          Do you and the other attorney who works with you, do

15  you work together to formulate lesson plans for each and every

16  class of recruits?

17  A   Yes.

18  Q   For the year 2002 and 2003, did you work to formulate a

19  lesson plan for recruits in the academy that covered

20  report-writing?

21  A   There is a lesson plan, and the same lesson plan would be

22  used whether I'm instructing the class or someone else is

23  instructing the class.

24  Q   Regarding your report-writing courses to new recruits,

25  specifically in 2002 and 2003, were recruits taught about the

Hyfantis - Direct by Jenkins

1    importance of accuracy in their reports?

2              MR. HERBERT:  Objection.

3              THE COURT:  Basis?

4              MR. HERBERT:  Relevance and foundation for accuracy.

5              THE COURT:  Okay.  Relevance is overruled.  Foundation

6    for accuracy is sustained.

7              You can define.

8    BY MS. JENKINS:

9    Q    Ma'am, when -- focusing on the time frame of 2002 to 2003

10   with regard to report-writing, were recruits taught about how

11   to prepare CPD reports in connection with their job

12   responsibilities?

13   A    I have to answer in terms of the legal standards that we

14   instruct related to the subject matter.  So in law classes

15   related to complaints and arrest reports, involves

16   understanding that the complaint should describe the facts that

17   support why it's reasonable the person should be taken into

18   custody, and the arrest report should be a document that is one

19   in which they're describing the circumstances that would

20   support the charge, so describing those circumstances

21   truthfully to the best of their ability.

22   Q    And when you say describe the facts, are -- and were in

23   2002 and 2003 -- were police recruits taught about the

24   importance of accuracy in documenting the events you just

25   described in a complaint and arrest report?

Hyfantis - Direct by Jenkins

1      MR. HERBERT:  Objection, Judge.  It's the same

2   question that was asked earlier.

3      THE COURT:  Okay.  I don't think so, because she was

4   laying a foundation.

5      But is your objection to the term "accuracy"?  Is that

6   what your objection is to?

7      MR. HERBERT:  Yes.  Yes.

8      THE COURT:  I'm going to overrule that and let her

9   define it.

10  BY MS. JENKINS:

11  Q   You can answer the question.

12  A   Am I being asked to define "accuracy"?

13     THE COURT:  No.  Do you want me to repeat the question

14  for you?

15     MS. JENKINS:  If you could, although --

16     THE COURT:  Sure.

17     (Reading:)  And when you describe the facts, are --

18  and were in 2002 and 2003 -- were police recruits taught about

19  the importance of accuracy in documenting the events you just

20  described in the complaint and arrest report?

21  BY THE WITNESS:

22  A   I guess I'm a little unclear about exactly what you mean by

23  "accuracy," as that would be different than I think I said

24  describing the circumstances truthfully that would support the

25  basis of the charge.

Hyfantis - Direct by Jenkins

1   BY MS. JENKINS:

2   Q    I'm happy to ask the question in a way that's consistent

3   with the words you just used.

4           Are police officers taught and were they taught in

5   2002 and 2003 to provide truthful information in the reports

6   that they prepared?

7   A    Yes.

8   Q    Okay.  Are officers trained on the subject of putting false

9   information in reports?

10  A    Well, in the context of any document that's under oath,

11  providing false information could be the basis of perjury

12  charges.

13  Q    Miss Hyfantis, do you instruct officers on the ways in

14  which various reports that they prepare could be used in future

15  proceedings?

16  A    In the context of an arrest report and a criminal

17  complaint, absolutely.  Those documents are going to be used in

18  criminal court.

19  Q    What do you explain to recruits about that?

20  A    Can you be more specific?

21  Q    Is the topic of the use of, for example, an arrest report,

22  the future use of that report, is that discussed in your class?

23  A    Well, in addition to recognizing that any statements that

24  are made under oath that are false could be the basis of

25  perjury.  Recognizing that that document that they're preparing

Hyfantis - Direct by Jenkins

1   ultimately is going to be used in criminal court, they may have

2   to testify about what's within the report as -- what's within

3   the report being truthful.

4   Q   Are -- were police -- were police recruits in 2002 and 2003

5   trained that arrest reports could be used by the Cook County

6   State's Attorney's Office?

7           MR. HERBERT:  I'm going to object.

8           THE COURT:  Okay.  It's overruled.  It's going to go

9   to that third element again, and then we'll see what happens

10  with it.

11  BY MS. JENKINS:

12  Q   In 2002 and 2003, were police recruits taught that their

13  reports -- including, for example, an arrest report -- could be

14  used by the Cook County State's Attorney's Office?

15  A   Yes.  That's what I meant by in criminal court.

16  Q   Same question as to the United States Attorney's Office.

17  A   Well, officers are informed that their actions could be the

18  basis of lawsuits and allegations of criminal wrongdoing.

19  Q   In 2002 and 2003, were recruits taught that their

20  reports -- including, for example, arrest reports -- could be

21  used by other law enforcement agencies?

22          MR. HERBERT:  Objection.

23          THE COURT:  Basis now?

24          MR. HERBERT:  Vague.

25          THE COURT:  Okay.  We can be specific.  Foundation it

Hyfantis - Direct by Jenkins

1  will be.  Sustained.

2  BY MS. JENKINS:

3  Q   Are police recruits taught and were they taught in 2002 and

4  2003 that reports that they author, including arrest reports,

5  could be used by the Federal Bureau of Investigation?

6        MR. HERBERT:  I'm going to object to the vague nature

7  of "be used" by the federal government.

8        I don't mean to be nit-picky, but I think it's an

9  important point.

10        THE COURT:  Okay.  All right.  I'll sustain the

11  objection, and you can rephrase.

12  BY MS. JENKINS:

13  Q   In 2002 and 2003, were recruits taught that police reports

14  that they author could be reviewed or seen by the Federal

15  Bureau of Investigation?

16        MR. HERBERT:  I'm going to object.  Same objection,

17  your Honor.

18        THE COURT:  Okay.  I think that one is fine, so

19  overruled.

20  BY THE WITNESS:

21  A   Officers are definitely trained that they can be sued and

22  they can be prosecuted for violating people's civil rights.  A

23  prosecution would be federal in those cases.  And logically

24  that involves understanding that anything in the course of an

25  investigation of an allegation of a federal offense would

Hyfantis - Cross by Herbert

1    involve scrutinizing their paperwork.

2         (Counsel conferring.)

3              MS. JENKINS:  Tender the witness for

4    cross-examination.

5              THE COURT:  Okay.

6                        CROSS-EXAMINATION

7    BY MR. HERBERT:

8    Q    Good afternoon.

9    A    Good afternoon.

10   Q    How are you?

11   A    Fine.  How are you?

12   Q    Good.  Thank you.

13             With respect to that last question, I want to make

14   sure I got what you said correct.

15             You were asked questions about how reports could be

16   reviewed by the -- by the FBI and that officers were instructed

17   that they could be sued and charged criminally?  That was the

18   basis of the question?

19   A    Yes.  That's the subject of one of the courses.

20   Q    Okay.  And I think, and correct me if I'm wrong, but you

21   stated that they could be charged criminally if they knew that

22   they were providing false information?  Was that your

23   testimony?

24        (No response.)

25   Q    You mentioned -- strike that.

Hyfantis - Cross by Herbert

1    A    Yeah.

2    Q    I believe you mentioned the word --

3    A    Well --

4    Q    -- "knowingly," if you did it knowingly, I believe is what

5    you said.  You talked about a mental state just a minute ago.

6    Correct?

7    A    I'm not sure exactly how I worded it.  But, just plainly,

8    officers would be trained that providing false information on a

9    false report could be the basis of criminal allegations.

10   Q    Okay.  And obviously it would have to be with a certain

11   mental state that they knowingly provided false information --

12            MS. JENKINS:  Objection, your Honor.

13            THE COURT:  Yeah, that's sustained.

14   BY MR. HERBERT:

15   Q    You were talking about how reports that are filled out by

16   police officers could be used by the Cook County State's

17   Attorney's Office, correct?

18   A    Yes.

19   Q    Okay.  And I believe you said that that was for the

20   prosecution of the offense in which the arrest report was

21   prepared for, correct?

22   A    I was trying to put it in -- the way I was describing the

23   use of the arrest report and the complaint was intended to

24   describe how it's formally covered in the lesson plan, the use

25   of the paperwork that they do in making arrests, and how that's

Hyfantis - Cross by Herbert

1    used by the State's Attorney to prosecute that defendant in
2    criminal court.
3    Q    Okay.  So the information let's say about an individual
4    being in possession of marijuana or in possession of a gun,
5    that information would go to the State's Attorney's Office for
6    prosecution of that individual charged with those offenses.
7    A    Yes.
8    Q    Okay.  And you also talked about the arrest report and how
9    it needs to -- the information contained within the arrest
10   report needs to support the charges.
11        Do you remember saying something along those lines?
12   A    Yes, I think I said describe the circumstances that support
13   the charge.
14   Q    Okay.  And that would involve -- I'll give you a scenario.
15   An individual that is found to be in possession of a bag of
16   marijuana in his pocket and found to be in possession of a
17   loaded gun.
18        The information contained in that arrest report would
19   be how the police officers recovered the weapon from the
20   individual, correct?
21        MS. JENKINS:  Objection, your Honor.  He's posing a
22   hypothetical to a witness who has not been qualified to give an
23   opinion.
24        THE COURT:  It's not a 702 witness, and it's
25   speculation otherwise, so sustained.

Hyfantis - Cross by Herbert

1    BY MR. HERBERT:

2    Q    You were asked about your use of force and then the classes

3    that are taught.

4              And I believe you talked about how there's

5    justifications -- they have to justify their use of force.

6    Correct?

7    A    Yes.  Anyone would have to justify their use of force.

8    Q    Okay.  So obviously implicit in that answer is the fact

9    that police officers are allowed to use force, correct?

10   A    Police officers are authorized to use a reasonable and

11   necessary amount of force to accomplish any authorized act,

12   defend themselves, defend another person.

13   Q    Okay.  Defend themselves, defend another person, such as

14   any other person, their partner?

15   A    Yes.

16   Q    Okay.  And that force could be up to and including deadly

17   force.  You talked about how you teach that.  Correct?

18   A    Yes.  We teach the legal justifications in Illinois on

19   deadly force, yes.

20   Q    And deadly force is what?

21   A    The statutory description is force likely to result in

22   death or great bodily harm.

23   Q    Okay.  And with respect to the classes, you said that

24   there's 63 hours of law classes, and you split that up with

25   your co-worker, correct?

Hyfantis - Cross by Herbert

1    A    Typically, yes.

2    Q    Okay.  So it would be fair -- first of all, do you know my

3    client Aldo Brown?

4    A    He looks familiar.  I don't know him beyond that.

5    Q    Okay.  As we sit here today, do you have any -- any

6    independent knowledge of whether you specifically taught a

7    class in which Aldo Brown was present at?

8    A    No.  I couldn't remember that.

9    Q    Okay.  With respect to your training on use of force, does

10   that include -- you talked about how it references specific

11   cases concerning use of force.  Correct?

12   A    There are two big United States Supreme Court cases that

13   preface the lesson plans.

14   Q    Okay.  What are those?

15   A    Or are included in the lesson plans, I should say.

16          MS. JENKINS:  Objection, your Honor.

17          THE COURT:  Sustained on the cases from the Supreme

18   Court.

19          MR. HERBERT:  Okay.  Nothing further.

20          THE COURT:  Okay.  Any redirect?

21          MS. JENKINS:  No.

22          THE COURT:  All right.  You may step down and be

23   excused.

24      (Witness excused.)

25          THE COURT:  And you can call your next witness.

1          MS. JENKINS:  Your Honor, there is -- the next witness

2     is here, but there is an issue we would like to take up briefly

3     at sidebar before --

4          THE COURT:  Okay.

5       (At sidebar outside the hearing of the jury:)

6          THE COURT:  Okay, what's the problem?

7          MS. JENKINS:  Your Honor, the next witness that the

8     government is going to call is Yolanda Hatch.  She is the

9     report-writing instructor at the academy.

10         One of the topics that she is going to cover is the

11    tactical response reports and report-writing, which is the

12    basis of Count 2 in the indictment.

13         Miss Hatch -- Officer Hatch would testify that she has

14    been a trained police officer since 1995, that tactical

15    response reports came into being in 2002 and 2003, but that she

16    did not become the trainer for report-writing until 2005, which

17    means that she would not have been the actual instructor in

18    Officer -- the defendant's class at the time he would have been

19    instructed on that.

20         However -- and I raise this because I fronted it with

21    counsel that we would elicit from her information about how

22    tactical response reports are written and how they are to be

23    prepared, and that tactical response reports have had the same

24    format and have required the same information since they were

25    introduced in 2002, that all new -- all officers, no matter

1    when they joined CPD, would have been trained on how to use

2    tactical response reports once they became routine with the

3    Chicago Police Department.

4            THE COURT:  And what's her basis for knowing that?

5            MS. JENKINS:  Her basis for knowing that is because

6    she personally would have been trained on, as a CPD officer, on

7    how to use tactical response reports --

8            THE COURT:  How does she know they've never been --

9    they've never changed since the beginning of their initiation?

10           MS. JENKINS:  I stepped out into the hallway with her

11   and showed her a blank tactical response report form, which is

12   the form that I would seek to have her walk through the jury

13   with.  And I asked her is this the form that tactical response

14   reports has always had, and her answer was yes.  It's my

15   understanding that these reports have only been around since

16   2002, and that the format, although -- the format of the report

17   has not changed, although the method by which officers provide

18   that information has changed.  In other words --

19           THE COURT:  But the basis for her statement of "yes"

20   is that she herself has filled them out and was trained on the

21   report?

22           MS. JENKINS:  And that beginning in 2005, she trained

23   officers on how to -- on how to prepare it.

24           And from the government's perspective, that testimony

25   is permissible and would go to weight and not -- would go to

1    the weight of her testimony and not its admissibility.  Counsel

2    is certainly free to cross her on the fact --

3              THE COURT:  And he will.

4              MS. JENKINS:  -- just as he did with Hyfantis, that

5    Officer Hatch does not recognize Mr. Brown and would not know

6    whether he sat in the class and doesn't know what the

7    instructor prior to her would have said or would not have said.

8              THE COURT:  Okay.  Your answer?

9              MR. HERBERT:  My answer is that I am fine with her

10   testifying, but then I want John Farrell to testify on exactly

11   the same basis.

12             John Farrell can testify that Aldo Brown received this

13   training --

14             THE COURT:  Because he was a trainer who trained on

15   the -- this report?

16             MR. HERBERT:  Trainer who trained on the use of force,

17   yes.

18             THE COURT:  No, no, no, no.  I'm talking about this

19   report now.

20             MR. HERBERT:  Right.  It's a separate -- it's a

21   separate fact.  But I'm saying if this witness is allowed to

22   come in, even though she did not teach Aldo Brown, to talk

23   about how she knows that police recruits were trained on this

24   report, that's fine, but then --

25             THE COURT:  I think that's a different answer than she

1    said she's going to elicit.

2          She's going to elicit that since 2005, they're trained

3    on this report, and based upon her being an officer who was

4    also trained on it, this is the report she's always used.  And

5    that's all she can say.  She can't say that the officers were

6    trained on it in 2000 or 2001 or '02.  She doesn't have that

7    knowledge.  She can only say what she personally was trained

8    on.  So she can't get that far.

9          So is Officer Farrell going to say, like this officer

10   just stated, that -- I don't know why I can't remember this

11   woman's name.

12          MS. JENKINS:  Hyfantis.

13          THE COURT:  Hyfantis.  Can he say I trained recruits

14   on this report back in 1999 up till 2005?  Is that what you

15   think he can do?

16          MR. HERBERT:  He can -- I don't know about recruits.

17   He might be able to.  I don't know.  He teaches use of force

18   all over the country.

19          THE COURT:  But why are we on use of force?  We're

20   talking about the report.

21          MR. HERBERT:  Oh, I might have confused everybody.

22          John Farrell is not going to talk about TRRs.  He's

23   going to talk about use of force.

24          I'm just saying that this is, to me -- correct me if

25   I'm misreading it -- but this I think clearly opens the door

1  for John Farrell to testify.  Based upon exactly the same

2  explanation that the government used to get her to testify in

3  this report, I think it opens the door for John Farrell to

4  testify on his report.

5         MS. JENKINS:  I guess just to briefly clarify, I am

6  not going to be asking Officer Hatch about the actual tactical

7  response report that Officer Brown completed after this

8  incident.  I'm going to be asking her about the basic

9  principles that officers are trained on when they are taught

10  how to complete the report.  I'm not asking her to form any

11  opinions or do anything with regard to the actual report that

12  we will admit into evidence at a later time.  I'm talking about

13  a blank report and how to complete it fully and accurately in

14  order for it to be submitted and approved.

15         THE COURT:  Okay.  Go ahead with your testimony.  It

16  goes to the weight for the beginning.  I'll hear what she says.

17  I'll listen to a motion if you think that it opens the door to

18  Farrell.  I didn't hear it, but maybe it did.  So let's get

19  started.

20      (Sidebar proceedings concluded.)

21      (Witness enters courtroom.)

22         THE COURT:  Please raise your right hand.

23      (Witness duly sworn and takes the stand.)

24         THE COURT:  Okay.  Have a seat.

25         And you may proceed.

```
 1              MS. JENKINS:  Thank you, your Honor.
 2             YOLANDA HATCH, GOVERNMENT'S WITNESS, SWORN
 3                       DIRECT EXAMINATION
 4   BY MS. JENKINS:
 5   Q    Good afternoon, ma'am.
 6            In a loud, clear voice, can you please state your name
 7   and spell your entire name for the jury?
 8   A    Yes.  My name is Police Officer Yolanda, Y-O-L-A-N-D-A,
 9   Hatch, H-A-T-C-H.
10   Q    And, Officer Hatch, where are you currently employed?
11   A    I work at the Education and Training Division, which is the
12   Police Academy.
13   Q    And is that for the Chicago Police Department?
14   A    Yes, it is.
15   Q    How long have you been employed with the Chicago Police
16   Department?
17   A    I've been employed for 20 years.
18   Q    When approximately were you sworn as a Chicago police
19   officer?
20   A    I was sworn in August of 1995.
21   Q    What is your current position within the police department?
22   A    My current position is an instructor for recruit training
23   at the Education and Training Division.
24   Q    And how long have you served in that role?
25   A    I've been an instructor for ten years.
```

Hatch - Direct by Jenkins

1   Q   Can you describe your basic job responsibilities with

2   regard to being an instructor at the academy?

3   A   My responsibilities are as an immediate supervisor of

4   police recruits, and my main job is that of an instructor.

5   Q   Is there a particular topic that you teach in your course?

6   A   What I teach on a daily basis would be patrol procedures,

7   case reporting, and integrated exercises.

8   Q   And when you say "case reporting," what do you mean?

9   A   Well, when a police officer has probable cause to effect an

10  arrest, afterwards there has to be a report that has to be

11  written.  Not always an arrest, but if an incident occurs, we

12  have to be able to report that incident.  That, in turn, would

13  be case reporting.

14  Q   How long -- I'm sorry, in the ten years that you've taught

15  case reporting, has the curriculum changed substantially?

16  A   It has not.

17  Q   Has CPD -- what is the system that CPD uses to effectuate

18  or accomplish their case reporting?

19  A   We now use an AIRA system, which is the Automated Incident

20  Reporting Application.  That came into existence within the

21  last five years.  Beforehand, it was actual physical reports.

22  Q   So is it fair to say that in the last five years, the

23  reporting system used by CPD is now electronic?

24  A   It is electronic.

25  Q   Prior to that time, how was case reporting done?

Hatch - Direct by Jenkins

1    A    We would either use -- when I came on the job, we would use

2    typewriters or we would use word processors or there were

3    actual physical reports, so we would write them out by hand.

4    Q    Officer Hatch, did you have to attend the CPD academy when

5    you were first hired by the Chicago Police Department?

6    A    Yes, I did.

7    Q    And what year did you attend the academy?

8    A    I attended the academy from August 7th of 1995 to

9    January -- January 20th, 1996.

10   Q    So that's approximately six months long?

11   A    Yes.

12   Q    Did you participate in a student -- as a student in the

13   report-writing course when you were enrolled in the academy?

14   A    Yes, I did.

15   Q    Has the report-writing curriculum changed substantially

16   since that time?

17   A    It had not changed as far as how we report crimes, no.

18   Q    Has the format by which those reports are generated?

19   A    The format has changed, yes.  It is now electronic.

20   Q    Are newly hired recruits required to attend the police

21   academy's report-writing course?

22   A    Yes, they are.

23   Q    How -- approximately how many hours of report-writing or

24   case reporting are recruits required to attend?

25   A    We now have 30 hours of case reporting.

Hatch - Direct by Jenkins

1    Q    Do you teach all 30 hours?

2    A    Yes.

3    Q    Are recruits tested on report-writing or case reporting, as

4    you referred to it?

5    A    There are only two hours that we give, which are the

6    introductory hours, and we explain our case reporting process.

7    But there are test questions that they use or that they have

8    throughout the course of the time they're in the academy, but

9    not specifically for case reporting.

10   Q    Do you personally administer any of the tests regarding

11   case reporting to new recruits?

12   A    I do not.

13   Q    Which department does that?

14   A    We have a section called Quality Control.  Instructional

15   Design and Quality Control.  That is their function.

16   Q    Are you aware of whether or not case reporting is a subject

17   on which recruits are tested?

18   A    Yes, I am aware.

19   Q    And are they?

20   A    Yes.

21   Q    Is report-writing or case reporting the only subject on

22   which recruits are tested?

23   A    No.

24   Q    What else are they tested on, just generally?

25   A    There are only a few questions regarding case reporting.

Hatch - Direct by Jenkins

1    Q    So I'd like to talk with you about the substance of the

2    report-writing course that you teach.

3              What are the topics or components of case reporting

4    that you teach to new recruits?

5    A    We specifically go over crimes.  We talk about knowing the

6    elements of each crime and making sure that you are giving an

7    actual and factual account of the incidents that occur.  We

8    also have an introductory where we introduce our case reports,

9    so there are certain hours in which we actually talk about

10   specific case reports.

11   Q    In your course, do you generally teach recruits how to

12   write reports?

13   A    Again, we -- we don't teach English.  We don't teach the

14   English language.  But what we do is we specifically have them

15   give an account, an actual and factual account, of any incident

16   that we bring up.

17   Q    Does your course cover what kinds of information should --

18   should be included in reports that officers will complete?

19   A    Yes.

20   Q    Do you review and teach in your course on how officers are

21   to obtain approval on the reports that they prepare?

22   A    Approval is given by the supervisor.  So, yes, we will tell

23   them once you've submitted your report, at that point that is

24   when a supervisor will be able to review it, and then they will

25   accept it.

Hatch - Direct by Jenkins

1    Q    And are you -- do you teach recruits and has your course

2    taught recruits on when to use particular reports?

3    A    Yes.

4    Q    I'd like to spend a few minutes talking with you about a

5    couple of types of reports.  And I would like to start with the

6    arrest report.

7              Are you familiar with Chicago Police Department's

8    arrest report?

9    A    Yes.

10   Q    Do you teach recruits about how to prepare and submit

11   arrest reports?

12   A    Yes.

13   Q    What is an arrest report?

14   A    An arrest report is after the person -- after there's

15   probable cause to believe that a crime has been -- occurred, an

16   arrest report then has to be written once you take that person

17   into custody.  And the information that's included on the

18   arrest report is all of the subject's information -- at this

19   point, they're an arrestee -- all of their information and then

20   the probable cause as to how that person has been arrested.

21   Q    What do you instruct recruits about when an arrest report

22   should be made?

23   A    It should be made after an actual arrest.

24   Q    How soon after?

25   A    Immediately after.

Hatch - Direct by Jenkins

1  Q   And why is that?

2  A   There are reports that have to be submitted.  There's a due

3  process, which means that immediately after that person's

4  arrest, then they -- they're taken into custody, reports are

5  written, and then they have to be available for -- they have to

6  be available to let for bail.  So afterwards there's a process

7  that we go to.  We take them into the processing center, which

8  could be a district station.  All of the reports are then

9  written, and then they have to be submitted, and then that

10  person is then taken into the lock-up, and they're

11  fingerprinted and photographed.

12  Q   So is it fair to say then that arrests -- that new recruits

13  are taught that arrest reports should be made as soon as

14  possible following a suspect's arrest?

15  A   Yes.

16          MR. HERBERT:  Objection.  Leading and relevance.

17          THE COURT:  Okay.  I'm going to sustain the objection

18  on leading, because it's not your testimony.  And it is

19  relevant.  So that part is overruled.

20  BY MS. JENKINS:

21  Q   Officer Hatch, is an arrest report one of the reports

22  that's prepared on CPD's automated system?

23  A   Yes.

24  Q   Now, are arrest reports prepared at the scene of the arrest

25  or somewhere else?

Hatch - Direct by Jenkins

1    A    They would be when you've actually physically taken that

2    person into the processing center.

3    Q    So where would that be, for example?

4    A    That would be in a district station or an area, unit area.

5    Q    Who prepares an arrest report?

6    A    That would be the arresting officer.

7    Q    Can there be more than one arresting officer?

8    A    Yes.

9    Q    In circumstances where there's more than one arresting

10   officer, should there be more than one arrest report?

11   A    Only one arrest report per arrestee.

12   Q    What do you teach recruits about what should be contained

13   in an arrest report?

14   A    Again, all of the relevant information for the subject and

15   the probable cause, meaning what were the actions of the actual

16   arrestee and did they commit that particular crime, all of that

17   information would be in the narrative of an arrest report.

18   Q    Do arrest reports contain a narrative section?

19   A    Yes.

20   Q    And who completes the narrative section of an arrest

21   report?

22   A    That would be the arresting officer.

23   Q    Are recruits -- are recruits trained about whether an

24   arrest report must contain a description of all of the acts of

25   the offender?

Hatch - Direct by Jenkins

1          MR. HERBERT:  Objection.  Vague.

2          THE COURT:  I'm going to overrule that.  I think that

3     all of the acts are important.

4          So you may answer the question.

5     BY THE WITNESS:

6     A    The actual -- again, the actual probable cause goes into

7     the arrest report.  There are several reports that are written.

8     Everything that is relevant to that actual arrest would go in

9     an arrest report.

10    BY MS. JENKINS:

11    Q    Do you -- do you instruct recruits about identifying

12    assisting officers in their arrest reports?

13    A    Yes, if --

14    Q    What is an assisting officer?

15         MR. HERBERT:  I'm going to object, Judge.  Relevance.

16         THE COURT:  Overruled.

17    BY MS. JENKINS:

18    Q    You can answer.

19    A    That would be the officer working in conjunction with the

20    actual arresting officer.  There could be two.  There -- and

21    anyone other than that person's partner, they will be included

22    in the arrest report as an assisting.

23    Q    So the name or identifying information of an assisting

24    officer should be included in an arrest report?

25    A    Yes.

Hatch - Direct by Jenkins

1          MR. HERBERT:  Objection, Judge.

2          THE COURT:  What is the basis this time?

3          MR. HERBERT:  It's leading and it's foundation.

4          THE COURT:  Okay.  Leading is sustained.  You have to

5     let your witness testify.  But it is -- there's no foundation

6     problem here.  And it is relevant.

7          So you may answer.

8     BY THE WITNESS:

9     A    Additional information or -- excuse me.  The information

10    for the actual officers would be in the arrest report, would be

11    in the narrative portion of the arrest report.

12    BY MS. JENKINS:

13    Q    Now, does an arresting officer that prepares the arrest

14    report sign that report?

15    A    Because it's electronic, he would not physically sign it.

16    There is a number that identifies all of us as police officers,

17    and we call that a PC number.  That number would then go into

18    that actual report, also the officer's name and the officer's

19    star number that identifies them.

20    Q    So does an officer physically take an arrest report out and

21    physically sign the document?

22    A    It would be -- it would be electronic.

23    Q    The signatures are electronic.  Is that right?

24    A    Not the -- the actual signature would be that officer's

25    number when they actually sign on to the system.

Hatch - Direct by Jenkins

1    Q    How is an arrest report -- let me back up.

2         Who approves arrest reports?

3    A    The arrest report would be approved by either a commander,

4    a watch commander, or it would be the station supervisor.

5    Q    And how is it approved, meaning how is an arrest report

6    approved?

7    A    Electronically.

8    Q    Are you familiar -- what do you instruct recruits

9    concerning the process by which a supervisor will approve an

10   arrest report?

11   A    We simply give them instructions stating the information

12   that's put on the report.  It is then submitted electronically.

13   And then you will wait for the approval of the supervisor,

14   which would be immediate.

15   Q    Are recruits trained on whether supervisors will -- are

16   responsible, excuse me, for determining the accuracy or

17   truthfulness of information contained in an arrest report?

18   A    No.  The supervisors approve the reports, but the accuracy

19   and the information that's actually included on the report

20   would be the police officer's responsibility.

21   Q    And when you say the police officer's responsibility, what

22   do you mean?

23   A    Meaning the supervisor would not always have the

24   opportunity to read every report.  However, the probable cause

25   must be there in order for the supervisor to approve it.  So

Hatch - Direct by Jenkins

1    for an arrest report, yes, the information should be accurate.

2    Again --

3    Q    You can finish your answer.  I did not mean to --

4    A    Again, they will -- they will make sure that the probable

5    cause is there in order for them to approve that report.

6    Q    Who is responsible for providing the accuracy of the

7    information contained in an arrest report?

8    A    That would be the police officer.

9    Q    And specifically the arresting officer, the assisting

10   officer, which officer?

11   A    That would be the arresting officer.

12   Q    Does your course touch upon the importance of accuracy in

13   arrest reports?

14   A    Yes, we do.

15   Q    What do you teach officers about the need for accuracy in

16   arrest reports?

17   A    In our introductory hours, again, we explain the case

18   reporting, we explain how important it is, how you must know

19   the law, and how it is extremely important to have actual and

20   factual information included on those reports.

21   Q    I'd like to switch gears, if we could, to talk about

22   another kind of report.

23          Officer, are you familiar with what's known as a

24   tactical response report?

25   A    Yes.

Hatch - Direct by Jenkins

1    Q    Do you know approximately when a tactical response report

2    came to be within the Chicago Police Department?

3    Approximately.

4    A    Approximately, I would say it was over ten years.

5    Q    Okay.  So were tactical response reports used when you

6    began teaching at the academy in 2005?

7    A    No.

8    Q    Prior to your becoming an instructor on case reporting, did

9    you learn how to complete tactical response reports?

10   A    Before, no.

11   Q    But when tactical response reports were implemented by the

12   Chicago Police Department, did you receive training and learn

13   how to complete tactical response reports?

14   A    Yes, we did.  When it came into existence, yes, we did.

15   Q    And just to clarify, at the time that you began teaching

16   the course in -- the training course in 2005, did you teach new

17   recruits how to use and complete tactical response reports?

18   A    I have taught tactical response in the last five years.

19   Q    Let me start with this:  What is a tactical response

20   report?

21   A    That is a report that must be written any time there is an

22   allegation of physical violence from a police officer or from a

23   subject, any time that a police officer discharges a weapon, or

24   any time a police officer discharges -- if they use any type of

25   force or if there's alleged force that was used on a subject.

Hatch - Direct by Jenkins

1    If a person complains that they believe that they've been

2    injured by a police officer, that report must be written.

3    Q    So let me break that down just a little bit for the jury.

4         What's the purpose of a tactical response report?

5    A    It is physical -- it is any time a police officer and a

6    subject become physical outside of an actual -- outside of an

7    actual physical arrest, meaning if a police officer was to

8    place handcuffs on a person in conjunction with an arrest, it

9    would not need to be written.  If a subject alleges that a

10   police officer used physical force, then a report has to be

11   written.

12   Q    And specifically a tactical response report has to be --

13   A    Yes.

14   Q    -- written?

15        Who -- who authors a tactical response report?

16   A    That would be the actual physical officer that was

17   involved.

18   Q    May there be only one tactical response report per

19   incident?

20   A    No.

21   Q    How many could there be?

22   A    However many subjects there are.

23   Q    Is the tactical response report one of the reports prepared

24   on the police department's automated system?

25   A    Yes.

Hatch - Direct by Jenkins

1  Q   Is a tactical response report prepared at the scene of the

2  incident?

3  A   No.

4  Q   Where is it prepared?

5  A   Once they're -- that person is arrested and they're

6  processing, then it has to be written.

7  Q   Who prepares the tactical response report?

8  A   That would be the actual officers that were involved in any

9  contact with the subject.  If there were multiple officers,

10  there would be multiple reports.

11  Q   I'd like to show, just you, what's been marked for

12  identification as Government Exhibit 9, which should appear on

13  the screen in front of you.

14      Before getting into any detail about this document,

15  first let me ask you, do you recognize this document?

16  A   Yes.

17  Q   What is it?

18  A   It is a tactical response report for Chicago Police

19  Department.

20  Q   And is this document contained in Government Exhibit 9 a

21  fair and accurate depiction of a blank or generic tactical

22  response report used by the Chicago Police Department?

23  A   Yes.

24      MS. JENKINS:  At this time the government would move

25  to admit, with permission to publish, Government Exhibit 9.

Hatch - Direct by Jenkins

1      THE COURT:  Any objection?

2      MR. HERBERT:  No.

3      THE COURT:  Okay.  It will be admitted.

4      (Said exhibit received in evidence.)

5      THE COURT:  Now, I did tell the jury today was an

6  early day, and it is.  So I'm going to let you go home now.

7  It's just a little after 4:00.  We have a full day tomorrow.

8  We're going to begin at 9:15 tomorrow.  So 9:15 until 5:00.

9  And I hope you enjoy the nice weather tonight.  Be safe.  And

10  go Cubs.

11      COURT SECURITY OFFICER:  All rise.

12      (Jury out at 4:10 p.m.)

13      THE COURT:  Okay.  You can step down.  Thank you.

14      (Witness exits stand.)

15      THE COURT:  So for the parties, please be here at 9:00

16  a.m.  There is no need for you to come at 9:15.  We have a very

17  small call, so come at 9:00 a.m. and we'll get started right

18  away, okay?  Have a nice evening.

19      (Proceedings concluded at 4:11 p.m.)

20

21

22

23

24

25

207

Hatch - Direct by Jenkins

1                    C E R T I F I C A T E

2          I certify that the foregoing is a correct transcript of the

3     record of proceedings in the above-entitled matter.

4

5

      /s/ GAYLE A. McGUIGAN                    April 30, 2016
6     Gayle A. McGuigan, CSR, RMR, CRR              Date
      Official Court Reporter
7                                              April 30, 2016
      _____              Date
8     Gayle A. McGuigan, CSR, RMR, CRR
      Official Court Reporter
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3   UNITED STATES OF AMERICA,       )   Docket No. 14 CR 674-1
                                     )
 4                  Plaintiff,       )   Chicago, Illinois
                                     )   October 21, 2015
 5             v.                    )   9:06 a.m.
                                     )
 6   ALDO BROWN,                     )
                                     )
 7                  Defendant.       )

 8
                              VOLUME 3-A
 9            TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
            BEFORE THE HONORABLE VIRGINIA M. KENDALL
10

11   APPEARANCES:

12   For the Government:      UNITED STATES ATTORNEY'S OFFICE by
                              MS. LINDSAY JENKINS
13                            MS. JESSICA ROMERO
                              Assistant United States Attorneys
14                            219 South Dearborn Street
                              5th Floor
15                            Chicago, Illinois 60604

16   For the Defendant:      LAW OFFICES OF DANIEL Q. HERBERT by
                              MR. DANIEL Q. HERBERT
17                            206 South Jefferson, Suite 100
                              Chicago, Illinois  60661
18
                              J. RUSSELL LAW LLC by
19                            MS. JENNIFER W. RUSSELL
                              206 South Jefferson, Suite 100
20                            Chicago, Illinois  60661

21   Also Present:           Mr. Connor Quinn, Student Intern

22   Court Reporter:         GAYLE A. McGUIGAN, CSR, RMR, CRR
                              Federal Official Court Reporter
23                            219 South Dearborn, Room 2318-A
                              Chicago, Illinois 60604
24                            (312) 435-6047
                              Gayle_McGuigan@ilnd.uscourts.gov
25
```

1          (In open court outside the presence of the jury:)

2                    THE CLERK:  This is case number 14 CR 674-1, USA

3      versus Aldo Brown.

4                    MS. ROMERO:  Good morning.

5                    THE COURT:  Good morning.

6                    MS. ROMERO:  Jessica Romero for the United States.

7                    MS. JENKINS:  Lindsay Jenkins for the United States.

8                    MR. HERBERT:  Good morning, your Honor.  Dan Herbert

9      for Aldo Brown.

10                    MS. RUSSELL:  Good morning, Judge.  Jennifer Russell

11     for Aldo Brown.

12                    THE COURT:  Okay.  Good morning.

13                    Do we have anything to address this morning?

14                    MS. ROMERO:  I wanted to -- one housekeeping matter.

15                    One of the witnesses, Mr. Taha Diban, he speaks both

16     English and Arabic, but he's not fluent in English, so he's

17     asked for an interpreter for purposes of his testimony today,

18     so we have an interpreter ready.

19                    THE COURT:  Okay.

20                    MS. ROMERO:  And so I wanted to notify the Court

21     when --

22                    THE COURT:  Thank you.

23                    MS. ROMERO:  -- he testifies, the interpreter will

24     come in with him.

25                    THE COURT:  Okay.

1          MS. ROMERO:  And then I did want to, again, just flag

2   any issues -- any potential issues, but one of the government's

3   witnesses today is Sergeant Larry Snelling.  And he teaches

4   tactical training at the Chicago Police Department Academy.

5   And I've informed him of the Court's ruling with respect to

6   Miss Hyfantis as well regarding any mention of, you know, the

7   definition of reasonableness or anything along those lines, but

8   I did want to explain that he's going to talk about the

9   different physical techniques that officers are trained on to

10  use in different types of situations.  He's not going to get

11  into the reasonableness analysis at all --

12          THE COURT:  Okay.

13          MS. ROMERO:  -- but he is going to get into, you know,

14  again, kind of the options that police officers have when

15  dealing with different types of subjects.

16          So I wanted to make sure the Court was aware of that.

17          And, finally, to the extent we get to the defense case

18  this afternoon and Mr. Brown testifies, I did want to make the

19  Court aware of the fact that -- and there was motions regarding

20  CRs and sustained CRs and, again, we don't plan on using any of

21  that in our case-in-chief.  However, I did hear during the

22  opening that defense counsel said that Mr. Brown had a long and

23  honorable career at the Chicago Police Department.  I'm not

24  sure what he's going to say during his testimony; but to the

25  extent during his direct he presents some type of character

1    evidence regarding his, you know, job performance at the CPD

2    or, again, more generally, that he's had a long and just

3    notable or honorable career at CPD, I do think it will be fair

4    to question Mr. Brown on the fact that he has been disciplined

5    by CPD as well.

6         So I wanted to raise that ahead of time so that both

7    the defense had notice that there is the potential that this

8    could happen and that the Court was aware of this possibility.

9         And I don't intend to go into it; but to the extent

10   the direct examination potentially goes that direction, we --

11   that's something we may want to correct for the jury regarding

12   what his disciplinary history is at the department.

13        THE COURT:  Okay.  Well, of course you can talk about

14   what he does and how many years and what he's been doing and

15   the different roles he's played.

16        Now, to the extent that you get in, like, that he's

17   been commended for bravery or, you know, saving children in a

18   burning fire or something, that would then potentially open the

19   door to those disciplinary issues.

20        Do you intend to go into his awards or commendations

21   or anything like that?

22        MR. HERBERT:  We do not.

23        THE COURT:  Okay.  But, otherwise, his history -- I

24   mean, what he has been doing for how many years with CPD is

25   relevant, and the fact that he's had different roles throughout

1    the department is relevant, and you can certainly go into that.

2              MR. HERBERT:  Thank you.

3              THE COURT:  Anything you need to address?

4              MR. HERBERT:  I guess two issues.

5              One -- and I didn't get a chance to speak to counsel

6    on this beforehand -- but they indicated yesterday that they

7    may call Vick Lombardo.  And I know he was not disclosed as a

8    witness for the -- at the pretrial.

9              MS. ROMERO:  Yes, he was.

10             MR. HERBERT:  He was?  Then I -- disregard, and I

11   apologize.

12        (Defendant enters courtroom.)

13             MR. HERBERT:  But the other issue is apparently George

14   Stacker is going to testify.

15             THE COURT:  Okay.

16             MR. HERBERT:  And George --

17             THE COURT:  For the government or for you?

18             MR. HERBERT:  For us.

19             THE COURT:  Okay.  Okay.

20             MR. HERBERT:  So I shouldn't say apparently.  I

21   guess --

22             THE COURT:  Right, that's why I wondered.

23             MR. HERBERT:  It's still unknown fully.  And the

24   reason is because obviously he has a criminal lawyer.  He was

25   brought before the grand jury.  And his criminal lawyer has I

```
 1        think advised him not to testify.

 2                THE COURT:  Okay.

 3                MR. HERBERT:  As of last night, George Stacker

 4        indicated he was going to testify.

 5                I've had several phone calls with his lawyer, Jerry

 6        Bischoff --

 7                THE COURT:  Okay.

 8                MR. HERBERT:  -- who plans on being here today.

 9                THE COURT:  Okay.

10                MR. HERBERT:  And I don't know if the Court wants to

11        address --

12                THE COURT:  Yeah, we'll have to address that.  If he

13        does testify, we can take a break from the jury and talk to

14        Mr. Bischoff and Mr. Stacker about what obligations -- or what

15        protections they have and what he would be doing if he were to

16        testify and make sure he understands.  And if he's going to

17        testify, that's fine.  Otherwise, we'll just make sure we make

18        the record.

19                Good morning, Mr. Brown.

20                THE DEFENDANT:  Good morning, your Honor.

21                THE COURT:  Okay.  So are we ready to proceed?  Is

22        there anything else there?

23                MS. ROMERO:  Judge, just one last thought.

24                I do think there was a listed witness for the defense,

25        Officer Keith Ross.  And I wanted again to flag -- I think
```

1    Mr. Ross would testify that he received a tip from a citizen

2    regarding drugs at the store --

3              MR. HERBERT:  (Nods head.)

4              MS. ROMERO:  -- that led the defendant and his partner

5    to go to the store that day.  And, again, that's in his arrest

6    report, and we're not really contesting that.  But I did want

7    to raise the concern regarding hearsay with respect to whether

8    the statements are admitted for the truth as opposed to the

9    effect on the defendant and his partner.

10             THE COURT:  Uh-hum.

11             MS. ROMERO:  I wanted to make sure that that's made

12   clear from the beginning --

13             THE COURT:  Well, to the extent that you want an

14   instruction or to instruct the jury, of course the reason for

15   him going there on that particular day is relevant, and it also

16   would not be for the truth of the matter that there were

17   actually drugs there, but that's why he went there.  So if you

18   think that the jury needs to be instructed as to the hearsay

19   aspect of it, I would be happy to do so.

20             MS. ROMERO:  And I think, again, it would be fair for

21   Officer Ross to testify what he told to the defendant and his

22   partner.

23             THE COURT:  Sure, because that's how they acted,

24   right.

25             MS. ROMERO:  But I don't think -- I think then it's

1    double hearsay -- or it is hearsay if he gets into the
2    statements from the citizen to him because the effect on him
3    isn't really the issue.  I think it's just --
4              THE COURT:  Yeah, right.
5              MR. HERBERT:  -- his communications with --
6              THE COURT:  Whatever he told Mr. Brown.  Right.
7              MR. HERBERT:  Okay.  So just so I'm clear, he cannot
8    testify to what this woman told him.
9              THE COURT:  Well, he can say that he had contact with
10   an individual who gave him information and the information that
11   he then provided was this.
12             MR. HERBERT:  Okay.
13             THE COURT:  Because otherwise if we say the woman said
14   X, Y, and Z and I told Mr. Brown X, we've got Y and Z out there
15   for no reason, and that's your double layer of hearsay.  But he
16   certainly can say I got information, received information from
17   this individual, this is what I then told Mr. Brown.
18             MR. HERBERT:  Very good.
19             THE COURT:  Okay?  All right.  Let me check and see if
20   I have a jury here.
21             Good morning.
22             THE CLERK:  They're all here.
23             THE COURT:  They're here?  Okay.  Let's go bring them
24   in then.
25             MR. HERBERT:  Your Honor, this is Connor Quinn.  I

1    apologize --

2           THE COURT:  I know.  I heard you introduce him to the

3    jury, so good morning.

4           MR. HERBERT:  I apologize --

5           THE COURT:  Yeah, a good, solid Irish name, Connor

6    Quinn.  I have a Connor.

7           MS. JENKINS:  Your Honor, we'll resume with Exhibit 9,

8    which we were discussing before, and I think it should be

9    ready.

10          THE COURT:  Let me just see if I have everything

11   booted up for you -- oh, do I have everything booted up?  Maybe

12   not.  Hold on.  Oh, maybe I just turned my screen off somehow.

13          Did you notice that there were some markings on the

14   screen yesterday?  Do you all know how to remove those when

15   they are --

16          MS. JENKINS:  I do, and I thought I did, but I can

17   check again.

18          THE COURT:  Oh, was it from the witness do you think?

19          MS. JENKINS:  It was.

20          THE COURT:  Oh, I see.

21          MS. JENKINS:  There was a mark from the witness.

22          THE COURT:  I wondered where it came from.

23          MS. JENKINS:  He touched the screen.

24          THE COURT:  Okay.  Got it.  All right.  Hold on.

25          THE CLERK:  All rise.

```
 1        (Jury in at 9:14 a.m.)
 2             THE COURT:  Good morning, everyone.
 3             THE JURY:  Good morning.
 4             THE COURT:  Oh, what a nice crowd.
 5             Please be seated.
 6             You do better than most of my students in my law
 7   classes.
 8             So I don't know if anybody is in mourning.  We had a
 9   rough night for our Cubs, so we have one -- one more last-ditch
10   hope, right?  And then we have another 100-and-something years
11   to wait maybe.
12        (Laughter.)
13             THE COURT:  But we will put that aside.  And thank you
14   for all being so timely.
15             We're going to continue where we left off yesterday.
16             If you would please retake the witness stand.
17        (Witness resumes stand.)
18             THE COURT:  Thank you.
19             Do you understand that you're still under oath from
20   yesterday?
21             Whoops, sorry, that's --
22        (Brief interruption of the proceedings.)
23             THE WITNESS:  Yes.
24             THE COURT:  Okay.  Very well.
25             So then you can proceed when you're ready.
```

Hatch - Direct (Resumed) by Jenkins

1          MS. JENKINS:  Thank you, your Honor.

2                    DIRECT EXAMINATION (Resumed)

3    BY MS. JENKINS:

4    Q    Good morning, Miss Hatch --

5    A    Good morning.

6    Q    -- Officer.  Officer Hatch.

7              Yesterday, before the break, we were talking about a

8    report called a tactical response report.

9              Do you recall that?

10   A    Yes.

11   Q    On the screen in front of you, if the item could be

12   published --

13             THE COURT:  Okay.

14   BY MS. JENKINS:

15   Q    -- is what was previously admitted into evidence as

16   Government Exhibit 9.

17             THE COURT:  Just wait -- there you go.

18   BY MS. JENKINS:

19   Q    Do you recognize the document depicted in Government

20   Exhibit 9?

21   A    Yes, I do.

22   Q    What is that?

23   A    That is what we call in the Chicago Police Department a

24   tactical response report.  It is a report stating the actions

25   of the subject.  It is the report stating the actions of the

Hatch - Direct (Resumed) by Jenkins

1    subject and the response from the police officer.

2    Q    And is this the form that officers complete when they

3    are -- let me ask it a different way.

4          Under what circumstances are officers required to

5    complete tactical response reports?

6    A    This report would be completed when there's an allegation

7    of physical abuse from a police officer.  Also if -- the

8    different types of uses of force, meaning physical, that the

9    police officer uses against a subject.

10   Q    Okay.  What I'd like to do over the next couple of minutes

11   is take this report sort of section by section.  I don't need

12   to discuss every box with you, but I'd like to discuss the

13   various sections of information that's required in order to

14   complete this report.

15         And just as a refresher for the jury, are Chicago

16   police officers trained on how to complete tactical response

17   reports?

18   A    Yes, we are.

19   Q    Now, starting at the top of Government Exhibit 9 on page 1,

20   to the left there's the words "Member Involved."

21         What information relates to "Member Involved"?  What

22   does that refer to?

23   A    The member would be the police officer that was involved in

24   the incident.  It would also mean if a subject, which would be

25   the arrestee, was involved in a physical altercation or alleged

Hatch - Direct (Resumed) by Jenkins

1    physical altercation with a lock-up keeper, which would be part

2    of the booking process.

3    Q    So does "Member" refer to an employee of the Chicago Police

4    Department?

5    A    Yes.

6    Q    And what information, generally speaking, is listed to the

7    right of the phrase "Member Involved"?

8    A    It would be the actual officer, the incident, the date of

9    the incident, the time; the officer's information, which would

10   be last name, first name, star number; the demographics of the

11   officer, which would be the sex, race, their age, height,

12   weight, their employee information.

13   Q    Okay.  I'd like to move to the next section of this

14   tactical response reform -- tactical response report remaining

15   on page 1.

16        Underneath "Member Information," I see the words to

17   the left that say "Subject Information."

18        What does "Subject Information" refer to?

19   A    The subject would be the person that was involved that was

20   either making the allegations or that were actually physically

21   involved with the officer.  In this instance, it would be the

22   arrestee.

23   Q    Okay.  And, generally speaking, what information or

24   categories of information are listed to the right of the phrase

25   "Subject Information"?

Hatch - Direct (Resumed) by Jenkins

1  A    It would be the actual name of the person that was

2  involved, sex, race, their date of birth, their address, all of

3  the information that -- what is either the person, if they're

4  injured, if they were alleging injury, the conditions of or the

5  situation that was involved, meaning condition, was it

6  daylight, was it night, did they -- were they hospitalized,

7  that type of information.

8  Q    And who inputs the information in the "Subject Information"

9  series of questions?

10  A    That would be the arresting officer.

11  Q    So the subject does not input any information into this

12  form, correct?

13  A    No.

14  Q    Okay.  I'd like to move to the next category of materials

15  on Government Exhibit 9.

16        We're going to enlarge that for the jury.

17        So now we're in the third section of Government

18  Exhibit 9.

19        So to the left-hand portion of this form, the phrase

20  "Reason for Use of Force" appears to the left.

21        What kinds of information, generally, is that

22  referring to?

23  A    That would be the actions of the subject or the arrestee

24  and the response from the police officer.

25  Q    And just to the right of the phrase "Reasons for Use of

Hatch - Direct (Resumed) by Jenkins

1    Force" is the phrase "Check All That Apply."

2            What does that refer to?

3    A    That means what were the, again, the actions of the

4    arrestee and the actual actions of the police officer.  Only

5    those that apply.

6    Q    So are officers instructed as to whether they should check

7    all boxes in this section of the form that apply to the

8    incident that occurred?

9    A    Yes.  Only those that apply.

10   Q    Are officers trained on why that is important?

11   A    Because it is actual and factual information.

12   Q    What does a checked box in this portion of the form

13   indicate with relation to a completed form?

14   A    It's -- it's stating the incident, the incident that

15   occurred.  Again, the actions of the subject, the arrestee, and

16   the response from the police officer, what was the police

17   officer's reactions slash response.

18   Q    So does a checked box indicate that an action occurred?

19   A    Yes.

20   Q    And what does an unchecked box on this form indicate once

21   the form is completed?

22   A    It does not apply.

23   Q    And when you say "does not apply," what do you mean?

24   A    It does not apply to the incident that occurred.

25   Q    It does not apply to the incident that occurred?

Hatch - Direct (Resumed) by Jenkins

1    A    Yes.

2    Q    Are officers trained on the importance of accurately

3    completing a tactical response report?

4    A    Yes.

5    Q    And what are they generally taught about that?

6    A    We tell them that anything that has occurred, again,

7    meaning the actions of the subject and the response of the

8    police officer, anything that you check in the box means that

9    that was the factual information.  Anything else, again, does

10   not apply.  If it was not checked, then it did not happen.

11   Q    Okay.  I'd like to just talk about sort of the

12   subcategories in this portion of the form that we're talking

13   about, to the right of the words "Check All That Apply."

14         The top half of the box states "Subject's Actions,"

15   and then has a series of categories or boxes.

16         Can you just explain, generally, what kinds of

17   information the officer who is completing the report is

18   supposed to input here?

19   A    The -- based on the actions of the arrestee, the police

20   officer would know what type of -- what type of assailant that

21   they became, if they were a resister or if they were an

22   assailant.  Whichever box applied, that is when you put the

23   checkmark there.  Underneath would be the member's response,

24   which means whatever or whatever type of action that the

25   subject used, the member would then respond in their boxes that

224

Hatch - Direct (Resumed) by Jenkins

1    were there.

2          Now, there are specific boxes that we usually -- that

3    are more common.  Anything that is not would be in the "Other"

4    box, at which the officer would have to explain the "Other."

5    Q    Okay.  And so let me just break that down a little bit.

6          Just to be clear, "Subject's Actions" refers to who?

7    A    That -- that -- the subject would be the arrestee in this

8    instance.

9    Q    Okay.  And "Member Response" refers to who?

10   A    The police officer that was involved.

11   Q    And, again, as we discussed earlier in this form, does the

12   subject have any input into the information that's placed into

13   these boxes?

14   A    The subject does not.

15   Q    Who completes the information?

16   A    That would be the officers that were involved.

17   Q    I'd like to move to the bottom of this form.

18         At the very bottom, there's an area that indicates

19   "Signatures."

20         Do you see that on the left-hand side of your screen?

21   A    Yes.

22   Q    What information is prepared and placed into the categories

23   listed to the right of the word "Signatures"?

24   A    That would be the officer's name, their star number,

25   employee number, and then there is a signature box.  But

Hatch - Direct (Resumed) by Jenkins

1    because it is electronic, we submit those forms electronically.

2    Q    Okay.  Below the "Reporting Member" information, it says

3    "Reviewing Supervisor."

4    A    Yes.

5    Q    What information goes in that box?

6    A    That would be the supervisor that actually reviewed this

7    document.

8    Q    Now, let me ask you a few questions regarding supervisor

9    approval.  And I'm speaking on this topic not just with respect

10   to a tactical response report, but also to the arrest reports

11   that we discussed yesterday.

12              Are recruits trained at the academy about the process

13   by which supervisors review and approve reports?

14   A    Yes.

15   Q    Is the approving supervisor responsible for determining the

16   accuracy of the information contained in a report prepared by

17   an officer?

18   A    The accuracy is the responsibility of the officer; however,

19   the supervisor will have the opportunity to review the

20   documents.

21   Q    Whose responsibility is it to ensure that accurate

22   information is placed on these forms?

23   A    The responsibility would be of the -- of the police

24   officer.  The --

25   Q    Do supervisors do any independent verification of the

226

Hatch - Direct (Resumed) by Jenkins

1    information contained in either an arrest report or a tactical

2    response report?

3    A    Only that the documents were -- the information was

4    correctly inputted into the computer.  They do not have the

5    ability to go outside of their actual location to verify every

6    single incident.  That is up to the police officer.

7    Q    And when you say "they" don't have the ability, are you

8    referring to supervisors --

9    A    Meaning the supervisor.

10   Q    Okay.  Officer Hatch, are you familiar with supplementary

11   reports?

12   A    Yes.

13   Q    What is a supplementary report?

14   A    A supplementary report is a report that we -- that is

15   actually written by a police officer.  It is an actual physical

16   form that is completed if some information was not inputted in

17   the original report.  There are incidents in which additional

18   information will be received for -- for an incident.

19   Therefore, we would need to add additional information, and we

20   would use that report.

21   Q    So let me break that down with you just a little bit.

22        Let's take an arrest report, for example, that you

23   testified about yesterday.

24        Once an arrest report is approved, can an officer go

25   back and change any of the information contained within an

Hatch - Direct (Resumed) by Jenkins

1   approved arrest report?

2   A    Not -- not for an arrest report.  For a case report.  A

3   case report actually has all of the information for the

4   incident that occurred.  An arrest report has the probable

5   cause, which would be the illegal actions of the arrestee which

6   led to an arrest.

7   Q    So once that's approved, can an officer make changes to

8   that report, once it's finalized and approved?

9   A    They cannot make any changes to the actual report; but if

10  there's additional information that needs to be added, then we

11  can use a supplementary report.

12  Q    Are officers trained about making reports containing false

13  information?

14  A    In our 30 hours of case reporting, we have two -- the first

15  two hours are introductory hours, at which we explain to them

16  the importance of having a factual report.

17        So those are, again, those are the introductory hours.

18  We do talk about making sure that all of your information is

19  accurate, it's -- and complete.

20  Q    Now, are officers trained on how reports that they prepare

21  can be used in future proceedings?

22  A    Yes, we do talk about that.

23  Q    And if you could explain generally for the jury what do you

24  tell officers about the -- about reports that they prepared

25  being used in future proceedings?

Hatch - Direct (Resumed) by Jenkins

1    A    What we do is we make sure that we ensure that as we are

2    explaining the information and we are -- we're completing these

3    reports in detail, we make sure that we let them know that any

4    report that you complete has the ability to be brought up in

5    either court or any other proceedings in the future.

6    Q    And when you say "in court or other proceedings," what are

7    some of the other proceedings that officers are advised that

8    their reports can be used for?

9    A    To make sure that, again, that all of the information is

10   accurate.  All of our rules and regulations state that we have

11   actual and factual reports, that that could be used later if we

12   find that information was not either included or if information

13   was omitted.

14   Q    Do you train officers about whether or not their reports

15   can be accessed by other federal law enforcement agencies?

16   A    Yes, we make mention of that.

17   Q    When you train officers on how to prepare reports, and I'm

18   specifically referring to arrest reports, do you train officers

19   on whether reports should be prepared in chronological order?

20   A    Yes, we do.  We state that.

21   Q    What do you explain to officers about that?

22   A    We do explain there is a way in which we complete reports.

23   All of the information should be given from the beginning to

24   the end, so we will specifically state chronological order.

25        (Counsel conferring.)

Gray - Direct by Jenkins

1      MS. JENKINS:  We tender the witness for

2   cross-examination.

3      THE COURT:  All right.

4      MR. HERBERT:  No questions, your Honor.

5      THE COURT:  Okay.  Then you may step down and be

6   excused.

7      THE WITNESS:  Thank you.

8   (Witness excused.)

9      THE COURT:  And you can call your next witness.

10      MS. JENKINS:  The government calls James Gray.

11   (Witness enters courtroom.)

12      COURT SECURITY OFFICER:  All the way up, sir.  Up

13   here.  Step up here, sir.  Face the judge.

14      THE COURT:  Sir, please raise your right -- raise your

15   right hand.

16   (Witness duly sworn and takes the stand.)

17      THE COURT:  Okay.  Please be seated.

18      You may proceed.

19      MS. JENKINS:  Thank you.

20      JAMES GRAY, GOVERNMENT'S WITNESS, SWORN

21      DIRECT EXAMINATION

22   BY MS. JENKINS:

23   Q   Good morning, sir.

24   A   Good morning.

25   Q   In a loud, clear voice, can you please state your name and

Gray - Direct by Jenkins

1    spell your name for the jury?

2    A    James Gray.  J-A-M-E-S.  G-R-A-Y.

3    Q    And, sir, how old are you?

4    A    40.

5    Q    How far did you go in school?

6    A    Three years college.

7    Q    Are you currently employed?

8    A    Yes.

9    Q    Where?

10   A    Hyatt Regency.

11   Q    How long have you been employed at the Hyatt Regency?

12   A    Two years.

13   Q    What city or suburb do you live in?

14   A    Riverdale.

15   Q    And in 2012, where did you live?  Just generally.

16   A    South side of Chicago.

17   Q    Sir, are you familiar with a convenience store in the City

18   of Chicago named Omar and Salma?

19   A    Yes.

20   Q    How are you familiar with that location?

21   A    It's a neighborhood store.

22   Q    Was it located near your residence in 2012?

23   A    Yes.

24   Q    Is it still open today?

25   A    No.

Gray - Direct by Jenkins

1    Q    What kind of store is it?

2    A    Just a convenience store.

3    Q    In 2012, can you estimate how frequently you went into that

4    particular convenience store?

5    A    Maybe two or three times a week.

6    Q    When you went into the store, did you typically make

7    purchases?

8    A    Yes.

9    Q    In 2012, were you familiar with the employees of the store?

10   A    Yes.

11   Q    And, sir, if you could just generally describe the

12   neighborhood in 2012 near this particular convenience store.

13   A    It was kind of a rough neighborhood.

14   Q    When you say "rough," what do you mean?

15   A    Like violence and ...

16   Q    Had you ever seen drugs sold inside the store?

17   A    No.

18   Q    Had you ever seen guns inside the store?

19   A    No.

20   Q    Had you ever seen drugs sold outside of the store in the

21   general vicinity of the store?

22   A    No.

23   Q    I'd like to direct your attention to September 27th of

24   2012.

25           Did you go to the Omar and Salma convenience store on

Gray - Direct by Jenkins

1    that day?

2    A    Yes.

3    Q    And approximately what time of day did you go there?

4    A    Like the afternoon.

5    Q    Did you go into the store alone?

6    A    No.

7    Q    Who did you go into the store with?

8    A    A friend of mine from the neighborhood.

9    Q    What was your friend's name?

10   A    Marco.

11   Q    Why did you go into the store that day?

12   A    I was going to get cigarettes.

13   Q    Were there other people inside the store --

14   A    Yes.

15   Q    -- when you went into the store?

16   A    Yes.

17   Q    Were there any employees in the store that you knew?

18   A    Yes.

19   Q    Do you remember any of the employees' names?

20   A    No.

21   Q    So once you went into the store, did you make a purchase?

22   A    No.

23   Q    Okay.  And approximately how long did you stand inside the

24   store -- or stay inside the store?

25   A    Like five minutes.

Gray - Direct by Jenkins

1   Q   What happened at the conclusion of about five minutes?

2   A   They didn't have what I wanted, and I proceeded to leave.

3   Q   Okay.  When you left the store, did you leave the store

4   alone?

5   A   No.

6   Q   Who did you leave the store with?

7   A   With the friend I came in with.

8   Q   Was that Marco?

9   A   Yes.

10  Q   Once you stepped outside the store, did anything unusual

11  happen?

12  A   I got to the front door and got pushed back in.

13  Q   Who pushed you back in?

14  A   Two police officers.

15  Q   Approximately how long had you been standing outside of the

16  store before the two police officers pushed you back in?

17  A   Maybe a few seconds.

18  Q   What were you doing outside the store at the time that the

19  officers arrived?

20  A   I was walking out of the store so ...

21  Q   And were you standing outside the store with anyone?

22  A   No.

23  Q   Where was Marco?

24  A   Like right behind me.

25  Q   Okay.  Now, when the officers arrived, what kind of car did

Gray - Direct by Jenkins

1    they arrive in?

2    A    Unmarked.

3    Q    And when you say "unmarked," did you recognize it to be a

4    police car?

5    A    Not right away, but I assumed.

6    Q    And how many officers were in the car when you saw them --

7    when you saw the car approach?

8    A    It happened so fast.  They jumped out, so I didn't ...

9    Q    Well, how many officers approached you?

10   A    Two.

11   Q    I'm sorry?

12   A    Two.

13   Q    Did you -- do you recall whether or not you had ever

14   encountered those particular officers before?

15   A    No.

16   Q    And do you know either of their names?

17   A    No.

18   Q    I'd like to show you on the screen in front of you what's

19   previously been admitted as Government Exhibit 1 Clip 6.

20          I'm going to ask you some questions about this after

21   it finishes playing.

22       (Tape played in open court.)

23          MS. JENKINS:  And, your Honor, if we could publish --

24          THE COURT:  Has it been admitted?

25          MS. JENKINS:  It has.

Gray - Direct by Jenkins

1    THE COURT:  All right.  Hold on, folks, because I

2    don't think I have your screen turned on.  I'm going to go back

3    to the beginning.  Wait until it boots.  You can see right

4    there.

5         There you go.

6         MS. JENKINS:  Thank you.

7    (Tape played in open court.)

8    BY MS. JENKINS:

9    Q   Okay.  Let me ask you some questions about the clip that we

10   just viewed.

11        First, do you recognize that portion of the Government

12   Exhibit 1 as something you've seen before?

13   A   Yes.

14   Q   At the beginning of the clip, we saw a vehicle approach.

15        What -- whose vehicle was that?

16   A   That was the unmarked car, police car.

17   Q   And who got out of that vehicle?

18   A   Two police officers.

19   Q   Did you see yourself in that video clip we just watched?

20   A   Yes.

21   Q   What were you wearing?

22   A   White shirt.  I can't remember -- blue jeans.

23   Q   And did you see your friend Marco in the video we just

24   watched?

25   A   Yes.

Gray - Direct by Jenkins

1   Q    What was he wearing?

2   A    A black hoodie, I think, just regular dark blue hoodie.

3   Q    Now, when you first saw these officers, did they identify

4   themselves as police officers?

5   A    No.

6   Q    Once the officers approached you and Marco at the opening

7   to the store, what did they do?

8   A    They pushed me back in, pushed us both back in the store.

9   Q    Did either of the officers ask you why you were standing

10  outside of the store?

11  A    No.

12  Q    Did either of the officers ask you what you had been doing

13  inside of the store?

14  A    No.

15  Q    Did you feel that you had a choice about whether you could

16  go back inside the store or leave the area?

17  A    No.

18  Q    Did the officers ask you any questions at all when they

19  pushed you back inside the store?

20  A    No.

21  Q    Now, once you got back inside the store, what's the first

22  thing that you remember happening?

23  A    I was handcuffed together.

24  Q    Were both hands handcuffed behind your back?

25  A    No.

Gray - Direct by Jenkins

1    Q    How were you handcuffed?

2    A    Handcuffed to my friend that I came in with.

3    Q    You were handcuffed to who?

4    A    The friend I came in with.

5    Q    And is that Marco?

6    A    Yes.

7    Q    In what area of the store were you standing?

8    A    In the front.

9    Q    Aside from the police officers, about how many other

10   people, approximately, were standing in the area where you were

11   handcuffed?

12   A    Maybe five.

13   Q    And with regard to your handcuffing, did you have one hand

14   free or were both hands restrained?

15   A    One hand free.

16   Q    Do you recall which officer handcuffed you?

17   A    No.

18   Q    Were all of the individuals inside of the store handcuffed?

19   A    Yes.

20   Q    So everyone inside the store was handcuffed?

21   A    Like, together.

22   Q    Okay.  I understand that there was a group of people

23   handcuffed together.

24   A    Uh-hum.

25   Q    But were there employees in the store?

Gray - Direct by Jenkins

1    A    Oh, yes.

2    Q    And were those employees handcuffed?

3    A    No.

4    Q    Now, I'd like to show you what's been previously admitted

5    into evidence as Government Exhibit 2 Group Photo Still 3.

6         Now, on the screen in front of you is an exhibit

7    marked Government Exhibit 2 Group Still 3.

8         Do you recognize that photograph?

9    A    Yes.

10   Q    Does it depict portions of the video that you've previously

11   watched?

12   A    Yes.

13   Q    And does it accurately depict your memory of what you saw

14   inside the store on that day?

15   A    Yes.

16   Q    I'd like to ask you to identify, as best you can, a few of

17   the individuals depicted in this photograph.

18        First, do you see yourself?

19   A    Yes.

20   Q    What are you wearing and generally where are you standing?

21   A    Next to the counter, with the white shirt.

22   Q    And so are you generally on the left-hand side of

23   Government Exhibit 2 Group Still 3?

24   A    Yeah, that's the left.  Right -- yeah.

25   Q    And you're wearing a white shirt?

Gray - Direct by Jenkins

1   A    Yes.

2   Q    Who is standing to your left?

3   A    It's the friend I came in with.

4   Q    And, again, is that Marco?

5   A    Yes.

6   Q    Okay.  In front of you, in the middle of this exhibit, who

7   is standing there?

8   A    The two police officers.

9   Q    Okay.  And, again, were these the two police officers who

10  approached you standing outside of the store?

11  A    Yes.

12  Q    Now, I'd like to ask you about the individuals depicted on

13  the right-hand side of Government Exhibit 2 Group Still Photo

14  3.

15       Do you recognize the person standing farthest to the

16  right in this exhibit?

17  A    Yes.

18  Q    Do you know his name?

19  A    No.

20  Q    How do you know him?

21  A    He works in that store.

22  Q    Had you previously seen this individual working inside of

23  the store prior to September 27th, 2012?

24  A    Yes.

25  Q    Were you friends with him?

Gray - Direct by Jenkins

1   A   No.

2   Q   Now, at the time you were placed in handcuffs, did either

3   officer tell you why you were being handcuffed?

4   A   No.

5   Q   Were you told that you were being placed under arrest?

6   A   No.

7   Q   Were you given any sort of explanation for why you were

8   being detained in the store?

9   A   No.

10  Q   Now, after you were handcuffed, were you searched?

11  A   Yes.

12  Q   Do you remember which officer searched you?

13  A   Yeah.

14  Q   And using the photo that's in front of you in Government

15  Exhibit 2 Group Still 3, which of the officers searched you, if

16  you could describe it by an article of clothing?

17  A   The one without the hat.

18  Q   The one without the hat searched you?

19  A   Yeah.

20  Q   Was anything taken from you as a result of the search of

21  your person?

22  A   No.

23  Q   Were you asked for identification?

24  A   I can't remember.

25  Q   Did the officer who searched you tell you what he was

241

Gray - Direct by Jenkins

1  looking for?

2  A    No.

3  Q    Now, while you were handcuffed, do you recall whether

4  either officer threatened to strike you?

5  A    Yes.

6  Q    Which one?

7  A    The one without the hat.

8  Q    And what did that officer say to you?

9  A    Said he'd punch me in my face.

10 Q    And how did you respond?

11 A    I told him, "You can't do that, there's cameras in here."

12 Q    And what did the officer who you were having this

13 conversation with say in response to your comment about

14 cameras?

15 A    Cursing, said he didn't care about the cameras.

16 Q    Now, did you observe whether anyone else standing there

17 depicted in this photograph was searched by either officer?

18 A    Yeah.

19 Q    So were those other individuals standing in this photograph

20 searched?

21 A    Not all of them.

22 Q    Okay.  Which ones were searched, at least initially, at the

23 time of this depiction?

24 A    The two and the worker.

25 Q    I'm sorry, can you say it again?

Gray - Direct by Jenkins

1    A    The one that works in the store and maybe two other guys.

2    Q    They were searched by the officers?

3    A    Yeah.

4    Q    Sir, did both officers remain in the front of the store in

5    the area that's depicted the entire time that you were standing

6    inside of the store?

7    A    No.

8    Q    Let's first talk about the officer with the hat.

9         Where did you see that officer go?

10   A    To the back of the store.

11   Q    Did you hear that officer say what he was looking for?

12   A    No.

13   Q    Did that officer with the hat eventually return to the area

14   where you were standing?

15   A    Yes.

16   Q    Did you see the other officer, the one without the hat, did

17   he stand in the area where you were standing the entire time?

18   A    Yes.

19   Q    He never moved?

20   A    I really don't remember, but ...

21   Q    Okay.  Were you able to observe whether either officer

22   searched the individual who is depicted in this photograph

23   standing to the right?  Was that individual searched?

24        MS. RUSSELL:  Objection.  Asked and answered.

25        THE COURT:  Overruled.

Gray - Direct by Jenkins

1      You can answer.

2    BY MS. JENKINS:

3    Q    You can answer.

4    A    Yeah.

5    Q    Okay.  And do you recall whether or not that individual

6    depicted on the right-hand side of the screen was handcuffed at

7    the time that he was searched?

8    A    No, I don't remember.

9    Q    Were you able to hear the conversation between the officer

10   standing in front of you in this photograph and the individual

11   standing to the right?  Were you able to hear the conversation

12   between them?

13   A    Yes.

14   Q    Were you able to see what was happening with them?

15   A    Yes.

16   Q    Did you see the individual to the right do anything?

17   A    No.

18   Q    Did you -- did you see him -- did you hear him say

19   anything?

20   A    Yes.

21   Q    And what did you hear him say?

22   A    He was telling him that he didn't have anything.

23   Q    And what did you understand that to mean?

24   A    I guess he -- well, I guess he asked him for -- did he have

25   any drugs or something, so I'm figuring that's what he asked.

Gray - Direct by Jenkins

1    Q    Okay.  Did you see the individual standing to the right

2    lift his shirt?

3    A    Yes.

4    Q    And can you please explain what you saw?

5    A    He just lifted his shirt up and --

6    Q    Did you see what that individual did next?

7    A    Nothing.

8    Q    Okay.  What happened after that individual lifted his

9    shirt?

10   A    Police officer struck him in the face.

11   Q    When you say "struck him in the face," what do you mean?

12   A    Punched him.

13   Q    Could you hear it?

14   A    No, I couldn't hear it, but I saw it.

15   Q    Describe what you saw.

16   A    He lifted his shirt, and he punched him in the face a

17   couple of times.

18   Q    And to be clear, who punched who in the face?

19   A    The officer without the hat.

20   Q    Punched who?

21   A    The -- the person that worked in the store.

22   Q    And is that the person standing to the right?

23   A    Yes.

24   Q    Now, at the time that the person on the right lifted his

25   shirt, did you see a weapon on him?

Gray - Direct by Jenkins

1    A    No.

2    Q    Did you hear whether the officer asked the person on the

3    right if he had anything?

4    A    Yes.

5    Q    And how -- what was the response?

6    A    He told him no.

7    Q    At any time did you see the person on the right resisting

8    the officer?

9    A    No.

10   Q    Did you see the person on the right attempting to flee?

11   A    No.

12   Q    Was the person on the right being aggressive in any way?

13   A    No.

14   Q    What about the other people who were handcuffed?  Was

15   anyone else standing in this photograph attempting to flee?

16   A    No.

17   Q    Now, after the officer hit this individual, what happened

18   next?

19   A    Took him to the back of the store.

20   Q    Who took who to the back of the store?

21   A    The police officer without the hat.

22   Q    Took who to the back of the store?

23   A    The store worker that he punched.

24   Q    And could you see where they went from where you were

25   standing?

Gray - Direct by Jenkins

1  A   Yeah.  I seen when he took him to the back, but that's

2  about it.

3  Q   So could you actually see from your position near the front

4  exactly what was happening in the back?

5  A   No.

6  Q   Could you hear anything from the position where you were

7  standing?

8  A   No.

9  Q   Now, did you ever see the officer without the hat return to

10 the area where you were standing following the incident you

11 just described?

12 A   I don't remember if he did or not.

13 Q   Okay.  Were you eventually unhandcuffed?

14 A   Yes.

15 Q   Do you remember which officer uncuffed you?

16 A   The one with the hat.

17 Q   And at any point were you placed under arrest?

18 A   No.

19 Q   At any point were you given an explanation as to why you

20 had been stopped inside the store?

21 A   No.

22 Q   Did you see whether anyone else was arrested?

23 A   No.

24 Q   At any point did you hear either officer yell the word

25 "Gun"?

Gray - Cross by Herbert

1    A    Yeah.

2    Q    Explain what you heard.

3    A    When he was in the back, the back of the store, he came --

4    one of them came up front and said, "He got a gun," or "Here's

5    a gun."

6    Q    So you heard one of the officers say --

7    A    Yeah.

8    Q    -- what?

9    A    "Here's a gun."

10   Q    And do you remember which officer that was?

11   A    The one with the hat.

12        (Counsel conferring.)

13        MS. JENKINS:  We would tender the witness for

14   cross-examination.

15        THE COURT:  Okay.

16                    CROSS-EXAMINATION

17   BY MR. HERBERT:

18   Q    Good morning, Mr. Gray.

19   A    Good morning.

20   Q    How are you?

21   A    All right.

22   Q    During your questions, you had a lot of, "I don't know," "I

23   don't remember," to some of the questions.  Right?

24   A    Yeah, depending -- the year that it happened, it's a few

25   years back.

Gray - Cross by Herbert

1   Q   What's a few years back?  This incident you're saying?

2   A   Yeah.

3   Q   Okay.  And you don't remember the incident that well today

4   because it was a few years back?

5   A   Yeah.

6   Q   Fair to say you remember the events better back then than

7   you do now.

8   A   No, I remember.  Like if I look at the video, then it comes

9   back.

10  Q   Okay.  And you've looked at the video, right?  You've

11  looked at it today?

12  A   Yes.

13  Q   How many times have you looked at it?

14  A   Just once.

15  Q   Just once?  When did you look at it?

16  A   Maybe a week ago, few weeks ago.

17  Q   Okay.  Where were you at when you looked at it a week ago

18  or a few weeks ago?

19  A   In the courthouse.

20  Q   Okay.  This courthouse?

21  A   Yeah.

22  Q   Okay.  And that was the first time that you had seen it?

23  A   Yes.

24  Q   And you looked at it with the -- with the government?

25  A   Yes.

Gray - Cross by Herbert

1   Q    Okay.  And as far as the -- how did you get here today?

2   Did you get a ride from somebody?

3   A    Yes.

4   Q    From the government?

5   A    Yes.

6   Q    They picked you up?

7   A    Yes.

8   Q    Okay.  Did you talk about your testimony today?

9   A    No.

10  Q    Okay.  As far as the incident, I know it happened a few

11  years ago, and you already said that your memory is -- you

12  don't remember everything that happened because of the fact

13  that it was a few years ago, correct?

14  A    Yes.

15  Q    Okay.  What do you -- what do you remember about that

16  particular day?

17          And I guess I'll ask a more specific question.

18          Do you remember what day of the week it was?

19  A    What day of the week?  No.

20  Q    Do you remember what day of the month it was?

21  A    September.  I know that.

22  Q    Okay.  September -- what day of the month?  Do you know?

23  A    No.

24  Q    Okay.  Do you know what year it was?

25  A    No.

Gray - Cross by Herbert

1    Q    So you know it was in the month of September, but you don't

2    know what year it was.

3    A    No.

4    Q    And you had -- you had been there a couple times a week for

5    years, correct?

6    A    Yeah.

7    Q    Okay.  And do you remember what you did prior to going to

8    the store that day, that unknown year?

9    A    Yes.

10          MS. JENKINS:  Objection, your Honor.  If we could be

11   heard at sidebar.

12          THE COURT:  Oh.  If we're going into something that I

13   don't know about, I guess I will.

14       (At sidebar outside the hearing of the jury:)

15          MS. JENKINS:  So your Honor made pretrial rulings

16   about the nature of which prior convictions that certain

17   witnesses could -- that could be elicited from particular

18   witnesses.

19          This particular witness, my recollection, and I

20   believe it notes in the ruling, is that there were no

21   convictions which could be elicited or discussed with him for

22   the reasons described at the pretrial conference.

23          I believe Mr. Herbert is aware that this witness was

24   leaving the Daley Center or somewhere in the City of Chicago

25   having a record or attempting to get a permanent record

Gray - Cross by Herbert

1    expunged.  I don't know the results of that, but I would hate

2    to elicit from this witness anything about record expungement

3    if there's been a ruling that the jury may not hear the nature

4    of any prior convictions.

5                MR. HERBERT:  And I think that's a fair

6    representation.

7                I did not -- I do not believe that it was something

8    that was covered in the pretrial ruling because of the fact

9    that there is no convictions that we are seeking to admit with

10   respect to him.

11               I think it merely goes to -- I am certainly trying to

12   get him to say that he was coming from an expungement, but it's

13   more along the lines of what do you remember about the day.  It

14   goes to his memory of the event.

15               THE COURT:  Yeah.  But that would just back-door that

16   he has a conviction.

17               MS. JENKINS:  Right.

18               THE COURT:  So I don't mind him saying he was coming

19   from, you know, the Cook County building or wherever he went,

20   whatever it is, but he can't say that he was trying to go get

21   an expungement, and I don't think you've told him anything

22   about it.

23               MS. JENKINS:  We have not, and so I don't know that he

24   would be able to draft an answer carefully.

25               THE COURT:  So I would have to give them an

Gray - Cross by Herbert

1    opportunity to address him not to say that, because if you get

2    expungement out, then, of course, you have --

3              MR. HERBERT:  Right.

4              THE COURT:  -- one thing to do is expunge your

5    criminal record so --

6              MR. HERBERT:  I wonder if there's a way I can ask the

7    question without -- or preventing him from saying that.

8              THE COURT:  Well, we can if I tell her -- she goes up

9    there and says something.  Either you don't ask the question at

10   all anymore, I sustain the objection because of the risk of

11   opening the door to that answer, or we give her an opportunity

12   to go over there and say you may say --

13             MR. HERBERT:  I'm fine with that.

14             THE COURT:  -- solely that you went to where -- where

15   did he go, by the way?

16             MS. JENKINS:  Somewhere in the city.  I don't remember

17   if it was the Daley Center --

18             THE COURT:  That's fine.

19             MS. JENKINS:  -- but he would say I was coming from

20   downtown.

21             THE COURT:  Coming from downtown, the Daley Center,

22   where I was getting some business taken care of.  I mean, it

23   could be everything from paying your taxes to getting a sticker

24   for your car.  You know?  So that's fine.

25             MR. HERBERT:  I'm fine with that.

Gray - Cross by Herbert

1              MS. JENKINS:  I'm happy --

2              THE COURT:  I'll go give you a moment to do that.

3       Okay?

4              MS. JENKINS:  We should do it in the presence of the

5       jury?  Which is fine.  I'm happy to do that.

6              THE COURT:  I don't think it's prejudicial.

7              MS. JENKINS:  That's fine.

8              THE COURT:  Yeah.  It will take a second.

9          (Ms. Jenkins confers with the witness.)

10             THE COURT:  All set?

11             MS. JENKINS:  Yes.

12         (Sidebar proceedings concluded.)

13             THE COURT:  Okay.  You may proceed now.

14             MR. HERBERT:  Thank you.

15      BY MR. HERBERT:

16      Q   Mr. Gray, do you remember where you were coming

17      from -- strike that.

18             Do you remember what you did prior to arriving at the

19      store?

20      A   Coming from downtown.

21      Q   Okay.  And how long had you been downtown prior to coming

22      to the store?

23      A   Maybe three hours.

24      Q   Okay.  And did you go straight from downtown to the store?

25      A   No.

Gray - Cross by Herbert

1   Q   What did you do in between then?

2   A   Went home.  Then went to the store.

3   Q   Okay.  And what time did you get to the store?

4   A   I don't remember the time I got -- made it there.

5   Q   Okay.  And is that because it was so long ago that you

6   don't remember?

7   A   Yeah, yeah.

8   Q   Okay.  And had you -- were you impaired at all at the point

9   you went to the store, either -- had you had anything to drink,

10  alcohol related?

11  A   No.

12  Q   Had you smoked any marijuana?

13  A   No.

14  Q   Okay.  You talked about how the neighborhood where this

15  store was located was I believe you said rough and a lot of

16  violence.

17  A   Yes.

18  Q   Why do you characterize the store -- the neighborhood

19  surrounding the store as being rough and having a lot of

20  violence?

21  A   Sorry?

22  Q   What makes you -- what made you tell the Ladies and

23  Gentlemen of the Jury that the store was rough and had a lot of

24  violence?  What -- what -- what have you witnessed for you to

25  come to that conclusion?

Gray - Cross by Herbert

1  A   Shootings.  Just violence.

2  Q   Okay.  That area is predominantly African-American,

3  correct?

4  A   Yes.

5  Q   Okay.  And the violence that you saw or were aware of, the

6  shootings, were those African-American individuals?

7         MS. JENKINS:  Objection, your Honor.  Relevance.

8         THE COURT:  I don't know what the relevance is.

9         MR. HERBERT:  I can explain.  I believe it goes

10  towards the reason that certain people were detained and the

11  reason why there was a level of alertness with respect to

12  certain individuals --

13         THE COURT:  Okay.  So I'll give you a little leeway.

14  Okay?

15  BY MR. HERBERT:

16  Q   And I'm not sure if that question was answered.

17         THE COURT:  Okay.  Let me just check for you.

18      (Pause in proceedings.)

19         THE COURT:  It was not.

20         Do you want me to repeat it?

21         MR. HERBERT:  That would be great, Judge.

22         THE COURT:  (Reading:)  And the violence that you saw

23  or were aware of, the shootings, were those African-American

24  individuals?

25  BY THE WITNESS:

Gray - Cross by Herbert

1  A   Not a hundred percent.

2  BY MR. HERBERT:

3  Q   Okay.  Predominantly?

4  A   Yes.

5  Q   Okay.  You indicated that you never saw anyone selling

6  drugs outside the store.

7  A   No.

8  Q   You never saw anyone selling drugs inside the store.

9  A   No.

10  Q   In the multiple times that you had gone there, was it

11  common to see people hanging out in front of the store?

12  A   Sometimes.

13  Q   Okay.  And in those sometimes, would it be multiple people?

14  A   As far as more than two or --

15  Q   Yeah, a group of people hanging out in front of the store.

16  A   Yeah.

17  Q   Not uncommon to see that when you went to the store,

18  correct?

19  A   Yeah, sometimes, but not all the time.

20  Q   Okay.  And you said that you had gone there to get

21  cigarettes, correct?

22  A   Yes.

23  Q   Did you purchase any cigarettes that day?

24  A   No, they didn't have them.

25  Q   Had you purchased cigarettes there before?

Gray - Cross by Herbert

1    A    Yes.

2    Q    And were you buying a pack of cigarettes or a loose

3    cigarette?

4    A    A pack.

5    Q    Okay.  Do you know what I'm talking about when I refer --

6    A    Yeah.

7    Q    -- to a loose cigarette?

8    A    Yeah.

9    Q    And they sold loose cigarettes at that store.

10            MS. JENKINS:  Objection.  He answered the question,

11   that he purchased a pack.

12            THE COURT:  I -- overruled.

13            You can answer the question.

14   BY MR. HERBERT:

15   Q    Do you remember the question?

16   A    No, what is --

17   Q    You said that you know what loose cigarettes are.

18   A    Yes.

19   Q    My question is that store sold loose cigarettes, correct?

20   A    I don't know.

21   Q    Okay.  You never purchased a loose cigarette there?

22   A    No.

23   Q    Okay.  You indicated that you didn't know the individual

24   that you were shown on the screen, Mr. Howard, you didn't know

25   him by name, correct?

Gray - Cross by Herbert

1    A    Who was that?

2    Q    That's the individual that was -- that you indicated was

3    struck by Mr. -- by my client, Mr. Brown.

4    A    Oh, okay.  No.  Didn't know him.

5         (Counsel conferring.)

6    BY MR. HERBERT:

7    Q    But you knew that he worked there, correct?

8    A    Yes.

9    Q    Okay.  And you knew that he worked there because you had

10   been there before?

11   A    Yes.

12   Q    What type of work did Mr. Howard do there?

13   A    One time I saw him stock shelves, but I don't really know

14   his exact job.

15   Q    Okay.  There was a lot of workers in the store, correct?

16   A    No.

17   Q    No?  How many?

18   A    All I know of is just that guy.

19   Q    Okay.  He would be the only one working in the store.

20   A    Yeah.

21   Q    Okay.  How about the Arab guys that were there, they didn't

22   work there?

23   A    No, that's the owners.  Like I guess they own the store.

24   Q    Okay.  You were shown the picture and you were asked

25   whether or not you knew the two police officers.

Gray - Cross by Herbert

1          Do you remember being asked that question?

2          And you said that you didn't, correct?

3    A    Yes.

4    Q    Okay.  Previously you've interviewed with the FBI, correct?

5    A    Yes.

6    Q    Okay.  And on that occasion -- and it was December 18th,

7    2012, correct?

8    A    I guess.  I don't know.

9    Q    Okay.  And on that date, you told the FBI agents that you

10   knew one of the officers from working at a store, a liquor

11   store, on 79th and Exchange, I believe.

12   A    I didn't know him, but somebody told me that he worked

13   there so ...

14   Q    Okay.  You indicated that when my client, Mr. Brown,

15   approached you, you said something to him along the lines of,

16   "Hey, you can't do that, there's cameras in here."

17   A    Yes.

18   Q    Do you remember saying that?

19   A    Yes.

20   Q    Okay.  And then Brown said he didn't care about that.

21   A    Yes.

22   Q    And this was before any physical action between Mr. Brown

23   and Mr. Howard, correct?

24   A    Yes.

25   Q    So Mr. Brown was aware of these cameras --

Gray - Cross by Herbert

1    A    Yes.

2    Q    -- at the point which he used physical force on this

3    individual, correct?

4    A    Yes.

5    Q    And you indicated that you saw Mr. Howard searched prior

6    to -- strike that.

7              You indicated on direct that you saw Howard searched

8    by the other individuals at the same time that the other

9    individuals were being searched.

10   A    Can you repeat that?

11   Q    Sure.

12             You indicated on direct that you -- that you remember

13   seeing Mr. Howard searched by the police.

14             Do you remember saying that?

15   A    Yes.

16   Q    Okay.  And this was at the same time that he was handcuffed

17   with all the other individuals?

18   A    No.  He -- I think he was handcuffed by himself.

19   Q    Okay.  He was handcuffed by himself?

20             You said some individuals were handcuffed to each

21   other, correct?

22   A    Yes.

23   Q    Is it your testimony that Mr. Howard was handcuffed by

24   himself?

25   A    I'm going to say I don't remember.

261

Gray - Cross by Herbert

1   Q   Okay.

2   A   But I knew he was handcuffed.

3   Q   And you don't remember because of the length of time.

4   A   Yeah.

5   Q   Okay.  The events are a little bit fuzzy in your mind

6   because of the length of time.

7   A   Yeah.

8   Q   And you don't remember every detail, correct?

9   A   Yeah, if I could go back, you know, and it will probably

10  come back to me if I could see the video.

11  Q   I'm saying as you're sitting here right now, you don't

12  remember every detail, correct?

13  A   I'm remembering.  It's coming all back.

14  Q   Oh, okay.  So better now than when you were asked questions

15  by the government?

16  A   No, it's about the same.

17  Q   Okay.  You testified about how my client, Mr. Brown, asked

18  you -- I'm sorry, asked Howard if he had anything, and Howard

19  told him, no, he did not have anything.

20  A   Yes.

21  Q   Do you remember saying that?

22  A   Yeah.

23  Q   Okay.  Isn't it true that Howard handed Mr. Brown a bag of

24  marijuana?

25  A   No.

Gray - Cross by Herbert

1    Q    Well, again, you were interviewed by the government on

2    December 18th, 2012.  And fair to say that that was closer in

3    time to the incident than it is today, correct?

4         You have to answer verbally.

5    A    Are you saying the date?  I don't -- I don't understand

6    what you're saying.

7    Q    That's all right.  I'll move on.

8         And on that date, when you interviewed with the

9    government, you talked about Howard, at the point in which he

10   lifted up his shirt, the officer asked Howard if he had

11   anything on him --

12        MS. JENKINS:  Objection, your Honor.  The lawyer is

13   reading from a statement to the witness as opposed to asking

14   questions.

15        THE COURT:  Right.  So you know how to do the

16   impeachment, so get him to affirm and then ask the question.

17   And is this -- is this under oath what you're reading from?

18        MR. HERBERT:  302.

19        THE COURT:  It's a 302.  Okay.  Can't do that then.

20   It's sustained.

21   BY MR. HERBERT:

22   Q    You were asked questions about the conversations between

23   Howard and Officer Brown at the point in which Howard lifted up

24   his shirt, correct?

25   A    Yes.

Gray - Cross by Herbert

1    Q    And when you were asked those questions, you told the
2    government that Brown -- I'm sorry, that Howard handed Brown a
3    bag of marijuana, correct?
4    A    No.  I don't remember that.
5    Q    You didn't tell them that?
6    A    No.
7    Q    So if it's contained within the report --
8    A    I don't remember.
9    Q    -- that's inaccurate.
10   A    I don't know.  I don't remember that.
11   Q    Just so I'm clear, you don't remember -- you don't remember
12   if you said that or you don't remember how it occurred?
13   A    I don't remember me saying that.
14   Q    Okay.  So you may have said it, you just don't know if you
15   said it.
16   A    No, I don't remember that.
17   Q    Okay.  You don't remember a lot of the details of this
18   incident, correct?
19   A    No.  I remember some.
20   Q    Okay.  Some, but not all.
21   A    Yeah, because of the time frame.
22            MR. HERBERT:  Nothing further.
23            THE COURT:  Okay.  Any redirect?
24            MS. JENKINS:  No, your Honor.
25            THE COURT:  Oh, okay.

Gray - Cross by Herbert

1              So you can step down, sir, and be excused.

2         (Witness excused.)

3              THE COURT:  You can call your next witness.

4              MS. ROMERO:  The government calls Mr. Taha Diban.

5         (Witness and Interpreter enter courtroom.)

6              COURT SECURITY OFFICER:  All the way up.  Right there

7    and face the judge.

8              THE COURT:  Please raise your right hand.

9              Do you swear that the testimony you are about to give

10   will be the truth, the whole truth, and nothing but the truth,

11   so help you God?

12        (Witness duly sworn through interpreter and takes the

13        stand.)

14             THE COURT:  Hold on.  I'm going to swear you in, too.

15             Please raise your right hand.

16             Do you solemnly swear that you will justly, truly,

17   fairly, and impartially act as an interpreter in the case now

18   before the Court, so help you God?

19             INTERPRETER:  I do.

20        (Oath administered to interpreter.)

21             THE COURT:  Thank you.

22             Let's have the microphones moved over a little closer

23   to you so that the jury can hear you, please.

24             Please be seated.

25             Thank you, John.

```
1              Towards you, since you will be --
2         (Interpreter complies.)
3              THE COURT:  Thank you.
4              TAHA DIBAN, GOVERNMENT'S WITNESS, SWORN
5              DIRECT EXAMINATION (Through Interpreter)
6    BY MS. ROMERO:
7    Q   Good morning.  Please tell us your name and spell your name
8    for the court reporter.
9    A   Taha. T-A-H-A.  Last name is D-I-B-A-N.
10   Q   And where do you live?
11   A   I live in the south side.
12   Q   Where are you from originally?
13   A   From Yemen.
14   Q   How long have you lived in the United States?
15   A   2001.
16   Q   When did you learn to speak English?
17   A   When I arrived to the U.S.
18             THE COURT:  Okay.  Hold on.  Just so -- I want you to
19   instruct the witness that he should keep his voice up so we
20   hear his voice as well, even though you're doing the
21   interpretation, please.
22        (Interpreter complies.)
23             THE COURT:  Thank you.
24   BY MS. ROMERO:
25   Q   Are you more comfortable testifying with the help of an
```

Diban - Direct by Romero

1    interpreter?

2    A    Yes.

3    Q    How far did you go in school?

4    A    Fourth grade.

5    Q    And how old are you?

6    A    I'm 38 years of age.

7    Q    Now, I want to direct your attention to September of 2012.

8         Where did you work at that time?

9    A    I was working for Omar and Salma.

10   Q    And where was Omar and Salma convenience store located?

11   A    2800 East 76th.

12   Q    By September of 2012, how long had you worked at the store?

13   A    Approximately three years.

14   Q    And what was your position or responsibilities at the

15   store?

16   A    I was a cashier.

17   Q    During the time that you worked in the store, did you ever

18   observe drugs being sold inside the store?

19   A    No.

20   Q    In September of 2012, specifically let's talk about

21   September 27th, 2012, how many employees were in the store that

22   day?

23   A    Three.

24   Q    And who was there?

25   A    Myself, Mohammad, and Jecque.

Diban - Direct by Romero

1  Q   And who was Jecque?  What was his job at the store?

2  A   He cleans floors and he also stocks the freezers.

3  Q   And who was Mohammad?  What were his responsibilities?

4  A   He also is a cashier.

5  Q   Now, directing your attention to approximately 1:00 o'clock

6  that day, do you recall if anything unusual happened at the

7  store?

8  A   Yes.

9  Q   Tell us, what did you see.

10  A   Two officers entered the store.  They -- they handcuffed

11  the customers.

12  Q   Were you or Mohammad handcuffed?

13  A   No.

14  Q   Did the police officers ask you questions about the store

15  employees when you -- when they entered the store?

16  A   Yes.

17  Q   What, if anything, did they ask you?

18  A   "Who is working here?"

19  Q   And how did you answer?

20  A   I said, "Myself and the other guy."  And then Jecque said,

21  "I also work here."

22  Q   Did the police officers ask you any questions about drugs

23  or guns in the store?

24  A   No.

25  Q   Did the police officers ask you any questions about any

Diban - Direct by Romero

1   drugs or guns that you had seen on Jecque or Mr. Howard?

2   A    No.

3   Q    Did you observe Mr. Howard get handcuffed?

4   A    Yes.

5   Q    And how -- where were you standing in the store in relation

6   to where Mr. Howard was handcuffed?

7   A    I was close to the door entrance to the cashiers.

8   Q    And approximately how close would that be to where

9   Mr. Howard was standing?

10  A    Six feet.

11  Q    Now, at some point did you observe Mr. Howard be

12  unhandcuffed?

13  A    Yes.

14  Q    And around that time, did any of the officers ask to search

15  Mr. Howard or for Mr. Howard to make anything visible to them?

16  A    He just lifted his shirt.

17  Q    Around that time, did Mr. Howard say anything to the

18  officers?

19  A    No.

20  Q    And could you see Mr. Howard's pants, and specifically his

21  pockets, from where you were standing where he lifted -- when

22  he lifted his shirt?

23  A    He had wide pants.  Yeah, his pants -- his pants were wide.

24  I didn't see anything.

25  Q    Did you -- did you see a gun in his pocket?

Diban - Direct by Romero

1    A    No.

2    Q    Did you see the shape of a gun on him?

3    A    No.

4    Q    Now, tell us what, if anything, the police officer did once

5    Mr. Howard showed him -- lifted his shirt.

6    A    He punched him in his face.

7    Q    After the police officer hit Mr. Howard in the face, did

8    they move towards an area of a cooler on the wall of the store?

9    A    Yes.  He grabbed him by his neck and took him to the cooler

10   area.

11   Q    All right.  I'm going to direct your attention to what's

12   been admitted into evidence as Government Exhibit 1, and

13   specifically it's the file titled "Front Right View" at minute

14   12:56.

15           INTERPRETER:  I'm sorry, can you speak up, please?

16           MS. ROMERO:  Yes.  It's the file titled Front Right

17   View at minute 12:56.

18       (Tape played in open court.)

19   BY MS. ROMERO:

20   Q    Mr. Diban, can you please explain to the jury, based on

21   what's on the screen right now, where were you standing at the

22   time that the defendant and Mr. Howard were by the coolers?

23   A    I was close to the cooler.

24   Q    And could you hear if the defendant or Mr. Howard made any

25   statements while they were at the coolers during what we just

Diban - Direct by Romero

1    saw?

2    A    No.

3    Q    At any point could you hear any statements that the

4    defendant made to Mr. Howard or to Jecque?

5    A    No.

6    Q    Now, what, if anything, did you do when you saw this police

7    officer punch one of the store employees?

8    A    I was surprised.

9    Q    At any point did you see Mr. Howard resist or threaten any

10   of the police officers in the store?

11   A    No.

12   Q    At any point did you see Mr. Howard try to fight or flee

13   the police officers?

14   A    No.

15   Q    Now, I want to direct your attention to what's been

16   admitted as Government Exhibit 1, the file titled Front Center

17   View.

18       (Tape played in open court.)

19   BY MS. ROMERO:

20   Q    In total, approximately how long were the police officers

21   in the store that day?

22   A    I would say around 45 minutes.

23   Q    And the clip we just saw indicated the police officers

24   were, at least one of them, was leaving the store with

25   Mr. Howard, correct?

Diban - Cross by Herbert

1   A    Yes.

2   Q    Around that time, did the defendant say anything to you?

3        INTERPRETER:  I'm sorry, say that again.

4   BY MS. ROMERO:

5   Q    Around that time, did the defendant say anything to you?

6   A    No.

7   Q    On the video, did you see the defendant speak to you?

8   A    Yes, the police, yes.

9   Q    What did he say?

10  A    He told me don't give the tape to anyone.

11  Q    What did you understand that to mean?

12  A    Meaning the video.

13  Q    Approximately when did you stop working at the store?

14  A    The same day, but I did go back to the store twice or three

15  times.

16       MS. ROMERO:  I tender the witness, your Honor.

17                   CROSS-EXAMINATION

18  BY MR. HERBERT:

19  Q    Good morning, Mr. Diban.

20  A    Good morning to you.

21  Q    Thank you.

22       I want to address that last point that you made.

23       You indicated on testimony that Officer Brown told you

24  don't give that tape to anyone as he was exiting the store.

25  A    Yes.

Diban - Cross by Herbert

1    Q    And you have met with the government on multiple occasions

2    for preparation for this trial, correct?

3    A    Yes, I did.

4    Q    And you were asked to tell them everything that you

5    remembered about the incident, correct?

6              MS. ROMERO:  Objection to the form, your Honor.

7              THE COURT:  Overruled.

8              You can answer the question.

9    BY THE WITNESS:

10   A    Yes.  They -- I was told that what you witnessed, you will

11   say what you witnessed.

12   BY MR. HERBERT:

13   Q    My question is you told them everything you remembered

14   about that incident, correct?

15   A    True.

16   Q    And it's fair to say that never once during those multiple

17   conversations did you ever tell them that Officer Brown came up

18   to you afterwards and said don't give that tape out?

19             MS. ROMERO:  Objection.

20             THE COURT:  Overruled.

21   BY THE WITNESS:

22   A    Can you repeat the question, please?

23   BY MR. HERBERT:

24   Q    Sure.

25             During those multiple conversations you had with the

Diban - Cross by Herbert

1    government, you were asked to explain everything that you

2    remembered about that incident that was relative to their

3    investigation, correct?

4    A    Yes, that is true.

5    Q    And you never once told anyone from the government during

6    those multiple interviews and occasions in which you were to

7    divulge everything you knew about the incident, you never once

8    told them that Officer Brown told you not to give the tape out,

9    correct?

10            MS. ROMERO:  Objection.

11            THE COURT:  Objection to the form is sustained.

12            MR. HERBERT:  Okay.

13   BY MR. HERBERT:

14   Q    You would agree with me that you never told anyone from the

15   government anything about Officer Brown directing you not to

16   divulge this tape.

17            MS. ROMERO:  Objection, your Honor.

18            May we have a sidebar?

19            THE COURT:  Sure.

20        (At sidebar outside the hearing of the jury:)

21            MS. ROMERO:  It was the disclosure letter we e-mailed

22   to you.  I can look for it.

23            Judge, the objection is Mr. Diban did, in fact, tell

24   us that moment in the tape the defendant made that statement to

25   him.  We produced that in a letter and disclosed it to him, so

Diban - Cross by Herbert

1   he has no good-faith basis for the question.

2           MR. HERBERT:  Okay, well, I don't know the contents of

3   that, but if you did tender it to me, then --

4           MS. ROMERO:  Yes.

5           MR. HERBERT:  -- I will move on.  But actually --

6           MS. ROMERO:  I move to strike, Judge.

7           MR. HERBERT:  He does not address it in this interview

8   in 2012.  And to the extent that he addressed it in a later

9   issue, I haven't seen it, have you?  I'm not saying that you

10  didn't give it, but I truly have not seen it.

11          THE COURT:  Well, go get the letter and show it to

12  him.

13      (Ms. Romero complies.)

14          THE COURT:  What I'll do is take a break and let them

15  get the document so that we can continue the discussion while

16  the jury is not in the box.

17      (Sidebar proceedings concluded.)

18          THE COURT:  Folks, I'm going to take care of a legal

19  matter, so why don't you take your morning break and we'll be

20  back in 15 minutes, okay?

21          COURT SECURITY OFFICER:  All rise.

22      (Jury out at 10:38 a.m.)

23      (Tendered.)

24          THE COURT:  I would ask that the witness step down and

25  go outside in the hallway while I handle this matter, okay?

Diban - Cross by Herbert

1    (Witness complies.)

2          THE COURT:  You can be seated, folks, those of you who

3    are watching.

4          MS. JENKINS:  Your Honor, what we've -- what we've

5    done here is we've pulled up an e-mail that the government sent

6    to Mr. Herbert on October 7 of 2015 at 3:30 in the afternoon.

7    We do not have the attached disclosure letter that the

8    government sent in the e-mail; however, we do have the content

9    of the e-mail, which indicates that the government is

10   disclosing that it would call Mr. Diban and a supplemental

11   disclosure regarding Mr. Diban is attached, including a

12   disclosure letter and a 302.

13         We can get a copy of the actual report, which is

14   downstairs in the U.S. Attorney's Office; but according to this

15   e-mail, this would indicate that Mr. Herbert would have

16   received the correspondence, or at least it would have been

17   sent to him, the disclosure letter and the 302.

18         What we don't have is the actual content of that

19   letter, and it sounds like Mr. Herbert does not recall whether

20   he -- I'll let him represent what he doesn't remember --

21         THE COURT:  And the 302 that was turned over states

22   that this witness did state that he was asked about the

23   videotape, to turn it over on a particular day; is that

24   correct?

25         MS. ROMERO:  No, Judge.  I wrote that e-mail.  It's

Diban - Cross by Herbert

1    the disclosure letter.  So I drafted a letter disclosing a

2    statement that Mr. Diban had made to myself as well as the FBI

3    agents that day or around that time.

4           THE COURT:  But the letter has the statement.

5           MS. ROMERO:  Correct.

6           THE COURT:  Okay.  So go get it so that we can -- are

7    you saying, Mr. Herbert, you didn't receive it?

8           MR. HERBERT:  No, I'm not saying that.

9           THE COURT:  Okay.

10          MR. HERBERT:  I'm saying I have no memory of ever

11   seeing this letter.  But if -- I believe the government, if

12   they represent what the letter says, then I will accept that.

13          THE COURT:  Okay.  So then we're stuck with the

14   situation where you crossed him saying he's never said it and

15   he, in fact, did say it.

16          So I will have to either strike that or permit you to

17   redirect and say, in fact, it was true.

18          But since it's a discovery issue and you wouldn't have

19   had a good-faith basis to impeach, my preference would be to

20   just simply strike the answers and the questions.

21          Do you have any objection to that?

22          MR. HERBERT:  Well, I do.  And if I could propose an

23   alternative --

24          THE COURT:  Sure, go ahead.

25          MR. HERBERT:  I object because my questions were

Diban - Cross by Herbert

1    relevant to at least to partial statements that were made by

2    Mr. Diban to the government.  We have one 302 -- well, we have

3    a couple 302s, but one relative to this incident.  And in that

4    302, he clearly does not mention anything about Brown

5    requesting the tape.

6           THE COURT:  Okay.  That would be a different form of

7    cross-examination, though.

8           Let me just go back to the actual questioning to see

9    what was said and what was answered on the record so far.

10          And it goes like this:

11          "My question is you told them everything you

12   remembered about that incident, correct?

13          "True.

14          "And it's fair to say that never once during these

15   multiple conversations did you ever tell them that Officer

16   Brown came up to you afterwards and said don't give that tape

17   out?

18          "Objection.

19          "Overruled."

20          Of course, I overruled the objection at that time

21   because impeachment by omission is a perfectly permissible form

22   of cross-examination, which is why I overruled Miss Romero's

23   first objection.

24          "Can you repeat the question, please?"

25          And then you said, "Sure."

Diban - Cross by Herbert

1      "During those multiple conversations you had with the

2   government, you were asked to explain everything that you

3   remembered about that incident that was relative to their

4   investigation, correct?

5      "Yes, that is true.

6      "And you never once told anyone from the government

7   during those multiple interviews and occasions in which you

8   were to" -- tell, you'll have knowledge -- I'm not sure what

9   that word is on the court transcript, "everything you knew

10  about the incident, you never once told them that Officer Brown

11  told you not to give the tape out, correct?

12     "Objection."

13     And then I sustained that one, so he didn't answer.

14     And then, finally, "You would agree with me that you

15  never told anyone from the government anything about Officer

16  Brown directing you not to divulge this tape."

17     Objection.  Sidebar.

18     So it is not appropriate to have crossed on that you

19  never told anyone anything about Officer Brown directing you

20  not to divulge this tape, so I'm going to strike that, and I'm

21  going to tell them to disregard it.

22     And there is no answer regarding whether he said

23  anything to the government yet.

24     You would still have the opportunity to cross, saying

25  that in the first interview he never said anything about the

Diban - Cross by Herbert

 1    tape, and it wasn't until the date that Miss Romero informed

 2    you of it that he did divulge to the government that he asked

 3    about the tape.

 4            So you still have that area of impeachment, which is

 5    that he divulged it many years later.  Right?

 6            MR. HERBERT:  Yes.

 7            THE COURT:  And so I think that will fix it.

 8            MR. HERBERT:  I agree with your Honor.

 9            MS. ROMERO:  And that's accurate.  That's true.

10            THE COURT:  Okay.  Very well.

11            MS. ROMERO:  Thank you.

12            THE COURT:  So if you have any question, I believe

13    that Miss Jenkins went to get the letter to actually show you,

14    in case you are concerned about the delivery of it, but I have

15    not heard that as an objection right now.

16            MR. HERBERT:  No, I believe what the government

17    represents --

18            THE COURT:  Okay.

19            MR. HERBERT:  -- but I would like to see the letter.

20            THE COURT:  Sure.  Okay.  You have a few minutes.

21    We'll take a few minutes for you to regroup.

22            LAW CLERK:  All rise.  This court is in recess until

23    11:00.

24        (Recess taken from 10:45 a.m. to 11:04 a.m.)

25        (In open court in the presence of the jury:)

Diban - Cross by Herbert

1          THE COURT:  Okay.  Please be seated, everyone.

2      (Witness resumes stand.)

3          THE COURT:  Have a seat.

4          And do you understand that you are still under oath,

5  sir?

6          THE WITNESS:  Yes.

7          THE COURT:  Okay.  Ladies and Gentlemen, before we

8  took our morning break, there were two questions that were

9  asked.

10          The first one asked about multiple conversations and

11  whether the witness had ever told anyone with the government

12  that Officer Brown told him not to give the tape out.

13          I am directing you to disregard those questions.

14  There were no answers to those two questions.  I'm ordering you

15  to just not consider them as part of your deliberation.  You

16  shouldn't have, because they're not evidence, the questions

17  aren't, remember?  But there's no need to consider them.

18          All right.  You may continue, Mr. Herbert, in the area

19  that we've discussed.

20  BY MR. HERBERT:

21  Q    Okay.  Mr. Diban, we'll try this again.

22          You were interviewed by the government in November of

23  2012, correct?

24  A    Yes.

25  Q    And that would have been a month or so after the incident

Diban - Cross by Herbert

1    at issue, correct?

2    A    Yes.

3    Q    Okay.  And fair to say that your memory of the incident was

4    better back then than it is now.

5    A    Yes.

6    Q    Okay.  And on that day in November of 2012, you were asked

7    to describe everything that occurred at the store with respect

8    to Mr. Brown striking Jecque Howard, correct?

9    A    Yes.

10   Q    And, in fact, you were asked about the police activity in

11   general, what they did when they came there and their reasons

12   for being there, they asked you questions to that extent,

13   correct?

14   A    Yes.

15   Q    Okay.  And you never told anyone from the government that

16   Brown came up to you and said get rid of that tape, correct?

17   A    Yes.

18   Q    And just so I'm clear and the jury is clear, yes, that's

19   correct, you never told anyone, correct?

20   A    Of course, my recollection is not that good, but it's

21   possible.

22   Q    Okay.  And you need -- you have an interpreter present

23   today, correct?

24   A    Yes.

25   Q    And that's because your understanding of English is not up

Diban - Cross by Herbert

1    to par to the point where you would feel comfortable answering

2    without an interpreter.

3    A    Yes.

4    Q    And there was no interpreter present when Officer Brown

5    allegedly made this statement to you that you testified to,

6    correct?

7    A    True.

8    Q    So you might have completely misunderstood what Officer

9    Brown said, correct?

10   A    I don't know.

11   Q    Okay.  You indicated that you quit working at the store,

12   correct?

13   A    Yes, I did.

14   Q    And when did you quit working at the store?

15   A    It was after the incident -- it was after the incident when

16   I went back in two or three days.

17   Q    Okay.  And why did you quit?

18   A    Because of the problem.

19   Q    What problem are you referring to?

20   A    That incident at the store.

21   Q    Okay.  Was that the only reason in which you quit?

22   A    Yes.

23   Q    Well, again, you spoke to the government in November 2012,

24   correct?

25   A    Yes.

Diban - Cross by Herbert

1    Q    Okay.  And on that date, you told the government that you

2    quit working at Omar and Salma as a result -- as a result of

3    the threats you received by people who live in the neighborhood

4    near the store.

5             INTERPRETER:  I'm sorry, I didn't hear the witness.

6        (Witness repeats.)

7    A    I do not recall.

8    Q    You do not recall if you told the FBI that statement or you

9    don't recall why you quit?

10   A    I quit only because of that incident.

11   Q    Okay.  Why did you tell the FBI then that you quit because

12   of the threats you were receiving by people who live in the

13   neighborhood near the store?

14   A    I told them that I was scared of the problems of the police

15   and also the black people coming into the store, and they just

16   barge in, they just come in.

17   Q    Okay.  So you did tell them that that was part of the

18   reason why you quit was because of the black people coming into

19   the store, correct?

20   A    Because there was a problem -- because there was a problem

21   with the blacks because it was due to me giving the videotape

22   to -- why did I give that videotape.

23   Q    So the black people from the neighborhood were coming in

24   and threatening you about giving them a video -- giving someone

25   a videotape?

Diban - Cross by Herbert

1    A    A lot of people were coming in and creating chaos in the

2    store, and some of them were threatening me.  They thought that

3    I had given the tape and -- to -- thinking that I was allied

4    with the government.

5    Q    Who were these people that came in and threatened you?

6    A    Customers.  I do not know them.

7    Q    Okay.  Black customers?

8         MS. ROMERO:  Objection, Judge.  Relevance.  He

9    indicated he didn't know.

10        THE COURT:  No.  Overruled.  He can answer.

11   BY THE WITNESS:

12   A    Yes.

13   BY MR. HERBERT:

14   Q    And black customers that normally came into the store?

15   A    Yes.  I would say customers.  And there were some new faces

16   as well.

17   Q    Okay.  And customers and new faces, and those people were

18   part of the crew that hung out outside the store?

19   A    I don't remember them.

20   Q    Okay.  But you were scared of these individuals that were

21   threatening you, correct?

22   A    Yes.

23   Q    You thought perhaps they would cause you harm, correct?

24   A    Yes.

25   Q    Including up to shooting you, correct?

Diban - Redirect by Romero

1    A    Yes.

2    Q    The store was a dangerous place, wasn't it?

3            MS. ROMERO:  Objection.  Foundation.

4            THE COURT:  Okay.  Overruled.  He's already testified

5    that it was in a bad neighborhood.  He can answer.

6    BY THE WITNESS:

7    A    Yes, it was bad.

8            MR. HERBERT:  Nothing further.

9            THE COURT:  Okay.  Any redirect?

10           MS. ROMERO:  Yes, your Honor.

11                        REDIRECT EXAMINATION

12   BY MS. ROMERO:

13   Q    Mr. Diban, you testified you worked at the Omar and Salma

14   convenience store for several years before September of 2012.

15   Correct?

16   A    Yes.

17   Q    And did you have the benefit of an interpreter in managing

18   or working at the store for those years?

19   A    No.

20   Q    In the store, you were able to manage using the English

21   language, correct?

22   A    Yes, things -- things that are associated with business,

23   daily, on a daily basis.

24   Q    And you had called the police before the incident on

25   September 27th, 2012, correct?

Diban - Redirect by Romero

1    A    Possible.

2    Q    That would have taken place in English as well, correct?

3    A    Yes.

4    Q    And Jecque Howard was an employee of the store who you

5    spoke to in English, correct?

6    A    Yes.

7    Q    Now, you were asked a lot of questions about the reason you

8    stopped working at the store.

9         What, if anything, specifically were you afraid of

10   after the incident with the defendant?

11   A    I was afraid that I would get harmed.

12   Q    By whom?

13   A    Because of this problem.

14   Q    Specifically the problem you're referring to is the beating

15   that took place at the store, correct?

16             MR. HERBERT:  Objection, Judge.  Leading.

17             THE COURT:  Objection to the leading is sustained.

18   BY MS. ROMERO:

19   Q    What incident are you referring to?

20             MR. HERBERT:  Objection -- I'm sorry.  Objection.

21   Asked and answered.

22             THE COURT:  Oh, no.  Overruled.

23   BY THE WITNESS:

24   A    The problem which was the incident in the store.

25   BY MS. ROMERO:

Diban - Redirect by Romero

1   Q    And my question to you, sir, is what -- what is the

2   incident that you are talking about?  Please be specific.

3              INTERPRETER:  Can you repeat the question, please?

4   BY MS. ROMERO:

5   Q    What is the incident you are referring to?  Please be

6   specific.

7   A    When the policemen came into the store and they beat --

8   they beat someone in the store.

9   Q    And who were you afraid of after that incident?

10  A    Anyone who would come into the store.

11  Q    Why?

12  A    Because I was not expecting that I would be subjected to

13  such a problem.

14  Q    You were asked questions about being afraid of customers at

15  the store, correct?

16  A    Yes.

17  Q    What time period were you referring to?

18  A    I was afraid that someone would walk in, the problem

19  happened when the policemen came and ...

20  Q    Were you afraid of Jecque Howard?

21  A    No.

22             MS. ROMERO:  Nothing further.

23             MR. HERBERT:  Nothing.

24             THE COURT:  Okay.  You can step down, sir.

25        (Witness excused.)

```
 1                THE COURT:  You can call your next witness.

 2                MS. ROMERO:  The government calls Sergeant Larry

 3    Snelling.

 4          (Witness enters courtroom.)

 5                COURT SECURITY OFFICER:  Up here, sir.  Just stand and

 6    face the judge.

 7                THE COURT:  Raise your right hand.

 8          (Witness duly sworn and takes the stand.)

 9                THE COURT:  Okay.  Have a seat.

10              LARRY SNELLING, GOVERNMENT'S WITNESS, SWORN

11                          DIRECT EXAMINATION

12    BY MS. ROMERO:

13    Q    Good morning, sir.

14                Please tell us your name and spell your last name for

15    the court reporter.

16    A    Good morning.  I'm Sergeant Larry Snelling.  Last name is

17    S-N-E-L-L-I-N-G.

18    Q    Where do you work?

19    A    I work for the Chicago Police Department.

20    Q    How long have you worked there?

21    A    23 years.

22    Q    What are your responsibilities?

23    A    Right now I'm in charge of recruit training, so I work at

24    the Education and Training Division.

25    Q    And specifically what do you do for the Education and
```

Snelling - Direct by Romero

1   Training Division?

2   A    I'm in charge of recruit training, so I run recruit

3   training.

4   Q    Have you ever been an instructor?

5   A    Yes, I have.

6   Q    And how long were you an instructor for in the academy?

7   A    Well, right now I'm currently still instructing, but I

8   started 2001.  I was a physical skills instructor until 2010.

9   Q    And prior to becoming an instructor, what were your duties

10  as a police officer with CPD?

11  A    I was assigned to the 2nd District.  I was also assigned to

12  the Englewood District.

13  Q    And just basically what are your responsibilities -- what

14  have they been over the years as an instructor for the academy?

15  A    Teaching use of force.  I teach a leadership class.

16  Running scenario-based training.  Physical skills.

17  Q    Now, what are the, just very general terms, what are the

18  different types of training that new recruits receive when they

19  go to the academy?

20  A    Recruits go through report-writing, use of force training,

21  and physical skills training.  We also put them through

22  scenario-based training.

23  Q    And is there a difference between legal training and

24  tactical training as used or explained in the academy?

25  A    Well, they're connected.  Taught separately.  The tactical

Snelling - Direct by Romero

1    training complements the legal training that they get.

2    Q   And what is tactical training?

3    A   Tactical training is hands-on training, so your physical

4    skills, defensive tactics technique, control tactics

5    techniques.

6    Q   What subjects have you personally taught over the years?

7    A   Use of force, defensive tactics, the physical skills, and

8    control tactics.

9    Q   Now, do you also teach new recruits about the

10    responsibilities of being a Chicago police officer?

11    A   Yes.

12    Q   What do you teach them about that?

13    A   The day they walk in, we tell them it's a noble profession.

14    They have to carry themselves professionally.  And they're here

15    to uphold the laws.

16    Q   Do you train recruits on the limits of police power?

17    A   Yes.

18    Q   What do you teach them about that?

19    A   That police powers are basically limited to not violating

20    the rights of citizens and to protect those rights of citizens.

21    Q   Now, with respect to use of force, in general terms, do you

22    teach use of force as a control technique?

23    A   Yes.

24    Q   Do you ever teach use of force as an investigative

25    technique?

Snelling - Direct by Romero

1    A    No.

2    Q    Do you teach recruits that it's proper to use force in

3    order to find evidence?

4    A    No.

5    Q    Why not?

6    A    Because use of force techniques and tactics are used to

7    control a subject based on his physical actions towards the

8    officer or someone else, not to get -- not to get information.

9    Q    Do you teach recruits about specific types of situations or

10   instances where it's proper to use force to control a subject?

11   A    Yes.

12   Q    And do you teach recruits about the relationship between

13   the need for force and the type of force or amount of force

14   that they use?

15   A    Yes.

16   Q    Now, under what circumstances do you teach that it's proper

17   for a police officer to escalate or transition to a higher use

18   of force?

19   A    That would depend on the actions of the subject that the

20   officer comes in contact with.

21   Q    And so what types of actions would you train your officers

22   on in terms of escalating force?

23   A    Well, when an officer uses force, that force has to be

24   effective in controlling the subject.  So if the officer is

25   using force that does not -- is not enough force to control the

Snelling - Direct by Romero

1   subject based on his actions, the officer can now transition to

2   a higher level of force.

3   Q    I'm going to ask you about the inverse.

4         Do you also train recruits that if the subject is

5   under control, that the use of force should be transitioned to

6   a lower level of force?

7   A    Yes, now that we -- we make sure that they understand that

8   transitioning can still be a tricky situation.  However, based

9   on the subject's actions, the officer can transition down to a

10  lower level of force based on the subject's response to the

11  officer's initial use of force.

12  Q    Do you teach officers that if they use force, it's their

13  responsibility to justify why force was used and why a

14  particular level of force was used?

15  A    Yes.  The officer has to understand the amount of force and

16  use it appropriately.

17  Q    And how do you go about teaching that?

18  A    Through scenario-based training.

19  Q    Tell us a little bit, just generally, what does that mean?

20  A    Well, we'll set up scenarios that are similar to real life.

21  Officers will approach as they would in a real-life situation.

22  If it's a situation where an officer has to use force to

23  control the situation, once that officer has used force, that

24  officer now has to explain why he used force.

25  Q    Now, is it fair to say that police officers encounter a lot

Snelling - Direct by Romero

1   of different types of people and situations as part of their

2   job?

3   A    Yes.

4   Q    And do you teach recruits physical control techniques that

5   they can use in these different types of situations?

6   A    Yes.

7   Q    Now, I'm going to ask you a few questions about situations

8   where -- and you referred to the term "subject".

9        Just to be clear, what do you mean by -- when you say

10  a subject, what do you mean by that?

11  A    A subject -- we use the term "subject" in the academy, but

12  it could be an offender or the person that the officer comes in

13  contact with or the person that the officer is investigating.

14  Q    I'm going to ask you about cooperative subjects.

15       What does that mean?

16  A    A cooperative subject is a subject who cooperates with an

17  officer's verbal direction.

18  Q    And what are the control techniques that you teach recruits

19  to use on cooperative subjects?

20  A    Verbal direction.  If it's an arrest situation, basic

21  holding techniques and control techniques for cuffing.

22  Q    Now, do you teach recruits to escalate force when a subject

23  is simply cooperative?

24  A    No.  If a subject is cooperating and the officer knows

25  that, no, we do not teach that, no.

Snelling - Direct by Romero

1  Q    Now, does the number of cooperative subjects that a police

2  officer deals with affect whether they can escalate force or

3  not?

4          So in other words, if there's more cooperative

5  subjects than police officers, is a police officer allowed to

6  use force?

7  A    The officer should have a heightened level of awareness.

8  However, if the subject's actions are cooperative, the officers

9  are -- should not use a level of force beyond basic verbal

10  direction or control moves.

11  Q    Now, I want to ask you about a term, "passive resister."

12  Are you familiar with that term?

13  A    Yes.

14  Q    And can you explain, what does that mean and how do you

15  teach that?

16  A    A passive resister is a subject who exhibits non-movement

17  in response to verbal direction from the officer.

18  Q    And what are the control techniques that you teach recruits

19  to use in order to control passive resisters?

20  A    Well, passive resisters, of course, verbal direction, but

21  they're not compliant with verbal direction, so certain things

22  can be used:  Pain compliance techniques, control holds, arm

23  bars, OC spray -- I'm sorry, OC spray under certain conditions.

24  Q    So let's break down some of those terms a little bit.

25          You said pain compliance.

Snelling - Direct by Romero

1    What does that mean?

2  A    A pain compliance technique would be an application to a

3  pressure-sensitive area, so that would be an area where the

4  nerve endings are close to the surface:  Tip of the nose, under

5  the tongue, behind the neck.  That -- an officer can apply a

6  level of pressure to one of those points and -- and to gain

7  compliance.  So we're gaining compliance through pain, but this

8  is not designed to create any tissue damage or any injury.

9  Q    Is a punch a pain compliance technique?

10 A    A punch is a direct mechanical strike, not a pain

11 compliance technique, no.

12 Q    You also mentioned holding techniques.

13    What do you mean by that?

14 A    Well, holding techniques, if we're trying to control

15 someone, one of the better ways of doing that is to control the

16 extremities, usually the arms, the delivery system, so barring

17 out the arms, locking the wrist, that type of hold technique.

18 Q    What does "barring out the arms" mean?

19 A    Well, locking the arm at the joints.  So basically the arm

20 has to bend to be effective.  So you want to straighten the arm

21 out so that it can't be bent.  It takes away some of the power

22 from the arm.

23 Q    And then you mentioned also the ability to use certain

24 types of instruments, such as pepper spray; is that right?

25 A    Yes.

Snelling - Direct by Romero

1   Q   Any other instruments in connection with passive resisters?

2   A   With passive resisters, they're -- they're -- as a pain

3   compliance technique, you can use certain control tools, but

4   they shouldn't be used as impact tools.

5   Q   Now, do you ever teach to use choking as a technique to

6   deal with a passive resister?

7   A   No.

8   Q   I'm going to ask you about the term "active resister."

9       Are you familiar with that?

10  A   Yes.

11  Q   What are the control techniques that -- I'm sorry, please

12  tell us, what does that mean?

13  A   An active resister is a subject who uses movement to avoid

14  physical control, so not limited to, but pulling away, pulling

15  the arms away, creating distance, fleeing and creating distance

16  in a slight flight, but full-blown flight would be running

17  away.

18  Q   And what are the control techniques that you teach recruits

19  to use with -- in the situation of an active resister?

20  A   So with an active resister now, there are emergency

21  take-down techniques, so there's techniques that can be used to

22  take the subject off of his feet to stop his flight.  There's

23  diffuse pressure striking, stunning techniques.  The OC spray

24  can be used here.  And no supervisor has to be notified under

25  those circumstances.  Can also use the Taser to use for an

Snelling - Direct by Romero

1    active resister to control.

2    Q    You used the term "emergency take-down."

3         What is the meaning of that as you teach it to

4    recruits?

5    A    Emergency take-down is when an officer understands that he

6    immediately has to get the subject off of his feet.  What we

7    teach is the higher the risk, the lower the subject.  So if he

8    poses a high risk, we want to get him down to the ground, get

9    him off of his feet.  This places the officer in a more

10   advantageous position to control.

11   Q    And you also mentioned stunning.

12        Can you explain a little bit what you mean by that?

13   A    Stunning is a diffuse pressure strike, so an open-hand

14   stun, slapping technique, is what most people would call it.

15   But it's not a direct mechanical strike, so it's -- it's a

16   dispersal of energy, so that energy is dispersed over a larger

17   surface area.  This is designed to create less tissue damage.

18   Q    Now, do you teach recruits to restrict breathing in order

19   to perform an emergency take-down?

20   A    I'm sorry, can you ask that again?

21   Q    Do you teach recruits to restrict breathing in order to

22   effectuate an emergency take-down?

23   A    We don't teach recruits to use any type of choke-holds when

24   using -- if it's just for an emergency take-down and the

25   subject has not exhibited any behavior that would classify him

Snelling - Direct by Romero

1    as someone who is using deadly force.

2    Q    And what about kicking?  Do you train officers on kicking

3    as a technique to control active resisters?

4    A    We teach kicking as a direct mechanical strike, but we do

5    not teach kicking when dealing with active resisters.

6    Q    All right.  So you started to talk about direct mechanical

7    strikes.

8            In what types of situations do you train officers to

9    use direct mechanical strikes?

10   A    When a subject becomes what an officer identifies as an

11   assailant.

12   Q    And as you teach that term, what does it mean?

13   A    An assailant is a person or subject who places an officer

14   or anyone else in reasonable fear of being attacked.

15   Q    And what are some of the specific techniques that you train

16   officers and recruits on when dealing with an assailant?

17   A    Well, there are different levels of assailants, so the

18   lower-level assailant, which would be -- because there are

19   three levels, the second and third.

20           We teach direct mechanical strikes, which would

21   include, but not limited to, punches, kicks, elbow strikes,

22   knee strikes, impact weapons, which would be your baton,

23   expandable batons.  Also emergency take-downs, OC spray, and

24   also the Taser.

25   Q    And is it correct to say that the techniques that you teach

Snelling - Direct by Romero

1   recruits to use on assailants are techniques intended to help

2   the officers protect their own well-being, as well as the

3   well-being of others, correct?

4   A   Yes.

5   Q   Now, do you train officers on how to communicate with their

6   partners in the context of dealing with these different types

7   of subjects?

8   A   Yes.

9   Q   Tell us a little bit about what you train officers on

10  regarding communication with their partner.

11  A   Well, based on what an officer sees, it can be a little

12  more advantageous for the officer to alert his partner of what

13  he sees or what's going on.

14  Q   So in scenario-based training, do you train recruits that

15  they should notify their partner of an imminent threat, for

16  example?

17  A   If -- if it's safe to do so and if the officer's response,

18  physical response, to that use of force is not immediate, so if

19  that officer has time, yes, we teach that he should.

20  Q   Now, do you also teach, in addition to control techniques,

21  that officers can radio for assistance?

22  A   Yes.

23  Q   And in what context do you teach recruits about that?

24  A   Well, if the officer feels that he needs help at the scene,

25  if he feels that there's a problem and there's more danger than

Snelling - Direct by Romero

1  he can handle himself, then he has the radio to radio for more

2  officers and back-up.

3  Q   Now, we talked a little bit about direct mechanical

4  techniques, I think is what --

5  A   Yes.

6  Q   -- what you called them.

7        When an officer uses these techniques, are they

8  trained to document that?

9  A   Yes.

10 Q   And what do you train recruits about how they have to go

11 about documenting when they use direct mechanical impact

12 techniques?

13 A   Well, any time an officer uses force beyond normal control

14 techniques, the officer has to document those actions in a

15 tactical response report.

16 Q   And so let's clarify.  You said "beyond normal control

17 techniques."

18        What are the normal control techniques that you're

19 referring to?

20 A   The -- the average and normal control technique would be

21 just basic control.  For an officer to take someone into

22 custody, even if the subject is cooperative, the officer has to

23 put hands on, so he still has to control the subject, he still

24 has to place cuffs on.  So that would be your basic control

25 technique:  An arm bar, barring out the arm, controlling the

Snelling - Direct by Romero

1    wrist.

2    Q    Now, is there a specific -- a specific type of report that

3    you train recruits on regarding reporting the use of force

4    beyond those normal techniques?

5    A    Yes.  That would be the tactical response report.

6    Q    All right.  And do you recall approximately when did the

7    Chicago Police Department begin using the tactical response

8    reports?

9    A    I believe it was late 2002.

10   Q    And during your experience as an instructor at the academy,

11   have you trained recruits on the use of the tactical response

12   report?

13   A    Yes, I have.

14   Q    Please tell us, what do you train recruits regarding how to

15   complete or -- actually, I'll take a step back.

16          Do you train recruits on the purpose of the tactical

17   response report?

18   A    Yes.

19   Q    What do you tell them about that?

20   A    Well, it's to document the force that was used, and it also

21   identifies the subject's actions and the officer's response to

22   the subject's actions.

23   Q    And what do you tell recruits about the importance of

24   accuracy in those, or truthfulness, in those reports?

25   A    Well, it's important to document as much as you can

302

Snelling - Direct by Romero

1  remember and as much as you know happened at that scene and to

2  report this accurately.

3  Q   Now, are the tactical response reports reviewed by any

4  other officers besides the police officer who completes it?

5       MR. HERBERT:  I'm going to object, Judge.  I think

6  this is beyond the scope of this witness, completion of

7  reports.

8       THE COURT:  I don't know -- I'm not on.  Hang on.

9       I don't know whether he has the ability to answer the

10 question, so I'll sustain a foundation objection and see if you

11 can lay that.

12 BY MS. ROMERO:

13 Q   Do you train recruits on the approval or review process for

14 tactical response reports?

15 A   No, we don't train the recruits on the approval or the

16 review process.  We train the recruits on their responsibility

17 for filling out that tactical response report.

18 Q   Do you inform them of the existence of a review process?

19 A   Yes.

20 Q   And what do you tell them about the existence of that

21 review process?

22 A   That it would be -- it will be reviewed by a sergeant,

23 their immediate supervisor, and then later reviewed by a

24 lieutenant.

25 Q   And do you tell them what the -- what the purpose of the

Snelling - Direct by Romero

1   review is?

2   A    The supervisors will review it for proficiency.

3   Q    What do you mean by that?

4   A    To -- to have a clear understanding that the document has

5   been filled out properly, like any other report.

6   Q    Specifically to a tactical response report, it's almost

7   like a multiple choice type form in connection with certain

8   sections, correct?

9   A    That's correct.

10  Q    There's different boxes --

11  A    Yes.

12  Q    -- to be checked?

13          Do you train recruits that if an event or technique

14  was not used or didn't happen that they should not check the

15  box indicating that it did?

16  A    Well, I wouldn't say we go that far in training.  What we

17  train recruits to do is to check the box corresponding to the

18  type of subject they've identified and to the best of their

19  ability list every action that they took against the subject.

20  Q    And switching gears to arrest reports, do you train, as a

21  part of the use of force training, recruits on how to document

22  use of force in arrest reports?

23  A    Arrest reports, the -- we stress that the arrest report has

24  to contain the probable cause for the arrest.  So we don't

25  stress that that information has to be in the arrest report

Snelling - Cross by Herbert

1  unless the subject or the offender is being charged with

2  battery to a police officer.

3  Q   Do you train recruits to accurately report the -- to

4  accurately report their -- I'm sorry, not -- do you train

5  recruits on the order in which they're to report information on

6  an arrest report?

7  A   To the best of the officer's ability, they should try to

8  record everything chronologically.

9  Q   And do you train or talk to recruits about the importance

10  of truthfulness in the arrest report?

11  A   Yes.

12          MS. ROMERO:  I have no further questions.

13          THE COURT:  All right.  Cross-examination.

14                    CROSS-EXAMINATION

15  BY MR. HERBERT:

16  Q   Good morning, Sergeant.  How are you?

17  A   I'm good.  How are you, sir?

18  Q   Good.  Thank you.

19          I was curious about a couple things in your testimony.

20          Specifically you talked about the transition from the

21  higher level of force to a lower level of force.  Remember

22  talking about that?

23  A   Yes, I do.

24  Q   And I guess my question is based on that, what types of

25  factors would allow an officer to transition, say, up to a

305

Snelling - Cross by Herbert

1   higher level of force?  And I'm sure there's many, but what

2   type of factors?

3   A    The subject changes his actions.  So if the subject is a

4   cooperative subject and he attempts to flee, he is now -- he's

5   now considered an active resister.

6            If he pushes the officer or strikes the officer, he's

7   now an assailant.

8            So the officer can transition to a higher level of

9   force to now defeat that attack.

10  Q    Okay.  And when you say "a higher level of force," the

11  officer can utilize a higher level of force than what the

12  offender is using as force, correct?

13  A    Yes.  What we teach officers and what we train officers to

14  do is to be one step above the subject or the assailant that

15  he's dealing with.

16  Q    Great.

17           And as far as size of the individuals, meaning the

18  officers versus the subject -- my trial partner noted that

19  you're a pretty muscular guy as you walked up to the witness

20  stand -- you being a muscular, big man, is there any situations

21  in which, when you deal with a subject, you can't use a certain

22  amount of force based upon the size of that subject?  Is that a

23  factor, I guess?

24  A    When -- size is not a factor when an officer is placed in a

25  position where he has to use force.  What we train officers to

306

Snelling - Cross by Herbert

1   do is to deal with what they have in front of them.  And if

2   it's an immediate threat, the officer will respond accordingly.

3   Q   Okay.  So just the fact that you're bigger than the

4   subject, that doesn't mean that you can't go to a certain level

5   of force based upon that fact alone, correct?

6   A   No.  No.

7   Q   Okay.

8   A   Size of the officer when dealing with an offender is no

9   factor.

10  Q   Okay.  You talked about passive resister.  And that -- I

11  think you described it as somebody -- non-movement and the

12  control techniques that you can use based upon that.

13          As you were describing it, I got the image of somebody

14  sitting in protest and with their arm folded and their legs

15  crossed, police tell them to move, they don't move.

16          Would that be an accurate example of a passive

17  resister?

18          MS. ROMERO:  Objection, Judge.  Beyond the scope.

19          THE COURT:  What I'm worried about more is the 702

20  analysis.

21          MS. ROMERO:  Uh-hum.

22          THE COURT:  So I'm going to -- I'm going to sustain

23  that objection and allow you to answer any questions about

24  training, but we don't have a hypothetical 702 witness here.

25  Okay?

Snelling - Cross by Herbert

1  BY MR. HERBERT:

2  Q   Well, as far as training, with a passive resister, do you

3  give recruits instruction and examples of what types of

4  situations or actions of a subject would make them a passive

5  resister?

6  A   Yes.

7  Q   And what are they?

8  A   Well, it's a person or subject who just does not respond to

9  verbal direction.  They refuse to move.

10 Q   Okay.  And the police are allowed to put their hands on

11 those individuals, pain compliance techniques, correct?

12 A   Yes.  If the situation calls for it, yes.

13 Q   Okay.  And control techniques, handcuffs, holding on to

14 somebody's arm --

15 A   Yes.

16 Q   -- that's part of your training as well?  Okay.

17         And you also talked about how your training dealt with

18 police response to active resisters and that an officer can

19 transition up when a subject goes from a passive resister to an

20 active resister, correct?

21 A   Yes.

22 Q   Okay.  And what types of actions on the subject's part

23 would turn that individual into an active resister?  What

24 examples do you teach to the recruits regarding that issue?

25 A   Movement to avoid physical control.  So pulling away,

Snelling - Cross by Herbert

1    creating distance between yourself and the officer, or even

2    attempting to engage in full-on flight.

3    Q    Okay.  You said pulling away.  If a police officer went to

4    grab somebody, do you teach this scenario:  If they go to grab

5    them and the individual attempts to not allow the officer to

6    grab him, would that be an example of an active resister?

7    A    Yes.

8    Q    Okay.  What about -- there doesn't have to be a certain

9    amount of movement that makes somebody an active resister;

10   isn't that correct?  It's not like somebody has to turn and run

11   away from the person before they become a resister and an

12   active resister.

13   A    No, it's movement, however slight, to avoid being

14   physically controlled by the officer.

15   Q    Okay.  Even if it's just a couple of inches.

16   A    Yes.

17   Q    That could still be an active resister, right?

18   (Indicating.)

19          MS. ROMERO:  Objection, your Honor.

20          THE COURT:  Okay.  Overruled.

21          You can answer it.

22   BY THE WITNESS:

23   A    Yes.

24   BY MR. HERBERT:

25   Q    Okay.  And when you talk about fleeing, I believe you

309

Snelling - Cross by Herbert

1    mentioned something about how fleeing does not -- that you

2    don't teach that fleeing is what we generally think of when

3    we're talking about fleeing, just turning and running away,

4    it's something less than that is what you teach, correct?

5    A    That's correct.

6    Q    Okay.  And fleeing could be somebody that moves a distance

7    away trying to avoid control of the police officer, correct?

8    A    Yes.  So just to clarify that, movement to create distance

9    to avoid physical control and creating distance between the

10   officer and the subject is considered a form of flight.

11   Full-on flight would be running away.

12   Q    And with respect to the TRR reports that you were asked

13   about, there is a box on there for fleeing, correct?

14   A    That's correct.

15   Q    And if a subject moved away from an officer and the officer

16   had to continue to move after that individual, then you

17   instruct your recruits that they can correctly check the box

18   "fleeing," correct?

19   A    Well, I don't know if we go as far as telling them that

20   they can correctly check the box "fleeing," but they can,

21   because that is a form of flight.

22   Q    Okay.  Thank you.

23        There would be nothing improper about checking the box

24   as "fleeing" in that situation --

25        MS. ROMERO:  Objection.

Snelling - Cross by Herbert

BY MR. HERBERT:

Q   That's what you instruct your recruits, right?

THE COURT:  That one is sustained.

BY MR. HERBERT:

Q   What other factors -- strike that.

We talked about an individual avoiding a police
officer taking control of him.

Let me ask you this:

If a subject bladed his stance so as to avoid the
police officer's ability to take control of that individual,
would that make -- would that blading of the stance, do you
teach your recruits that that is some type of an active
resister?

A   Bladed stance, no.  Actually what we teach a bladed stance,
that applies to what we call an assailant.

Q   Okay.  So it would be higher than an active resister,
correct?

A   A bladed stance facing the officer?  Yes.

Q   Okay.  And an active resister, I believe you said that the
police officer's ability to use force, according to what you
teach the recruits, is that they're able to use direct
mechanical strikes, correct?

A   I'm sorry, can you repeat that?

Q   Sure.

With an assailant, when somebody turns into an

311

Snelling - Cross by Herbert

1    assailant, you instruct your recruits that at that point police

2    officers are allowed to elevate or transition their level of

3    force and utilize such things as direct mechanical strikes,

4    correct?

5    A    That's correct, yes.

6    Q    And a direct mechanical strike is -- could be a

7    (indicating) punch, right?

8    A    Yes.

9    Q    And direct mechanical strike could be kicking somebody.

10   A    Yes.

11           MR. HERBERT:  Nothing further.

12           MS. ROMERO:  I have no questions.

13           THE COURT:  Okay.  Then you can step down and be

14   excused.

15       (Witness excused.)

16           THE COURT:  Call your next witness.

17           MS. JENKINS:  Your Honor, at this time the government

18   would read two stipulations and then call its next witness.

19           THE COURT:  That's fine.

20           MS. JENKINS:  Stipulation Number 2:

21           Government Exhibit 6 is a true and accurate copy of

22   the Chicago Police Department tactical response report, written

23   by defendant Aldo Brown on September 27th, 2012, under Event

24   Number 1227108076.

25           This tactical response report related to the events of

1    September 27th, 2012, at the Omar and Salma convenience store

2    located at 2800 East 76th Street in Chicago, Illinois.

3           The tactical response report was made and maintained

4    in the regular course of the Chicago Police Department's

5    business around the time of the events reflected in the

6    tactical report, and it is the regular practice of the Chicago

7    Police Department to maintain such records.

8           So stipulated?

9           MR. HERBERT:  So stipulated.

10          MS. JENKINS:  And Stipulation Number 3:

11          Government Exhibit 5 is a true and accurate copy of

12   the Chicago Police Department arrest report, written by

13   defendant Aldo Brown on September 27th, 2012 under Event Number

14   1227108076.

15          This arrest report related to the September 27th, 2012

16   arrest of Jecque Howard at the Omar and Salma convenience store

17   located at 2800 East 76th Street in Chicago, Illinois.

18          The arrest report was made and maintained in the

19   regular course of the Chicago Police Department's business

20   around the time of the events reflected in the arrest report,

21   and it is the regular practice of the Chicago Police Department

22   to maintain such records.

23          So stipulated, Counsel?

24          MR. HERBERT:  So stipulated.

25          MS. JENKINS:  Thank you.

```
 1              THE COURT:  Okay.  Your next witness?
 2              MS. ROMERO:  The government calls Vick Lombardo.
 3          (Witness enters courtroom.)
 4              THE COURT:  Please raise your right hand.
 5          (Witness duly sworn and takes the stand.)
 6              THE COURT:  All right.  Have a seat.
 7              You may proceed.
 8              VICK LOMBARDO, GOVERNMENT'S WITNESS, SWORN
 9                        DIRECT EXAMINATION
10   BY MS. ROMERO:
11   Q   Good afternoon, sir.  Please tell us your name and spell
12   your name.
13   A   Vick Lombardo.  Vick, V-I-C-K.  Lombardo, L-O-M-B-A-R-D-O.
14   Q   What do you do for a living?
15   A   I am an FBI agent.
16   Q   How long have you been with the FBI?
17   A   About 17 years.
18   Q   And currently what is your position at the FBI?
19   A   I am the supervisor for the Law Enforcement Corruption and
20   Civil Rights Squad.
21   Q   And what does your squad do?
22   A   We're broken up into a number of missions, but our main
23   missions are to investigate any type of malfeasance committed
24   by any sworn law enforcement officer -- federal, state, or
25   local -- as well as address civil rights investigations, which
```

Lombardo - Direct by Romero

1    include hate crimes, excessive force cases, and something

2    called the Freedom of Access to Clinics Act.

3    Q    How long have you been a supervisor in your group?

4    A    This particular squad, I've been serving as the supervisor

5    since September 2012.

6    Q    And prior to becoming a supervisor for that group, tell us

7    a little bit about your experience at the FBI.

8    A    I spent my first year, year and a half, working bank

9    robbery, kidnapping, and extortion on the Violent Crime Squad,

10   and then I worked on a Government Fraud Squad for about a year

11   and a half.  And then I spent the majority of my career working

12   public corruption cases -- Governor Ryan,

13   Governor Blagojevich -- a number of public corruption cases.

14   Q    How many FBI agents work in your squad?

15   A    Currently, there's 12 agents, and then we have task force

16   officers.

17   Q    And do you -- does the FBI in general and your squad in

18   particular work with any other agencies or groups in order to

19   investigate police misconduct in the Chicago area?

20   A    Yes, ma'am.

21            MS. RUSSELL:  Objection.  Relevance.

22            THE COURT:  I think it is relevant.  Overruled.

23   BY THE WITNESS:

24   A    Yes, ma'am.  We have actually embedded on our squad a

25   Chicago Police sergeant, an Illinois State Police sergeant, and

Lombardo - Direct by Romero

1   a Cook County Sheriff's officer to address any issues that may

2   come up with each of those departments, and we also work with

3   various chiefs' associations and local suburban departments.

4   BY MS. ROMERO:

5   Q   Now, typically how does the FBI go about investigating

6   cases involving police misconduct or excessive force?

7   A   Okay.  So specifically for civil rights or deprivation of

8   civil rights cases, in the Chicago area, specifically Chicago

9   Police Department, the majority of those referrals come from

10  the Independent Police Review Authority.  That is an

11  independent agency from the Chicago Police Department that

12  handles any kind of complaints against law enforcement

13  officers.

14  Q   And how long has the FBI worked with -- and I'll just refer

15  to it as IPRA -- how long has the FBI worked with IPRA to

16  investigate those types of cases?

17  A   Since before I joined the squad in September 2012.

18  Q   Now --

19          MS. ROMERO:  May I approach, your Honor?

20          THE COURT:  You may.

21      (Tendered.)

22  BY MS. ROMERO:

23  Q   I'm going to direct your attention first to what's been

24  admitted in evidence as Government Exhibit 1.

25          Do you recognize that disk?

Lombardo - Direct by Romero

1    A    Yes, ma'am, I do.

2    Q    And what is it?

3    A    It's a disk of the different views of the grocery store

4    where the incident occurred.

5    Q    And when is the first time that you reviewed or received

6    this particular video files contained on the disk?

7    A    Back in around October of the year of the incident.  It was

8    within a few weeks of the incident occurring.  We got -- we

9    received regular contact with IPRA and go through any kind of

10   complaints they received.  And at that time, they showed us the

11   video and we got a copy.

12   Q    And did you review Government Exhibit 1 prior to your

13   testimony?

14   A    Yes, ma'am, I did.

15   Q    And are the files contained consistent with what you saw

16   back in October of 2012?

17   A    Yes, ma'am.

18   Q    Now, I'm directing your attention to what's been marked as

19   Government Exhibit 10 Group.

20        Do you recognize those still shots as the group

21   exhibit that's marked in front of you?

22   A    Yes, ma'am.  These are still shots from the Front Center

23   View from the camera entering the grocery store.

24   Q    And do they truly and accurately depict the images

25   contained in the particular times indicated on the stills on

Lombardo - Direct by Romero

1    the video?

2    A    Yes, ma'am, to the best of my knowledge.

3         MS. ROMERO:  Your Honor, the government moves to admit

4    Government Exhibit 10 Group.

5         THE COURT:  Any objection?

6         MS. RUSSELL:  No.

7         THE COURT:  Okay.  It will be admitted.

8         (Said exhibit received in evidence.)

9    BY MS. ROMERO:

10   Q    Now, in addition to the video from the Omar and Salma

11   convenience store, did you obtain any other materials from IPRA

12   regarding the incident from September 27th, 2012?

13   A    Yes, ma'am.  In every case where we have these types of

14   allegations, we will receive an entire IPRA file with all the

15   Chicago police reports, the use of force records, TRRs,

16   whatever else.  It is reviewed for *Garrity* issues and then we

17   review it.

18   Q    And specifically why are the police reports of a particular

19   incident that's being investigated for misconduct, why are

20   those important to the FBI?

21   A    Well, it's important to understand the standpoint of where

22   the police officer is -- what they have seen, what they have

23   experienced.  What the FBI does not want to do is get into

24   Monday morning quarterbacking.  And what I mean by that is if a

25   particular officer took a particular action within the

Lombardo - Direct by Romero

1  guidelines of the use of force policies with their department,

2  and it's the equivalent of what any other officer in that same

3  position with the same training would have done, then we're

4  likely not going to move forward with it as a criminal

5  proceeding or investigate it.  So in cases --

6         MR. HERBERT:  Judge, I would object.  Narrative.  Ask

7  that that answer be stricken.

8         THE COURT:  Yeah, I'm going to sustain the objection.

9         So that answer that the agent just provided to you

10  about what they do in screening these issues should not be

11  regarded by you in any way for deliberations.  So strike it,

12  please.  And that was evidence.  Do not have it come into your

13  deliberations.

14         You may proceed.

15  BY MS. ROMERO:

16  Q   I'm going to ask you specifically about an arrest report

17  obtained regarding an incident -- an arrest that took place at

18  the Omar and Salma convenience store on September 27th, 2012.

19         Do you recall receiving and reviewing that report?

20  A   Yes, ma'am.

21  Q   All right.  I'm going to direct your attention to what's

22  been admitted into evidence as -- pursuant to the stipulation,

23  your Honor -- as Government Exhibit 5.

24         THE COURT:  That's fine.

25  BY MS. ROMERO:

Lombardo - Direct by Romero

1  Q   Do you recognize that document?

2  A   Yes, ma'am, I do.

3  Q   Can you just very simply explain to the jury what -- what

4  are we looking at right here?

5  A   We're looking at a Chicago Police Department arrest report.

6  Any time the CPD arrests someone, they will complete one of

7  these reports.  It will start out in a draft form, be reviewed

8  by a supervisor, and once it's approved it will have the final

9  approval marking on the top.

10         MR. HERBERT:  Judge, I'm going to object, based on

11  foundation for this witness to explain what he's testified to.

12         THE COURT:  Okay.  I'm going to sustain it as a

13  foundation objection solely, and then see if you can lay the

14  foundation for his understanding of that.  All right?

15  BY MS. ROMERO:

16  Q   How is it that you are familiar with arrest reports?

17  A   Having worked initially back in the late '90s in the Bank

18  Robbery squad, we would regularly review CPD reports as part of

19  our investigations because we worked jointly with CPD on our

20  Gang task force with our Bank Robbery and as well as with these

21  types of investigations.

22  Q   More broadly, does the FBI ever obtain arrest reports or

23  any other CPD police reports in the context of investigations

24  outside of the context of police misconduct?

25  A   Yes.

Lombardo - Direct by Romero

1          MR. HERBERT:  Judge, I'm going to object to relevance

2     of these questions for this witness.

3          THE COURT:  Okay.  Overruled.  There's relevance.

4          You may continue.

5     BY MS. ROMERO:

6     Q    And typically what ability does FBI have to access Chicago

7     Police Department reports?  How does that work?

8     A    In most cases, it's a memorandum of understanding.  We

9     share investigative reports.

10    Q    All right.  So directing your attention to page 3 of the

11    arrest report that's Government Exhibit 5, could you please

12    read the narrative section that's on the screen in front of

13    you?

14    A    Yes, ma'am.

15         (Reading:)  Event Number 08076.  This is an arrest

16    made by tactical unit 463B while conducting a narcotic

17    investigation at the above address listed within the 4th

18    District violence zone.  A/Os received information from a

19    concerned citizen that the above subject was selling narcotics

20    inside the store located at 2800 East 76th Street.  A/Os

21    relocated to the above address listed and observed the above

22    subject fitting the description given by the concerned citizen.

23    P/O Brown approached the above subject to conduct a field

24    interview, at which time the above subject stated to P/O Brown,

25    "I got some weed on me," and reached toward his rear pants

Lombardo - Direct by Romero

1    pocket, at which time P/O Brown observed a handgun inside the

2    above subject's rear pants pocket.  P/O Brown conducted an

3    emergency take-down for officer safety and recovered the gun

4    from the above subject's rear pants pocket.  The above subject

5    was trying to pull away from P/O Brown, at which time P/O Brown

6    delivered an open-hand stun to gain control of the above

7    subject.  The above subject was placed into custody, at which

8    time P/O Brown conducted a custodial search and recovered one

9    plastic bag containing seven plastic baggies containing a

10   crushed, green, leafy substance of suspect cannabis from the

11   above subject's rear pants pocket.  The above subject was

12   transported to the 4th District for further processing.  The

13   above subject stated, quote, I was carrying the gun for my

14   protection, end quote.

15   Q    Based on your experience, are you familiar with -- there's

16   a term A slash O.  Do you understand what that's referring to?

17   A    Typically it is an acronym for arresting officer.

18   Q    And directing your attention to the -- can you please read

19   for the jury what's indicated under the section "Attesting

20   Officer" of Government Exhibit 5?

21   A    It's showing the name A.D. Brown, with his police officer

22   number, badge number.

23   Q    And what's indicated above that?  What's actually the text?

24   A    (Reading:)  I hereby declare and affirm, under penalty of

25   perjury, that the facts stated herein are accurate and to the

Lombardo - Direct by Romero

1    best of my knowledge, information, and/or belief.

2    Q    And what is the date and time that's indicated for when

3    this document was electronically signed?

4    A    September 27th, 2012 at approximately 5:33 p.m.

5    Q    And just to clarify, is it military time on the --

6    A    It is military time.  17:33.

7    Q    Thank you.

8             I'm going to direct your attention now to what's been

9    admitted in evidence as Government Exhibit 6.

10            And are you -- tell us a little bit, as a result of

11   your experience, are you familiar with tactical response

12   reports?

13   A    Yes, ma'am.  They're required to be filled out when use of

14   force is necessary or utilized.

15   Q    And what's been your experience in becoming familiar with

16   tactical response reports?

17            MR. HERBERT:  Objection, Judge.

18            THE COURT:  Overruled.

19   BY THE WITNESS:

20   A    Can you ask the question again, please?

21   BY MS. ROMERO:

22   Q    How is it that you've become familiar with tactical

23   response reports as a result of your experience?

24   A    Much like the arrest reports, it's something I've seen and

25   dealt with over my career working with Chicago police officers.

Lombardo - Direct by Romero

1    Q    Now, if you could please read out loud for the jury --
2         (Counsel conferring.)
3    BY MS. ROMERO:
4    Q    Could you please indicate to the jury out loud, what box is
5    checked under the column that lists "Passive Resister" under
6    the row that says "Subject's Actions"?
7    A    Under "Subject's Actions," "Passive Resister," it's marked
8    "did not follow verbal direction."
9    Q    And beneath that, what is indicated as the "Member's
10   Response" to that situation?
11   A    He marked "Member Presence" and "Verbal Commands."
12   Q    Now, directing your attention to the column to the right
13   that's listed as "Active Resister" under the row that is
14   "Subject's Actions," what boxes are checked in connection with
15   that?
16   A    That the active resister fled or pulled away or both, and
17   that the response by the arresting officer was an open-hand
18   strike and an emergency take-down and cuffing.
19   Q    Now, with respect to the columns or general box that are
20   indicated as "Assailant, Assault, or Assailant Battery," are
21   any boxes checked in there?
22   A    No, they were all left blank.
23   Q    And specifically are there boxes in the row that says
24   "Member Response" that specifically say "Closed-Hand Strike
25   Punch"?

324

Lombardo - Direct by Romero

1    A    No, ma'am.

2    Q    Is there an entry for that any -- does it read that?

3    A    Well, there's an entry for it, but it's blank.

4    Q    And then next to that, does it say "kicks"?

5    A    Yes.

6         MR. HERBERT:  Judge, if I can just be heard?

7         This exhibit is in evidence.  We'll stipulate that the

8    witness will read correctly.  I don't -- I don't want to go

9    through every exhibit in here.  It's in evidence.

10        THE COURT:  Okay.  To the extent that it's

11   supplemental, it's overruled.

12        You can turn to the portions of the exhibit and ask

13   questions based upon the exhibit that is in evidence.

14        So continue.

15   BY MS. ROMERO:

16   Q    So to clarify, in this report was it disclosed that a

17   closed-hand punch or a kick were used on Jecque Howard?

18        MR. HERBERT:  Objection, Judge, to "disclosed."

19        THE COURT:  Oh, to the form of the question?

20        MR. HERBERT:  Yes.

21        THE COURT:  All right.  Sustained.

22   BY MS. ROMERO:

23   Q    Is there an entry on Government Exhibit 6 that indicates

24   that a closed-hand punch or a kick were used on Jecque Howard?

25   A    No, ma'am.

Lombardo - Direct by Romero

1   Q    Directing your attention to the signature line, can you

2   please read out loud which is the police officer that indicated

3   that they completed and were signing this report

4   electronically?

5              MR. HERBERT:  Judge, I'm going to object.

6              THE COURT:  Overruled.

7              MR. HERBERT:  Relevance.

8              THE COURT:  What is the basis?  You had one more?

9              MR. HERBERT:  Relevance to --

10             THE COURT:  Oh, relevance.

11             MR. HERBERT:  -- anything related to this.

12             THE COURT:  Overruled.

13  BY THE WITNESS:

14  A    Aldo D. Brown, 27 September 2012, at 17:20 and 30 hours.

15  BY MS. ROMERO:

16  Q    And that is basically 5:20, in regular --

17  A    Yes, ma'am.

18             MS. ROMERO:  I tender the witness, your Honor.

19             MR. HERBERT:  We have no questions.

20             THE COURT:  Okay.  You can step down.

21        (Witness excused.)

22             THE COURT:  You can call your next witness.

23             MS. JENKINS:  Your Honor, may we be heard briefly at

24  sidebar?

25        (At sidebar outside the hearing of the jury:)

1      THE COURT:  Okay.

2      MS. JENKINS:  Your Honor, the government is prepared

3  to rest at this time, but we wanted to just confirm one issue.

4      The government moved to -- moved to admit Government

5  Exhibit 4, which were a series of training records, and I

6  believe your Honor --

7      THE COURT:  It was a conditional admission, but then

8  you didn't challenge them on business records when you crossed.

9  It was just the challenge that you made at the final pretrial

10  conference.

11      MR. HERBERT:  I did challenge that he didn't have any

12  knowledge about any of the information contained within there

13  as far as how it was put in there, who input it in there,

14  had --

15      THE COURT:  I see, as far as the way it was

16  maintained.

17      MR. HERBERT:  Right.  He wasn't the keeper of the

18  records.  That was clearly established.

19      MS. JENKINS:  But his testimony was not that he was

20  the keeper of the records.  His testimony is that he is an

21  employee of the Chicago Police Department.  He is aware that

22  within the -- his responsibilities within the Internal Affairs

23  Department, he is aware that Chicago Police keep true and

24  accurate records of officer trainings as a part of its regular

25  course of business and that those records were made by a person

1    with knowledge at the time, and that the -- that is what he

2    testified to, because the question was whether or not the --

3    whether he was aware whether CPD keeps -- keeps and maintains

4    records related to officer training in connection with its

5    regularly conducted business activity, and his answer to that

6    question was yes.  Of course, his answer is not that he sits

7    around with thousands of police officers and makes sure they

8    keep training records --

9         THE COURT:  I think the testimony was that also these

10   roll call entries are done, I would imagine, entries are done

11   by various different people that are doing the roll call

12   trainings, right?  That's because each one is done at a

13   different time and a different date.

14        MS. JENKINS:  And it certainly would go to weight and

15   not admissibility.  He's free to argue, as he did on

16   cross-examination, that the -- that the particular CPD officer

17   who testified about the records admitted that an officer might

18   miss a training here or there or may not participate at all,

19   and that there is no -- that there -- it would be incumbent

20   upon the officer to follow up and make sure the training is

21   done.  It would go to weight and not admissibility.

22        THE COURT:  Your response?

23        MR. HERBERT:  I do.  I don't believe that proper

24   foundation has been laid.  This individual works for the FBI.

25        THE COURT:  Oh, no, no.

1          MS. JENKINS:  He's not.

2          MR. HERBERT:  I --

3          MS. JENKINS:  He works for the Chicago Police

4    Department and has been detailed to the FBI, but he is an

5    employee of the Chicago Police Department.  He's paid by the

6    Chicago Police Department.

7          MR. HERBERT:  But his role in the Chicago Police

8    Department before he went on the FBI task force he testified

9    was as an internal affairs officer.

10          These are training records pertaining to officers that

11    are held and stored and created by a unit that we don't know

12    who it is yet because he didn't testify to that.  He has no

13    idea who this person was or what unit inputted this

14    information.  He has no idea about the accuracy of this.

15          And just one other point.  I still don't know what the

16    relevance of these documents are.  But if the government is

17    going to argue them as substantive evidence that this is proof

18    that he violated his Fourth Amendment rights, I don't know what

19    they're being used for --

20          THE COURT:  Don't go there.

21          MS. JENKINS:  Not at all.

22          THE COURT:  That's not what it's for.  It's to show

23    that he was trained on the use of force and that he went

24    through the typical training that all recruits go through and

25    that he had knowledge of the parameters of the training.  And I

1  have specifically kept out from both of your arguments any kind

2  of definition of what that Fourth Amendment analysis would be

3  because I do think this jury is perfectly capable of reading

4  that jury instruction and talking about what is reasonable

5  under all the facts and circumstances, that we now have

6  information that they were trained on what to do under all

7  types of circumstances.  You cross-examined him about the

8  different types of circumstances.  And we've specifically -- I

9  have specifically removed that Fourth Amendment analysis that I

10  think this jury needs to do on their own without your help.

11  And so I think it's clean.

12       So my practical question for you is if I have not

13  admitted them as a business record, of course the one option is

14  for me to keep their case open for the purpose of going and

15  getting an individual from the Chicago Police Department to lay

16  the foundation for that record.

17       Is that what you're looking for?

18       MR. HERBERT:  No, I'm not, and I don't want you to go

19  through that.  But, you know, a bunch of the training classes

20  in there are completely irrelevant to this case.

21       THE COURT:  Yeah, we certainly didn't -- when it was

22  published, we didn't go through ones that were irrelevant, only

23  those that pertained to the types of facts that would be for

24  this case.

25       If you think in some way that that is prejudicial that

1      other types of classes are listed, I'm not sure.

2            MS. JENKINS:  May I just add briefly, we had a

3      discussion pretrial about the redaction of portions of this

4      record and, in fact, we've redacted records from September 2012

5      forward, and we didn't get any suggestion at that time, and I

6      realize it's a moving target, but --

7            THE COURT:  Well, he really didn't -- he objected to

8      that redaction in the final pretrial conference, and I ruled

9      against him in that regard as just being irrelevant.

10           MS. JENKINS:  That said, from the government's

11     perspective, if there are particular entries other than the

12     ones that we asked that witness about that you think are

13     particularly prejudicial, we're happy to make the appropriate

14     redactions if you think there is an entry or name or

15     description that would be inflammatory in some way.  Frankly, I

16     don't think they are.

17           THE COURT:  How could training be prejudicial to --

18           MR. HERBERT:  Well, I'm just thinking -- and perhaps

19     I'm overthinking it -- I think it's proper if foundation is

20     laid, which I'm not going to have them call in a keeper of

21     records, but it's proper to have those training classes that

22     Sergeant Moore identified, but everything else I don't think

23     there's any relevance to any of it, and I think it was only a

24     couple of classes.

25           MS. JENKINS:  Again, we had this discussion before,

1    but we'll, of course, defer to the Court on whatever is best.

2         Frankly, there's only three pages that I focused on

3    for purposes of my direct.  So ...

4         THE COURT:  I think the proper foundation was laid by

5    the witness, and so the admission -- the admission of the

6    document will be in, in its entirety.

7         I think there was an opportunity to work together to

8    redact anything, amongst yourselves, but you certainly could

9    have asked me to make that kind of ruling during the final

10   pretrial conference.

11        But, more importantly, I don't see how learning about

12   his very thorough training in all areas of the law is

13   detrimental to him in any way, shape, or form.  It shows him to

14   be actually up on a lot of the issues.  And so I don't see it

15   as being a problem.

16        MR. HERBERT:  Your Honor, may I just -- I just thought

17   of something.

18        THE COURT:  Sure.

19        MR. HERBERT:  And I'm assuming that there's classes in

20   there that talk about report-writing and all of that stuff.  I

21   think that that can have a negative influence on the --

22        THE COURT:  I don't know, you didn't highlight any

23   report-writing.

24        MS. JENKINS:  I didn't highlight -- my memory is

25   that -- I don't want to represent -- I don't want to

1    misrepresent.

2         THE COURT:  Over lunch you can look at that and see if

3    there's something else you need to work on, but the record is

4    going to come in.  And if you believe that there's still

5    something prejudicial, I'll give you one more bite at the apple

6    to see.  But I think someone's training record that shows that

7    he actually was prepared and going to class is not harmful to

8    your client but actually helpful to show that he is a

9    professional.

10        Anything else from the government?

11        MS. JENKINS:  With that, the government is prepared to

12   rest.

13        THE COURT:  Okay.  So I'll allow you to rest in front

14   of the jury, and then I will pick up your case at 1:30 this

15   afternoon.

16        MR. HERBERT:  Great.  Judge, I'm going to do a motion

17   for acquittal.

18        THE COURT:  Okay.  Do you want -- so then I'll meet

19   you back here at -- let's do 1:20 for that, and you can argue

20   your motion for acquittal.  Okay?

21        MS. RUSSELL:  If I may, Judge, I think Mr. Stacker and

22   his private attorney are here regarding the indemnity issue.

23        THE COURT:  So after we let the jury go out, let's see

24   what's going on with that.  Okay?  Thank you.

25        (Sidebar proceedings concluded.)

333

1          THE COURT:  Does the government have anything further

2     they would like to present?

3          MS. JENKINS:  No, your Honor, the government would

4     rest.

5        (Government rests.)

6          THE COURT:  Okay, folks, that is the government's case

7     in chief.

8          We do have a defense case that will be presented, and

9     we'll begin that defense case at 1:30 this afternoon.  So go

10    and have a nice lunch.

11         Remember, do not research anything on the internet or

12    anywhere else.  Do not talk about the case.  Enjoy all other

13    conversations, even the crying about the Cubs being only one

14    loss away from maybe being out again.  All right?

15         Did you have a question, sir?  Oh, I thought you were

16    raising your hand.  Okay.  Or you were just bemoaning their

17    fate, maybe.

18         Okay.  Thank you.

19         COURT SECURITY OFFICER:  All rise.

20       (Jury out at 12:23 p.m.)

21         THE COURT:  Okay.  You may be seated, folks.

22         Let me hear -- do we have the attorney here?

23         MR. HERBERT:  Yes.

24         THE COURT:  Okay.  Mr. Bischoff?

25         MR. BISCHOFF:  Yes.

334

1      THE COURT:  My understanding is your client has been

2   subpoenaed for this afternoon, and I also don't know the

3   circumstances of his case or his pending other matters.

4      Can you please state your name for the record and tell

5   me what you understand it to be, please?

6      MR. BISCHOFF:  For the record, Jerry Bischoff on

7   behalf of George Stacker, who is present.

8      I did receive a subpoena from the defense for

9   Mr. Stacker's testimony.  He authorized me to accept service on

10  his behalf.  He is present.  He -- I have advised him -- spent

11  a great deal of time with him, as a matter of fact -- and my

12  advice to my client was to not testify, to take the Fifth.  We

13  discussed that for -- at length.

14      That said, Mr. Stacker is here, he's available, and

15  he's willing to testify.  He's going to waive that right.

16      THE COURT:  Okay.  Is he here now, please?

17      MR. BISCHOFF:  He is.

18      THE COURT:  Okay.  If he could please step forward.

19      MR. BISCHOFF:  He's just outside --

20      THE COURT:  If you could bring him here, please.

21      MS. RUSSELL:  I'll get him.

22      THE COURT:  His name is Stacker or Stecker?

23      MS. JENKINS:  Stacker.  S-T-A-C-K-E-R.

24      THE COURT:  Thank you.

25      MS. JENKINS:  And just for purposes of the record,

335

```
 1    Officer Stacker was provided with statutory immunity for
 2    purposes of his grand jury testimony only before the grand jury
 3    in, I believe it was October of 2013 or thereabouts, so he was
 4    immunized statutorily, but only for the purpose of his
 5    testimony --
 6              THE COURT:  Only for the purpose of his testimony --
 7              MS. JENKINS:  And the order clearly states, which I
 8    have a copy of, if your Honor wishes to see it.
 9              THE COURT:  Okay.  Do you -- is that your
10    understanding as well?
11              MR. BISCHOFF:  That is my understanding.
12              THE COURT:  All right.  Let's talk with him first.
13              I'd like to see a copy of the letter, please.
14         (Pause in proceedings.)
15         (George Stacker enters courtroom.)
16              THE COURT:  Sir, if you could come up here, please.
17              Good afternoon.
18              GEORGE STACKER:  Good afternoon.
19              THE COURT:  Are you Officer Stacker?
20              GEORGE STACKER:  That's correct.  George Stacker.
21              THE COURT:  Okay.  Could you state your name and spell
22    the last name for the record, sir?
23              GEORGE STACKER:  Last name S-T-A-C-K-E-R.  Stacker.
24    First name George.  G-E-O-R-G-E.
25              THE COURT:  Thank you.
```

1          Okay, Mr. Stacker, the reason that I asked you to

2    call -- to come in and talk with me is because it's my

3    understanding that the defense has subpoenaed you to testify

4    this afternoon.  Are you aware of that?

5          GEORGE STACKER:  That's correct.

6          THE COURT:  Okay.  And you had this subpoena issued to

7    your attorney, because you are represented currently, correct?

8          GEORGE STACKER:  That's correct.

9          THE COURT:  Okay.  And your attorney had a

10   conversation with you and advised you about the potential

11   ramifications of testifying, right?

12         GEORGE STACKER:  That's correct.

13         THE COURT:  And he's telling me that he has advised

14   you against testifying.

15         Is that your understanding?

16         GEORGE STACKER:  Yes, it is.

17         THE COURT:  Okay.  So what I want to make sure you

18   understand is that you do have a constitutional right not to

19   incriminate yourself.  So right now what I'm looking at here is

20   the order from August 20th of 2013 regarding what we call -- do

21   you call it letter immunity?

22         MS. JENKINS:  That's actually statutory immunity --

23         THE COURT:  Oh, this is statutory --

24         MS. JENKINS:  -- but only for the purpose of the grand

25   jury --

1          THE COURT:  I see.

2          MS. JENKINS:  -- the special -- I believe it was the

3    September grand jury.

4          THE COURT:  Uh-hum.  Let me just read.

5       (Pause in proceedings.)

6          THE COURT:  Okay.  So this particular order, which was

7    issued by the chief judge back in the grand jury, ordered that

8    you would not be excused from testifying or giving evidence in

9    the proceeding before the special August 2012 grand jury

10   regarding the testimony and evidence on the grounds that it

11   would incriminate you and, therefore, you were ordered to

12   testify before the grand jury, and you weren't allowed to

13   assert the Fifth Amendment.  And yet it only applies to that

14   proceeding and the proceeding before the grand jury when you

15   testified.

16          Is that your understanding of what you were given as

17   far as your immunity order?

18          GEORGE STACKER:  That's correct.

19          THE COURT:  Okay.  All right.  So that means that

20   today when you take the stand and I put you under oath, you

21   could be asked questions that could incriminate you.  Your

22   answers could be used against you, and they could use those

23   answers to charge you with a criminal violation or with other

24   types of violations.  In fact, they could be used with the

25   police department, for example.

1              So if that is the case, I want to make sure you

2      understand that if you take the stand, you will be waiving that

3      constitutional right that you have not to incriminate yourself.

4              Do you understand that?

5              GEORGE STACKER:  Yes, I do.

6              THE COURT:  Okay.  And you have talked with your

7      attorney and, in spite of his advice, you have chosen to

8      testify?

9              GEORGE STACKER:  That is correct.

10             THE COURT:  Okay.  Then we will have testimony this

11     afternoon.  We're going to start up at 1:30.

12             GEORGE STACKER:  Thank you.

13             THE COURT:  Okay?

14             MR. BISCHOFF:  I just want to add one thing to your

15     admonishment.

16             I have also discussed with my client, and based on my

17     conversations with the government, I do believe that they take

18     the position that what he previously had testified to in front

19     of the grand jury was not entirely truthful, and I've also

20     advised my client of that fact.

21             THE COURT:  Okay.  Very well then, sir.

22             Do you understand that it's the government's position

23     that there were parts of the testimony before that were

24     untruthful, your attorney apparently has been conveyed that

25     information.

1          Do you understand that?

2          GEORGE STACKER:  Yes.

3          THE COURT:  Okay.  So there could be ramifications if

4     you testify, could incriminate you for perjury then, for lying

5     under oath, either now or prior in your grand jury proceeding.

6          Do you understand that?

7          GEORGE STACKER:  Yes.

8          THE COURT:  Okay.  And you do have a constitutional

9     right not to do that.

10          GEORGE STACKER:  Okay.

11          THE COURT:  Okay.  Thank you.

12          Since we are -- you may be excused, sir, until 1:30.

13     Thank you.

14        (George Stacker exits courtroom.)

15          THE COURT:  Since we're on the issue of constitutional

16     rights, have you had a chance to talk with your client -- I

17     know you told me he will be testifying, right?

18          MR. HERBERT:  Yes, he will be.

19          THE COURT:  Okay.  So do you want to talk with him

20     over lunch some more or --

21          MR. HERBERT:  Your Honor, I just don't see us getting

22     to Aldo Brown today because we have a number of witnesses.

23          THE COURT:  Well, I can still take care of this

24     matter, if that's the case.  My -- I want to make sure he

25     understands.  He also has a constitutional right, of course,

1    not to incriminate himself.

2              Are you ready --

3              MR. HERBERT:  Yes.

4              THE COURT:  -- for me to ask him those questions?

5              MR. HERBERT:  I am.

6              THE COURT:  All right.

7         (Mr. Brown approaches.)

8              THE COURT:  So Mr. Brown --

9              THE DEFENDANT:  Yes, ma'am.

10             THE COURT:  -- I want you to make sure that you

11   understand, sir, that, as I've told the jury more than once

12   over the last few days, it remains the government's burden to

13   prove you guilty beyond a reasonable doubt.

14             You do not have to testify.  That is not required.

15   You don't have to put on any case at all.

16             That burden of proof remains with them from the

17   beginning all the way through to the end when the jury

18   deliberates.

19             So if you want to testify in your case, you are

20   permitted to do that, of course.

21             But when you take the witness stand, you are waiving a

22   Fifth Amendment right not to incriminate yourself.  And you do

23   have that right.  You have a right not to testify.  You have a

24   right so that you will not say anything that could be used

25   against you, either here in this prosecution or in some other

1    prosecution or matter.

2            Do you understand that?

3            THE DEFENDANT:  Yes, your Honor.

4            THE COURT:  Okay.  Now, did you have a chance to talk

5    with your attorneys about waiving your right and testifying and

6    about what the consequences of that would be if you testify?

7            THE DEFENDANT:  Yes, your Honor.

8            THE COURT:  Okay.  And did Mr. Herbert and Ms. Russell

9    explain to you that those consequences could be damaging to you

10   in the sense that you could be charged with another crime or

11   you could have consequences within this proceeding?

12           THE DEFENDANT:  Yes, your Honor.

13           THE COURT:  Okay.  And after having that thorough

14   discussion with those attorneys, is it your desire to testify

15   in your own case?

16           THE DEFENDANT:  Yes, your Honor.

17           THE COURT:  Okay.  All right then.  I will permit him

18   to go forward as well as the other, and we will move with that.

19           And I thought there was one other issue.

20           Wasn't there one -- oh, you're going to work on

21   your --

22           MS. ROMERO:  Exhibit 4.

23           THE COURT:  -- exhibit.  Okay?

24           Thank you, Mr. Brown.

25           Thank you.  We'll see you at 1:20 for your motion.

1          MR. HERBERT:  Yes.  Thank you.

2          THE COURT:  Okay.  Thank you.

3          LAW CLERK:  All rise.  Court is in recess until 1:30.

4     (Lunch recess taken at 12:33 p.m.)

5                    C E R T I F I C A T E

6     I certify that the foregoing is a correct transcript of the

7  record of proceedings in the above-entitled matter.

8

9
   _/s/ GAYLE A. McGUIGAN_____          _April 30, 2016_
10  Gayle A. McGuigan, CSR, RMR, CRR                Date
    Official Court Reporter
11
                                               _April 30, 2016_
12  _____               Date
    Gayle A. McGuigan, CSR, RMR, CRR
    Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3  UNITED STATES OF AMERICA,        )  Docket No. 14 CR 674-1
                                    )
4                   Plaintiff,      )  Chicago, Illinois
                                    )  October 21, 2015
5            v.                     )  1:22 p.m.
                                    )
6  ALDO BROWN,                      )
                                    )
7                   Defendant.      )

8
                          VOLUME 3-B
9          TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
          BEFORE THE HONORABLE VIRGINIA M. KENDALL
10

11  APPEARANCES:

12  For the Government:     UNITED STATES ATTORNEY'S OFFICE by
                           MS. LINDSAY JENKINS
13                         MS. JESSICA ROMERO
                           Assistant United States Attorneys
14                         219 South Dearborn Street
                           5th Floor
15                         Chicago, Illinois 60604

16  For the Defendant:      LAW OFFICES OF DANIEL Q. HERBERT by
                           MR. DANIEL Q. HERBERT
17                         206 South Jefferson, Suite 100
                           Chicago, Illinois  60661
18
                           J. RUSSELL LAW LLC by
19                         MS. JENNIFER W. RUSSELL
                           206 South Jefferson, Suite 100
20                         Chicago, Illinois  60661

21  Also Present:           Mr. Connor Quinn, Student Intern

22  Court Reporter:         GAYLE A. McGUIGAN, CSR, RMR, CRR
                           Federal Official Court Reporter
23                         219 South Dearborn, Room 2318-A
                           Chicago, Illinois 60604
24                         (312) 435-6047
                           Gayle_McGuigan@ilnd.uscourts.gov
25

344

```
 1        (In open court outside the presence of the jury:)
 2             MS. ROMERO:  Good afternoon.  Jessica Romero again.
 3             MR. HERBERT:  Good afternoon, Judge.  Dan Herbert.
 4             THE COURT:  Okay.  Good afternoon.
 5             You wanted to make a motion?
 6             MR. HERBERT:  Yes.
 7             THE COURT:  You may do so now.
 8             MR. HERBERT:  Yes, Judge.
 9             At this stage I would like to make a motion for
10        acquittal at the conclusion of the government's case.
11             I believe that the information at this stage would not
12        allow for a reasonable jury to return a finding of guilt with
13        respect to any of the counts.
14             And I'm going to be very brief, Judge, but with
15        respect to Count One, the unlawful seizure, I believe that the
16        government has already declared that it is not claiming that
17        the seizure was unlawful.
18             MS. ROMERO:  Yeah, the reviewed indictment we gave you
19        does not have that allegation.
20             MR. HERBERT:  Okay, great.
21             And then as far as the unreasonable force, I
22        understand that it's the jury's determination.  I would just
23        say that based upon the evidence that has been entered in this
24        case that a reasonable jury could not -- could not return a
25        verdict of guilty based upon the witnesses, specifically
```

1    Mr. Snelling.

2            THE COURT:  Okay.

3            MR. HERBERT:  I do understand it's --

4            THE COURT:  Okay.

5            MR. HERBERT:  And then with respect to Counts Two and

6    Three -- with respect to Count Two, the witness clearly

7    identified this victim as being an active resister, fled,

8    pulled away.  I think that with respect to Count Two, this is

9    an issue that I don't believe a jury can return a finding of

10   guilt because I think that it's something that's somewhat

11   outside of their ability, because it's a technical term, and

12   that's what we're -- that's what we're looking at here is --

13   the undisputed evidence at the conclusion of the government's

14   case is that the entry of being an active resister, fled, and

15   pulled away, the undisputed evidence in this case is that that

16   was accurate, that it was not false in any way.  So I would say

17   that a jury could not find at this stage a finding of guilt

18   with respect to that.

19           And as far as punching and kicking, I think the

20   evidence, again, has shown that this information is not

21   required in any of the reports -- any of the reports identified

22   here by the government's own witnesses.  They talked about what

23   is needed in reports and they talked about the arrest report.

24   It needed information relevant to the probable cause charging.

25   And the case report is supposed to include all facts to support

1     the arrest report for the case going forward.

2             So with that, Judge, I would just -- I would ask that

3     you grant the motion.

4             THE COURT:  Okay.  Response, please?

5             MS. ROMERO:  Yes, Judge.

6             With respect to both counts that defense counsel

7     raised, the standard is that the evidence has to be considered

8     in the light most favorable to the government.  And it's the

9     government's position, in light of the video, the testimony of

10    the bystanders, and the testimony of the instructors who

11    explain the meaning of a lot of the terms as contained in the

12    TRR specifically, that there's enough evidence for the Court to

13    find that a reasonable jury could find the defendant guilty of

14    those counts.

15            THE COURT:  Okay.  And you're not going to go to the

16    first count?

17            MS. ROMERO:  So with respect to both counts, the

18    evidence is substantially the same.

19            With respect to Count One, we believe that when taken

20    in the light most favorable to the government, the video alone

21    provides enough of a basis for a jury to be able to reach the

22    decision in this case.  In addition, there was testimony.  And

23    even though it's the basis of the other counts, the false

24    statements in the report are also indicative of the defendant's

25    potential intent and knowledge and understanding with respect

1    to Count One.

2          And then, similarly, with respect to the remaining

3    counts, the information contained in the reports is

4    inconsistent with what's depicted on the video. And the terms

5    and the procedures for completing the reports, as were

6    explained by the instructors from the CPD academy, specific

7    with the TRRs, that they're instructed to indicate that all

8    actions that took place in the context of the use of force

9    should be reported on the report.

10          And on that basis, we think that the motion on each of

11    those counts should be denied.

12          THE COURT: Any reply?

13          MR. HERBERT: I'll rest on my previous argument.

14          THE COURT: Okay. All right. As to Count One, I

15    think that it is accurate to say that the video evidence itself

16    leads to -- excuse me, if taken in the light most favorable to

17    the government, leads to a potential conclusion that the victim

18    in the store did not resist or did not run away or did not

19    fight or give any actions that would require any force

20    whatsoever, so I think a reasonable jury could conclude that

21    the hitting and the kicking and the chokehold, if they find

22    that to be such, were excessive under the law, so that one

23    should go to the jury.

24          As far as the second and third, the reports are

25    inconsistent with what we view on the video, and so that

1    inconsistency raises one level for the government, but then the

2    second level is that the defendant would have known that he had

3    to write these reports differently based upon his training

4    within the academy and through the department.  And so I think

5    there is a potential for the jury to find all of those

6    elements.  And in the light most favorable to the government,

7    that is a possibility.  It is not a situation where I can say

8    that there is no way that they could reach that conclusion, and

9    that would not permit me, therefore, to take it away from them

10   and their determination.

11           So it's denied.

12           MR. HERBERT:  Thank you.

13           THE COURT:  And we will proceed.  Are you ready to

14   proceed?

15           MR. HERBERT:  Yes.

16           THE COURT:  We need Mr. Brown, though.

17           MR. HERBERT:  I'll get him.

18           THE COURT:  Okay.  We want to make sure we have him.

19           MR. HERBERT:  Should I bring the witness in now or

20   wait --

21           THE COURT:  You can bring the witness in.  That's

22   fine.  I just don't want to bring the jury out until he is

23   here.

24       (Defendant enters courtroom.)

25           THE COURT:  Oh, there he is.  Okay.

```
 1            Okay, Tresa, you can line them up.

 2            Is Ms. Russell around, too, or should I be waiting for

 3   her?  Or are you fine with where she is?  It takes them a while

 4   to line up anyway.

 5            Do we need to wait for Miss Russell?

 6            MR. HERBERT:  She's coming.  She's putting this

 7   witness on.  Do you want him to sit here?

 8        (Witness enters courtroom.)

 9            THE COURT:  No, he can come up here and stand.

10   Sir, if you would come up here.  And then when the jury comes in,

11   please stand and I'll swear you in.

12            THE CLERK:  All rise.

13        (Jury in at 1:31 p.m.)

14            THE COURT:  All right.  Please be seated, everyone,

15   and get settled.

16            We are going to start up now with the defense case.

17            Call your first witness, please.

18            MS. RUSSELL:  Judge, we call Officer Keith Ross.

19            THE COURT:  I didn't hear you.

20            MS. RUSSELL:  Officer Keith Ross.

21            THE COURT:  Thank you.

22            Please stand and raise your right hand.

23            THE WITNESS:  Sure.

24        (Witness duly sworn and takes the stand.)

25            THE COURT:  Okay.  Have a seat.
```

Ross - Direct by Russell

1      There are some exhibits on the witness stand, so could

2  we please retrieve those?

3          MS. ROMERO:  Yes, your Honor.

4          KEITH ROSS, DEFENDANT'S WITNESS, SWORN

5                DIRECT EXAMINATION

6  BY MS. RUSSELL:

7  Q    Mr. Ross, can you please state and spell your first and

8  last name?

9  A    My name is Keith Ross.  Last name Ross, R-O-S-S.

10  Q    Sir, where are you currently employed?

11  A    The Chicago Police Department.

12  Q    And directing your attention to September of 2012, where

13  were you employed at that time?

14  A    The Chicago Police Department.

15  Q    And what role do you serve at the Chicago Police

16  Department?

17  A    I was in Patrol then.

18  Q    What district did you work in?

19  A    The 4th District.

20  Q    And can you describe the 4th District for the Ladies and

21  Gentlemen of the Jury?

22  A    The entire district, it's probably the second largest

23  district in the city.  A lot of crime.  A lot of activity.

24  Just a big district.

25          THE COURT:  Miss Russell, I'm going to ask you to take

Ross - Direct by Russell

1    that microphone that's at the very corner of the jury box, turn

2    it towards you a bit -- yes -- because I'm having a little bit

3    of trouble hearing you.

4              MS. RUSSELL:  Okay.

5         (Counsel complies.)

6              THE COURT:  Thank you.

7    BY MS. RUSSELL:

8    Q    Are you familiar with the Omar and Salma corner store?

9    A    Yes, I am.

10   Q    And how are you familiar with the store?

11   A    Pretty much by being in Patrol, as well as being in CAPS,

12   pretty much familiar with that location and the store.

13   Q    When you say CAPS, what do you mean?

14   A    CAPS is Chicago Alternative Policing Strategy.  I was the

15   CAPS liaison for the 4th District, and I covered all 12 beats.

16   Q    When you say you were the CAPS liaison, can you please

17   describe what that means?

18   A    Well, as far as the liaison, I was as far as the go-to as

19   far as for all the beat and community meetings as far as I

20   actually facilitated all 12 meetings.  For any community

21   concerns, any community problems, I was made aware of them.

22   Q    Going back to September of 2012, did you receive any

23   information regarding different activity going on at the Omar

24   and Salma corner store?

25   A    Yes, I did.

Ross - Direct by Russell

1    Q   What did you do with that information?

2    A   I got that information, and I forwarded it to one of the

3    plainclothes tactical units.

4    Q   When you say you "forwarded it to," what do you mean by

5    that?

6    A   As far as via face-to-face, where I gave them that

7    information.

8    Q   Okay.  What specific -- strike that.

9         When you say the plainclothes tac. officers, what --

10   or beat officers, who specifically did you give the information

11   to?

12   A   Specifically, I gave it to Officer Stacker and Officer

13   Brown.

14   Q   What exact information did you share with them?

15   A   I shared the information as far as that was given to me

16   from a concerned citizen.

17   Q   What exact information did you share?

18   A   Specifically, it was related to drug activity, drugs being

19   sold at the particular location, Omar Food.

20   Q   And did you share with them any information regarding

21   weapons at that store?

22   A   Yes.

23   Q   What was the specific information you shared?

24   A   The information was stated as far as drugs were being sold

25   at the store by the security staff, as well as one of the

Ross - Direct by Russell

1    managers who actually managed the store.  It was stated that

2    the operation that was going on as far as they had drugs hidden

3    in a freezer supposedly in the back that did not work.  The

4    drugs were hidden inside the store.  The security was actually

5    security slash look-outs.  Specifically, they had weapons.  You

6    know, it wasn't detailed which one had weapon, but they had

7    weapons and drugs inside the store.

8    Q    So the information that you shared with them was the

9    security had weapons?

10   A    Yes.  Security.

11   Q    What does that mean?

12   A    Well, in the conversation --

13           MS. ROMERO:  Objection.

14           THE COURT:  All right.  Sustained.  Sustained.

15   BY MS. RUSSELL:

16   Q    When is it that you shared this information with Officers

17   Brown and Stacker?

18   A    Well, I can say within five minutes.  I met with the woman,

19   and I happened to see them, I flagged -- I flagged them down,

20   and I shared that information with them.

21           MS. RUSSELL:  No further questions.

22           THE COURT:  Before you begin, can you hold on just a

23   second?

24       (Pause in proceedings.)

25           THE COURT:  You can proceed with cross.

Ross - Cross by Romero

1                              CROSS-EXAMINATION

2    BY MS. ROMERO:

3    Q    Officer Ross, you testified you provided a tip to Officer

4    Brown and Officer Stacker regarding the Omar and Salma

5    convenience store, correct?

6    A    Correct.

7    Q    On what day did you provide that tip?

8    A    That had to be the day, if you want me to go back, the day

9    I was actually doing a report.  I was doing a burglary report.

10   Q    And sitting here today, do you remember what that day was?

11   A    It should -- it could have been, what, September the 23rd,

12   20 -- maybe September the 23rd, I think.

13   Q    So it's correct to say you did not provide the tip to the

14   defendant on September 27th, correct?

15   A    No, I did not.

16   Q    Or September 26th, the day before.

17   A    No, I did not.

18   Q    Or September 25th, the day before that?

19   A    No, I did not.

20   Q    In fact, you provided the tip several days before the

21   incident took place at the convenience store involving the

22   defendant, correct?

23   A    Correct.

24   Q    At the time that you provided the tip to the defendant and

25   his partner, did you share with them the circumstances under

Ross - Cross by Romero

1   which you had obtained the tip?

2   A   Yes, I did.

3   Q   And did you indicate to them that the person who had

4   reported this information to you had also provided unreliable

5   information to you regarding this burglary?

6   A   No, I did not.

7   Q   In fact, you indicated that you were called by this person

8   to investigate a burglary, correct?

9   A   Correct.

10  Q   But that you observed that, in fact, there was no forced

11  entry at that location, correct?

12  A   That still didn't say it wasn't a burglary.  We just didn't

13  see that anything broken where we would call out an evidence

14  technician, but there were no -- the items she said was gone

15  were missing.

16  Q   And the item was a dog?

17  A   A dog, a TV, and an Xbox.  The locations that she said they

18  were at, there was no TV, no Xbox, no dog.

19  Q   So in addition to not observing signs of forced entry, the

20  location she directed you to investigate was also not -- did

21  not corroborate her information, correct?

22  A   Well --

23  Q   Sir, please listen to my question.

24          MR. HERBERT:  Objection, Judge.

25  BY MS. ROMERO:

Ross - Cross by Romero

1    Q    In addition --

2              THE COURT:  That's sustained.  He was answering.

3              MS. ROMERO:  Okay.

4              THE COURT:  You can answer the question.

5    BY THE WITNESS:

6    A    Really, she reported a burglary.  We went and did the

7    preliminary investigation, which is investigate what she said

8    and what she said was taken.  That information was put in a

9    case report.

10             Now, as far as if it was actually determined that the

11   burglary was not -- actually was false, that was left up to the

12   Detective Division to investigate once they got the case

13   report.  We just did the preliminary investigation.  There was

14   no TV.  We went in the rooms, they were not there, and we put

15   it in the case report.

16             So I can't say if it was a burglary or not.  We just

17   did the case report.

18   BY MS. ROMERO:

19   Q    And my question to you, sir, is you did not inform Officer

20   Brown and Officer Stacker that the source of your information

21   about the store had provided unreliable information to you at

22   the same time as well, correct?

23             MS. RUSSELL:  Objection, Judge.

24             THE COURT:  Overruled.

25   BY THE WITNESS:

357

Ross - Cross by Romero

1   A    Can you repeat?

2              Because you saying unreliable information.  I don't

3   know if the information was reliable as far as from her

4   burglary or not.  We just did the case report.  And after we

5   did the case report, she relayed the information as far as

6   regarding the store.  And I got that information.

7              So far I really can't tell you that her burglary

8   report and -- her burglary was not, you know, was not valid.

9   You know, I can't tell you that.

10             MS. ROMERO:  Judge, can I ask that the question be

11  re-read?  I think it was non-responsive.

12             THE COURT:  (Reading:)  My question to you, sir, is

13  you did not inform Officer Brown and Officer Stacker that the

14  source of your information about the store had provided

15  unreliable information to you at the same time as well,

16  correct?

17             THE WITNESS:  You asking me this question?

18             THE COURT:  I'm rephrasing --

19             THE WITNESS:  Oh, okay.

20             THE COURT:  That's the question that she asked me to

21  re-read.

22             Would you like that posed again?

23  BY MS. ROMERO:

24  Q    Did you tell Officer Stacker or Officer Brown about the

25  fact that this source had provided unreliable information?

Ross - Cross by Romero

1          That's the question.

2     A   I told them I got the information from the source of the

3     burglary report, correct.

4     Q   Sir, do you understand my question?

5     A   You saying -- you asking me is it unreliable --

6              MS. RUSSELL:  Objection.

7              THE COURT:  Hold on.  Hold on, everybody.

8              Objection sustained for argumentative.  Rephrase.

9     BY MS. ROMERO:

10    Q   Did you tell Officer Brown and Officer Stacker that the

11    source of the information had also given other information that

12    was unreliable?

13             MS. RUSSELL:  Objection.  Asked and answered.

14             THE COURT:  Overruled.  I don't think we've gotten the

15    answer, and that's the point.

16    BY THE WITNESS:

17    A   The answer is -- I'm hearing you.  I just explained to you,

18    I got the information from the person that did the burglary

19    report, and that's -- I told them I got a burglary report, the

20    woman gave me a tip, and this is the tip.

21    BY MS. ROMERO:

22    Q   So you agree you did not tell them that this person had

23    provided unreliable information, correct?

24    A   I'm really not --

25             MS. RUSSELL:  Objection --

Ross - Cross by Romero

1  BY THE WITNESS:

2  A    -- I'm really not understanding what you saying --

3         THE COURT:  No, when you -- okay.  You need to stop

4  when she objects.

5         The objection to the phrase "unreliable" is granted.

6  Rephrase.

7  BY MS. ROMERO:

8  Q    You didn't tell Officer Brown and Officer Stacker, "The

9  person who gave me this information also provided other

10 information that has turned out to be false."  You did not say

11 that to them, correct?

12 A    No, I did not.

13 Q    Now, between September 23rd, 2012, and September 22nd --

14 I'm sorry, 27th, 2012, did the defendant or his partner ask you

15 for assistance in going to search the store at any point?

16 A    No, they did not.

17        MS. RUSSELL:  Objection.  Relevance.

18        THE COURT:  Overruled.

19 BY MS. ROMERO:

20 Q    Did they obtain a search warrant?

21 A    To my knowledge, I don't -- I'm not sure.

22 Q    Now, you were not present inside the store on

23 September 27th, 2012, correct?

24 A    Correct.

25 Q    The information that you provided to Officer Brown and

Ross - Cross by Romero

1   Officer Stacker indicated that both managers and security staff

2   of the store were armed; is that correct?

3   A    I wouldn't say she said both manager, because she didn't

4   specifically say.  As she gave me the information, it was about

5   six, seven males, male blacks standing outside, along with the

6   supposedly security.  She said security slash lookout.  That's

7   what she called them.

8   Q    So the -- go ahead.

9   A    She didn't say as far as that person or that person had the

10  weapon.  She stated the security had a weapon.

11  Q    And that these were located outside the store?  Is that

12  what you just said?

13  A    Supposedly on them.  Or in the store.  Not outside the

14  store.

15  Q    The people that you were just referring to, the male blacks

16  that you just referred to, she indicated to you they were

17  located outside the store, correct?

18  A    No.  I'm talking with her, looking right at the male blacks

19  standing outside the store.  We were talking on the street,

20  facing the store.  She didn't want to look that way.  She's

21  talking to me, and I'm looking at the store while she's talking

22  to me.  And it's male blacks standing right outside the store

23  while she's talking to me, and she's telling me the security

24  guards that's outside, security slash lookouts, are doing

25  the -- selling the drugs as well as got a weapon.  That's what

Ross - Redirect by Russell

1   she told me.

2   Q    Now, according to you, the information was specific to

3   those people who were located at the store in front of the

4   store on September 23rd, 2012, correct?

5   A    Correct.

6        (Counsel conferring.)

7   BY MS. ROMERO:

8   Q    And to clarify, she didn't give you the name of anybody,

9   correct?

10  A    No, she did not.

11  Q    And she indicated it was multiple male blacks, correct?

12  A    Correct.

13       MS. ROMERO:  I have nothing further.

14       THE COURT:  Okay.  Miss Russell, any redirect?

15       MS. RUSSELL:  Just briefly, Judge.

16                    REDIRECT EXAMINATION

17  BY MS. RUSSELL:

18  Q    Sir, you were asked a number of questions about unreliable

19  information.

20       Is it your testimony that you received information

21  regarding the burglary, you put it in the case report, you

22  observed items missing, and then the detectives would follow

23  up; is that correct?

24  A    Correct.

25  Q    And in your role as a Chicago police officer, when someone

Ross - Redirect by Russell

1   is filing a complaint, is it your job to determine reliability,

2   unreliability?  Or if they're interested in filing a complaint,

3   you file a complaint?

4          MS. ROMERO:  Objection.  Beyond the scope.

5          THE COURT:  Okay.  I think it's a tad beyond the

6   scope, but it's also -- it's also confusing, and it's heading

7   into 702 area, so ...

8          MS. RUSSELL:  Understood, Judge.

9          THE COURT:  If you can break it down, I will be happy

10  to let you try.

11  BY MS. RUSSELL:

12  Q   The information that was provided to you regarding the

13  burglary, do you know it to be false?

14  A   No.

15  Q   And when you receive a tip regarding criminal activity, is

16  that something you can ignore?

17  A   No.  Not always.

18         MS. RUSSELL:  Nothing further.

19         THE COURT:  Do you have anything further?

20         MS. ROMERO:  No, your Honor.

21         THE COURT:  Okay.  Sir, you can step down and be

22  excused.

23         THE WITNESS:  Okay.

24     (Witness excused.)

25         THE COURT:  And you can call your next witness.

```
 1              MR. HERBERT:  I'll go get him, Russ.
 2         (Witness enters courtroom.)
 3              COURT SECURITY OFFICER:  All the way up, please.
 4              THE COURT:  Please raise your right hand.
 5         (Witness duly sworn and takes the stand.)
 6              THE COURT:  All right.  Have a seat.
 7              You may proceed, Miss Russell.
 8              SENORA BEN, DEFENDANT'S WITNESS, SWORN
 9                        DIRECT EXAMINATION
10    BY MS. RUSSELL:
11    Q   Ma'am, can you please state and spell your first and last
12    name, please?
13    A   Sergeant Senora Ben.  S-E-N-O-R-A.  Last name Ben.  B-E-N.
14    Q   And where are you currently employed?
15    A   Chicago Police Department.
16    Q   In September of 2012, were you also employed at the Chicago
17    Police Department at that time?
18    A   Yes.
19    Q   And what was your role there?
20    A   I was the tac. sergeant.
21    Q   And what were your roles and responsibilities as a tac.
22    sergeant?
23    A   My role is to supervise over ten officers.  And we would go
24    out and conduct narcotics surveillance, gang activity, and
25    contact cards of individuals.  Whatever was needed in the
```

Ben - Direct by Russell

1    community.

2    Q    You indicated that you supervise a team.

3              Was Officer Aldo Brown on your team?

4    A    Yes.

5    Q    Was Officer George Stacker on your team?

6    A    Yes.

7    Q    On September 27th of 2012, did you happen to be called to

8    the store of Omar and Salma?

9    A    Yes.

10   Q    And how did you arrive there?

11   A    It was a supervisor request call that was -- that had me to

12   go there.

13   Q    And were you the supervisor that answered that call?

14   A    Yes.

15   Q    And when you arrived there, what did you observe?

16   A    When I got to the store, it was several males in the store,

17   a few sitting on the floor, and a couple standing maybe.

18   Q    Was there anyone outside the store?

19   A    Yes.

20   Q    How many people were outside?

21   A    Was one female outside at the time.

22   Q    And as you sit here today, do you know who that female was?

23   A    It was the mother of the individual.

24   Q    What individual?

25   A    Howard.

Ben - Direct by Russell

1    Q    And was there anyone other than the female outside?

2    A    Not at the time.  When I first got there, not at the time.

3    Just a female right then and there.

4    Q    And based on what the female told you, what did you do?

5    A    I went in the store, and I spoke to the individuals who

6    called for a supervisor before I spoke to the female.  And the

7    individual sitting on the floor at the time was, "Fuck the

8    police" --

9              MS. JENKINS:  Objection, your Honor.  Hearsay.

10             THE COURT:  Sustained.

11   BY MS. RUSSELL:

12   Q    So did you interview the individuals that were inside the

13   store?

14   A    I just asked who called for a supervisor.

15   Q    And did anyone respond?

16   A    One individual responded, but he started using --

17   Q    Can you tell me what you observed about that individual?

18   A    He was sitting on the floor, I guess in Indian style, and I

19   asked who called for a supervisor, and he told me I called --

20   not like he called, but he started right in going that "I

21   wanted to speak to somebody" and "fuck the police" --

22             MS. JENKINS:  Objection, your Honor.  Hearsay.

23             THE COURT:  Sustained.  Yeah.  The first part of the

24   answer was not, because it's not for the truth of the matter,

25   but why she responded.  The second part is.

Ben - Direct by Russell

1  BY MS. RUSSELL:

2  Q   How would you describe his behavior?

3  A   Irate.

4  Q   And did you learn who that person was?

5  A   Yes.

6  Q   Who was it?

7  A   That was Neal Paul I think his last name is.

8  Q   And do you now know that person to be Mr. Howard's brother?

9  A   Yes.

10 Q   Did you have an opportunity to have further conversations

11 with the individual that you know is now Mr. Neal and

12 Mr. Howard's mother?

13 A   The mother, yes.

14 Q   And what, if anything, did she indicate to you?

15      MS. JENKINS:  Objection, your Honor.  Hearsay.

16      THE COURT:  Calls for hearsay.  Sustained.

17 BY MS. RUSSELL:

18 Q   After you had the conversation with Mr. Neal's mother, did

19 you investigate further what had happened on -- inside the

20 store?

21 A   Yes.

22 Q   And what steps did you take to investigate?

23 A   I went in to talk to the --

24      MS. JENKINS:  Objection, your Honor.  Relevance.  Why

25 is it relevant?

Ben - Direct by Russell

1          THE COURT:  Well --

2          MS. JENKINS:  I apologize.

3          THE COURT:  -- that's my question.

4          Do you have something you can say to me outside of the

5    presence -- I mean in front of the jury or does it have to be

6    outside?

7          MS. RUSSELL:  Sidebar, please.

8          THE COURT:  Okay.

9        (At sidebar outside the hearing of the jury:)

10         MS. RUSSELL:  We're getting into --

11         THE COURT:  You can talk louder.  I can't hear you

12   when you whisper.

13         And when that's on, they can't hear you.

14         MS. RUSSELL:  All right.  So she's going to testify

15   that in the process of her investigation she spoke to several

16   people inside the store, and Mr. Howard was inside the store,

17   had an opportunity to speak with her, to talk to her, to make

18   any complaints to her about what happened and did not.  And

19   that's the extent of it.

20         MS. JENKINS:  He was under arrest.

21         THE COURT:  Yeah.

22         MS. JENKINS:  He presumably would have been advised of

23   his *Miranda* rights.

24         Why in the world would he have made a statement at

25   that time?

Ben - Direct by Russell

1    MS. RUSSELL:  When his brother is there and his mom is

2    there complaining -- the brother is complaining about his

3    injuries, she wasn't asking him -- interrogating him.

4    MS. JENKINS:  We don't have him to confirm that.  All

5    we know is that he was placed under arrest.

6    MS. RUSSELL:  The question was whether it's relevant

7    or not, and it's relevant to --

8    MS. JENKINS:  In light of your explanation --

9    THE COURT:  Ladies, would you all please remember that

10   I'm the one at sidebar that you're presenting your arguments to

11   and not each other?

12   MS. RUSSELL:  Yes.

13   THE COURT:  So your proper form of questioning would

14   have been when he was on the witness stand to say did you ever

15   ask -- or did you ever file a complaint or tell anyone at the

16   time that you were injured, and he could have answered that;

17   but now what you're doing is you've got an arrested defendant

18   in cuffs who has a right to remain silent, and there's so many

19   other potential inferences and constitutional violations that

20   could occur if we ask what -- why he didn't say something.

21   I mean, the inference of why he didn't say something

22   when he's been advised of his rights, that can't come out.

23   MS. RUSSELL:  She's also going to testify that she

24   observed Mr. Howard and he appeared with no injuries.

25   THE COURT:  You can talk about what he looked like and

Ben - Direct by Russell

1    what he -- what you observed and whether she observed injuries,

2    but you can't ask her whether she questioned him whether he

3    wanted to make a complaint after he was advised of his rights

4    and under arrest.  Okay?

5                MR. HERBERT:  Judge, I'm sorry to interrupt, but

6    Mr. Howard, just to be clear, Mr. Howard was asked on cross

7    whether or not he met with Sergeant Ben after the arrest.

8                THE COURT:  Okay.

9                MR. HERBERT:  And he admitted to that and he also

10   admitted that he did not tell her that he had been mistreated

11   by Aldo Brown.

12               THE COURT:  Right.  So that's in already.

13               MR. HERBERT:  Okay.

14               THE COURT:  Yeah, that's in already.  Okay?

15               MS. RUSSELL:  Right.  Okay.

16               THE COURT:  Okay.  Thanks.

17         (Sidebar proceedings concluded.)

18               THE COURT:  Okay.  Miss Russell, you can proceed.

19               MS. RUSSELL:  Thank you, Judge.

20   BY MS. RUSSELL:

21   Q    Sergeant, when you were on the scene that night, did you

22   observe Mr. Jecque Howard on the scene?

23   A    Yes.

24   Q    And did you observe him to have any injuries about his face

25   or person?

Ben - Cross by Jenkins

1    A    No.

2              THE COURT:  Anything?  Okay.

3              MS. RUSSELL:  No further --

4              THE COURT:  Are you --

5              MS. RUSSELL:  -- questions.

6              THE COURT:  Are you done?  Okay.

7         So any cross-examination?

8              MS. JENKINS:  Yes, your Honor.

9              THE COURT:  There you go.

10             MS. JENKINS:  Thank you.

11                       CROSS-EXAMINATION

12   BY MS. JENKINS:

13   Q    Good afternoon, Sergeant.

14   A    Good afternoon.

15   Q    Approximately what time would you estimate you arrived at

16   the Omar and Salma store that day on September 27th of 2012?

17   A    It was sometime in the afternoon.

18   Q    Were you personally present inside the store during the

19   events leading up to Mr. Howard's arrest?

20   A    No.

21   Q    So it's fair to say that you are not aware of -- at the

22   time you came to the store, you were not aware of what had

23   actually happened inside of the store based on your own

24   personal observations?

25   A    No, I was not aware at that time.

Ben - Cross by Jenkins

1   Q   Okay.  I'd like to show you what's been marked and admitted

2   into evidence as Government Exhibit 6.

3           It should appear on the screen in front of you.

4           MS. RUSSELL:  Objection, Judge.  It's outside the

5   scope.

6           THE COURT:  Okay.  Hold on.  I'll take a look at it

7   before we show the jury, so let me see.

8           JUROR:  There is --

9           THE COURT:  I just turned it off, and there's no

10  exhibit -- but thank you for that warning.

11      (Laughter.)

12          THE COURT:  They're all letting me get accustomed to

13  my new equipment.

14      (Pause in proceedings.)

15          THE COURT:  No, that's appropriate.  Objection

16  overruled.

17  BY MS. JENKINS:

18  Q   Sergeant, do you see the document in front of you marked as

19  Government Exhibit 6?

20  A   Yes.

21  Q   What is that document, generally?

22  A   This is a TRR.

23  Q   What does that stand for?

24  A   It's a tactical response report.

25  Q   Can I direct your attention to the bottom of the document

Ben - Cross by Jenkins

1   at the very end?

2          Did you electronically approve that document?

3   A   Yes.

4   Q   Did you review it before you approved it?

5   A   Yes.

6   Q   Did you conduct any independent investigation as to whether

7   or not the information contained in that report was accurate?

8   A   Meaning investigating asking the officers or the individual

9   that was in custody?

10  Q   No.  Did you -- did you perform any independent

11  verification of any of the information contained in the report

12  at the time that you approved it on September 27th?

13  A   Observing the individuals, yes.

14  Q   I don't know that the box is asking you about observing

15  individuals.

16         Where -- let me ask you the question.

17         Where does the form ask that you observed the

18  individuals?

19  A   Nowhere.

20  Q   Okay.  So my question was whether or not you independently

21  verified the accuracy of the information contained in the

22  report at the time you approved it at 5:41 on September 27th?

23         MS. RUSSELL:  Objection.  Relevance.

24         THE COURT:  Okay.  Overruled.

25         MS. RUSSELL:  Foundation.

Ben - Cross by Jenkins

1    BY THE WITNESS:

2    A    I verified the information from the officer that was --

3    that was -- submitted on this report.

4    BY MS. JENKINS:

5    Q    You verified it?

6    A    I -- he was sitting there.  He filled it out and I signed

7    it -- well, electronically signed it.

8    Q    So when I use -- let me ask you this:

9         When you use the word "verify," what do you mean?

10   A    I looked at the information on the report and checked -- he

11   checked the boxes, and everything was accurate to his

12   understanding.

13   Q    Officer, you would -- excuse me.

14        Sergeant, you would agree with me that you don't know

15   what was accurate to his understanding because you weren't

16   there, correct?

17   A    Correct.  I was not there.

18   Q    So is it fair to say that you reviewed and approved

19   Government Exhibit 6 for completeness?

20   A    Yes.

21        MS. JENKINS:  No further questions.

22        THE COURT:  Do you have anything on that,

23   Miss Russell?

24      (Counsel conferring.)

25        THE COURT:  Maybe you didn't, but maybe Mr. Herbert

Ben - Redirect by Russell

1    did.

2             MR. HERBERT:  I'm sorry.

3                      REDIRECT EXAMINATION

4    BY MS. RUSSELL:

5    Q    Sergeant, have you ever been disciplined for approving the

6    report reflected in the government's exhibit?

7             MS. JENKINS:  Objection.  Relevance.

8             THE COURT:  I -- you went into whether it was a

9    complete and accurate report, so she can ask the question.

10            It's only to this report, right?

11            MS. RUSSELL:  Yes.

12            THE COURT:  Okay.  Go ahead.

13   BY THE WITNESS:

14   A    No, I was not.

15            MS. RUSSELL:  Thank you.

16            THE COURT:  All right.  Are we done?

17            MS. JENKINS:  Yes.  Nothing from the government.

18            THE COURT:  Okay.  You may be excused.

19        (Witness excused.)

20            THE COURT:  And call your next witness, please.

21        (Witness enters courtroom.)

22            MS. RUSSELL:  Judge, we're calling Mr. George Stacker.

23            COURT SECURITY OFFICER:  Face the judge.

24            THE COURT:  Raise your right hand.

25        (Witness duly sworn and takes the stand.)

1              THE COURT:  Okay.  Have a seat.

2              And you may proceed when you're ready, Miss Russell.

3           GEORGE STACKER, DEFENDANT'S WITNESS, SWORN

4                  DIRECT EXAMINATION

5  BY MS. RUSSELL:

6  Q   Sir, can you please state and spell your name for the jury,

7  please?

8  A   Last name is Stacker.  S-T-A-C-K-E-R.  First name is

9  George.  G-E-O-R-G-E.

10  Q   And where are you currently employed?

11  A   4th District tac. team.

12  Q   Are you employed at the Chicago Police Department?

13  A   That is correct.

14  Q   And in what role are you employed?

15  A   I'm a tactical officer.

16  Q   And when you say you're a tactical officer, what do you

17  mean by that?

18  A   What my assignments are is that we deal with gangs.  We

19  deal with African-American gangs, we deal with Hispanic gangs.

20  We deal with numerous gangs.

21  Q   Outside of that, what are your other responsibilities?

22  A   We deal with guns, drugs, different aspects, hazard aspects

23  in the community.

24  Q   And what was your position in September of 2012?

25  A   I was acting as a tactical officer.

Stacker - Direct by Russell

1  Q    And what district or area are you responsible for

2  patrolling?

3  A    4th District.

4  Q    And directing your attention to October 15th, 2013, did you

5  testify before the grand jury in this matter?

6  A    Yes.

7            MS. JENKINS:  Objection, your Honor.

8            May we be heard at sidebar?

9            THE COURT:  Yeah.  I can't believe we have to keep

10 doing this, but we will.  One more sidebar.

11      (At sidebar outside the hearing of the jury:)

12            THE COURT:  I really don't know where you're going

13 with this, but you just don't start with someplace's grand jury

14 testimony.  It's his testimony here today.

15            MS. JENKINS:  It can only be --

16            THE COURT:  Go ahead.

17            MS. JENKINS:  It would only be relevant --

18            THE COURT:  How about to me and not to --

19            MS. JENKINS:  Your Honor, you're correct, of course.

20            From the government's perspective, it could be used to

21 impeach him if he gives inconsistent testimony here today --

22            THE COURT:  Right.

23            MS. JENKINS:  -- but the jury should -- this jury

24 should not be instructed that he testified before a prior -- in

25 a prior proceeding before a grand jury and certainly not with

Stacker - Direct by Russell

1   immunity unless and until we get to that point.

2          THE COURT:  That's right.  Okay.  So just direct

3   questions.

4          Can you do that without going to his testimony?

5          MS. RUSSELL:  Judge, we think the fact that he was --

6   his testimony was -- or the government granted him immunity to

7   testify before the grand jury is relevant here and --

8          THE COURT:  Okay.  So here's the situation:  He

9   received a benefit before, but he doesn't have that benefit

10  now.

11         MS. RUSSELL:  That's correct.

12         THE COURT:  And so if you're -- because the testimony

13  before the grand jury was protected, that testimony actually

14  had the potential for having a bias, if he were -- whatever he

15  said there was protected.

16         And so you would then have the ability to say at that

17  time, you could say whatever you wanted to say because you had

18  protection.

19         But now since he's not protected, you don't have that

20  same bias level.

21         So what you instead have is you have him to tell a

22  story.  And then if you want to front the fact that that story

23  is inconsistent with what he has said on a previous occasion, I

24  would permit you at the end of that to say:  Did you testify

25  differently before?

Stacker - Direct by Russell

1          You could front that, if you would like to do that.

2          But right now we don't have the same bias level

3     because he's not -- he's not protected right now.

4          MS. RUSSELL:  Right.

5          THE COURT:  Do you see the difference?

6          MS. RUSSELL:  I definitely do.

7          THE COURT:  Yeah.  So you can use it to impeach him

8     yourself.

9          MS. RUSSELL:  Which we obviously won't be doing.

10         THE COURT:  Right.  Right.

11         MS. RUSSELL:  But we do think the fact he did receive

12    immunity at the prior grand jury proceeding is relevant.

13         Do you want to add --

14         MR. HERBERT:  Judge, if I can --

15         THE COURT:  Sure, give me some --

16         MR. HERBERT:  Jen is not going to get into his grand

17    jury testimony.  I think that's a point of confusion.

18         She is going to ask him questions relative to the

19    incident.

20         She merely wants to front the fact that you were given

21    a benefit by the government on this particular day.  That's it.

22         And then she's going to move into tell me what

23    happened on September 27th.

24         THE COURT:  And I see that, except how does giving --

25    how does having his testimony protected on a previous day

Stacker - Direct by Russell

 1   impact whether he's a truth-teller today when he's not

 2   protected?

 3           MR. HERBERT:  I would argue that the jury has seen so

 4   much of George Stacker and heard so much about George Stacker

 5   that it would be prejudice if we were not allowed to instruct

 6   the jury that George Stacker has not been charged criminally in

 7   this case.

 8           I think it's -- the jury could really --

 9           THE COURT:  Well, that's completely improper whether

10   he -- he could still be charged, I mean, for all I know.

11   That's completely improper to go into whether or not he's been

12   charged.

13           So I think what you need to do is I think you can --

14   you can tell his story.  If he's attacked for credibility

15   purposes, I suppose you could have a prior consistent statement

16   because it's under oath.  They would have the prior

17   inconsistent statement under oath.

18           But the -- I mean, I'll entertain if there comes a

19   point where his immunity before would impact his truth-telling

20   now -- I mean, can someone give me a scenario where that works?

21           MS. JENKINS:  From the government's perspective, it

22   doesn't seem there would be one unless and until he testifies

23   inconsistently, at which point he would be impeached with his

24   grand jury transcript; and, in fairness, the jury should be

25   advised at that time, in fact, when you testified before the

Stacker - Direct by Russell

1   grand jury, you received some benefit.

2          THE COURT:  Yeah, yeah.

3          MS. JENKINS:  That's the full -- but as it stands --

4          THE COURT:  I do think that's the right format.  I

5   really do.

6          MS. JENKINS:  If he gives consistent testimony, then

7   like any other witness who testified before the grand jury,

8   including witnesses you've heard from here --

9          THE COURT:  It's an oddity because usually it's the

10  government who has got the grand jury transcript.

11         MS. RUSSELL:  We fully understand that.

12         THE COURT:  Right.  Right.  So you're on a flip-flop

13  state this whole trial.

14         MS. RUSSELL:  Right.  Right.

15         THE COURT:  So that is correct.  I'm not going to

16  allow you to reference the grand jury yet.  I'm not going to

17  strike the statement yet because it may come out.  If it

18  doesn't come out, then I'll strike it later.  Okay?  But I

19  don't think it's prejudicial just yet.

20         MS. RUSSELL:  And if it does come out at that time --

21         THE COURT:  Absolutely.  Yes.  Right.  And I think it

22  will at some point, depending on what's said, what's being

23  said.

24         MS. RUSSELL:  Okay.

25         THE COURT:  Okay?  Are we all on the same page?  Okay.

Stacker - Direct by Russell

1    Thank you.

2         (Sidebar proceedings concluded.)

3              THE COURT:  Okay.  The objection is sustained, and we

4    will move on.

5              Miss Russell, you may proceed.

6    BY MS. RUSSELL:

7    Q    Officer, directing your attention to the date of

8    September 27th, 2012, were you on duty on that date?

9    A    That's correct.

10   Q    And did you have a partner?

11   A    Yes, I did.

12   Q    Who was your partner?

13   A    Officer Aldo Brown.

14   Q    And on that date, did you go to the corner store called

15   Omar and Salma?

16   A    That is correct.

17   Q    Where is that store located?

18   A    2800 East 76th Street.

19   Q    Can you describe that store?

20   A    It's a small store.  It's a very nasty store.  A lot of

21   drug activity in there.  A lot of crime is ridden around there.

22   Q    Can you describe the area where the store is located?

23   A    Directly on the corner of 76th and Coles.

24   Q    What neighborhood is that?

25   A    That area is called -- that neighborhood is called Terror

Stacker - Direct by Russell

1    Town.  It borders two gangs on one side, gang Blackstone --

2              MS. JENKINS:  Objection, your Honor.

3              THE COURT:  Sustained to the characterization.  And I

4    don't think the reference that we're going down is also

5    relevant at this stage.  It may become so later.  So that's

6    sustained.

7    BY MS. RUSSELL:

8    Q    What prompted you and Officer Brown to go to the store?

9    A    We had information that there was criminal activity at this

10   store.

11   Q    What specific information did you receive?

12   A    That it was guns and drugs located in this store, several

13   male blacks in this store hanging out, acting as security, and

14   they had guns and drugs in this location.

15   Q    Did you receive information regarding the whereabouts of

16   the drugs and guns in the store or outside of the store?

17   A    The drugs and guns was supposedly be inside the store, near

18   the back, in the back area, near the coolers.

19   Q    Who did you receive that information from?

20   A    A police officer, Officer Ross.  Chicago police officer

21   Keith Ross.

22   Q    After you received that information, when did you go to the

23   store?

24   A    A few days after.

25   Q    And when you arrived at the store, what did you observe?

383

Stacker - Direct by Russell

1   A   We observed several males loitering inside the store, not

2   buying anything, hanging out, and we proceeded to try to get

3   them in some type of order and try to find these drugs and guns

4   inside this location.

5   Q   When you and Officer Brown went to the store, were you in a

6   marked or unmarked police car?

7   A   Unmarked.

8   Q   So when you arrived at the store, you saw the individuals

9   outside, as you just testified to.  What did you do?

10  A   We immediately walked in.  They were surprised to see us

11  because normally when you drive down the street, it's a lot of

12  hollering, it's a lot of screaming, stating, like, "Here come

13  the police" --

14          MS. JENKINS:  Objection.  Non-responsive.

15          THE COURT:  All right.  Sustained.

16  BY MS. RUSSELL:

17  Q   Why did you think that you had surprised them, as you just

18  testified?

19  A   Because nobody -- it was no lookouts when we arrived,

20  meaning that it was nobody outside to inform people inside what

21  was going on.

22  Q   What happened then?

23  A   We proceeded inside.  We tried to gain control because

24  there was more people, we was outnumbered, so we trying to

25  establish control in this location.

Stacker - Direct by Russell

1   Q    And you had information that there were guns in that

2   location?

3   A    That is correct.

4   Q    So what did you observe when you entered the store?

5   A    We observed several males in the store, several

6   African-American men in the store, loitering in this location.

7   Q    And did you enter the store with Officer Brown?

8   A    Yes, I did.

9   Q    So what did you do?

10  A    We established order.  We immediately handcuffed everybody.

11  And I proceeded to the back where the coolers were to try to

12  find the guns and drugs in this location.

13  Q    And what did Officer Brown do?

14  A    He was in the front monitoring the front at that time.

15  Q    So when you were in the back by the coolers, did you find

16  anything?

17  A    Yes, we did.

18  Q    What did you find?

19  A    We found a book bag that had inside a big bottle of open

20  liquor, big bottle of Hennessy.  We saw small plastic baggies.

21  We saw a small scale.  And we saw Ziploc baggies.

22  Q    So after you observed the backpack and looked inside of it,

23  what did you do?

24  A    Well, I immediately thought there must be some drugs in

25  here because they have drug paraphernalia in here.

Stacker - Direct by Russell

1       MS. JENKINS:  Objection.  Non-responsive.

2       THE COURT:  Okay.  Sustained.

3   BY MS. RUSSELL:

4   Q    Once you had the backpack, what did you do?

5   A    We took the backpack to the front and asked whose backpack

6   was this.

7   Q    And did anyone respond?

8   A    No.  Nobody claim ownership of that bag.

9   Q    Was Officer Brown at the front of the store with you at

10  this time?

11  A    Yes.

12  Q    And what -- can you describe for the Ladies and Gentlemen

13  what the other individuals in the store were doing?

14  A    Cursing us out, calling us out on names, stating "F the

15  police" --

16      MS. JENKINS:  Objection, your Honor.  Calls for

17  hearsay.

18      THE COURT:  Sustained.

19  BY MS. RUSSELL:

20  Q    When you say calling us out by names, what do you mean by

21  that?

22  A    Calling us out, as in calling us --

23      MS. JENKINS:  Objection, your Honor.

24      THE COURT:  Sustained.  Calls for hearsay answer.

25  BY MS. RUSSELL:

386

Stacker - Direct by Russell

1   Q   And what did you do in response?

2   A   Told everybody to be quiet, keep your mouth shut, we're

3   trying to conduct a simple investigation.  Once we done,

4   everybody will go.

5   Q   And did that stop the individuals?

6   A   No.

7   Q   Did the same type of behavior continue?

8   A   Absolutely.

9   Q   And what did you do?

10  A   We kept telling them be quiet, be quiet, be quiet, shut up,

11  be quiet so we can get this over with.

12          At that time, my partner, we switched, and he went to

13  the back to see if he could find something.

14  Q   And you stayed at the front?

15  A   That's correct.

16  Q   And what were you doing when you were up at the front?

17  A   Telling everybody to be quiet because they was belligerent

18  to us.

19  Q   Was there anyone inside the store that wasn't handcuffed?

20  A   Rephrase that question.

21  Q   Was there anyone at the store that was in the store when

22  you arrived that you did not handcuff?

23  A   That -- yes.

24  Q   And do you know who that person was?

25  A   His name was -- last name was Bell.  We let the brother

Stacker - Direct by Russell

1    leave.

2    Q    The brother of Jecque Howard?

3    A    That's correct.

4    Q    And why did you let him leave?

5    A    He had a badge around his neck, like an ID, stating that he

6    worked for the U.S. Government, so we asked him to leave

7    because it seemed like he didn't have anything to do with what

8    we was -- what we was looking for, so he was asked to go.

9    Q    Okay.  So other than Mr. Howard's brother, was everyone

10   else in the store handcuffed?

11   A    Yes.

12   Q    And when Mr. Brown was in the back of the store, what were

13   you doing?

14   A    Trying to establish control.

15   Q    And did you observe Mr. Brown at any time search any of the

16   individuals?

17   A    Initially, yes.

18   Q    Did he search all of the individuals?

19   A    That I wasn't sure because I went to the back, but he's

20   probably started off his search.

21   Q    Okay.  So let's go back to when you initially go into the

22   store, you go to what area of the store?

23   A    The rear.

24   Q    And where is Mr. Brown?

25   A    In the front.

388

1   Q    So you find the backpack, and then you relocate to the

2   front; is that correct?

3   A    That is correct.

4   Q    And when you relocate to the front, what does Mr. Brown do?

5   A    He goes to the back.

6   Q    And is he -- have you observed him searching any of the

7   individuals in handcuffs at this point?

8   A    Not at that point.  He went to the back.

9   Q    Okay.  When is it that he began searching the individuals

10  in the front of the store?

11  A    When I went to the back.  He started off with the search.

12  Q    Okay.  Let me back it up a little bit.

13          So when you first get there, you go to the back of the

14  store; is that right?

15  A    That's correct.

16  Q    And at this point, is Mr. Brown -- is Officer Brown

17  searching the individuals?

18          MS. JENKINS:  Objection.  Calls for speculation.

19          THE COURT:  Sustained.

20  BY MS. RUSSELL:

21  Q    Do you observe at this point Mr. Brown searching the

22  individuals?

23  A    He started -- he possibly started off with --

24          MS. JENKINS:  Objection.  Calls for speculation.

25          THE COURT:  All right.  To the best of your ability,

Stacker - Direct by Russell

1    if you observed it, you may answer, but only if you observed

2    it.

3            You can rephrase the question.

4    BY MS. RUSSELL:

5    Q   Let me rephrase it.  Let me rephrase it.

6            At what point do you see Officer Brown searching the

7    individuals?  Is it before or after you go to the back?

8    A   After.  I went to the back first.

9    Q   Okay.  So you find the backpack, and then you come to the

10   front of the store?  Is that your testimony?

11   A   Yes.

12   Q   And when you come to the front of the store, what is

13   Officer Brown doing?

14   A   We -- he goes to the back to see if he could find anything.

15   Q   Okay.  And when is it that he searches the individuals?

16   A   He searched -- oh, he searched it before he went to the

17   back.

18   Q   Okay.  So let me just make sure we're clear on how this all

19   happened.

20           So you arrive at the store.  You go to the back of the

21   store.

22           Is it your testimony that you find the backpack and

23   then you -- and then what do you do after you find the

24   backpack?

25           Is it your testimony that you come to the front of the

Stacker - Direct by Russell

1   store?

2   A    That's correct.

3        MS. JENKINS:  Objection.  The lawyer is testifying,

4   not the witness.

5        THE COURT:  So it's leading and it's narrative, so it

6   is sustained.

7   BY MS. RUSSELL:

8   Q    So once you're back at the front of the store with the

9   backpack, what do you observe?

10  A    We observed a male standing in front of the store.

11  Q    Did you observe Officer Brown while you're inside the store

12  search the individuals in the store?

13  A    Yes.

14  Q    At what time?

15  A    When I -- when I came back to the front.

16  Q    With the backpack?

17  A    That's correct.

18  Q    Okay.  Can you describe what -- where the individuals were

19  in the front of the store?

20  A    Right on the front, near the counter.  Some were on one

21  side, some was on another side.

22  Q    Okay.  How long did you stay in the front of the store?

23  A    Not that long.  A few minutes, I guess.  Wasn't long.

24  Q    Why did you -- sorry.  Go ahead and finish.

25  A    It wasn't that long.

391

<center>Stacker - Direct by Russell</center>

1   Q    Okay.  What did you do after you left the front of the
2   store?
3   A    What did I do after I left the front of the store?
4   Q    Yes.
5   A    I -- rephrase that question.
6   Q    You just testified you were in the front of the store.
7   A    Uh-hum.
8   Q    What did you do next?
9   A    We trying to still establish order in the store.
10  Q    At any point did you have contact again with Mr. Neal?
11  A    That's correct.
12  Q    And when did you have contact with Mr. Neal?
13  A    When he -- he is outside cursing and trying to come back in
14  the store.
15  Q    And do you hear this when you are inside the store?
16  A    Yes.
17  Q    And what do you do in response?
18  A    I go out and tell him do not come back in this store.
19  Q    Okay.  And so when you leave the store, what is Officer
20  Brown doing?
21  A    He is conducting -- he is monitoring the other males in the
22  store, and he's talking to another male subject, which is
23  Howard.
24  Q    Okay.  Did you hear the conversation between Officer Brown
25  and Mr. Howard?

Stacker - Direct by Russell

1    A    No.  Vaguely.  Very vaguely.

2    Q    Okay.  Do you recall that conversation?

3    A    No.

4    Q    So when you left the store, Officer Brown was talking to

5    Mr. Howard.

6    A    Yes.

7    Q    How long were you outside?

8    A    A few seconds.

9    Q    When you come back into the store, can you describe what

10   you see?

11   A    The males are still on the -- in the store.  They're

12   handcuffed.  I come back in and state, "Brown, Brown," and I

13   walk toward the aisle, and he meets me at the aisle and state

14   that "I have a gun."

15   Q    And did you see Mr. Brown with the gun --

16   A    Yes, I did.

17   Q    -- Officer Brown with the gun?

18   A    He did show me a loaded gun, yes.

19   Q    And where was he when he showed the gun to you?

20   A    He was at the aisle.  We met at the aisle.

21   Q    At any time after you came into the store and before Mr. --

22   or Officer Brown showed you the gun, did you hear anyone in the

23   store say, "He has a gun"?

24   A    Yes, somebody screamed out, says, "He has a gun."

25   Q    And how did you interpret that?

Stacker - Direct by Russell

1  A    That it was a weapon in the store that Officer Brown

2  recovered off a subject.

3  Q    And when you heard that, is -- what did you say next?

4  A    I said --

5         MS. JENKINS:  Objection.  Calls for hearsay.

6         THE COURT:  Sustained.

7  BY MS. RUSSELL:

8  Q    When you heard that, what action did you take?

9  A    When I heard that, I met him at the aisle, and I went back

10  to the front to be more of a guard officer, because we were

11  still outnumbered with the male subjects in the store, plus I

12  had to look out the door to make sure this guy wasn't trying to

13  come in the door.

14  Q    And when you say "this" --

15  A    In -- inside the store.  Excuse me.

16  Q    And when you say "this guy," who do you mean?

17  A    We're talking about --

18  Q    Do you mean Mr. Howard's brother?

19  A    Yes, that's correct.

20  Q    So by the time you come back into the store, Officer Brown

21  had already recovered the weapon?

22  A    Yes.

23  Q    So what happened next?

24  A    We're still trying to maintain control in the store.  I'm

25  still trying to keep these guys quiet.  Howard's brother is

Stacker - Direct by Russell

1  outside causing a disturbance.  He's trying to get back in the

2  store.  And we're trying to establish control in the store

3  until we get a transport to come to get this guy out of here.

4  Q    When you left the store to go outside to deal with

5  Mr. Neal, did you have any concerns leaving Officer Brown in

6  the store alone?

7  A    Yes.

8  Q    What concerns did you have?

9  A    That he was by his self during a serious situation with all

10  these guys in the store.  It was too many males.  We was

11  outnumbered in this store.

12  Q    And at that point, had you recovered any weapon?

13  A    Did I recover a weapon?

14  Q    At the point before you left to go to the front of the

15  store, had any weapon been recovered?

16  A    No.

17  Q    So after the weapon is recovered, what do you do next?

18  A    Well, once the weapon is recovered, we're still trying to

19  maintain order.  And at that point in time, we're waiting on a

20  transport to come and take this guy out of here.

21  Q    Did you have an opportunity to ever return to the store

22  after the 27th?

23  A    That's correct.

24  Q    When did you go back?

25  A    The next day.

Stacker - Direct by Russell

1     Q    And who were you with?

2     A    Officer Brown.

3     Q    And why did you go back the next day?

4     A    Just to see was there any more criminal activity or drug

5     activity at this location.

6     Q    And did you have an opportunity to speak with anyone while

7     you were there?

8     A    We -- well, my partner talked to -- there was a lady, a

9     mother there.  She was in the store.  I guess their parent was

10    in the store or something so ...

11    Q    And when you returned, did you find any additional illegal

12    activity going on?

13    A    No.  Not at that time, no.

14    Q    And how long were you in the store the next day?

15    A    I'm not sure.

16    Q    Was it less than 10 minutes?

17    A    Might have been 15 minutes, 20 -- something like that, 15

18    minutes.

19         (Counsel conferring.)

20    BY MS. RUSSELL:

21    Q    Just one follow-up.

22         Was the purpose of you going back to the store to

23    obtain the videotape?

24    A    No.

25         MS. RUSSELL:  That's it.

Stacker - Cross by Jenkins

1          THE COURT:  Okay.  You may cross.

2          MS. JENKINS:  Thank you.

3                         CROSS-EXAMINATION

4    BY MS. JENKINS:

5    Q    Good afternoon, Officer.

6    A    Good afternoon.

7    Q    You may have said this.  How many years have you been an

8    officer with the Chicago Police Department?

9    A    Fifteen.

10   Q    And how long in those 15 years was the defendant your

11   partner?

12   A    About five years.

13   Q    Fair to say that in those five years, the two of you became

14   close?

15   A    That's correct.

16   Q    Friends?

17   A    Yes.

18   Q    You don't want to see anything bad happen to him, right?

19   A    No.

20   Q    Okay.  I'd like to show you, just so that we can all be on

21   the same page, what's previously been admitted into evidence as

22   Government Exhibit 10 Group Still 22.

23         Do you see that in front -- on the screen in front of

24   you?

25   A    Yes.

Stacker - Cross by Jenkins

1   Q    Okay.  Can you please identify yourself by an article of

2   clothing that you're wearing?

3   A    I have on a baseball cap, a Sox baseball cap.

4   Q    Do you see Officer -- excuse me, do you see the -- do you

5   see Mr. Howard in this photograph?

6   A    Yes.

7   Q    Where is he in relation to you?

8   A    Behind me.

9   Q    Is he cuffed or uncuffed at this time?

10  A    Uncuffed.

11  Q    Do you see the defendant in this photograph?

12  A    I do.

13  Q    And where is he?

14  A    Near a cooler.

15  Q    And is that toward the top of this depiction?

16  A    It is.

17  Q    Now, I'd like to back up, if I could, to talk about the tip

18  you testified about.

19       Do you recall that testimony?

20  A    I have to look at my grand jury, if you asking me the

21  questions.

22  Q    No, no, I'm asking if you recall testifying just today --

23  A    Yes.

24  Q    -- about the fact that you and your partner received a tip.

25  A    That's correct.

Stacker - Cross by Jenkins

1   Q    Okay.  Neither you nor the defendant received the tip on
2   the day you went into this store; is that correct?
3   A    That is correct.
4   Q    And neither you nor the defendant spoke with the citizen
5   directly; is that correct?
6   A    That is correct.
7   Q    You got that piece of information from Officer Ross, right?
8   A    That's correct.
9   Q    Officer Ross did not provide you with the name of any
10  particular individual; is that correct?
11  A    That is correct.
12  Q    Now, is it fair to say that when you and the defendant
13  arrived to the store that day that you brought two people who
14  were standing just outside of the store into the store with
15  you?
16  A    I don't recall that.
17  Q    Okay.  Might we show you a piece of video that might
18  refresh your recollection -- if you saw a portion of the video
19  recording from that day, would that help you remember whether
20  or not people walked back into the store with you when you
21  first entered the store with the defendant?
22  A    Sure.
23           MS. JENKINS:  And for the record, the government is
24  publishing Government Exhibit Clip 6, Exterior View.
25           (Tape played in open court.)

Stacker - Cross by Jenkins

1  BY MS. JENKINS:

2  Q   Officer, does that refresh your memory as to whether or not

3  you and your partner brought additional people into the store

4  at the time that you and the defendant entered the store?

5  A   That's correct.

6  Q   Would you agree with me that you have now increased the

7  number of people who have entered the store for purposes of

8  your investigation that day?

9  A   No, I would not agree with that.  We saw two people walking

10  out, and we wanted to check them out.

11  Q   Well, did you give those people that you just saw on that

12  video clip, were they free to go?

13  A   Sure.

14  Q   You told them that they had a choice about whether they

15  could come into the store or not?

16      MR. HERBERT:  Objection, Judge.  Goes to relevance

17  with respect to the seizure of this individual.

18      THE COURT:  No, this will be a credibility issue now,

19  so that's overruled.

20  BY MS. JENKINS:

21  Q   Did you inform either of the two individuals just depicted

22  on that video that they were free to leave and not go into the

23  store with you and your partner?

24  A   I did not.

25  Q   You did not inform them of that?

Stacker - Cross by Jenkins

1    A    No.

2    Q    So they were not free to leave?

3    A    They was free to leave if they wanted to leave.

4    Q    Okay.  Is it fair to say that those two individuals who you

5    saw exiting the store at the time you were entering the store,

6    that you didn't know at that time whether those individuals

7    were armed?

8    A    I did not know that.

9    Q    Now, when you first got into the store, I believe your

10   testimony on direct examination just today was that you tried

11   to establish order in the store.  Is that correct?

12   A    That is.

13   Q    Did you obtain a search warrant to search the store that

14   we've been discussing?

15   A    No.

16   Q    Did you have an arrest warrant for anyone on that day in

17   relation to the store?

18   A    No.

19   Q    Did you ask the manager or owner of the store for

20   permission or consent to search the store?

21   A    No.

22   Q    Okay.  What's the first thing you recall doing?  Was your

23   testimony that you began handcuffing people?

24   A    Yes.

25   Q    Did you tell any of the people who you were handcuffing why

Stacker - Cross by Jenkins

1    you were handcuffing them?

2    A    I said that we're investigating a tip, but I didn't go into

3    specifics of what of we was doing or looking for.

4    Q    With regard to the people inside of the store when you

5    began handcuffing, did you give those people the option to

6    leave the store while you conducted your investigation with the

7    defendant?

8    A    No.

9    Q    Now, you testified on direct examination that during this

10   encounter you learned -- you learned that the -- there was a

11   backpack in the back of the store; is that right?

12   A    Yes.

13   Q    Okay.  And at some point, did you also learn that the

14   individual depicted in Government Exhibit 10 Group Still 22 --

15   it's there on the screen for you.

16           Did you learn that the identity of the individual

17   standing behind you in this photograph was Jecque Howard?

18   A    Yes.

19   Q    Did you learn that Mr. Howard was employed at that store?

20   A    He stated he was, but we did not believe him.  Or I did not

21   believe him.

22   Q    Sir, that's not what I asked you.  I asked you if you

23   learned that he was employed at the store.

24   A    I did not learn that.  He stated that he was employed

25   there, but I did not believe that.

Stacker - Cross by Jenkins

1    Q    Okay.  Did you handcuff Mr. Howard when you first entered
2    the store?
3    A    Yes.
4    Q    Did you personally search him?
5    A    No.
6    Q    At some point, did you uncuff Mr. Howard?
7    A    I did.
8    Q    As depicted in Government Exhibit 10 Group Still Photo 22,
9    your back is turned to Mr. Howard; is that correct?
10   A    That is correct.
11   Q    He is not handcuffed at that time; is that correct?
12   A    That is correct.
13   Q    Were you trained to turn your back to an uncuffed subject
14   who poses a threat to you?
15          MS. RUSSELL:  Objection.  Relevance.
16          THE COURT:  Overruled.
17   BY THE WITNESS:
18   A    Repeat that question.
19   Q    Were you trained to turn your back to an uncuffed subject
20   who poses a threat to you?
21   A    That was a negligence on my part.
22   Q    That was not my question.
23          My question was whether you were trained to turn your
24   back to an uncuffed subject who poses a threat to you?
25          MS. RUSSELL:  Objection.  Asked and answered.

Stacker - Cross by Jenkins

1    THE COURT:  Overruled.

2  BY THE WITNESS:

3  A    No, I was not.

4  BY MS. JENKINS:

5  Q    Now, your testimony on direct examination just now was that

6  you stepped away from the people toward the front of the store

7  to see about some commotion outside; is that correct?

8  A    Yes.

9  Q    And I think you indicated on direct that that commotion was

10  by an individual named Paul Neal?

11  A    Correct.

12  Q    Okay.  So is it your testimony that you were not inside of

13  the store at the time the defendant struck Mr. Howard?

14  A    I was in the store.

15  Q    You were in the store?

16  A    I was turning and walking out of the store.  I wasn't

17  completely out yet.

18  Q    So did you see the first strike that the defendant made to

19  Mr. Howard?

20  A    Yes.

21  Q    So -- I guess I'm confused, so let's make sure we break it

22  down.

23    Where were you standing at the time that the defendant

24  struck Howard?

25  A    I was on the other side of -- I was behind Aldo Brown,

Stacker - Cross by Jenkins

1    Officer Brown.

2    Q    And which direction were you facing?

3    A    My body was geared toward the door.

4    Q    So was Officer -- was the defendant behind you?

5    A    Yes.

6    Q    So you could not see him from your position as you were

7    walking out of the door?

8    A    I caught it out of the corner of my eye at the last second.

9    Q    But is it your testimony, Officer, that your back was to

10   Officer Brown at the time of the first strike?

11   A    I was turning toward the door.

12            MS. JENKINS:  If I can ask to publish Government

13   Exhibit, which has already been admitted into evidence,

14   Government Exhibit 2 Group Still 9.

15            THE COURT:  You may.

16            MS. JENKINS:  Thank you.

17   BY MS. JENKINS:

18   Q    Do you see yourself in this photograph, Officer?

19   A    Yes, I do.

20   Q    Where are you standing?

21   A    On the side of Mr. Brown -- Officer Brown.

22   Q    Are you by the door?

23   A    I'm in -- I'm going toward the door.  I'm in the middle.

24   Q    Your testimony is that in this photograph you are going

25   toward the door?

405

Stacker - Cross by Jenkins

1          MS. RUSSELL:  Objection.  Asked and answered.

2          THE COURT:  Sustained.

3    BY MS. JENKINS:

4    Q    Is it your testimony that you did not see the first strike

5    by the defendant on Mr. Howard?

6          MS. RUSSELL:  Objection.  Mischaracterizes his

7    testimony.

8          THE COURT:  Overruled.

9    BY THE WITNESS:

10   A    Repeat the question.

11   BY MS. JENKINS:

12   Q    Is it your testimony that you did not see the first strike

13   that the defendant made to Mr. Howard?

14   A    Yes.

15   Q    I'd like to ask you some additional questions about

16   Mr. Howard.

17          During the entire time that Mr. -- let me rephrase.

18          During your initial encounter with Mr. Howard in the

19   store, did you ever observe a gun on him?

20   A    No.  Not initially.  No.

21   Q    Did you ever observe him in possession of marijuana?

22   A    Not initially, no.

23   Q    At any point during this encounter that we've been

24   discussing, did you radio for assistance?

25   A    In what capacity are you saying?  You talking about at the

Stacker - Cross by Jenkins

1    end?  We did radio for assistance at the end.

2    Q    Prior to Mr. Howard being placed under arrest, so prior to

3    that time, did you radio dispatch for assistance to get other

4    officers on the scene before Mr. Howard was placed under

5    arrest?

6    A    No.

7    Q    You would agree with me that if you radioed for dispatch

8    assistance, other officers would have been dispatched to the

9    scene?

10   A    Yes, if they wasn't tied up on anything, yes.

11   Q    But it's not for you to decide whether other officers are

12   tied up, right?

13   A    No, it's not.

14   Q    At the time that the defendant was struggling with

15   Mr. Howard, did you ever step over and offer assistance?

16   A    No.

17   Q    Did the defendant ever ask you for assistance?

18   A    No.

19   Q    Did you ever step over and attempt to render assistance,

20   whether he asked you or not?

21   A    No.

22   Q    Now, you testified about how you were seeking to establish

23   order in the business.  Is that correct?

24   A    Yes.

25   Q    You picked up a wet floor sign, right?

Stacker - Cross by Jenkins

1    A    That's correct.

2    Q    Was that one of the ways that you were establishing order

3    in the business?

4    A    No.

5    Q    What was the purpose of your picking up the wet floor sign?

6    A    Because I was frustrated because all of the chitter-chatter

7    and disrespect that the people in the store was giving us.

8    Q    I'd like to show you what's previously been admitted into

9    evidence as Government Exhibit 5, which is the arrest report in

10   this case, and specifically page 3 of that arrest report.

11         MS. JENKINS:  If you could blow up the text.

12   BY MS. JENKINS:

13   Q    And, first, is it fair to say that you did not author the

14   arrest report for Mr. Howard?

15   A    Repeat that?

16   Q    You did not author the arrest report for Mr. Howard.

17   A    I don't understand your question.

18   Q    Did you write the arrest report for Mr. Howard?

19   A    No.

20   Q    Who wrote it?

21   A    Officer Brown.

22   Q    Okay.  What's in front of you is the narrative section on

23   the third page of this arrest report.  If you could read it to

24   yourself.  I'd like to ask you some questions when you're done.

25   A    Okay.

Stacker - Cross by Jenkins

1    Q    With regard to the statements written on that narrative in

2    the arrest report for Government Exhibit 5, is that narrative

3    accurate?

4    A    It is a summary of events that happened.

5    Q    Sir, I did not ask you if it was a summary.  I asked you if

6    it was accurate.

7         MR. HERBERT:  I'm going to object, Judge.  It's vague

8    as to what parts and what does she mean by accurate.

9         THE COURT:  It's overruled.  And isn't this your

10   witness?  So it's Miss Russell's objection to make.

11        You may continue.

12   BY MS. JENKINS:

13   Q    Is the summary contained, that you just read, in Government

14   Exhibit 5 accurate?

15   A    I don't understand your question.

16   Q    Do you know what accuracy is?

17   A    Yes, I do.

18   Q    Okay.  I'm happy to break it down if that would assist.

19   Because you're telling me you're not sure if it's accurate?

20        MS. RUSSELL:  Objection.

21   BY MS. JENKINS:

22   Q    You're not certain if it's accurate?

23        THE COURT:  Hold on.  That's compound.  The objection

24   I didn't hear.

25        MS. RUSSELL:  Argumentative.

Stacker - Cross by Jenkins

1          THE COURT:  Okay.  Sustained.

2          You can break it down, please, but you have to do it

3    one at a time.  Give him a chance to answer.

4    BY MS. JENKINS:

5    Q    Let me ask you first, there's a reference in this narrative

6    to A slash Os.  What does that refer to?

7    A    Arresting officers.

8    Q    Are you one of the arresting officers?

9    A    Yes.

10   Q    The sentence beginning on the second page reads, "A/Os

11   received information from a concerned citizen that the above

12   subject was selling narcotics inside the store."

13          Is that an accurate statement to the information you

14   had received?

15   A    We did get information from a police officer that a citizen

16   told him.  That is correct.

17   Q    Where does this report say that you and the defendant

18   received information from another officer?

19   A    It does not.

20   Q    The next sentence reads, "A/Os relocated to the above

21   address listed and observed the above subject fitting the

22   description given by the concerned citizen."

23          Again, did a concerned citizen give you a description?

24          MS. RUSSELL:  Objection.  Asked and answered.

25          THE COURT:  Overruled.

Stacker - Cross by Jenkins

1   BY THE WITNESS:

2   A    The police officer gave us the description.  He gave us the

3   information that the citizen told him.

4   BY MS. JENKINS:

5   Q    So where in the narrative does it say that another officer

6   gave you the information?

7   A    It does not say that.

8   Q    You stated at the very beginning of your testimony that you

9   were conducting an investigation in the store that day, right?

10  A    That's correct.

11  Q    At the conclusion of this day when Mr. Howard was arrested,

12  did you take the names and phone numbers of any of the

13  individuals inside the store to further your investigation?

14  A    No.

15  Q    Isn't that something you ordinarily do in connection with

16  your narcotics investigations?

17  A    Yes.

18       MS. JENKINS:  No further questions.

19       THE COURT:  Any redirect, Miss Russell?

20       (Counsel conferring.)

21       MS. RUSSELL:  Judge, can we have a brief sidebar?

22       THE COURT:  Okay.

23       (At sidebar outside the hearing of the jury:)

24       THE COURT:  Okay.

25       MR. HERBERT:  I guess I didn't inform Russell, but at

Stacker - Cross by Jenkins

1    this point I just wanted to front the issue that we plan on

2    getting into the fact that there was prior consistent testimony

3    given at the grand jury in this case, so I just wanted to bring

4    that issue up with the Court, because he's been impeached by

5    the government again.

6            THE COURT:  He has been questioned for his credibility

7    and his truthful statement as to what happened that day.

8            MS. JENKINS:  From the government's perspective, he

9    may have been impeached, but it's not -- there's not been any

10   allegation of recent fabrication.  I have to actually look at

11   the rule to be 100 percent certain.

12           THE COURT:  Let's get it for you.

13           You get it for me so I don't have to do the stairs.

14   (Pause in proceedings.)

15   (Counsel conferring.)

16           THE COURT:  Okay.  So what's your position?

17           MS. JENKINS:  So as I read Rule 801(d)(1)(B) --

18           THE COURT:  Okay.

19           MS. JENKINS:  -- this declarant is testifying, he is

20   subject to cross-examination about his prior statement, and the

21   statement is consistent with the declarant's testimony and it's

22   offered to rebut an express or implied charge that the

23   declarant recently fabricated it or acted from a recent

24   improper influence or motive from so testifying.

25           From the government's perspective, there is no

Stacker - Cross by Jenkins

1    allegation that he recently fabricated anything.  It's simply

2    that he testified inconsistently with the events on the

3    videotape, and his testimony on direct examination was

4    inconsistent with the evidence that the jury heard.  There's

5    certainly no allegation that he recently fabricated it.  In

6    fact, his prior testimony is under oath.

7            (Pause in proceedings.)

8            THE COURT:  I think it does apply in a broader sense.

9    Because 608 -- excuse me, 801(d)(1)(B)(1) says not simply to

10   rebut an express but also an implied charge that he recently

11   fabricated it or acted from a recent improper influence, motive

12   in so testifying, so you've given the bias that he is here for

13   his partner's benefit, that he doesn't want anything to happen

14   to him, and you challenged his interpretation of the video and

15   the report, which was -- is recent in comparison to the report

16   that was filed, so I'm not sure why you think that doesn't

17   apply.

18           So it has to be, you know, very specific, though.  So

19   it has to go to a specific allegation of something that she

20   challenged as not being truthful.

21           MR. HERBERT:  Okay.

22           THE COURT:  And she didn't challenge everything.  She

23   challenged whether he observed the strike.  She challenged

24   whether he was letting people go or come in to the store.  Let

25   me think what else.

Stacker - Cross by Jenkins

1       MR. HERBERT:  His view -- or, I'm sorry, his

2   observation of Stacker -- of Brown at the point in which the

3   first strike happened.

4       THE COURT:  Oh, that's what I just said.  I think

5   that's pretty much the main thing that she challenged.

6       MS. JENKINS:  From the government's perspective, it

7   seems to the government that what counsel is trying to do is

8   get in the fact that he received immunity in the grand jury,

9   which is what we talked about.

10      The ultimate and overarching concern from the

11  government's perspective is that counsel not be permitted to

12  argue, either through the questioning or later -- or in his

13  case, including through his client, that somehow because this

14  witness received immunity or was not charged or has not yet

15  been charged that that somehow means the defendant is absolved

16  of responsibility.

17      THE COURT:  Right.  That would be completely improper.

18  You did mention that earlier.  You cannot say that what

19  happened to this witness is -- like he got a pass where the

20  other guy didn't, because he's not getting a pass right now,

21  and he has the potential, even to this day, of being charged

22  with a crime, including perjury, because now he's going to be

23  under oath and be inconsistent, by your own accusation.

24      You know, so by your own accusation by using the grand

25  jury to impeach him with a prior consistent statement -- or to

Stacker - Cross by Jenkins

1  rehabilitate him with a prior consistent statement, after she's

2  challenged that he's inconsistent, now you're really opening up

3  the door that he could be charged with perjury.  And if he is

4  charged with perjury and that's available, you could never say

5  to this jury that this guy has gotten a pass and why didn't the

6  government charge him and why didn't the government -- why did

7  they just go after me.  And that could never be argued.  That

8  would be improper for the jury.

9           Do you see that?

10          MR. HERBERT:  I absolutely see it, Judge.

11          The only point I would make is that we are not

12  indicating that he was impeached to the standpoint that he

13  varied or deviated from his grand jury testimony.

14          THE COURT:  No, I know that's your point, but your

15  point is that by putting in a consistent statement, we're

16  identifying inconsistencies in his testimony, you're trying to

17  rehabilitate the inconsistencies in what he just said, and once

18  you bring that in, you're exposing him as well.

19          MR. HERBERT:  I see your point.

20          THE COURT:  You recognize that.

21          MR. HERBERT:  I do.

22          THE COURT:  He knows the risk.  I gave him his

23  warning, and he knows that risk.  But you cannot use later, at

24  all, the inference to this jury that because he's here and free

25  from being charged on this very day that he somehow has been

Stacker - Cross by Jenkins

1   given a benefit by the government, because the only benefit

2   they gave him was prior in the grand jury, and that's now going

3   to come out, I would imagine, that he testified pursuant to

4   immunity at that point.  But now you have to let them know that

5   he's not testifying pursuant to immunity today.

6          MR. HERBERT:  Okay.  Trying to think how we can do

7   that.

8          MS. JENKINS:  Not to overcomplicate, but we don't

9   think any line of questioning would be appropriate about

10  whether he has been charged, expects to be charged.

11         THE COURT:  Oh, right.  No, that's right.

12         MS. JENKINS:  Never can guess about that --

13         THE COURT:  Number one, I don't know.  That's the

14  executive branch.  And for all I know, tomorrow an indictment

15  could come down.  That's why it's so prejudicial.  You can't

16  infer that.  And the only time you could make that kind of

17  argument would be in the defense setting when they get a

18  cooperation agreement where the government is going to give you

19  their 5K1 or a 3553 departure and that's going to give a

20  benefit such that his testimony then can be suspect because of

21  that bias.  But right now his testimony is not suspect because

22  of bias because he's -- he's exposing himself.

23         MR. HERBERT:  Right.  And we are not -- we never

24  intended to make any arguments to that extent.

25         THE COURT:  Okay.  Just making sure.

Stacker - Cross by Jenkins

1          MR. HERBERT:  Yeah.

2          THE COURT:  And I will sustain it, and I will warn you

3     not to --

4          MR. HERBERT:  Oh, no.

5          THE COURT:  So those two areas I think were the two

6     areas that I identified was the doorway, about what he did with

7     the men at the doorway, and the -- whether he saw the strike.

8          But if you think there's another one, raise it now so

9     we can --

10         MS. JENKINS:  From the government's perspective, I

11    will need to identify if there are actually specific -- I don't

12    remember where there are specific statements where he

13    specifically says that.  If there is, obviously you are more

14    than welcome to impeach him on that, but we would need to

15    direct him to his specific testimony on that point.

16         MR. HERBERT:  But here's my thought on it, Judge, and

17    however you want to have it done.  It was more going to be

18    along the lines of you were asked questions about where you

19    were standing in relation -- or what you did in the doorway

20    and --

21         THE COURT:  I'll tell you what.  Let's tell the jury

22    to take their break.  It's taking a little longer.

23    (Sidebar proceedings concluded.)

24         THE COURT:  Okay, Ladies and Gentlemen, this is taking

25    a little longer than expected, so go back and have a break for

417

1    15 minutes.

2            And I'm sure there's a treat there for you, again, to

3    keep you happy.

4        (Laughter.)

5            THE COURT:  Sir, don't talk to anyone while you are on

6    your break.  Okay?

7            And 15 minutes.  Thank you.

8            COURT SECURITY OFFICER:  All rise.

9        (Jury out at 2:54 p.m.)

10       (At sidebar outside the hearing of the jury:)

11           THE COURT:  What I'd like you to do right now is go

12   look at the grand jury statement, see which ones you intend to

13   show, so that she can then give me an objection if she doesn't

14   think it is a prior inconsistent one, so we can hammer that

15   out.

16           MR. HERBERT:  Okay.

17           THE COURT:  You know, I'll give you a few minutes to

18   do it.  I'll come back in 15 minutes, and then we'll bring the

19   jury in.

20           MS. JENKINS:  Thank you, your Honor.

21       (Recess taken from 2:55 p.m. to 3:13 p.m.)

22       (In open court out of the presence of the jury:)

23           THE COURT:  Did you have a chance to look at the

24   statements?

25           MS. RUSSELL:  Yes, Judge.

418

1          THE COURT:  Okay.

2          MS. RUSSELL:  I think Mr. Herbert would like to do a

3     re-examination, if that's possible.

4          THE COURT:  Didn't you direct?

5          MS. RUSSELL:  I did.

6          THE COURT:  It's very unorthodox.

7          MS. RUSSELL:  I agree.

8          THE COURT:  Why would I allow you to do that,

9     Mr. Herbert?

10          MR. HERBERT:  I don't know --

11        (Counsel conferring.)

12          MR. HERBERT:  Yes, but it's for a reason, and I think

13     you have to explain it for the Court.

14          THE COURT:  Oh, it's for a reason?

15          MR. HERBERT:  No, no.  You can do it.  No, I'm saying

16     that's fine.

17          MS. RUSSELL:  I'm sorry, Judge, I misunderstood.

18          THE COURT:  Oh, okay.  So when it's your witness, you

19     know, you stay with the witness.

20          MS. RUSSELL:  I agree.

21          THE COURT:  And I have confidence in her ability as

22     well.

23          MS. RUSSELL:  I misunderstood.

24          THE COURT:  Yeah.  She's doing a great job --

25          MR. HERBERT:  She's doing a great job.

Stacker - Cross by Jenkins

1          THE COURT:  -- so you can do that.

2          Are there areas that you're going to direct us to that

3    you will be -- specific statements from that grand jury

4    testimony?

5       (Counsel conferring.)

6          MS. RUSSELL:  Yes, Judge, the areas right before the

7    punch and --

8          THE COURT:  I know the areas, but now we have to look

9    at the grand jury statement and what statement would be a prior

10   consistent one that would rehabilitate this implied recent

11   fabrication.

12      (Counsel conferring.)

13         THE COURT:  Does anyone have a copy of the grand jury

14   for me?

15         MS. JENKINS:  I do.

16         THE COURT:  That would be great.

17         MS. JENKINS:  It's very long.

18      (Tendered.)

19         THE COURT:  Okay.  Oh, my.  Okay.

20         MS. JENKINS:  If counsel could maybe direct us to

21   the --

22         THE COURT:  Well, that's what I asked you to do at the

23   break is to go directly to the lines that you think are the

24   prior consistent statements.

25      (Counsel conferring.)

Stacker - Cross by Jenkins

1          MS. RUSSELL:  Page 46.

2          THE COURT:  46 did you say?

3          MS. RUSSELL:  Yes.

4          THE COURT:  Okay.  Thank you.

5      (Pause in proceedings.)

6      (Counsel conferring.)

7          THE COURT:  So the part from did you see where

8   Officer --

9          MS. RUSSELL:  Right.

10          THE COURT:  Did you see where Officer Brown punched or

11   struck Mr. Howard?

12          MS. RUSSELL:  Correct.

13          THE COURT:  (Reading:)  Officer Brown gave Mr. Howard

14   a hand stunt.  Under what circumstances can you give a hand

15   stunt.

16          That wouldn't be part of it, but --

17          (Reading:)  Did you see Mr. Howard make a gesture or

18   movement towards you or Mr. Brown at the time?  He did not --

19          So the testimony on direct was actually that he saw it

20   out of the corner of his eye, so I don't know whether he's

21   testified inconsistent with this.

22          MS. JENKINS:  In addition, your Honor, I was not the

23   Assistant U.S. Attorney.  Miss DePodesta is the person who put

24   Mr. Stacker before the grand jury.

25          THE COURT:  Does that matter?

Stacker - Cross by Jenkins

1          MS. JENKINS:  Well, I say that only to say that I

2     cannot determine whether or not she was referring to the fact

3     that a video was just played and whether she's asking Officer

4     Stacker if what he saw was what -- if -- if her question refers

5     to what the officer saw on the video --

6          THE COURT:  Oh, yeah, right, right.

7          MS. JENKINS:  -- because I was not the person who put

8     this witness in the grand jury --

9          THE COURT:  Yeah.

10         MS. JENKINS:  -- I cannot clarify that.  That's the

11    only reason I raised it.

12         MS. RUSSELL:  But he did say that he saw out of the

13    corner of his eye the punch, and then it was I think very

14    convoluted on cross about you saw it, you were facing this way,

15    you had your back here, did you see it, did you not see it.

16    And I think at one point he said no, which ...

17         THE COURT:  This is a problem, though, because on page

18    46, Mr. Stacker was shown a video, and the prosecutor says to

19    the witness, "Did you see where Officer Brown punched or struck

20    Mr. Howard?"  And he's affirming that he gave Howard a hand

21    stunt, which is as if he's observing it play on the video.

22    It's not his observation.  It's not his personal observation.

23         Is there another place where he says I saw it or I did

24    not see it?

25         So that one won't work.

Is there another one that you want to use that you think is a prior consistent statement to rehabilitate him?

I'm not going to go through the whole transcript.

MS. RUSSELL: I understand, Judge.

THE COURT: Okay.

All right. If there's no others, then we're going to call the witness back in, and you can -- oh, you want to keep that. There you go.

Well, just in case, let me hold on to this.

Yes. Get the jury, and then you can bring the witness back in, Miss Russell.

MR. HERBERT: Judge?

THE COURT: Yeah.

MR. HERBERT: The only -- I would just ask, page 45, there's talk about -- there's talk about Stacker going outside to confront Mr. Neal.

THE COURT: Sarah, go tell John to hold on with my jury so I can finish this.

MR. HERBERT: I'm sorry.

THE COURT: Okay. Tell me where? In the middle of the page?

MR. HERBERT: In the middle of the page.

THE COURT: Okay.

MR. HERBERT: Was that individual Paul --

THE COURT: Yes. And he was outside of the store at

Stacker - Cross by Jenkins

1    this time --

2            MS. ROMERO:  I'm sorry.  Your Honor, the witness is

3    coming --

4            THE COURT:  Yes.  Sorry.  Your co-counsel raised

5    another issue.

6            MR. HERBERT:  I guess, Judge, it would be from page 44

7    into 45.

8            THE COURT:  That's exactly what he said, though, but

9    she didn't challenge that as being a recent fabrication.  I

10   mean -- and of course she denies that anything is a recent

11   fabrication.  I think there's an implied accusation of recent

12   fabrication in the two areas they said, but this is exactly

13   what he said.  So -- and I don't -- I don't think that you

14   challenged that he let Paul Neal go.  You didn't challenge

15   that.

16           MS. JENKINS:  No, not at all.

17           THE COURT:  Right.

18           MS. JENKINS:  Not at all.

19           MR. HERBERT:  I think the challenge comes in was from

20   the impeachment of Howard leaving the store -- I'm sorry, of

21   Stacker leaving the store with Brown inside, because there was

22   questions about, well, he never asked you for help and you

23   didn't think he needed help.  So I think that that would be

24   prior consistent to fend off that impeachment of the area.

25           MS. JENKINS:  But from the government's perspective,

Stacker - Cross by Jenkins

1    this colloquy on page 45 into 46 is not -- Officer Stacker is

2    not saying, yes, I went outside.

3              He's being asked about Mr. Neal.  He confirms for --

4    in response to the question that this Mr. Neal was outside the

5    store.

6              THE COURT:  And you didn't challenge that.

7              MS. JENKINS:  Right.

8              THE COURT:  Yeah.  And, in fact, she said that he let

9    him go and that that's what he had done -- no, that doesn't

10   work either.

11             I mean, I don't know what the grand jury is.  You all

12   know what the grand jury is.  I was expecting to see something

13   different.  That doesn't work either.

14             Okay.  Let's go.

15             MS. ROMERO:  Judge, can we clear the screen again?  I

16   think --

17             MS. JENKINS:  I'll do it.

18             THE COURT:  Oh, I don't know.  Who does that?

19             MS. ROMERO:  I think it was --

20             THE COURT:  Is it the witness?

21             MS. ROMERO:  -- the touchscreen.

22             I think Mr. Herbert accidentally --

23             THE COURT:  Oh.  So can't you clear it over there or

24   do you have to be up there?  There's a button there I'll bet

25   you.

425

Stacker - Cross by Jenkins

1          Come on in, John.  Thank you.

2          COURT SECURITY OFFICER:  All rise.

3      (Jury in at 3:22 p.m.)

4          THE COURT:  Okay.  Folks, get settled, and we're going

5  to pick up where we left off.

6          You can have your witness return to the stand, please.

7          Do you have the witness -- do you have your witness?

8          Are you redirecting in any way?

9          MS. RUSSELL:  No.

10          THE COURT:  Oh, well, then we don't need to have him

11  return.  Are you done?

12          MS. RUSSELL:  Done.

13          THE COURT:  Oh, okay.  All right.  Have a seat, folks.

14          All right.  So then I will let that witness go.

15      (Witness excused.)

16          THE COURT:  And hope you had a nice break.  There was

17  something back there.

18          Remember, no calories while you're serving your civic

19  duty.

20          And call your next witness then.

21          MR. HERBERT:  Thank you.

22      (Witness enters courtroom.)

23          THE COURT:  Up here.

24          COURT SECURITY OFFICER:  Step up here, sir.  Just face

25  the judge.

```
 1              THE COURT:  Please raise your right hand.
 2         (Witness duly sworn and takes the stand.)
 3              THE COURT:  Okay.  Have a seat.
 4         You may proceed, Mr. Herbert.
 5         MR. HERBERT:  Thank you.
 6              KEITH MILMINE, DEFENDANT'S WITNESS, SWORN
 7                        DIRECT EXAMINATION
 8  BY MR. HERBERT:
 9  Q    Good afternoon, sir.  How are you?
10  A    Fine.
11  Q    Would you please introduce yourself and spell your first
12  and last name?
13  A    My name is Keith Milmine.  K-E-I-T-H.  Last name is
14  Milmine, M-I-L-M-I-N-E.  I am currently the 4th District
15  tactical lieutenant for the Chicago Police Department.
16  Q    Okay.  And, Lieutenant -- I'll call you Lieutenant, if
17  that's okay.
18         How long have you been employed by the Chicago Police
19  Department?
20  A    A little over 19 years.
21  Q    Okay.  And how long have you served in the position of
22  lieutenant?
23  A    Approximately five years.
24  Q    Okay.  And prior to that, did you hold a different rank?
25  A    Yes.  I was a sergeant for approximately five to six years.
```

Milmine - Direct by Herbert

1    Q    And just briefly, as far as achieving the ranks of
2    sergeant, lieutenant, those are promotions?  Is that correct?
3    A    Yes, sir, they are.
4    Q    Okay.  And you indicated that you're the tac. lieutenant
5    for the 4th District.
6    A    Yes.
7    Q    And can you just briefly tell the Ladies and Gentlemen of
8    the Jury what your responsibilities are as the tac. lieutenant
9    in the 4th District?
10   A    As the tactical lieutenant in the 4th District, my primary
11   duties are to supervise approximately 30 to 40 officers,
12   traditionally in civilian dress.  We work hand-in-hand with the
13   commander and the executive officers to primarily target gangs,
14   narcotics, community problems.  We work with -- traditionally.
15   We also work with outside agencies.  Pretty much it.
16   Q    And as a tac. lieutenant, you indicated that you have
17   patrol officers that work under your command?
18   A    Yes, I do.
19   Q    And you have sergeants that work under your command?
20   A    Yes, I do.
21   Q    Okay.  And in September 2012, were you serving as the tac.
22   lieutenant in the 4th District?
23   A    Yes, I was.
24   Q    Okay.  And was Sergeant Ben one of your sergeants in the
25   tac. unit during that time?

Milmine - Direct by Herbert

1    A    Yes, she was.

2    Q    Okay.  And you approved a tactical response report from the

3    September 27th, 2012 incident, correct?

4    A    Yes.

5    Q    Okay.

6            MR. HERBERT:  And if I could approach the witness?

7            THE COURT:  You may.  Of course.

8        (Tendered.)

9    BY MR. HERBERT:

10   Q    I'm showing you what's previously been marked as Government

11   Exhibit Number 6.

12           My question is do you recognize that report?

13   A    Yes.  It's a tactical response report.

14   Q    Okay.  And that's the report that you testified to

15   approving; is that correct?

16   A    Yes.

17   Q    Okay.  Thank you.

18           And, finally, have you been disciplined as a result

19   of -- strike that.

20           Have you been disciplined for approving a false report

21   in relation to this incident?

22   A    No.

23   Q    Has anyone indicated to you that you approved a false

24   report in any way?

25           MS. JENKINS:  Objection.  Conclusion --

Milmine - Cross by Jenkins

1          THE COURT:  It's sustained.

2          MR. HERBERT:  No further questions.

3          THE COURT:  Okay.  Any cross-examination?

4          MS. JENKINS:  Very briefly.

5          THE WITNESS:  Can I pull this down a little bit?

6          THE COURT:  Oh, sure, yeah.  You can move it to where

7     it fits best for you.

8          THE WITNESS:  Thank you.

9          (Counsel conferring.)

10                        CROSS-EXAMINATION

11    BY MS. JENKINS:

12    Q    Good afternoon, sir.

13    A    Good afternoon.

14    Q    Lieutenant.  I should address you formally.  Good

15    afternoon, Lieutenant.

16          Showing you a closer view of Government Exhibit 6,

17    which is the tactical response report you were asked about, and

18    specifically if I could show you page 2.

19          That's your approving electronic signature on this

20    document?

21    A    Yes, it is.

22    Q    When you approved this document, did you independently

23    verify the information contained in the report?

24    A    What do you mean by independently verify?

25    Q    Did you confirm whether or not the events and incidences

Milmine - Cross by Jenkins

1    described on the first page of the report were accurate to what

2    actually happened?

3    A    Based upon the available information at the time I approved

4    this, which is this document itself, based upon what I had on

5    this document, I believed it to be true and I approved it.

6    Q    I think I'm asking a slightly different question.

7             Did you -- when you received the report to approve it,

8    did you take any steps in order to determine whether or not

9    accurate information was contained within the report?

10   A    No, I did not.

11   Q    Were you in the store on September 27th, 2012?

12   A    No, I was not.

13           MS. JENKINS:  No further questions.

14           THE COURT:  Anything else?

15           MR. HERBERT:  Nothing else.

16           THE COURT:  All right.  You can step down and be

17   excused.

18        (Witness excused.)

19           THE COURT:  And you can call your next witness.

20           MR. HERBERT:  Thank you.

21        (Witness enters courtroom.)

22           COURT SECURITY OFFICER:  All the way up, sir.  Just

23   step up here and face the judge.

24           THE COURT:  Please raise your right hand.

25        (Witness duly sworn and takes the stand.)

431

1          (Counsel conferring.)

2                  THE COURT:  Okay.  Have a seat.  Watch the microphone.

3                  THE WITNESS:  Okay.

4                  THE COURT:  There you go.

5                  THE WITNESS:  I'm fine.

6          (Counsel conferring.)

7                  MR. HERBERT:  All set, your Honor.

8                  THE COURT:  Yes.  All set.  You can proceed.

9                     KEITH HILL, DEFENDANT'S WITNESS, SWORN

10                             DIRECT EXAMINATION

11  BY MR. HERBERT:

12  Q    Good afternoon, sir.

13  A    Good afternoon.  How you doing?

14  Q    I'm good.  Thank you.

15          Would you please introduce yourself to the Ladies and

16  Gentlemen of the Jury?  Spell your first and last name.

17  A    Officer Keith Hill.  K-E-I-T-H.  Hill, H-I-L-L.  I'm a

18  29-year veteran police officer, Chicago Police Department.  I

19  work in the 4th District.

20  Q    Okay.  How long have you worked in the 4th District?

21  A    27 years.

22  Q    Okay.  And currently what are your duties in the

23  4th District?

24  A    I'm currently the lock-up keeper and desk relief --

25  Q    Okay.

Hill - Direct by Herbert

1    A    -- officer.

2    Q    With respect to the lock-up keeper, did you hold that

3    position in September 2012 as well?

4    A    Yes, I did.

5    Q    Would you please briefly describe for the Ladies and

6    Gentlemen of the Jury what your responsibility and duties are

7    as a lock-up keeper?

8    A    Well, when we receive prisoners, my job is to interview

9    them, do a visual inspection, enter their name and any

10   information into the computer, and fingerprint, search, and

11   photograph.

12   Q    Okay.  And the purpose of you interviewing the

13   individuals -- what is the purpose of you interviewing the

14   arrestees?

15   A    We ask them if they're sick or injured or need to go to the

16   hospital.

17   Q    Okay.  And what happens if somebody indicates that they are

18   sick or injured?

19   A    We then stop the intake process and we call for -- let

20   the -- let the supervisor know, and then either he calls for a

21   supervisor -- I mean calls for an ambulance or -- if it's that

22   serious, or we have a car take them to the hospital.

23   Q    Okay.  And with respect to the lock-up, can you just

24   briefly describe for the Ladies and Gentlemen of the Jury how

25   it is that somebody comes into your custody in the lock-up?

Hill - Direct by Herbert

1  A   Well, they come -- if I'm -- if I'm doing the intake

2  process of putting the information in and doing the

3  questionnaire, they come and they stand in front of us and

4  they -- right in front of the corner that we have there.

5  Q   Okay.  And when you're talking about "they," the people

6  that come in front of you --

7  A   Oh, that's the arrestee.

8  Q   Okay.  So somebody -- you're not part of the arrest.

9  Somebody is arrested in your district, and they're brought to

10  you for lock-up, correct?

11  A   True.  Yes.

12  Q   Okay.  And then there's lock-up facilities there that they

13  actually will sit in a cell, correct?  After being processed by

14  you?

15  A   Yes.

16  Q   Okay.  And are you required to document anywhere any

17  information that you receive regarding the individual that

18  you're processing?

19  A   Yes, we -- there's a -- there's a part in the arrest report

20  that you do the visual -- the visual observation and a question

21  observation, and that's when you document any visual -- how

22  the -- how the arrestee came in.

23  Q   Okay.

24  A   Ah-ha.

25  Q   And is it fair to say that sometimes you have dozens of

434

Hill - Direct by Herbert

1   people that you -- that you process, depending on a given day?

2   A    Yes.

3   Q    Okay.  So my question is on September 27th, 2012, do you

4   remember if you processed anyone by the name of Jecque Howard?

5   A    Not exactly, but I do know that I saw that my name was on

6   the arrest report.

7   Q    Okay.

8   A    Ah-ha.

9            MR. HERBERT:  And this is on -- is this on the

10  witness's screen, I guess?  Is my question.

11           THE COURT:  The arrest report is on the screen.  You

12  can see what is on their screen --

13           MR. HERBERT:  Oh, thank you.

14           THE COURT:  -- by looking at that outside panel right

15  there.

16           MR. HERBERT:  Great.  Thank you.

17  BY MR. HERBERT:

18  Q    Showing you what we have previously marked as Government

19  Exhibit Number 5 -- thank you -- do you know whether or not you

20  had any information that you input in this report?

21  A    Well, not by what's on this page.  It would have to be

22  on -- on another page of the arrest report.

23  Q    Okay.  The arrest report is a two-page document, correct?

24  A    It might be more than two.  I'm not exactly sure.

25  Depending on the -- how it's on the -- boy, that's -- according

Hill - Direct by Herbert

1  to this, it says it's 2 of 5, so it would probably be the last

2  page.

3  Q   Okay.  We're showing you now what's marked as page --

4  A   Page 5.

5  Q   -- page 5.

6  A   All right.  Yes.  My name is on there.

7  Q   Okay.  And --

8        MR. HERBERT:  I'm sorry, can you scroll back one page?

9  BY MR. HERBERT:

10  Q   And now we're showing you page 4?

11  A   Yes.

12  Q   And there's various questions in there pertaining to any

13  observations that you may have made, correct?

14  A   Yes.

15  Q   Okay.  And fair to say that the boxes that are checked

16  "no" -- or, I'm sorry, the word "no" is typed in there

17  regarding any pain, injury, my question is would you have input

18  that information in this report?

19  A   Yes.

20        MS. ROMERO:  Objection to leading.

21        THE COURT:  Okay.  Overruled.  I think we're fine for

22  now, but be careful.

23        MR. HERBERT:  Okay.  Thank you.

24  BY MR. HERBERT:

25  Q   And would it be fair to say that had you witnessed any

Hill - Direct by Herbert

1    injuries on Jecque Howard, that you would have indicated that

2    in this report?

3              MS. ROMERO:  Objection.  Leading.

4              THE COURT:  Okay.  Overruled.

5    BY THE WITNESS:

6    A    Yes.

7              MR. HERBERT:  Okay.  And I have nothing further.

8              THE COURT:  Okay.

9         (Counsel conferring.)

10             THE COURT:  Any cross?

11             MS. ROMERO:  No, your Honor.

12             THE COURT:  Okay.  You can step down and be excused.

13             THE WITNESS:  Okay.

14        (Witness excused.)

15             THE COURT:  And you can call your next witness.

16             MR. HERBERT:  Judge, at this point, maybe we can have

17   a brief sidebar.

18             THE COURT:  Okay.

19        (At sidebar outside the hearing of the jury:)

20             MR. HERBERT:  I don't know what your feelings are on

21   breaking early, but here is my position:

22             We may be down to our last witness, and we may -- we

23   want to reconsider whether we're going to call him, so I don't

24   know if the Court would consider breaking tonight, knowing that

25   we can wrap this thing up very quickly tomorrow.

437

1          THE COURT:  I -- the only hesitation I have is that

2     you're telling me that you might reconsider your advice to your

3     client, but that would be something -- I would rather we do

4     what we do, which is go until 5:00 and finish our trial day.

5          So do you have one more witness or are you going

6     straight to the defendant?

7          MR. HERBERT:  Well, we also have that one additional

8     issue.  I know you don't want to hear this, but we believe that

9     the motion to reconsider the expert testimony may be -- may be

10    a ripe issue to raise.  We ordered the transcripts from the

11    pretrial ruling and from the off-the-record discussion prior to

12    Miss Hatch testifying.  We haven't reviewed it yet.  But I know

13    that we raised it with your Honor, but we believe that this was

14    opening the door to allow our expert witness testify.  And we

15    still -- we may make another motion if we think there's any

16    basis in there.  And I can represent to the Court that I have

17    not reviewed it to see if there is any basis.

18         THE COURT:  That's not really my issue.  You're on

19    jury trial and you want to get the transcript -- and my court

20    reporter got it for you, I know, because she gave a copy to me,

21    then -- you're on trial.  You have to make your motion, which

22    I've already reconsidered --

23         MR. HERBERT:  I know.

24         THE COURT:  -- three times, I believe, and sat through

25    the testimony.

 1          So do you have another witness before the defendant or

 2    not?

 3          MR. HERBERT:  No.  That's it.

 4          THE COURT:  And have you -- I mean, I already advised

 5    him today, and he told me he wanted to testify.

 6          Have you changed your mind?

 7          MR. HERBERT:  I think it's something that I need to

 8    talk with him about.  I have not necessarily changed my mind;

 9    but I think that since I spoke with him last evening, I think

10    that there's information that I need to provide to him to -- so

11    that he can fully consider whether or not he wants to testify.

12          THE COURT:  What's your position?

13          MS. ROMERO:  Judge, the trial has been scheduled and

14    the evidence has come in and the schedule was set very clearly.

15    I mean, a ten-minute break --

16          THE COURT:  I'll give you 10 or 15 minutes to talk to

17    him and see what you want to do, and then we'll call him if

18    he's going to go.

19          MR. HERBERT:  Okay.  Thank you very much.

20      (Sidebar proceedings concluded.)

21          THE COURT:  Okay, folks.  Go back in and have some

22    more treats for 15 minutes while I deal with this, okay?  Only

23    15 minutes.

24          COURT SECURITY OFFICER:  All rise.

25      (Recess taken from 3:39 p.m. to 3:57 p.m.)

```
 1          (In open court in the presence of the jury:)
 2               THE COURT:  Okay, folks.  Get settled.  Be seated.
 3               And you may call your next witness.
 4               MR. HERBERT:  The defense will call Aldo Brown.
 5          (Approaching.)
 6               THE COURT:  Mr. Brown, please raise your right hand.
 7          (Witness duly sworn and takes the stand.)
 8               THE COURT:  Okay.  Have a seat.
 9               MR. HERBERT:  All set?
10               THE COURT:  Whenever you're ready, sir.
11               MR. HERBERT:  Okay.  Thank you.
12             ALDO BROWN, DEFENDANT'S WITNESS, SWORN
13                     DIRECT EXAMINATION
14   BY MR. HERBERT:
15   Q    Good afternoon, sir.
16          Would you please introduce yourself?
17   A    Yes.  I'm Officer Brown.  Aldo Brown.
18   Q    Spell your first and last name.
19   A    My first name is spelled A-L-D-O.  My last name is spelled
20   B-R-O-W-N.
21   Q    Aldo, how old of a man are you?
22   A    I'm 39 years old.
23   Q    And where do you live, without giving your address?
24   A    In the North Beverly community on the south side of
25   Chicago.
```

Brown - Direct by Herbert

1    Q    Okay.  And with whom do you live with?

2    A    I live with my wife and three kids.

3    Q    And how old are your kids?

4    A    My oldest daughter is 14; I have a son, 12; and a daughter,

5    8.

6    Q    Okay.  And they're currently in school?

7    A    Yes.

8    Q    Okay.  And your wife, how long have you been married?

9    A    I've been married 13 years.

10        MS. ROMERO:  Objection, your Honor.  Relevance.

11        THE COURT:  Okay.  Overruled for now.

12        I don't assume you're going much further, correct?

13        MR. HERBERT:  I'm not.

14        THE COURT:  All right.

15   BY MR. HERBERT:

16   Q    You've been married for 13 years.

17        How long have you known your wife?

18   A    I've known my wife since elementary school.

19   Q    Okay.  And did you grow up in the Chicagoland area?

20   A    Yes, I did.

21   Q    What part of town?

22   A    The Pullman area on the southeast side of Chicago.

23   Q    And did you go to high school in that area?

24   A    No.

25   Q    Where did you go to high school?

Brown - Direct by Herbert

1    A    Went to Carver High School.

2    Q    Okay.  And did you graduate from Carver High School?

3    A    Yes, I did.

4    Q    What year did you graduate?

5    A    1994.

6    Q    And what did you do after graduating high school?

7    A    I joined the U.S. Army.

8    Q    Okay.  And how long did you serve in the U.S. Army?

9    A    Five years.

10   Q    Okay.  And that was full-time duty, correct?

11   A    Yes.

12   Q    Okay.  And did you receive an honorable discharge?

13   A    Yes.

14   Q    Okay.  And what happened after -- did you return home then?

15   A    I returned home.

16   Q    Okay.  And what did you do then as far as work?

17   A    I went to barber college.

18   Q    Okay.  And after that, did you join the police department

19   at some point?

20   A    Yes, I did.

21   Q    And what year did you join the police department?

22   A    In December of 2002.

23   Q    Okay.  And when you joined the police department, you went

24   to the training academy, I assume?

25   A    Yes.

Brown - Direct by Herbert

1   Q   Okay.  And then after graduating from the training academy,
2   what happened next?  Where did you work?
3   A   I was assigned to the 4th District.
4   Q   Okay.  And what type of assignment did you have when you
5   first went to the 4th District?
6   A   I was a beat officer.
7   Q   Okay.  And just briefly describe what a beat officer is.
8   A   A beat officer is usually an officer that's in uniform.
9   They answer various calls within the 4th District.
10  Q   Okay.  And that's the typical blue-and-white squad car that
11  we see around all the time?
12  A   Yes.
13  Q   Okay.  And at some point did your assignment change to a
14  different unit?
15  A   Yes, it did.
16  Q   And describe that for us.
17  A   After three years, I was assigned to the 4th District
18  tactical unit.
19  Q   Okay.  And can you describe for the Court and the jurors
20  what exactly a tactical unit is?
21  A   A tactical unit is a specialized unit within the
22  4th District that deals with gangs, narcotics, gambling, any
23  other -- prostitution, any vices that goes on within the
24  4th District.
25  Q   Okay.  And as far as your assignment goes, how are you

Brown - Direct by Herbert

1   generally dressed as a tac. officer?

2   A   We're generally dressed in plainclothes.

3   Q   Okay.  And when you -- excuse me.

4           When you say "plainclothes," do you have any police

5   insignia on you?

6   A   Yes.

7   Q   Describe that.

8   A   We usually have our vest on and our duty belt.

9   Q   Okay.  And your duty belt is a big black belt, correct?

10  A   Yes.

11  Q   And does it contain any items on the duty belt?

12  A   Yes.  It contains your gun, your handcuffs, OC spray.  If

13  you have the baton, it contains the baton also.

14  Q   Okay.  And the OC spray is the same thing as, like, pepper

15  spray?

16  A   Yes.  Pepper spray, Mace.

17  Q   Okay.

18  A   Same thing.

19  Q   And just in wrapping up with your uniform, the vest that

20  you wear, is there anything specific about the vest that you

21  wear?

22  A   Yes.  It has my district on it.  It has my police star sewn

23  in the vest.  And on the back, it have "Police" going across in

24  real big letters.

25  Q   Okay.  And what type of a vest is this?

444

Brown - Direct by Herbert

1    A    It's a bulletproof vest.

2    Q    Okay.  And you're required to wear that by the department?

3    A    Yes.

4    Q    Okay.  As are all officers?

5    A    Yes.

6    Q    Okay.  I want to direct your attention to September 2012.

7         Were you working for the 4th District tactical team on

8    that -- in that month?

9    A    Yes.

10   Q    Okay.  And who were you assigned to work with?

11   A    My partner was George Stacker.

12   Q    And how long have you worked with George Stacker?

13   A    About six years.

14   Q    Okay.  And in the tactical unit, did you have a direct

15   supervisor?

16   A    Yes.

17   Q    And who was that?

18   A    That was Sergeant Senora Ben.

19   Q    Okay.  And in the tactical unit, were you assigned to a

20   specific team?

21   A    Yes, I was.

22   Q    And how many officers were on that team?

23   A    It's ten officers on a team.

24   Q    Okay.  And Sergeant Ben would be the sergeant for all of

25   the officers on that team?

445

Brown - Direct by Herbert

1   A    Yes.

2   Q    Okay.  And is there a lieutenant assigned to the tactical

3   unit?

4   A    Yes, there is.

5   Q    Okay.  And was that Lieutenant Milmine?

6   A    Yes.

7   Q    Okay.  And directing your attention more specifically to

8   September 27th, 2012, did you go to the Omar and Salma

9   convenience store on that day?

10  A    Yes, I did.

11  Q    And what was the purpose of you going to the store on that

12  day?

13  A    We were going there to conduct a preliminary investigation

14  about drugs being sold, people inside the store holding guns.

15  They said it was selling loose cigarettes over the counter.

16  Just -- it was a numerous amount of vices going on within that

17  store.

18  Q    And how did you receive this information?

19  A    I received the information from Keith Ross.

20  Q    Okay.  And Keith Ross was the police officer that testified

21  earlier today?

22  A    Yes, sir.

23  Q    Okay.  And do you remember when you received that

24  information from Keith Ross in relation to September 27th,

25  2012?

Brown - Direct by Herbert

1    A    We received the information probably a couple days prior to

2    entering that store.

3    Q    Okay.  Why is it that you didn't go directly to the store

4    immediately after receiving the information from Keith Ross?

5    A    Because we had other complaints that we had to do before

6    making it over to the Omar and Salma store.

7    Q    Okay.  With respect to the information that you received

8    from Keith Ross about the guns and the drugs being sold, was

9    this -- were you surprised to receive information such as this

10   or was this somewhat routine for you to receive information

11   like that?

12   A    Pretty much routine for that particular community.

13   Q    Okay.  And do you know whether you had been to the Omar and

14   Salma convenience store prior to September 27th, 2012?

15   A    Yes, I have been there before.

16   Q    Okay.  And the area in which the Omar and Salma grocery

17   store was located, the 7600 block of South Coles, were you

18   familiar with that area?

19   A    Yes, I am.

20   Q    And how is it that you were familiar with that area back in

21   September 2012?

22   A    Like I said, at that time I was working in the 4th District

23   ever since I graduated from the police academy, so I was

24   familiar with pretty much all of the communities within the

25   4th District.

Brown - Direct by Herbert

1  Q    Okay.  And how many years had you been working in the

2  4th District at the point in which -- in September of 2012, how

3  many years had you worked in the 4th District?

4  A    Probably about 11 years.

5  Q    Okay.  And you had made arrests in that -- in the district,

6  correct?

7  A    Yes.

8  Q    And you responded to calls for service in the district,

9  correct?

10  A    Yes.

11  Q    Okay.  And fair to say that you responded to calls for

12  service and made arrests in the direct vicinity of the Omar and

13  Salma grocery store?

14  A    Yes.  All the time.

15  Q    Okay.  When you say "all the time," what were the problems

16  that you were aware of, prior to the information -- the

17  specific information that you received from Keith Ross, did you

18  have a general understanding of the problems associated within

19  that 7600 block, 7500 block of Coles?

20  A    Yes.  That particular area was listed as a violent zone

21  within the 4th District.

22  Q    And when you say it was "listed as a violent zone," what

23  does that mean exactly?

24  A    That mean it's been a chronic numbers of shootings, arrests

25  for narcotic sales, drug complaints, complaints about gangs,

Brown - Direct by Herbert

1    and other illegal activities.

2    Q    And when you say it was "listed as a violent zone," how is

3    it that you were aware of the fact that it was listed as a

4    violent zone?

5    A    We are told that information at roll call by a sergeant.

6    Q    Okay.  So on September 27th, 2012, you made the decision to

7    go to the Omar and Salma grocery store.

8    A    Yes.

9    Q    Convenience store is probably a better term.

10   A    I did.

11   Q    Okay.  And describe what happened when you got to the area.

12   A    When we got to the area, we pulled up in our vehicle.  We

13   exit our vehicle and approached the store.

14   Q    Okay.  And when you say "we," you were with George Stacker?

15   A    Yes, me and my partner.

16   Q    Okay.  And you were dressed in the same manner that you

17   previously testified to?

18   A    Yes.

19   Q    Okay.  And what do you observe when you first get out of

20   your vehicle, I guess?

21   A    When I got out my vehicle, I observed two guys attempting

22   to walk out the store.

23   Q    Okay.  And did you have any description of any of the

24   offenders regarding the complaint that you were there

25   investigating?

Brown - Direct by Herbert

1   A    Yes.  Several male blacks.

2   Q    Okay.  Any more specific description or is that generally

3   it?

4   A    Several male blacks.  That was pretty much the description.

5   Q    Okay.  But you didn't have the names of anyone, correct?

6        MS. ROMERO:  Objection to leading.

7   BY THE WITNESS:

8   A    No.

9        THE COURT:  Sustained.

10       MR. HERBERT:  Okay.

11  BY MR. HERBERT:

12  Q    So tell us what happened when you went into the store.

13  A    We pulled up in front of the store, parked our car.  We

14  approached the store.  As we approached the store, and -- it

15  was two guys standing like almost in the doorway of the store

16  as if they were getting ready to exit the store.  We approached

17  them.  Once they recognized that we was the police, they tried

18  to make their way out the door.

19  Q    Okay.  And what race were these two individuals?

20  A    They were two male blacks.

21  Q    Okay.  And did you prevent them from leaving the store?

22       MS. ROMERO:  Objection to leading.

23       THE COURT:  Sustained.

24  BY MR. HERBERT:

25  Q    What did you do then specifically with them?

Brown - Direct by Herbert

1   A    We detained those two subjects and took them back inside

2   the store.

3   Q    Okay.  And what was it about those individuals that you

4   made the determination to detain them?

5   A    They fit the description as lookouts.

6   Q    Okay.  When you say "the description," which description?

7   A    The male black description.

8   Q    Okay.  And from what information?

9   A    From the information received from -- received from Keith

10  Ross.

11  Q    Okay.  And when you received the information about

12  lookouts, did you know what that meant?

13  A    Yes, I did.

14  Q    And what did that mean to you?

15  A    Lookouts mean that it's people who are usually put outside

16  the store or in the doorway of the store, and they act as

17  security for drug dealers.

18  Q    And had you, prior to September 27th, 2012, had you gone

19  into any structures that were selling narcotics?

20          MS. ROMERO:  Objection to leading.

21          THE COURT:  Sustained.  You have to do those

22  open-ended questions.

23          MR. HERBERT:  Okay.

24  BY MR. HERBERT:

25  Q    What information did you have -- what did you base your

Brown - Direct by Herbert

1  information on as far as your knowledge of lookouts?

2  A    Like I said, lookouts usually stand in the doorway or

3  outside of the store looking out for the police.

4  Q    Okay.  And then tell us what happened when you went inside

5  the store.

6  A    We went inside the store.  We observed several other males

7  inside of the store.

8  Q    And what about that was of significance to you?

9  A    They were standing around, loitering inside the store.

10  They wasn't making purchases.  They basically was just hanging

11  around in the store.

12  Q    Okay.  What race were these individuals?

13  A    Male blacks.

14  Q    And what significance, if any, did you place on the fact

15  that they were male blacks and loitering in the store?

16  A    Well, the only reason I could see them being in the store

17  is to make a purchase.  We didn't see anyone making purchase.

18  We asked them did they make a purchase.  They said no.  So we

19  assumed they was in the store loitering.

20  Q    Okay.  With respect to the information that you received

21  from Officer Ross, did that have any impact on your assessment

22  of these individuals?

23           MS. ROMERO:  Objection.

24           THE COURT:  Sustained.

25  BY MR. HERBERT:

Brown - Direct by Herbert

1   Q    Anything else, other than what you've testified to, why you

2   believe that it was significant that you talk to these

3   individuals?

4   A    It was significant just to talk to them.  We were

5   conducting a preliminary investigation.  During preliminary

6   investigations, we do talk to the subjects, just to see what's

7   going on, what's their reason for being there, why are they

8   there, just to get a feel of what's going on inside the store.

9   Q    Okay.  And when you talk about your preliminary

10  investigation, which investigation were you referring to?

11  A    Based on the information that we received from Keith Ross.

12  Q    Okay.  And so what happened -- strike that.

13       What did you do when you observed these male blacks?

14  A    Once we seen it was a fair number of them, we began to

15  place them all in handcuffs.

16  Q    Okay.  And as far as your threat level, what was your

17  threat level -- threat level like at the point in which you

18  entered the store?

19  A    It was about medium.  We were looking out to make sure

20  didn't any -- if anyone ran, if anyone threw something, you

21  know.  Sometimes you come in the store, if they holding drugs,

22  they'll toss it on a shelf or toss it under a shelf.  So we

23  were just looking out for those type of activities.

24  Q    Okay.  And at some point did your threat level -- when I

25  say "threat level," what do you mean by "threat level"?

Brown - Direct by Herbert

1    A    "Threat level" means my awareness for my safety.

2    Q    Okay.  What do you base your awareness for your safety on?

3    What factors?

4    A    The factors are the subjects we're dealing with, if they're

5    in compliance or if they're not in compliance.

6    Q    Okay.  And at some point did your threat level rise above,

7    transition above, medium?

8              MS. ROMERO:  Objection.  Leading.

9              THE COURT:  Oh, for leading?  Yes.  No, that's fine,

10   you can answer that question.  Overruled.

11             I thought you had a different objection.

12             You can answer it.

13   BY MR. HERBERT:

14   Q    Do you remember the question?

15   A    Yes.

16             When the subjects in the store was asking us, and

17   swearing at us, asking us, what are we doing there, why you all

18   here, we didn't call you all, you know.  So that gave me reason

19   to believe that they were hiding something inside that store.

20   Q    Okay.  And do you know how many subjects were saying those

21   things to you?

22   A    Almost all of them.

23   Q    Okay.  And how many people are you referring to when you

24   say "almost all of them"?

25   A    It was between five and six people.

Brown - Direct by Herbert

1   Q    Okay.  And what happened next?

2   A    What happened next?  I began to search -- well, what

3   happened next, we came in, we cuffed them all together.  After

4   that, I recall Howard saying, "Why did you all cuff me?  I work

5   here."

6   Q    Okay.  And then what happened after Howard said that?

7   A    We asked the guys behind the counter did he work there, and

8   they said yes.

9   Q    Okay.  And then what did you do in response to that?

10  A    I basically was asking Howard, you know, if he work here,

11  who are all these other guys loitering inside of the store and

12  why are they here.

13  Q    Okay.  What happened next then?

14  A    He couldn't give me a reason of why they were there.

15  Q    Okay.  When you say he couldn't give you a reason --

16  A    He didn't.

17  Q    What does that mean, he didn't?

18  A    He didn't -- he didn't have a reason for the other subjects

19  to be inside of the store.

20  Q    Okay.  And what happened next?

21  A    I began to search the subjects in the front of the store.

22  Q    Okay.  And at the point in which you searched the subjects,

23  were they handcuffed?

24  A    Yes.

25  Q    Okay.  And describe the search that you conducted on these

Brown - Direct by Herbert

1   subjects.

2   A    Search was a frisk of their pockets, they general area,

3   waistband, anywhere within hand reach, you know, at -- at that

4   time.

5   Q    Okay.  And these subjects were not under arrest at that

6   point, were they?

7   A    No, they were not.

8   Q    Okay.  Were they free to leave at that point?

9   A    No, they were not.

10  Q    What's the difference between being free to leave and

11  arrest?

12           MS. ROMERO:  Objection.

13           THE COURT:  Sustained.

14  BY MR. HERBERT:

15  Q    What happened after you conducted -- strike that.

16           You said that you conducted a search.

17           Did you search all of the individuals?

18  A    No, I did not.

19  Q    Who did you not search?

20  A    Jecque Howard.

21  Q    Okay.  And do you remember specifically not searching

22  Howard or is that something that was supplemented by the video?

23           MS. ROMERO:  Objection.  Leading.

24           THE COURT:  Sustained.

25  BY MR. HERBERT:

Brown - Direct by Herbert

1    Q    Do you know whether or not you realized you didn't search

2    Howard on the day in question?

3            MS. ROMERO:  Objection.  Leading.

4            THE COURT:  Sustained.

5    BY MR. HERBERT:

6    Q    So after you conducted the search, what happened next?

7    A    I conducted the search.  I searched the guys that I

8    searched in front of the store.  They didn't have anything on

9    them.

10   Q    Okay.  And when you say "anything," what were you --

11   A    Anything illegal.  I'm sorry.  Anything illegal.

12   Q    Okay.  What did you do next?

13   A    I began to just search the general area to make sure there

14   wasn't any weapons on the shelves, did anybody throw drugs on

15   the shelves or on the floor.  Just basically, you know,

16   checking the area out for my safety.

17   Q    Okay.  And why were you doing that?

18   A    Because it could have been anything in the store.  Like I

19   said, we was conducting a preliminary investigation.  So, I

20   mean, that's pretty much our job is to search the area to make

21   sure there's no guns, drugs, any paraphernalia, you know,

22   just -- pretty much just doing a search.

23   Q    Okay.  And did you find anything back at the store at this

24   point, any contraband?

25   A    Not at that point.

Brown - Direct by Herbert

1   Q    What happened next then?

2   A    Next I got a call from Officer Stacker.  He asked me to

3   come here.

4   Q    Okay.  And when you say "call" --

5   A    He called my name.  He said, "Brown, could you come here

6   for a minute?"

7   Q    Okay.  And what happened next?

8   A    I walked towards the front door to the front aisle, and I

9   met Howard right -- I mean, not Howard.   Strike.   I met Stacker

10  up in the front by the front door of the store.

11  Q    And what happened next?

12  A    Officer Stacker showed me a bag.  It was a book bag that

13  contained a lot of -- it was a lot of plastic baggies.  It was

14  a sandwich bag box with, like, the size of sandwich bags.  It

15  was a box, you know, sandwich bag box.

16  Q    Go on.

17  A    It was a bottle of liquor.  And there was a scale, a small

18  scale, inside the bag.  Yes.

19  Q    Okay.  And did you notice anything about the bottle of

20  liquor?

21  A    Yes.  I know the bottle was open and half -- halfway gone.

22  Q    Okay.  And with respect to the bags that you said you saw,

23  was there anything significant to you about the bags?

24  A    Yes.  Pretty much everything besides the liquor that was

25  inside the bag are used to manufacture drugs.

Brown - Direct by Herbert

1    Q    And as far as this scale goes, can you just better describe

2    the type of scale?  I mean, it obviously is not a bathroom

3    scale, correct?

4    A    No.

5    Q    Would you describe it as best as you can?

6    A    It was a scale about this big.  (Indicating.)  It looks

7    like one of those scales they weigh jewelry on.

8    Q    I'm sorry, weigh what?

9    A    It looked like a scale that they weigh jewelry on in a

10   jewelry store.  It was about this big.  (Indicating.)  Yes, a

11   digital scale.

12   Q    Okay.  And was that significant to you at all?

13   A    Yes.

14   Q    Why?

15   A    Because most drug dealers use those scales to weigh drugs.

16   Q    Okay.  After you obtained this information, did that have

17   any effect on your level of awareness?

18   A    Yes, it did.

19   Q    How so?

20   A    It gave me reason to believe that they were selling drugs

21   out of that location.

22   Q    What happened next?

23   A    After that, I continued to search the rear of the store.

24   Q    Okay.  And what happened?

25   A    Same thing, looking for guns, drugs.  I searched the rear

Brown - Direct by Herbert

1   pretty good.  I didn't find anything, any drugs or guns.

2   Q   Okay.  And then what happened?

3   A   In the meantime, while I was conducting my search, I heard

4   Stacker and Howard getting into a heated conversation.

5   Q   Okay.  And when you say you heard Stacker and Howard in a

6   heated conversation, could you hear any of the words that were

7   being said by anyone?

8   A   Yes.

9   Q   What did you hear?

10  A   I don't remember everything word for word, but I heard

11  Howard telling Stacker, "Fuck the police" -- excuse my

12  language -- "Fuck the police, I don't give a fuck about the

13  police."

14  Q   Okay.  And at that point, did those statements have any

15  effect on you?

16  A   Yes, they did.

17  Q   What?

18  A   It raised my level of alertness that Stacker may be in

19  trouble in the front of the store.

20  Q   Okay.  And what did you do then?

21  A   I returned to the front of the store.

22  Q   And what happened?

23  A   At that time, I approached Howard.

24  Q   And tell us what happened.

25  A   Well, he was getting -- things was getting loud between him

Brown - Direct by Herbert

1    and Stacker.  I came back to the front of the store.  I

2    approached Howard.

3    Q    When you say they were being -- they were getting loud, did

4    you hear anything else other than what you testified to hearing

5    Howard say?

6    A    It was some other things said.  I can't remember word for

7    word what was said, but it was almost as if they were getting

8    ready to exchange blows.

9    Q    Okay.  And what did you observe when you finally got up

10   there?

11   A    I observed Howard, he wasn't cuffed anymore, and he was,

12   you know, standing there with his hands to his side talking to

13   Stacker.

14   Q    Okay.  And the fact that Howard was now uncuffed, did that

15   have any effect on your level of awareness?

16   A    Yes, it did.

17   Q    How so?

18   A    Because Howard was the only person I didn't search in the

19   front of the store.

20   Q    Okay.  And when did you realize that Howard was the only

21   person that you didn't search in the front of the store?

22   A    I realized it right away.

23   Q    Okay.  And what about him being unhandcuffed and unsearched

24   had any effect on you?

25   A    I wasn't sure if Stacker searched him.  You know, I'm

Brown - Direct by Herbert

1   assuming Stacker unhandcuffed him because Stacker was the only

2   police officer at that time in the front of the store.

3   Q   Okay.  And what happened?  Describe what happened then.

4   A   I began to approach Howard.  As I approached him, he looked

5   at me and said, "What the fuck you going to do"?

6   Q   Okay.  And what, if anything -- how, if any way, did that

7   affect you?

8   A   It affected me to the fact that, you know, I took it as he

9   wanted to fight me.

10  Q   Okay.  Were you -- were you angry at that point?

11  A   No, I was not.

12  Q   Did you have any emotions at that point?

13  A   Yes.  I -- I was -- I was very alert, but I just wanted to

14  focus on Howard and see if possibly I can calm him down.

15  Q   Okay.  And what happened next?

16  A   I asked Howard to lift his shirt.

17  Q   Okay.  What was the reason for you asking him to lift his

18  shirt?

19  A   Just to check to see if he had any weapons.

20  Q   Okay.  And was that your primary concern at that point?

21  A   Yes.

22  Q   Okay.  And what happened then?

23  A   After that Howard began to -- he still was saying things

24  like, "Man, fuck" -- you know, "Fuck you, I ain't got to do

25  nothing."  I asked him to lift his shirt.  He was messing with

Brown - Direct by Herbert

the zipper of his pants on -- I don't know what he was doing.
I really couldn't tell.

   At that point, I was asking him, you know, "Let me see
your hands, put your hands up." He was still fumbling around
with his pants.

   And I looked to the rear of his -- I looked to the
rear of Howard, and I seen what appeared to be a handgun in his
back pocket.

Q Okay. Were you giving him verbal directions?

A Yes.

Q Was he responding to those?

A No.

Q Okay. And you said that you saw what you believed to be a
handgun.

   What led you to believe that it may be a handgun?
What did you observe?

A I observed what appeared to be shiny, nickel-plated, with a
wooden handle.

Q Okay. At the point in which you first observed what you
believed to be a handgun, could you observe the entire handgun?

A Majority of the butt of the handgun.

Q Okay. And the butt of the handgun being what? Would that
be the handle?

A The handle, yes.

Q Okay. And had you seen -- you had obviously seen weapons

Brown - Direct by Herbert

1   in the past?

2   A   Yes.

3   Q   Okay.  And what did this do to your alert level?

4   A   I was probably at the highest level of alertness that you

5   can be at that point.

6   Q   Okay.  Did you have any physical emotions at that point

7   other than being highly aware?

8   A   Yes, I did.

9   Q   What were they?

10  A   I was upset.

11  Q   Okay.  What happened next?

12  A   I continued to give Howard verbal commands and which he

13  denied to comply, you know.

14  Q   Which -- what verbal commands did you give to him at that

15  time?

16  A   "Put your hands up."  And I was asking him, "Is that a

17  handgun in your pants?"  You know, at first I thought it was in

18  his waistband.  I says, "Is that a handgun you got?"

19         He just kept saying, "Man, fuck you," you know.

20  Basically just totally disregarding, you know, my instructions.

21  Q   Okay.  What happened next?

22  A   After Howard, I gave him all the several verbal commands, I

23  then struck Howard.

24  Q   Okay.  Describe for the Ladies and Gentlemen of the Jury

25  how you struck Howard.

Brown - Direct by Herbert

1    A    It was -- it wasn't total -- my hand was like partially

2    balled up when I striked him, like this.  (Indicating.)

3    Q    Okay.

4    A    Yeah.

5    Q    And where did you strike, on Howard's body, did you strike

6    him?

7    A    In the face.

8    Q    Okay.  And what was the reason for you striking Howard at

9    that point?

10   A    I wanted to give him what we call in the police department

11   a stun to the face.

12   Q    What is the purpose of a stun?

13   A    To basically, like, to stun him to knock off -- knock him

14   off balance, you know.  And the reason I did that is so he

15   couldn't grab the handgun and shoot me.  At that point, you

16   know, I seen a gun, I was scared, he wasn't listening to my

17   verbal directions, I had to react quickly.

18   Q    And were you concerned about anything else in the area

19   other than your interaction with Howard at that point?

20   A    Yes, I was.

21   Q    What else were you concerned about?

22   A    The people that were standing behind me.

23   Q    What about them were you concerned about?

24   A    I was concerned that they were going to try to attack me

25   from behind when I was dealing with Howard at the time.

Brown - Direct by Herbert

1  Q   Okay.  Why is it that you chose to stun Howard as opposed

2  to going in and tackling him or something along those lines?

3          MS. ROMERO:  Objection.  Leading.

4          THE COURT:  Sustained.

5          MR. HERBERT:  Okay.

6  BY MR. HERBERT:

7  Q   Did you have any other options that you thought were viable

8  at the point in which you stunned him, other than the stun?

9  A   No, I did not.

10  Q   Why not?

11  A   Because when dealing with a subject that has a gun, the

12  last thing you want to do is get into a struggle or a wrestling

13  match or give them any opportunity to retrieve the handgun.

14  Q   Okay.  And what is it about getting into a wrestling match

15  with this individual that would somehow scare you into thinking

16  that he could retrieve his handgun?

17  A   Because when you're entangled with somebody, it's very

18  stressful dealing with a subject that has a handgun.  You need

19  to be able to see they waist at all times and make sure they

20  don't retrieve the gun to shoot you.

21  Q   Okay.  What happened after you gave Howard -- strike that.

22          When you gave Howard the stun, did you do this to

23  punish him?

24  A   No, I did not.

25  Q   Did you do this because you were angry at him?

466

Brown - Direct by Herbert

1    A    No, I did not.

2    Q    Okay.  What happened after you gave Howard the stun?

3    A    After I gave him the stun, he was stunned.  He took a

4    step -- couple step back as if he was trying to gain his

5    composure.

6    Q    Okay.  And what -- what about him taking a couple steps

7    back, did that impact any of your actions in any way?

8    A    Yes.  I began to follow him in a direction that, you know,

9    he were going.

10   Q    Okay.  And what was your purpose for following him at this

11   point?

12   A    To prevent him from fleeing.

13   Q    Okay.  And why is it that you were concerned about him

14   fleeing?

15   A    Because at that time, he still had the handgun on him.

16   Q    Okay.  So what happened then?

17   A    At that time he backed up against a freezer, and I pursued

18   him.

19   Q    Okay.  And when you pursued him, how did you pursue him?

20   Physically, what did you do to pursue him?

21   A    I put my hand up in his collar area, and I had him by his

22   shirt, and I pushed myself back with my hand, leaving my gun

23   hand free, and giving myself enough distance where I could keep

24   an eye on his waist area.

25   Q    And why is it that you were concerned about keeping an eye

Brown - Direct by Herbert

1    on his waist area?

2    A    To make sure he didn't grab the gun and shoot me.

3    Q    And what about you keeping distance, what significance --

4    what was the reason why you wanted to keep distance?

5    A    I wanted to keep distance so if I had to react, use any

6    other force, any other strikes, I can do so.  Also to keep --

7    to keep an eye on his waist area and his hands to make sure he

8    didn't grab that gun.

9    Q    Okay.  At this point, do you have your back to the entrance

10   to the store?

11   A    Yes, I did.

12   Q    And did you have your back to -- were there any people that

13   were located where you had your back to at this point?

14   A    At that point, my back was towards everybody in the store.

15   Q    Okay.  And what, if any, significance did that have on you?

16   A    It had significance because at the time Howard was still

17   not complying.  I had to try to deal with Howard and at the

18   same time watch my back to make sure I didn't get attacked from

19   the back.

20   Q    Okay.

21   A    Because Howard was saying things like, "F him up, F him up,

22   don't let him do this, F him up," so -- you know, he was trying

23   to give orders for the other guys to come and attack me.

24   Q    Okay.  And did you believe he was talking to the other

25   guys?

468

Brown - Direct by Herbert

1   A    Yes, he was.

2   Q    Okay.  And describe how you were holding Howard.  Where

3   were you holding him on his body?

4   A    I had him in the collar.  It was like right up in this

5   area.  (Indicating.)

6   Q    Okay.  You're grabbing your shirt and your tie area.

7   A    Yeah.  Well, he didn't have on a shirt and tie.  He had on

8   a shirt, so I had him, like, right at the top of his shirt.

9   Q    Okay.

10  A    Right -- probably towards -- you know, in his neck area.

11  Q    Do you know whether or not your hand was around his neck at

12  any point?

13          MS. ROMERO:  Objection.  Leading.

14          THE COURT:  Sustained.

15  BY MR. HERBERT:

16  Q    Did you ever choke Howard?

17  A    No.

18  Q    Was Howard -- did he -- did you experience Howard having

19  trouble talking at any point?

20          MS. ROMERO:  Objection.  Leading.

21          THE COURT:  Overruled.

22  BY THE WITNESS:

23  A    No.

24  BY MR. HERBERT:

25  Q    In fact, was he talking while you had him by the collar

Brown - Direct by Herbert

1   area?

2   A   Yes.

3   Q   Okay.  At any point did he say anything that he couldn't

4   breathe?

5   A   No.

6   Q   Okay.  What happened next?

7   A   He just kept yelling, "All I got is some weed, all I got is

8   some weed, I don't have a gun, all I have is some weed."

9   Q   Okay.  And what happened next?

10  A   I was -- kept telling him to put his hands up.  He kept

11  reaching in his waist area.  He was trying to push me.  He

12  was -- he was just making movements with his hands, and he

13  wasn't following verbal direction.  My verbal directions with

14  him for him to put his hands up.  Once he got his hands up, you

15  know, I mean, would have turned him around.  You know, I was

16  trying to get to the gun.  That was -- that was my main focus.

17  I was trying not to get shot.  I mean, that was a very

18  dangerous situation to be in.  When someone have a gun and they

19  not complying, I mean, that's very dangerous.

20  Q   How many verbal directions did you give him, such as "Put

21  your hands up, put your hands up"?

22  A   I couldn't even tell you how many.  I gave him numerous.

23  Q   Okay.  Did you note -- did you make any observations about

24  any actions with his lower half of his body?

25  A   Yes, I was.

Brown - Direct by Herbert

1    Q    And what, if anything, did you observe regarding Mr. Howard

2    and what he was doing with his lower half of his body at this

3    point?

4    A    Well, he -- he went to the front of his pants, and it

5    looked like what he was trying to do was pull out some

6    marijuana.

7    Q    Okay.  And, in fact, did you get marijuana from him?

8    A    He did hand me some, you know, but I couldn't let that

9    distract me, because I think his purpose of handing me that was

10   trying to distract me, you know, so I wouldn't be able to get

11   to the gun.

12   Q    Okay.  And where was his back pockets located at this

13   point?

14   A    They were, like, back against the freezer.

15   Q    Okay.  And were they back -- strike that.

16        What happened next?

17   A    I kept -- you know, I continued my hold on him.  His

18   hand -- he stuck his hand out, and it kind of brushed against

19   my gun.

20   Q    Okay.  And what, if any, effect did this have on you?

21   A    Gave me reason to believe that he was going to try to grab

22   my gun.

23   Q    Okay.  And what did you do?

24   A    At that time I delivered another strike to his side.

25   Q    Okay.  And when you say "delivered a strike," tell us what

Brown - Direct by Herbert

1    you did.  I mean, describe the strike.

2    A    It was a -- like an upper-cut punch.

3    Q    Okay.

4    A    Yes.

5    Q    Do you know what part of his body you made contact with?

6    A    I don't know what side of his body.  I was trying to hit

7    him in his arm, just trying to stop him from doing the reaching

8    that he was doing.

9    Q    Okay.  And what was your reason for striking him at this

10   point?

11   A    Because his hand brushed across my gun.

12   Q    Okay.  And what happened next?

13   A    Next he was still yelling, saying things like, "Hey, you

14   all, F him up, F him up."  So I took Howard and I moved him

15   into the middle of the aisle.

16   Q    Okay.  What was your reason for moving him to the middle of

17   the aisle?

18   A    It was creating distance and shielding from the other

19   subjects that was in the store.

20   Q    Okay.  And what happened next?  Or strike that.

21        What was important to you about distance and shielding

22   at that point?

23   A    Well, if I got him away from the other subjects, I was

24   hoping they wouldn't be able to hear him telling, you know,

25   saying attack me.  And also, you know, I didn't have to watch

Brown - Direct by Herbert

1    behind my back to see if one of them was going to probably

2    attack me.

3    Q    Okay.  And with your decision to strike in these two

4    situations, would you describe your mindset leading to you

5    striking him?

6    A    I was scared.  I was very, very scared.  You know, like I

7    said, when you're dealing with a subject that has a handgun,

8    that's probably the most dangerous situation a police could

9    ever be in.

10   Q    Okay.  How much time elapsed from the time in which you

11   determined I'm going to strike this person, how quickly did you

12   strike him?

13   A    I don't know.

14   Q    Okay.  Quickly?

15   A    Quick.

16   Q    Was it a split-second decision?

17   A    Yes.

18              MS. ROMERO:  Objection.

19              THE COURT:  Sustained.

20   BY MR. HERBERT:

21   Q    So when you get into the back of the -- or towards the back

22   of the store in this aisle, what happens then?

23   A    I was able to get Howard down on the ground.

24   Q    And how did -- how did you get him down to the ground?

25   A    I used force.

Brown - Direct by Herbert

1    Q    What force did you use?

2    A    It's kind of -- it was a push.  I pushed him down.

3    Q    Okay.

4    A    You know, what is considered to be an emergency take-down.

5    Q    And why is it that you wanted to get Howard on the ground?

6    A    Because the lower the subject, you know, the lower the

7    threat.  I have more control having him on the ground versus

8    standing up, you know.

9    Q    Okay.

10   A    It's to lower the threat level.

11   Q    And how on the ground -- what position of his body did you

12   prefer to have him in on the ground?

13   A    Face-down.

14   Q    Why face-down?

15   A    Because that's the position we're trained to put them in.

16   We can see his waist area.  And it's easier to handcuff him

17   when he's face-down versus -- they don't -- we don't ever want

18   to handcuff people with them facing up because if you step over

19   them, they can kick you, you know, so we always want them

20   face-down to make it difficult for them to kick you or make it

21   difficult for them to escape, you know.  That's just the method

22   that I preferred.

23   Q    Okay.  Did you want -- when you say you wanted him down on

24   the ground face-down, that wouldn't be sitting up, correct?

25   A    No.

Brown - Direct by Herbert

1    Q    Okay.

2    A    No.

3    Q    When you took him down -- you used the emergency take-down

4    I believe you said, you took him down -- how did he land?

5    A    I think he -- from my recollection, he landed on his back.

6    Q    Okay.  And what happened next?

7    A    What happened next?  I was telling him to roll over.  He

8    wouldn't roll over.

9    Q    And do you know how many times you told him roll over?

10   A    Numerous of times.

11   Q    Okay.  And, again, why did you want him to roll over?

12   A    So he can be handcuffed and searched.

13   Q    And what happened next?

14   A    He told me, "Wait, wait, wait, let me take out my

15   earrings."

16   Q    Okay.  And what happened at that point?

17   A    I told him, "No, you can't take out your earrings, roll

18   over."  And he began to take out his earrings anyway.

19   Q    Okay.  And what, if any, effect did this have on you, him

20   making the request to take out the earrings?

21   A    To show me that he had disregard for all my verbal

22   commands.

23   Q    Okay.  And what happened next?

24   A    What happened next?  I finally get him to roll -- well, no.

25   Excuse me.  He attempted to get up.

Brown - Direct by Herbert

1  Q   Okay.  How did he attempt to get up?  What did he do

2  physically to attempt to get up?

3  A   I don't remember what.  I just remember him bending at the

4  waist like he was trying to get up.

5  Q   Okay.  And did you take any -- why was that concerning for

6  you, him trying to get up?

7  A   I thought he was going to attempt to flee.

8  Q   Okay.  And, in fact, prior to that point, had you

9  determined that Howard had fled at any point?

10          Had he fled from you at any point -- strike that.

11          Let me withdraw the question.

12          What did you do when Howard tried to get up?

13  A   I gave him a -- a back-hand, open-hand stun.

14  Q   To where in his body?

15  A   To his face area.

16  Q   Okay.  And what was the purpose for you giving the stun at

17  that point?

18  A   To get him to comply with my verbal commands.

19  Q   At this point had Howard -- or prior to that, had Howard

20  been saying anything or yelling anything other than what you've

21  testified to?

22          MS. ROMERO:  Objection.  Leading.

23          THE COURT:  Sustained.

24  BY MR. HERBERT:

25  Q   Did you hear anything else from Howard other than -- or at

Brown - Direct by Herbert

1    this point, because we haven't gotten to this point yet, at

2    this point was Howard saying anything?

3    A    Yes.

4    Q    What, if anything?

5    A    He was just saying -- I don't remember exactly what he was

6    saying.  I just -- I don't.

7    Q    Would you say -- was Howard talking throughout this

8    incident at various times?

9              MS. ROMERO:  Objection.  Leading.

10             THE COURT:  Sustained.  Try who, what, when, where,

11   how.

12             MR. HERBERT:  Okay.

13   BY MR. HERBERT:

14   Q    When you struck Howard, what happened after he tried

15   getting up?  When you struck him, what happened?

16   A    I believe that last time I struck him, he said, "Okay,

17   okay, okay, I'm going to roll over," and then he rolled over.

18   Q    Okay.  And what did you do?

19   A    Told him to put his hands behind his back.

20   Q    Okay.  And did he?

21   A    Yes, he did.

22   Q    And then what did you do?

23   A    I handcuffed him.

24   Q    Okay.  And then what happened next?

25   A    I searched his rear area, starting with his waist.  Then I

Brown - Direct by Herbert

1    went down to his pocket where I found the handgun.

2    Q    Okay.  And if I can show you what we marked as Defendant

3    Exhibit Number 1.

4              MR. HERBERT:  Can I approach the witness?

5              THE COURT:  You may.

6         (Approaching.)

7    BY MR. HERBERT:

8    Q    Is this the handgun that you found?

9    A    Yes, that looks like the handgun, yes.

10   Q    And where did you find it on Howard?

11   A    It was in his rear pants pocket.

12   Q    Okay.  And at some point did you determine whether or not

13   the gun was loaded?

14   A    Yes, I did.

15   Q    And when did you make that determination?

16   A    As soon as I got it, I looked at it and it was loaded.

17   Q    And how did you know it was loaded?

18   A    I can see the bullets.  It was -- it's a revolver.  And if

19   you look on the side of it, you can see the bullets in the gun.

20   Q    Okay.  And what did you do after retrieving the gun?

21   A    I went back towards the front of the store to let Stacker

22   know that I retrieved the gun from him.

23   Q    Okay.  And then what happened next?

24   A    Howard was yelling -- Howard was yelling, "Don't let him do

25   this to me, you all, F him up, F him up, get him."

Brown - Direct by Herbert

1   Q   Okay.  But at this point, Howard is in handcuffs, correct?
2   A   Correct.
3   Q   Were you still concerned for your safety at this point?
4   A   Yes, because I thought that Howard actions and what he was
5   saying was trying to start a riot inside the store.
6   Q   Okay.  Were you concerned about anything else other than a
7   riot starting in the store?
8   A   No.
9   Q   Okay.  And at this point, had you made the determination
10  that nobody else was armed?
11  A   No.
12  Q   At this point, had you made the determination that there
13  was no guns in the store?
14  A   No.
15  Q   At this point, had you made the determination that people
16  from outside weren't going to come in?
17          MS. ROMERO:  Objection.  Leading.
18          THE COURT:  Okay.  Sustained.
19  BY THE WITNESS:
20  A   No.
21          THE COURT:  Well, when I sustain an objection, you
22  can't answer.
23          So you'll have to strike that last answer, folks.
24          THE WITNESS:  I'm sorry.
25          THE COURT:  Go ahead.

Brown - Direct by Herbert

1  BY MR. HERBERT:

2  Q   Were you concerned about any other individuals other than

3  the people in the store?

4           MS. ROMERO:  Objection.  Leading.

5           THE COURT:  Overruled.

6  BY MR. HERBERT:

7  Q   Do you remember the question?

8  A   Was I concerned?

9  Q   Yeah.  Do -- were you concerned at this point about any

10  other individuals other than the people in the store?

11  A   Yes.

12  Q   Who?

13  A   Howard's brother, Paul Neal.

14  Q   Okay.  And do you know where Paul Neal was at this point?

15  A   No.

16  Q   Did you know where Paul Neal was just prior to this point?

17  A   Well, I know that Stacker gave him instructions to leave,

18  and he refused to leave.  He was -- during the time we was in

19  the store, he was standing in the doorway, you know, yelling at

20  us, trying to distract us from our investigation that we were

21  conducting.

22  Q   Okay.  And you walked -- or after you showed Stacker the

23  gun, what did you do then?

24  A   Like I said, Howard was yelling, get me, get me -- "Don't

25  let him do this to me, you all, get him."  I walked back

Brown - Direct by Herbert

1    towards Howard, and I gave him like a leg swipe.

2    Q    Describe what a leg swipe is.

3    A    Just kicked him with the inner -- inner part of my foot,

4    like a swipe, in a swiping motion.

5    Q    Would it be like -- kind of like a kicker --

6    A    Yes.

7    Q    -- kicking a football?

8    A    Yes.

9    Q    Okay.

10   A    Yes.

11   Q    What part of -- did your foot make contact with Howard?

12   A    Yes, it did.

13   Q    Do you know what part of the body you struck when you did

14   this kick, swipe?

15   A    I don't remember exactly, but I believe it was in the

16   upper -- upper leg area.

17   Q    Okay.

18   A    Yeah.

19   Q    And what was the reason that you kicked Howard at this

20   point?

21   A    I gave him another verbal command telling him to be quiet.

22   You know, I just wanted to hush him up, make him be quiet, stop

23   trying to rally these other guys up against me and my partner,

24   you know.

25   Q    Were any of these strikes, did you deliver them to punish

Brown - Direct by Herbert

1    Howard in any way?

2    A    Not at all.

3    Q    Did you deliver them because you were angry in any way?

4           MS. ROMERO:  Objection.  Leading.

5           THE COURT:  It's overruled.

6    BY THE WITNESS:

7    A    No.

8    BY MR. HERBERT:

9    Q    Were all of these strikes strikes that you had been taught

10   in training?

11   A    Yes.

12   Q    Were all of these strikes consistent with the department

13   policy that you were taught during training?

14          MS. ROMERO:  Objection.

15          THE COURT:  Okay.  It's department policy is why I'm

16   sustaining it.

17          You can rephrase.

18   BY MR. HERBERT:

19   Q    Were all of these strikes consistent with the instruction

20   that you received at the academy?

21          MS. ROMERO:  Objection.

22          THE COURT:  Overruled.

23   BY THE WITNESS:

24   A    To the best of my recollection.

25   BY MR. HERBERT:

Brown - Direct by Herbert

1   Q   After you -- how long was it before you left the store

2   after you had cuffed Mr. Howard?

3   A   I don't know.

4   Q   Okay.  What did you do after you left the store?

5   A   Man.  After I left the store, we went back to the

6   4th District to process the arrest.

7   Q   Okay.  And when you say "process the arrest," what does

8   that mean?

9   A   Those are booking procedures -- booking procedures --

10  Q   Okay.

11  A   -- for when -- after you make an arrest, those are the

12  booking procedures.  You go back, you fill out reports.  You

13  know, whatever -- whatever you got to do as far as dealing with

14  that particular arrest.

15  Q   Okay.  And the reports, would an arrest report be one of

16  them?

17  A   Yes.

18  Q   A case report?

19  A   Yes.

20  Q   Okay.  And a tactical response report, we've heard a lot of

21  testimony about that, correct?

22  A   Yes.

23  Q   And how is it -- did you fill out a tactical response

24  report?

25  A   Yes.

Brown - Direct by Herbert

1   Q    And why is it that you filled out a tactical response

2   report?

3   A    Because I used force during the arrest of Jecque Howard.

4   Q    Okay.  And is a tactical response report required to be

5   prepared during every arrest?

6   A    Not every arrest.

7   Q    Okay.  Did anyone tell you to do the tactical response

8   report?

9   A    No.

10  Q    Was it your decision to do the tactical response report?

11  A    Yes.

12  Q    Okay.  And the report, the information that's contained

13  within the report, you filled that out, correct?

14  A    Yes.

15           MS. ROMERO:  Objection to leading, Judge.

16           THE COURT:  Okay.

17           MR. HERBERT:  I'm trying to move it along.

18           THE COURT:  It's overruled.  That's fine for that.

19  BY MR. HERBERT:

20  Q    And at the point in which you filled out that report, did

21  you also fill out an arrest report?

22  A    Yes.

23  Q    Okay.  And you put the information in the -- in the

24  narrative and in the boxes, correct?

25  A    Yes.

Brown - Direct by Herbert

1    Q    Okay.  And what was your memory of the incident at the

2    point in which you filled out these reports?

3              Do you understand that question?

4    A    No.

5    Q    Okay.  You've seen the video in this case?

6    A    No.

7    Q    Okay.  You've seen it -- as we sit here today, you've seen

8    the video, correct?

9              MS. ROMERO:  Objection to leading, Judge.

10             THE COURT:  Okay.  That's fine.  Overruled.  For this.

11   BY THE WITNESS:

12   A    Yes, I have seen the video.

13   BY MR. HERBERT:

14   Q    Okay.  Many times, I'm assuming, correct?

15   A    Not that many times.

16   Q    Okay.  The first time that you saw the video, it would have

17   been -- when was it in relation to when you filled out the

18   reports?

19   A    I don't know.  It was -- well, they had a video that was

20   posted on YouTube.

21   Q    Was it after you filled out the reports?

22   A    Yes.

23   Q    Okay.

24   A    It was days later.  Or -- yeah, days later.

25   Q    Okay.  And when you filled out the arrest report, what was

485

1  your purpose for filling out the narrative section of the

2  arrest report?

3  A   Just to list probable cause for the arrest.

4  Q   Okay.  And was that how you were trained in the training

5  academy was to list the probable cause for the arrest?

6  A   Yes.

7  Q   Okay.  And as far as the case report, did you fill the

8  narrative section out on that?

9  A   Yes.

10 Q   Okay.  And what information did you put in the case

11 report -- strike that.

12          At the point in which you filled out the case report,

13 did you include what you believed to be all the relevant

14 information?

15 A   Things that were relevant, yes.

16 Q   Okay.  And with the TRR, that's a report, you've already

17 testified that it was -- it's to document force used by a

18 member?

19          MS. ROMERO:  Objection to leading.

20          THE COURT:  Okay.  You're going to have to get rid of

21 your leading questions.

22          MR. HERBERT:  Okay.  I wanted to make sure I --

23          THE COURT:  You can give him directionals, of course,

24 but you're giving the definition so ...

25          MR. HERBERT:  Okay.

Brown - Direct by Herbert

1    BY MR. HERBERT:

2    Q    The purpose of a TRR report, again, if you can provide us

3    with that?

4    A    Basically, it's just a statistical report that you do when

5    you have to use force.

6    Q    Okay.  And when you filled that report out, did you fill it

7    out truthfully?

8    A    At that time, I filled it out to the best of my

9    recollection.

10   Q    What does that mean?

11   A    I listed what -- what I can remember as far as the incident

12   and the probable cause.

13   Q    Okay.  You've seen the report, correct?

14   A    Yes.

15   Q    And the box that says "kick" was not checked, correct?

16   A    Yes.

17   Q    Okay.  Why was it not checked?

18   A    Well, I -- I just -- I guess I didn't remember to check the

19   box.  I mean --

20   Q    Were you attempting to deceive anyone?

21   A    No, not at all.

22   Q    The next day did you go to the store again?

23   A    Yes, I did.

24   Q    And what was the purpose of you going to the store the next

25   day?

Brown - Direct by Herbert

1  A    Usually when we conduct an investigation, at that point it

2  wasn't preliminary.

3          We did go inside the store.  We did retrieve drugs.

4  We did retrieve a gun.

5          So any time we make that type of an arrest at a

6  location, we always go back to do a follow-up investigation.

7  Q    At any point were you concerned about retrieving a

8  videotape?

9  A    No.

10 Q    At any point did you ask -- strike that.

11         When you went to the store, did you ask anyone for a

12 videotape?

13 A    No.

14    (Counsel conferring.)

15         MR. HERBERT:  Nothing further.

16         THE COURT:  Okay.  All right, Ladies and Gentlemen,

17 it's time for our day to end.

18         I have a rather full morning tomorrow, so we'll pick

19 up the trial at 10:00 a.m. rather than as early as we did

20 today.

21         Do not talk about the case with each other or others.

22 Do not go on the internet.  Do not research any terms or any

23 locations.  Stay off all electronic communications regarding

24 the case.

25         And have a nice night.  Safe travels.

Brown - Direct by Herbert

1          COURT SECURITY OFFICER:  All rise.

2      (Jury out at 4:57 p.m.)

3          THE COURT:  Okay.  Mr. Brown, because you have been

4   tendered for cross, you may not talk about your testimony with

5   your attorneys this evening.  Okay?  Because you now are on

6   cross-examination.  All right?

7          THE WITNESS:  Yes, your Honor.

8          THE COURT:  So just think of other things, and we will

9   pick up tomorrow.  You may --

10         THE WITNESS:  I'll try.

11         THE COURT:  -- step down.  Right.

12         Okay.  You may be seated, folks, in the back.

13         For tomorrow morning, please do come at the 9:15 time

14  to let me know whether you have any issues that are going to

15  pertain to this testimony or the rest of the case or a rebuttal

16  case.

17         And I need a copy of the jury instructions that we are

18  at at this point.  I'd like to get those by 6:00 o'clock

19  tonight, just where we are right now, so that I can review them

20  this evening, and then we can address those after the case

21  tomorrow.

22         Is there anything that anyone needs to address this

23  evening?

24         MR. HERBERT:  Do you want a joint -- do you want two

25  jury instructions?

489

Brown - Direct by Herbert

1          THE COURT:  Well, I'm going to put the onus on the

2     government, which is some tradition we have here in this

3     building, which doesn't occur in civil cases, where they will

4     give me the ones that we have -- I have ruled upon already and

5     that are part of our package, and then I will take from you

6     those that you believe are still outstanding, and those from

7     you that you believe are still outstanding.  So by 6:00 p.m.

8          If you want to e-mail them so you don't have to come

9     back here, I'll give you Sarah Gallo's e-mail.  She is the law

10    clerk who will receive that information from you.  Okay?

11         We are using Word now.  I don't know what the

12    government is doing, but -- are you finally into Word --

13         MS. JENKINS:  We are.

14         THE COURT:  -- as opposed to Word Perfect?

15         MS. JENKINS:  Yes.

16         THE COURT:  Okay.  Anything from anyone tonight?

17         All right.  Have a nice evening.

18         MS. JENKINS:  I'm sorry, I was not able -- I assume we

19    are going to proceed with closing arguments tomorrow.

20         THE COURT:  Oh, I assume so.  I would imagine you're

21    going to cross.  I don't know what the rest of the case is.

22         You don't have anything else?

23         MS. JENKINS:  Absolutely.

24         MR. HERBERT:  No.

25         THE COURT:  Okay.  And then I don't know if you have a

Brown - Direct by Herbert

1    rebuttal case, so if you do, then we'll go forward with that.

2              All right.  Thank you.

3              MR. HERBERT:  Thank you.

4              LAW CLERK:  All rise.  This court is adjourned.

5         (Proceedings concluded at 5:00 p.m.)

6                   C E R T I F I C A T E

7         I certify that the foregoing is a correct transcript of the

8    record of proceedings in the above-entitled matter.

9

10
     _/s/ GAYLE A. McGUIGAN_____          _April 30, 2016_
11   Gayle A. McGuigan, CSR, RMR, CRR               Date
     Official Court Reporter
12
     _____          _April 30, 2016_
13   Gayle A. McGuigan, CSR, RMR, CRR               Date
     Official Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )  Docket No. 14 CR 674-1
                                     )
4                   Plaintiff,       )  Chicago, Illinois
                                     )  October 22, 2015
5              v.                    )  9:18 a.m.
                                     )
6   ALDO BROWN,                      )
                                     )
7                   Defendant.       )

8
                         VOLUME 4-A
9           TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
          BEFORE THE HONORABLE VIRGINIA M. KENDALL
10

11  APPEARANCES:

12  For the Government:     UNITED STATES ATTORNEY'S OFFICE by
                           MS. LINDSAY JENKINS
13                         MS. JESSICA ROMERO
                           Assistant United States Attorneys
14                         219 South Dearborn Street
                           5th Floor
15                         Chicago, Illinois 60604

16  For the Defendant:     LAW OFFICES OF DANIEL Q. HERBERT by
                           MR. DANIEL Q. HERBERT
17                         206 South Jefferson, Suite 100
                           Chicago, Illinois  60661
18
                           J. RUSSELL LAW LLC by
19                         MS. JENNIFER W. RUSSELL
                           206 South Jefferson, Suite 100
20                         Chicago, Illinois  60661

21  Also Present:          Mr. Connor Quinn, Student Intern

22  Court Reporter:        GAYLE A. McGUIGAN, CSR, RMR, CRR
                           Federal Official Court Reporter
23                         219 South Dearborn, Room 2318-A
                           Chicago, Illinois 60604
24                         (312) 435-6047
                           Gayle_McGuigan@ilnd.uscourts.gov
25

1      (In open court outside the presence of the jury:)

2          THE CLERK:  Case number 14 CR 674-1, USA versus Aldo

3  Brown.

4          THE COURT:  Do we have the defense here -- oh, there

5  they are.

6          THE CLERK:  Yes.

7          THE COURT:  Okay, good.

8          MS. JENKINS:  Good morning, your Honor.  Lindsay

9  Jenkins and Jessica Romero for the United States.

10          THE COURT:  Good morning.

11          MR. HERBERT:  Good morning, your Honor.  Dan Herbert

12  on behalf of Aldo Brown.

13          MS. RUSSELL:  Jennifer Russell on behalf of Mr. Brown.

14          THE COURT:  Good morning.

15      So I received an e-mail last night just a few minutes

16  after I left, it was about 8:00-something, saying that there

17  was some concern potentially that my direction to Mr. Brown

18  telling him not to discuss his testimony might have encroached

19  upon the *Santos* case.

20      I was very clear that he was simply not to discuss his

21  testimony which, under *Perry*, he is not permitted to do even

22  under the *Santos* case, but he is permitted to talk to you.  So

23  I issued that order last night to clarify that, just in case

24  there was some misunderstanding and he thought he couldn't talk

25  to you, with the understanding that then be able to discuss

1    whatever other strategies or witnesses or closing or whatever

2    it is else that you might want to discuss.  So I sent that out.

3    We called both your phone numbers also, I had my clerk do that,

4    just so you knew that that was the case.

5              I don't know whether there was that misunderstanding.

6    If there was, it was for a period of about five hours.

7              I know you filed your motion for me at 11:00 p.m., so

8    you were up and working and should have received it, and I do

9    know that you had called chambers this morning at 8:00 to say

10   you would like more time.

11             So here's my thought, before you even say whether you

12   interpreted it one way or another.

13             There's two issues on our plate.

14             One is whether you misinterpreted that to say I

15   couldn't talk to him, and if so, I'll give you a little more

16   time to talk to him about other matters, of course, outside the

17   scope of *Perry*.

18             And, two, you filed a motion at 11:00 regarding their

19   two witnesses, which is still going back to this issue of

20   expert testimony and narrowing.

21             And so if you want more time, I would be happy to

22   grant you a few hours.  Then you can spend that time responding

23   to the motion, which I received at 11:00 o'clock, although you

24   can do so orally as well.

25             So that's my proposal to you.

1          Let me hear your thoughts.

2          MR. HERBERT:  Well, your Honor, we did perhaps

3  misunderstand you.  We erred on the side of caution, and we did

4  not speak with our client.

5          THE COURT:  Okay.  That's fair enough.

6          So -- and that's why I issued the order, just so that

7  you knew that that wasn't the -- it's not a complete bar on

8  discussion at all.  It's just discussion of testimony during

9  cross because you're not allowed to coach him on his answers

10 because he had been tendered.  And that's the limited area that

11 is prohibited.

12         I mean, I think -- I took the cases out, asked -- you

13 know, *Perry* holds that a flat prohibition against a criminal

14 defendant conferring with his lawyer during an overnight or

15 otherwise substantial recess violates the Sixth Amendment, but

16 it makes clear, as do the cases before and after, that while

17 the judge may instruct the lawyer not to coach his client, he

18 may not forbid all consideration of the defendant's ongoing

19 testimony since that would as a practical matter preclude the

20 assistance of counsel across a range of legitimate legal

21 tactical questions.

22         So with that in mind, I'm giving you the time if you

23 want to do those legitimate legal and tactical questions which

24 you were potentially not doing last night between 5:00 and

25 10:00.  Okay?

 1              MR. HERBERT:  (Nods affirmatively.)

 2              THE COURT:  All right.  So that is my first order.

 3         So if you want that time -- I think you already said

 4    to the Court that you would like that time.

 5              MS. RUSSELL:  We did request it, Judge.

 6              THE COURT:  Okay.  So how much time do you need?  It

 7    shouldn't be much.

 8              MS. RUSSELL:  45 minutes, Judge.

 9              THE COURT:  Oh, yeah.  I mean, you have that.  I can

10    give you more if you want.

11         So we're scheduled to begin at 10:00.  I can give you

12    more time if you want to start -- tell me a time that you think

13    would be comfortable.

14              MR. HERBERT:  11:00.

15              THE COURT:  11:00 is fine.  That's fine.

16         And then that gives you an opportunity to spend time

17    with him that you -- and, besides, you were working on a motion

18    anyway, so -- you had a lot of other work to do, but now you'll

19    have time, and let him know that all of those matters of

20    representation he's free to -- to have.

21         And I will be more explicit next time so that there

22    isn't any confusion regarding that.

23         That gives you a little time if you would like to give

24    me a written response.  You don't have to give me a written

25    response.  But I won't go through his motion until 11:00, just

```
 1    so that they have the opportunity to think clearly with their
 2    lawyer -- I mean with their client and work with him.  Okay?
 3              Does that sound reasonable to everyone?
 4              MS. JENKINS:  Yes, yes.
 5              MR. HERBERT:  Yes, Judge.  You know, I have one other
 6    issue --
 7              THE COURT:  Oh, sure.
 8              MR. HERBERT:  -- that I was going to raise.  I don't
 9    know if --
10              THE COURT:  No, that's fine.
11              MR. HERBERT:  Okay.  It's with regard to one of the
12    government's motions in limine, and that was to allow the
13    hearsay statements of Stacker to the defendant Howard.  We
14    objected to it.  The Court allowed that in.
15              THE COURT:  I don't think it ever came out.
16              MS. JENKINS:  No.
17              THE COURT:  Mr. Howard never said what Stacker told
18    him.  The statement that they moved to admit was the statement
19    that he didn't react because Howard took off his handcuffs and
20    said "I'm going to hit you" -- or what is the statement?  It's
21    a little bit broader than that.
22              MS. ROMERO:  "I'm taking the cuffs off you so you
23    can't say you were in cuffs when I hit you."
24              THE COURT:  So I -- you can't say I was in cuffs when
25    I hit you.  That never came into testimony.
```

1          MS. ROMERO:  Specifically, the Court --

2          MR. HERBERT:  That's my argument, just so I can -- I

3  think I mis -- I'm confusing the Court here.

4          The issue is that the motion was to allow the

5  statement of Stacker to Howard.

6          At the hearing, at the trial, the government asked

7  Howard what he said to Stacker.  I objected and said, "Judge,

8  that's hearsay and it's against the ruling."

9          And I was admonished rather harshly in front of the

10  jury that I violated a pretrial order.

11          THE COURT:  I did not say that.  I did not say that.

12  And I'll get the record to show that.

13          I know that you feel as though the rulings have been

14  against you, but that is not accurate to say I admonished you

15  harshly in front of the jury.

16          MR. HERBERT:  Judge, and I'm not challenging -- I'm

17  not saying that's you've treated us --

18          THE COURT:  Or that there was a violation of a

19  pretrial order.

20          MR. HERBERT:  That was -- well, what you -- what you

21  stated, and I -- we don't have the transcript --

22          THE COURT:  I'll get it.

23          MR. HERBERT:  -- but I conferred with counsel.

24          You basically stated that this issue was ruled upon in

25  the pretrial order, and I advised the Court that, no, it was

1    ruled upon as far as Stacker's statement to Howard.

2          And that is exactly what the motion is, that's what

3    the ruling was, and that's not --

4          THE COURT:  And tell me now what is possibly the

5    prejudice since both of your witnesses, Mr. Stacker and your

6    client, have both elicited testimony, all of the hearsay

7    statements of the individuals handcuffed in the store,

8    including your client -- I mean, including the victim, that the

9    individuals were, you know, saying F you and cuff him -- hit

10   him, attack him, all of those things.

11         That's what was -- that you tried to get in is now in

12   through all of those statements.

13         MR. HERBERT:  Right, your Honor.  And I agree with you

14   on that.

15         I'm not so concerned about the prejudice with respect

16   to the statement coming in.  It's more along the lines of,

17   especially in this courtroom, Judge, you're a very affable

18   judge and you have a very good relationship with the jurors,

19   and I was -- I believe that that admonishment was enough for

20   the juror to look at me as perhaps being somewhat -- violating

21   court rules.

22         And I think it was --

23         THE COURT:  Well, I'll take a look at it again.

24         My recollection of it was not that harsh.  I actually

25   thought, and I said outside of the presence of the jury, to be

1    careful about your reaction to me because you were very upset

2    with that ruling and had shown a lot of visual, and I think I

3    called it harumphing, to the ruling, which I think is a concern

4    for you in front of the jury, but I'll take a look at it.

5              What do you propose would be a solution to that?

6              MR. HERBERT:  I agree with you that the comment about

7    me rolling my eyes --

8              THE COURT:  That was outside of the presence of the

9    jury.

10             MR. HERBERT:  Yes.  That's our memory as well.

11             A solution?  Perhaps to instruct the jury that the

12   testimony of Howard should not have -- or the statement of

13   Howard should not have come in, and that the defendant's

14   objection that was overruled should have been sustained.

15             THE COURT:  Well, not so simply put.

16             First of all, the statement of Howard could come in,

17   and it wasn't even articulated at trial by either side because

18   the statement was not for the truth of the matter asserted, but

19   how the officer responded to -- how Stacker responded to the

20   statement, which you specifically elicited repeatedly to

21   explain your client's behavior and Stacker's behavior.  Both

22   officers elicited the testimony not objected to by the other

23   side that Howard was saying, "F you, F you, rough him up,

24   tackle him," or whatever the words were, and that was elicited

25   numerous times yesterday in the defense case.

500

1    So to say that it never should have come in when you

2    have just put it in through those two officers makes no sense.

3    But, more importantly, because we don't just rule on

4    what's good for the goose is good for the gander, we also

5    recognize that it isn't hearsay if it is to respond -- it is to

6    explain the way Stacker or Brown responded to that person at

7    that moment, and that is exactly why you put it in, and I

8    assume exactly why you didn't object.

9    MS. JENKINS:  Exactly.

10    THE COURT:  So it's not an error on evidentiary

11    ground.

12    So you're left with what you are concerned is a

13    rebuke, which I really don't think occurred, but I am

14    open-minded enough to read that transcript and see.  And if

15    there's something in there and we can make you look nicer in

16    front of the jury, I would be happy to do so, but I believe

17    I've treated you very respectfully throughout the course of the

18    proceedings.

19    MR. HERBERT:  And, Judge, just to be clear, I agree

20    with you.  This is not in any way to insult the Court or any

21    way --

22    THE COURT:  I'm not insulted.  I'm too old for that.

23    MR. HERBERT:  The only purpose is advocacy for my

24    client.

25    THE COURT:  Understood.

1    MR. HERBERT:  That is it.

2    THE COURT:  Understood.

3    So advocacy for your client, number one, it's not

4    hearsay, it's not being offered for the truth.

5    Number two, it's not prejudicial because you've

6    elicited it as well.

7    So the only thing left is your concern that maybe

8    there was some rebuke that wasn't to the pretrial ruling.  I

9    did misunderstand, and I will state that's true.  I

10   misunderstood it was for a different witness.  But I really

11   don't think that there was any rebuke.  I thought your response

12   was very frustrated.  Did not call you out on that in front of

13   the jury, which I never do.  And after the break, I said to you

14   at sidebar be careful with your reaction to the Court because

15   that can imbue a reaction in the jury, and that was just for

16   your own benefit to be careful that they do respect you.

17   MS. JENKINS:  Just briefly --

18   THE COURT:  Go ahead.

19   MS. JENKINS:  -- on that score, of course the jury

20   will be instructed according to the pattern that it should

21   never take anything you said or did during the trial as any

22   indication on how you believe -- the Court believes, excuse me,

23   that the evidence should be.

24   So the jury will be instructed that it's their job to

25   make those decisions, and it's certainly not to take anything

1    that you said or did in terms of rulings or anything of that

2    nature as what their decision should be.

3              THE COURT:  All right.  Anything else this morning?

4              All right.  You go ahead and have time with your

5    client.  I'll see all of you at 11:00.

6              I will expect a response to the motion *in limine*

7    either orally or in writing at 11:00.  I'll rule, and then

8    we'll go into cross.

9              MR. HERBERT:  Thank you.

10              THE COURT:  Thank you.

11              MS. JENKINS:  And when do we want to take up jury

12    instructions?

13              THE COURT:  Well, it is going to have to be after

14    that, so we'll probably have a lunch break a little later if we

15    start at 11:00, and we'll figure it out, okay?

16              MS. JENKINS:  Thank you.

17              THE COURT:  They actually looked pretty good to me

18    last night, but I do want to discuss your proposals so we get

19    those on -- you know, hammered out.  But it doesn't look like

20    there's a lot of work for us to do.

21              All right.  Go ahead.

22              MS. ROMERO:  Thank you, your Honor.

23              THE COURT:  Thank you.

24         (Judge Kendall attends to other matters.)

25         (In open court outside the presence of the jury:)

1          THE CLERK:  Case number 14 CR 674-1, USA versus Aldo
2    Brown.
3          MS. ROMERO:  Good morning.  Jessica Romero and Lindsay
4    Jenkins for the United States.
5          THE COURT:  Good morning.
6          MR. HERBERT:  Good morning.  Dan Herbert and Jen
7    Russell for the defendant.
8          THE COURT:  Okay.  Good morning.
9          The two things we have outstanding before we turn to
10   the trial again, one is the issue you raised this morning.
11         I did rule on the evidentiary matter regarding it not
12   being hearsay, but I did check the transcript, and there was no
13   admonishment, simply the statement that it's been ruled on.  An
14   admonishment would be you should not do this.  So I don't think
15   there was any prejudice there either.  To the extent that that
16   is a concern, I don't see it.  Okay?
17         What about an answer to his motion *in limine*?
18         MS. ROMERO:  Yes, Judge.  And I'm prepared to answer
19   orally.
20         The issues have already been raised --
21         THE COURT:  They have.
22         MS. ROMERO:  -- and addressed by this Court,
23   specifically the issue of this notion that somehow the
24   testimony of Miss Hyfantis or Miss Hatch was -- Officer Hatch
25   was 702 testimony.

1      That's not the case.  It was fact testimony, both as

2   the Court observed, and the foundation that was laid was this

3   is what the academy trains officer -- recruits on during the

4   pertinent time period.  Or in the case of Miss Hatch, she was

5   familiar with the curriculum, both as a result of her training

6   and the proximity to when she began working there.

7      In addition to that, the motion seems to argue that --

8   and this is on page 3 of the motion -- that it's unfairly

9   prejudicial to the defendant somehow to have had testimony that

10  explains arrest reports or TRRs because those are the basis of

11  Count 2 and 3 of the indictment.  That just doesn't make any

12  sense.

13     The jury has -- needs information in order to decide

14  the case properly regarding what a TRR actually is and what an

15  arrest report actually is.

16     And in addition to that, we presented information

17  about how officers are trained on what the purpose of the

18  reports are and the proper methods for completing them.

19     There was no testimony elicited about department

20  policies in any way, as is argued in the motion.

21     And, ultimately, the motion once again raises *Thompson*

22  as the basis for why this type of testimony should have been

23  prohibited.  I think it mischaracterizes the ruling in *Thompson*

24  and the facts in *Thompson*.  *Thompson* dealt with the issue of

25  excessive force and department policies on the question of

1    reasonableness.

2         And, again, we did not present evidence of department

3    policy on report-writing, but *Thompson* just simply doesn't

4    address the issue in the context of an obstruction charge,

5    whether it is proper or improper for the government to lay

6    foundation regarding the training that police officers receive

7    when preparing police reports.

8         And, in total, based on all this, I think the

9    testimony of Miss Hyfantis and Officer Hatch not only was

10   proper and the proper foundation was laid, but it's clearly

11   distinguishable from the proposed testimony of Mr. Farrell, who

12   is an opinion witness, who as the Court identified not only

13   relied on defendant's out-of-court statements in preparing his

14   opinion, but the department policy.  So even if his opinion

15   were somehow proper, it's still irrelevant to the question of

16   reasonableness, because his opinion was based on whether the

17   defendant complied with department policy regarding excessive

18   force.

19        So for all those reasons, we continue to oppose the

20   motion to have Mr. Farrell testify.

21        And we think the motion to strike the testimony of the

22   two government witnesses should be denied.

23             THE COURT:  Okay.  I'll give you a short rebuttal.

24             MR. HERBERT:  Okay.  Judge, we would state that the

25   testimony of Officer Hatch specifically opened the door to

1    allow John Farrell's testimony.

2            The government correctly noted that Officer Hatch and

3    Hyfantis were not proffered as experts, and that's for the

4    simple reason that the government never disclosed them as

5    experts.  They had an opportunity to disclose expert witnesses.

6    They failed to do so.  We, on the other hand, did raise it in a

7    timely fashion, and I believe we filed it back in July, and we

8    indicated the reasons why we wanted to have John Farrell

9    testify.

10           And going towards that issue, it's exactly -- John

11   Farrell's testimony would not only be exactly the same

12   concerning his ability to give testimony about the use of force

13   issue as Officer Hatch and Hyfantis, but we would submit that

14   it would be more reliable because Hatch and Hyfantis talked

15   about what the policy was for filling out reports and

16   concerning 2002 when Officer Brown went to the academy.  We

17   have no testimony from these individuals about anything

18   relating to policy concerning writing reports in 2012.

19           John Farrell, his testimony would not only be able to

20   say this is what recruits were trained on -- and he knows that

21   because the use of force model has been in existence and part

22   of department policy for years, well before 2002.  And more

23   specifically, Farrell could talk about the use of force policy

24   in 2012, which is exactly the issue that the jury has to

25   decide.

507

1          So we believe that the door has been opened, and

2     Farrell's testimony would be exactly on par with Hatch and

3     Hyfantis.

4          We would ask that he be allowed to testify or, in the

5     alternative, that the testimony be stricken of Hatch and

6     Hyfantis or, I guess in a second alternative, that I believe

7     there needs to be some type of a limiting instruction given to

8     the jury concerning the testimony of Hatch and Hyfantis.

9          I think it would be reasonable for a jury to infer

10    that Hyfantis and Hatch's testimony can be used to support the

11    fact that Aldo Brown intentionally falsified these reports.

12         If their testimony is not being offered to talk about

13    what should be in the reports, just what's being trained, I

14    think that there needs to be a limiting instruction on the

15    jury's use or consideration of that testimony.

16         And I think the government even fronted that fact at a

17    sidebar that they could take it for the weight and, you know,

18    they -- there has to be something along those lines.

19         So for those reasons, I would rest.

20         THE COURT:  Okay.  So you've expanded your request for

21    relief now to three things, because the one that was filed last

22    night at 11:00 p.m. was solely to strike the testimony of

23    Hyfantis and Hatch, not to seek again, for the fifth time, the

24    admissibility of Mr. Farrell or to do the limiting instruction,

25    but we are going to do jury instructions when we finish with

1    the cross, so we can address that issue of the jury instruction

2    then, so that one I will hold off.

3              So we've gone through this a number of times.  And the

4    reason the Court excluded Mr. Farrell's testimony was because

5    he would be opining on the reasonableness of Mr. Brown's

6    actions when he struck the victim witness here, held him at the

7    neck, and kicked him.  And it would be to say and conclude in

8    his expertise that those were all reasonable actions based upon

9    this use of force policy.

10             And that's precisely not what the Court should permit

11   him to do because it is, as I said, the Fourth Amendment

12   analysis is so acceptable and understandable and capable of

13   being thought through, through the average ken of an individual

14   juror that we have here, and they're going to be instructed

15   that under all of the circumstances, was this a reasonable act.

16             And under the circumstances, he very thoroughly and

17   completely described that when he first struck him, he believed

18   he had a weapon and he needed to control the situation; that

19   when he moved away from him, he believed he was fleeing and he

20   had to control the fleeing individual; and that when he brought

21   him back to the back of the store that there were others in the

22   front that were causing a ruckus that could cause him harm.

23             Those are all things that this jury is perfectly

24   capable of viewing, seeing, and analyzing.

25             So *Thompson* is about the issue of using a policy to

1  say that if you violate a policy, you couldn't therefore infer

2  that the Fourth Amendment has been violated.  That's why we

3  keep it out.

4       And we're keeping any reference to policies of

5  excessive force that this is the policy and, therefore, if this

6  was violated it means a violation, that is why it's been kept

7  out in that regard.

8       But Hatch and Hyfantis have never been 702 witnesses.

9  They have never spoken in hypothetical matters.  They've never

10  reached a conclusion as to the reasonableness of any action.

11      In fact, I curtailed their testimony significantly by

12  saying you may not discuss what are the reasonableness and

13  parameters of force that can be used, such that they could only

14  testify to lay this foundation about whether your client

15  received any training whatsoever on force, whether the -- they

16  received training on these report-writing procedures, and what

17  is the procedure for the police in repairing -- preparing

18  reports.

19      *Thompson* doesn't apply to report-writing.

20      The second and third counts are obstruction counts.

21  Theoretically, they're in a different charge but, essentially,

22  they're in the 1500 statutes, which are obstruction of justice

23  statutes.  And *Thompson* doesn't apply to those.

24      So that, number one, is not an issue for *Thompson*, so

25  we should -- that is mixing apples and oranges, really.

1          So *Thompson* only can apply to these issues of

2     training, and Hatch and Hyfantis both lay that foundation, and

3     they are permitted to give that foundation in order to support

4     the elements of intent and knowledge in their case.

5          The one area of concern that has been raised now twice

6     is whether Ms. Hatch could testify about the TRRs because she

7     did not train -- or was not in the training academy at the time

8     that the defendant would have received this training.  And I

9     said at sidebar before and previously that that goes to the

10    weight of her testimony, and also that I was confident you

11    would attack the weight of her testimony for that reason on

12    cross-examination, and I gave you permission to do so, and you

13    didn't do it.  I looked at the transcript and I thought it's

14    just not there.

15         So that was the one area that could have been

16    challenged, and it wasn't challenged.  I don't know if that was

17    a strategic reason or not.

18         So because the Farrell testimony is still this opining

19    about the reasonableness standard of the Fourth Amendment and,

20    therefore, takes it outside of the jury's hands, he should not

21    testify because Hatch and Hyfantis are fact witnesses and have

22    laid the foundation for these counts.  And because Two and

23    Three don't pertain to the *Thompson* standard at all, there's no

24    reason to reconsider my previous rulings.

25         So I am not going to permit Mr. Farrell to testify.

1          And I am not going to strike the testimony of Hatch

2     and Hyfantis.

3          I will consider whatever proposed limiting instruction

4     you would like to propose during our discussion later today on

5     jury instructions.

6          So are we ready to proceed?

7          MS. ROMERO:  Yes, Judge.  Just one technical matter.

8     I'll be using the Elmo for the cross-examination.

9          THE COURT:  Okay.

10         MS. ROMERO:  So just to make sure --

11         THE COURT:  Oh, do I need to switch something?

12         MS. ROMERO:  I think so.

13         THE COURT:  I'll figure it out.

14         All right.  John, we're ready.  Thank you.  Bring them

15    in while I figure out my technology here.

16         MS. ROMERO:  Thank you.

17         MR. HERBERT:  Your Honor, do you want the witness on

18    the stand?

19         THE COURT:  Yes, please.

20       (Off-the-record discussion.)

21       (Jury in at 11:16 a.m.)

22         THE COURT:  Good morning, everyone.  Please be seated

23    and get comfortable.

24         Thank you for your patience in our later start this

25    morning.  It's probably appropriate that we got a later start

Brown - Cross by Romero

1   since some of us are in mourning.  We have to wait another

2   100-and-something years for our Cubbies to do anything.  But we

3   did some work to make the case move along more smoothly for you

4   the rest of today.  I do think you will get the case today, so

5   we're going to try hard to get to that point.

6           Now, today we're picking up with cross-examination of

7   Mr. Brown.

8           And, Mr. Brown, I'm just reminding you, sir, that you

9   are still under oath.

10          Do you understand that?

11          THE DEFENDANT:  Yes, your Honor.

12          THE COURT:  Okay.  All right.  Then you may proceed,

13  Miss Romero.

14          MS. ROMERO:  Thank you, your Honor.

15                      CROSS-EXAMINATION

16  BY MS. ROMERO:

17  Q   Sir, on September 27th, 2012, you were a sworn Chicago

18  Police Department officer, correct?

19  A   Correct.

20  Q   You took an oath to uphold the law?

21  A   Correct.

22  Q   And you had 10 years of experience under your belt.

23  A   12.

24  Q   Now, by the time you walked into that convenience store,

25  you were familiar with the Constitution of the United States?

Brown - Cross by Romero

1    A    I was.

2    Q    Arrest reports?

3    A    Yes.

4    Q    TRRs or tactical response reports?

5    A    Yes.

6    Q    Now, it was your testimony yesterday that you hit

7    Mr. Howard for the first time as soon as you saw the gun inside

8    of his back pocket; is that correct?

9    A    Along with some other things that went on the reason that I

10   hit him.

11   Q    But in terms of timing, it was around the time that you hit

12   him for the first time, that's when you first saw the gun.  Was

13   that your testimony?

14          MR. HERBERT:  I'm going to object, Judge.  I believe

15   it's misstating testimony.  It's vague as to the timing.

16          THE COURT:  So really you're objecting to foundation.

17          MR. HERBERT:  Yes.

18          THE COURT:  Okay.  This is cross, so you may ask the

19   question.

20          Overruled.

21   BY THE WITNESS:

22   A    Can you repeat the question?

23   BY MS. ROMERO:

24   Q    Was it your testimony yesterday that the first time that

25   you hit Mr. Howard was around the time when you first saw --

Brown - Cross by Romero

1    claim to have seen the gun in his pocket?

2    A    It was around that time, yes.

3    Q    Now, I'm going to direct your attention to what's been

4    admitted into evidence as Government Exhibit 2 Group Still

5    Number 4, which is a shot of the Front Center View video file

6    at minute 13:05.8.

7              THE COURT:  Hold on.  I don't have his on yet.  Wait

8    just one second, Miss Romero.

9              MS. ROMERO:  Sure.

10             THE COURT:  There you go.

11   BY MS. ROMERO:

12   Q    I'm also going to direct your attention to Still Number 5,

13   which is a split second after that.

14             Still Number 6, which is minute 13:06.

15             Still Number 7, which is minute 13:06.1.

16             And Still Number 8, which is minute 13:06.2.

17             Do you see those?

18   A    Yes.

19   Q    And you agree that's the first time you hit Mr. Howard,

20   correct?

21   A    Yes.

22   Q    So it's around minute 13:06 on the video, correct?

23   A    Correct.

24   Q    And give or take a few seconds, that's when you claim you

25   first saw the gun, correct?

Brown - Cross by Romero

1    A    Correct.

2    Q    And around that time, you also claim that you saw the gun,

3    but your partner did not see the gun, correct?

4    A    I don't know -- I can't testify to what my partner seen or

5    what he didn't see.

6    Q    Okay.  Fair enough.

7          Now, let's talk about the circumstances leading up to

8    minute 13:06 on the video.

9    A    Uh-hum.

10   Q    You and your partner walked into the store at approximately

11   the 2:20 minute mark as depicted in Government Exhibit 10 Group

12   Still Number 1.

13          Do you see that?

14   A    I do.

15   Q    And you agree with that.

16   A    If I -- that's what it said, that's what it say.  You know,

17   I can't remember.  It was three years ago.

18   Q    Okay.  But as depicted in this exhibit, you agree you

19   walked into the store at approximately the time that's

20   indicated, which is 2 minute and 22 seconds, give or take.

21   A    If that's what it say.  I mean, like I said, I don't -- I

22   wasn't looking at my watch at the time.  Right now today, it

23   says 2:22.  That's what's on the screen.  That's what I have to

24   agree with.

25   Q    Okay.  And you agree that Mr. Howard was handcuffed pretty

516

Brown - Cross by Romero

1   much upon your entry, correct?

2   A   Correct.

3   Q   And you agree that he was later unhandcuffed by your

4   partner, correct?

5   A   When I came -- well, yes.  After reviewing -- after

6   reviewing the video, I understand he was uncuffed by my

7   partner, yes.

8   Q   Well, you knew he was uncuffed the day you hit him, right?

9   A   When I hit him, yes, he was uncuffed.

10  Q   Okay.  So I'm going to direct your attention to Government

11  Exhibit 10 Group Still Number 20.

12          And this indicates that your partner was uncuffing

13  Mr. Howard at approximately minute 11:19.

14          Do you see that?

15  A   Yes.

16  Q   So, give or take, approximately 9 minutes went by from the

17  time you walked into the store with your partner and the time

18  that your partner uncuffed Mr. Howard, correct?

19  A   Correct.

20  Q   Now, during those 9 minutes, you did not search Mr. Howard?

21  A   No.

22  Q   But as depicted in Government Exhibit 10 Group Still Number

23  2, you searched the person immediately to his right; is that

24  correct?

25  A   Correct.

Brown - Cross by Romero

1    Q    As depicted in Government Exhibit 10 Group Still 3, you
2    searched the person to his far right, correct?
3    A    Correct.
4    Q    As depicted in Government Exhibit 10 Group Still Number 4,
5    you searched the person in front of him?
6    A    I did.
7    Q    And that was James Gray, correct?
8    A    Yes.
9    Q    As depicted in Still Number 5, you searched the cooler to
10   his left, correct?
11   A    Correct.
12   Q    As depicted in Still Number 10, you searched the shelf
13   behind him, correct?
14   A    That's what I appear to be doing.  I don't know if I
15   searched the total shelf.  I'm looking at it.  I'm not sure if
16   I searched the whole shelf, but it looks like that's what I'm
17   doing is searching the shelf.
18   Q    And you were searching the area for contraband, correct?
19   A    Correct.
20   Q    And you were searching the area for guns, correct?
21   A    Correct.
22   Q    And your testimony was you felt that there was a certain
23   threat level that you had to tend to, correct?
24   A    Correct.
25   Q    And you also searched the counter areas depicted in

Brown - Cross by Romero

1   Government Exhibit 10 Still Number 9, correct?

2   A   Correct.

3   Q   And it's fair to say you also searched the ATM and other

4   shelves in the store, correct?

5   A   Correct.

6   Q   Now, you didn't find any weapons.

7   A   Not at that time.

8   Q   You didn't find any drugs.

9   A   Not at that time.

10  Q   You didn't find any contraband, correct?

11  A   Not at that time.

12  Q   And it's fair to say during this time, you were able to see

13  Mr. Howard's back pocket, correct?

14          MR. HERBERT:  I'm going to object, Judge.

15          THE COURT:  Overruled.  You can ask.

16  BY THE WITNESS:

17  A   I didn't look at Howard's back pocket.

18  BY MS. ROMERO:

19  Q   But you were able to, right?

20  A   No.  If I was looking on the shelf, I was looking on the

21  shelf.  I didn't look in Howard's back pocket.

22  Q   I'm going to show you what's been admitted as Government

23  Exhibit 10 Group Still Number 7.

24          In fact, Mr. Howard has his back to you, correct?

25  A   I can't see his face.  I don't know if that's Mr. Howard or

519

Brown - Cross by Romero

1    not.

2    Q   Well, if you can't see his face, you can see his back,

3    right?

4    A   I can see --

5             MR. HERBERT:  Objection, Judge.

6             THE COURT:  Overruled.

7    BY THE WITNESS:

8    A   I can see his back.

9    BY MS. ROMERO:

10   Q   So --

11   A   But --

12   Q   You can't see that, sir?

13   A   At what -- what time?  The time -- yeah, I can see his

14   back.

15   Q   And you're standing right here, correct?  (Indicating.)

16   A   Correct.

17   Q   And for the record, I'm marking both Mr. Howard and the

18   defendant on Still Number 7.

19            And both of Mr. Howard's back pockets are visible at

20   minute 6:05, correct?

21   A   Well, both his pockets are visible, but it look like my

22   head is looking in a different direction.

23   Q   Because you were looking for guns?

24   A   I couldn't tell you at that point what I was looking for,

25   but I was looking.

Brown - Cross by Romero

1   Q   Well, you were concerned for your safety?

2   A   Most definitely, always.

3   Q   And at this time, when Mr. Howard had his back pockets

4   visible to you, at this time you didn't see the gun, correct?

5   A   I was not aware he had a gun at that time.

6   Q   Because if you had seen it, you would have taken it from

7   him, correct?

8   A   If I were able to.

9   Q   And, in fact, if you had suspected that Mr. Howard was

10  armed or dangerous at that time, you would have taken

11  precautions for your safety while you were in the front with

12  him, correct?

13  A   Most definitely.

14  Q   But, in fact, at minute 6:30, as depicted in Still Number

15  8, you turned your back to him, correct?

16  A   Yes, I did.

17  Q   At minute 7:28, as depicted in Still 11, you turned your

18  back to him.

19  A   As I said, I wasn't aware he had a gun.  And, yes, I did.

20  Q   And you didn't think he was dangerous, correct?

21  A   I didn't know what level he was at that time, you know.  He

22  didn't appear to be dangerous at that time.

23  Q   In fact, as depicted in Still 14, at minute 7:37, you stood

24  directly next to Mr. Howard, correct?

25  A   Yes.

Brown - Cross by Romero

1   Q    And you agree at this time Mr. Howard's left hand, which is

2   the closest hand to where you are standing, was not handcuffed.

3   A    No, it was not.

4   Q    And, in fact, your gun holster is to your right, correct?

5   A    Looks like I have my hand protecting my gun holster.

6   Q    The question was your gun holster is on the right side of

7   your body, correct?

8   A    It is.

9   Q    And that's the side of your body that you had towards

10  Mr. Howard's free hand at minute 7:37, correct?

11  A    Yes.

12  Q    And as depicted in Still 17, by minute 9:31 you felt

13  comfortable enough leaving the people in the front of the store

14  unattended to walk back to talk to your partner, correct?

15  A    I can't say I felt comfortable.  Around that time I was

16  called by my partner.

17  Q    And so you did -- but you did leave the people in the front

18  of the store unattended at that time.

19  A    Yes, to go see what my partner wanted, yes.

20  Q    Okay.  So let's talk about that.

21       Now, according to you, around this time, which would

22  have been minute 9:31, as depicted in Still 17, you go talk to

23  your partner.

24  A    Yes.

25  Q    And at this point you've been in the store about 7 minutes

522

Brown - Cross by Romero

1    or so; is that right?

2    A    According to the time, it looked like 9 minutes.

3    Q    But you enter the store at minute 2 --

4    A    At 2, okay.

5    Q    So approximately 7 minutes.

6    A    Yes.

7    Q    Total.  Okay.

8         Now, around this time you learned that your partner

9    had found a book bag?

10   A    Yes.

11   Q    And in the book bag, your partner said there was a liquor

12   bottle?

13   A    Yes.

14   Q    And empty plastic baggies?

15   A    Yes.

16   Q    And a scale.

17   A    Yes.

18   Q    Did you personally see these items around this time?

19   A    I -- I mean, I can't even see what I was doing, so I can't

20   recall if I seen them or not.

21   Q    So sitting here today, you don't remember if you saw those

22   items on September 27 --

23   A    I seen those items -- those items, but you asking me do I

24   see them on this picture.  I can't say I see them on this

25   picture.  I can't see what I'm doing.

Brown - Cross by Romero

1   Q    No, no.  The question is:  Do you remember seeing them on
2   that day?
3   A    I seen them on that day.
4   Q    Okay.  And that made your threat level change somehow; is
5   that correct?
6   A    It did.
7   Q    And --
8   A    My awareness.
9   Q    -- the reason was because, according to you, that was
10  evidence of drug dealing, correct?
11  A    I can't say it was evidence.  It was -- those -- those
12  items are used for manufacturing drugs.  But, you know, I can't
13  say it was evidence because I didn't witness any drug selling
14  on that day, so I can't say that it was evidence.  Evidence is
15  a strong word.
16  Q    You did not see drug dealing on that day is your testimony
17  at the store, correct?
18  A    I didn't see drug dealing.  Not dealing.  No.
19  Q    You didn't see drugs anywhere else in the store besides
20  Mr. Howard's pocket, correct?
21  A    Correct.
22  Q    So the empty bags, the liquor bottle, and a scale were
23  important to you and your partner because it indicated you
24  should keep searching the store or that you were in danger?
25  A    Yes.  Those particular items are used to manufacture drugs,

Brown - Cross by Romero

1    but the items themselves are not illegal.  I mean, you can have

2    a scale, you can have plastic baggies, you can drink if you're

3    grown enough, but -- it's just not illegal.  So that's why I

4    say, you know, I told you I can't call it evidence or anything

5    other than what it was.

6    Q    Okay.  But your testimony then is that you found items that

7    in and of themselves are not illegal, correct?  To possess.

8    A    Correct.

9    Q    But that somehow increased your security concerns at

10   approximately minute 9:31 that day.

11   A    Yes, it did increase, yes.

12   Q    Empty plastic bags increased your perception of risk on

13   September 27th, 2012.  That's your testimony.

14   A    I did not say risk.  I said awareness.

15   Q    It increased your awareness of what?

16   A    Yes.  Of there may possibly be drugs inside the store.

17   Q    But I thought you had a tip that there were drugs inside

18   the store.  Why do empty plastic bags change that at all?

19   A    Because when we entered the store, you know, we were at a

20   certain level -- we always aware or try to be aware of what's

21   going on in and around us, okay?  But, you know, like I say, I

22   searched several people in front of the store, in the front

23   part of the store.  I didn't see anything.  I have searched

24   several shelves.  I didn't see anything.  But, you know, of

25   course when I seen the book bag, that gave me some knowledge

Brown - Cross by Romero

1    that there may be drugs inside of the store.

2    Q    Now, you agree you did not document what you saw in the

3    book bag in your arrest report, correct?

4    A    Correct.

5    Q    You didn't take photos of it?

6    A    Correct.

7    Q    You didn't inventory it?

8    A    Correct.

9    Q    You didn't document it in any way.

10   A    Correct.

11   Q    Now, it's fair to say after you talked to your partner

12   sometime around this time, you testified you switched positions

13   and he came to the front of the store and you went to the back

14   of the store, correct?

15   A    Correct.

16   Q    And you testified yesterday that while you were in the back

17   of the store, you heard a heated conversation between your

18   partner and Mr. Howard specifically?  That's your testimony?

19   A    Correct.

20   Q    But you couldn't see who your partner was talking to while

21   you were in the back of the store, correct?

22   A    Correct.

23   Q    And you agree, as depicted in Government Exhibit 10 Still

24   Number 20, that around the time that you were in the back of

25   the store, your partner uncuffed Mr. Howard, correct?

526

Brown - Cross by Romero

1    A    Correct.

2    Q    And you agree that your partner uncuffed Mr. Howard in

3    order to allow him to be able to use both his hands, correct?

4    A    I don't know why Stacker uncuffed Howard.  You know, I

5    can't answer for Stacker.

6    Q    And you testified yesterday that by the time you returned

7    to the front of the store, you saw your partner and Mr. Howard

8    and that you noticed Mr. Howard was not in handcuffs anymore,

9    correct?

10   A    Correct.

11   Q    And that increased your, is it threat level or awareness

12   level?  What --

13   A    I just -- it wasn't not just seeing him in handcuffs.

14   Because they was in a heated argument and some of the things

15   that he was saying to Stacker increased my threat level.

16   Q    And, in fact, you said that it appeared that they were

17   almost exchanging blows?  I think those were your words?

18   A    It -- it was heated to the point where I thought they were

19   probably going to get into a struggle, you know, of some kind.

20   Q    And your testimony is that -- that's the first thing you

21   saw when you went back to the front of the store, correct?

22   A    Yes.  Them facing each other, yeah, what --

23   Q    Excuse me?

24   A    Yeah.

25   Q    And that's what you saw immediately before you approached

Brown - Cross by Romero

1    Mr. Howard and you saw the gun, correct?

2    A    Could you repeat that?

3    Q    I'll ask it another way.

4         Your testimony is you came to the front of the store,

5    you saw your partner and Mr. Howard almost exchanging blows,

6    and that increased your perception of a threat by Mr. Howard,

7    specifically, correct?

8    A    Correct.

9    Q    I'm going to direct your attention to Government Exhibit 10

10   Group Still Number 22 at minute 12:47.6.

11        You're depicted returning to the front of the store,

12   and your partner has his back to Mr. Howard, correct?

13   A    Correct.

14   Q    And he's not talking to Mr. Howard, correct?

15   A    Well, I don't know why he turned around, but the

16   conversation he had was dealing with Mr. Howard.  You know, at

17   that point I don't know who is talking -- well, he was talking

18   to Mr. Howard.  Everything that he was saying, regardless of

19   where -- which direction he was pointed at, at that time was

20   dealing with Mr. Howard.

21   Q    Now, after you observed that, you walked over to Mr. Howard

22   and told him to lift his shirt and unbutton your pants -- his

23   pants so you could see his waistband; is that correct?

24   A    I did not tell him to unbutton his pants.

25   Q    Did you tell him to lift his shirt?

Brown - Cross by Romero

1    A    Yes.

2    Q    And Mr. Howard lifted his shirt, correct?

3    A    No.  I asked him to lift his shirt, and he lowered his

4    pants.  He just didn't lift his shirt right away --

5    Q    Okay.

6    A    -- like I asked him to.

7    Q    Okay.  So you specifically told him lift your shirt and he

8    lowered his pants, correct?

9    A    Correct.

10   Q    And at that point, you had not seen the gun, correct?

11   A    I want to say it was around that time I did see the gun,

12   what appeared to be a gun, at that time.

13   Q    Okay.  So I'm going to direct your attention to what's been

14   admitted as Exhibit 10 Still 24.

15            So around minute 13, Mr. Howard is I think unbuttoning

16   his pants.

17            Do you see that?

18   A    Yes.

19   Q    And that's around the time you believe you saw the gun for

20   the first time, correct?

21   A    It may have been seconds before that.

22   Q    Well, two seconds later, as depicted in Still 25, at minute

23   13:02, you're still letting Mr. Howard reach for his pants,

24   correct?

25   A    I said -- I said seconds before.  And you pulling up a

Brown - Cross by Romero

1    picture of two seconds later.

2    Q    That's right.  And you weren't trying to get to the gun,

3    were you?

4    A    Excuse me?  I believe I asked him before -- you know, I

5    gave him a full warning.  I asked him, did he have a gun, you

6    know, before I made attempt to get to the gun.

7    Q    Okay.  So your testimony is you walked up to him, you asked

8    him to raise his shirt, Mr. Howard responds by dropping his

9    pants, and you see the gun, correct?

10   A    I believe I seen a gun before he dropped his pants.

11   That's -- that's -- you know, I believe I seen --

12   Q    So did you see the gun before or after you asked Mr. Howard

13   to raise his shirt?

14   A    Before.

15   Q    Okay.  So you see a gun in the -- in Mr. Howard's pocket

16   before you ask him to raise his shirt?

17           MR. HERBERT:  Judge, I'm going to object.  It's

18   misstating the evidence to a small extent, but I think it's a

19   big factor.

20           His testimony is he saw what he believed to be a gun,

21   and the questions are you saw a gun.

22           THE COURT:  Overruled.

23   BY THE WITNESS:

24   A    Yes, I seen what appeared to be a gun.

25   BY MS. ROMERO:

Brown - Cross by Romero

1    Q    So you respond to what you think is a gun by asking him to

2    lift his shirt?

3    A    Yes.  And my reason is, for that, is that we wanted to

4    establish do we have a gun or not.  I mean, a lot of innocent

5    people get shot, cops see things, what appear to be a gun, and

6    it's a cell phone or it's a lighter.  I mean, I wanted to be

7    pretty much sure of what I seen.

8    Q    Okay.  So the reason you waited to hit Mr. Howard was so

9    you could protect him from -- from what?

10   A    I wanted to protect Mr. Howard?  Is that what you're asking

11   me?

12   Q    Sir, if you believed you saw a gun at minute 13:02 or any

13   time around that, you could have searched him, just like you

14   searched anyone else, didn't you?

15   A    Yes, but I elected not to do that at that time.  I didn't

16   want to put my hands on Mr. Howard at that time.

17   Q    Okay.  And instead you let him reach for his belt and

18   unbutton his pants, correct?

19   A    I didn't allow him to do anything.  He just did it.

20   Q    And you just stood there.

21   A    Exactly.

22   Q    Okay.  And you agree that by minute 13:06, you were

23   convinced Mr. Howard had a gun, correct?  Because at this

24   point, you're starting to -- you can see your arm is in motion

25   to hit him, correct?

531

Brown - Cross by Romero

1    MR. HERBERT:  Objection.  Form of the question.
2    Compound.
3    THE COURT:  Okay.  Sustained for the compound.
4    BY MS. ROMERO:
5    Q    By minute 13:06, your arm is in motion to hit Mr. Howard,
6    correct?
7    A    Well, if I'm in motion at 13:06, I was in fear for my life.
8    And, you know, like I said, it was some words exchanged, you
9    know, also.  So, you know, I had to do what I had to do to
10   protect myself, but I am in motion, according to this picture,
11   at 13:06.
12   Q    And Mr. Howard is not in motion, correct?
13   A    Yes, he was in motion.  He was raising his shirt at that
14   time.
15   Q    And you told him to raise his shirt.
16   A    Not at that time.  Seconds before.  He dropped his pants.
17   I told him to raise his shirt.  So he didn't follow verbal
18   direction.  He was still moving his hands in the direction that
19   he wanted them to.  At that time I didn't ask him to raise his
20   shirt.
21   Q    And at 13:06, both of Mr. Howard's hands are visible?
22   MR. HERBERT:  I'm going to object just on the basis of
23   are they visible per the screen or visible for Mr. Brown when
24   he was experiencing it at the time.
25   THE COURT:  Fair enough.  Sustained.

Brown - Cross by Romero

BY MS. ROMERO:

Q    On Still 7, which is on the screen in front of you,

Mr. Howard's hands are both visible to you, correct?

            MR. HERBERT:  Same objection, Judge.

            THE COURT:  No.  Different question.  Overruled.

BY THE WITNESS:

A    Not -- not his whole hand, because half his hand is under

his shirt.

BY MS. ROMERO:

Q    You knew where his hands were, right?

A    According to this picture, I know where his hands are.  I'm

looking dead at his hands.

Q    Okay.  Now, in your arrest report, you wrote that

Mr. Howard reached for his rear pants pocket at the time that

you first struck him, correct?

A    Did I say simultaneously?

Q    Sir, the question is you wrote in your arrest report that

he reached for his rear pants pocket, correct?

A    Correct.

Q    Now, after the first hit, Mr. Howard stumbled and covered

his head.

            Do you remember that?

A    I remember him walking backwards and his hands did go up,

yes.

Q    And at that point, you didn't try to control his hands,

Brown - Cross by Romero

1    correct?

2    A    No.

3    Q    Instead, you grabbed him, you said by the collar area?

4    A    Yes.

5    Q    And at the time of the incident, you indicated in your

6    arrest report that you were 6' 3"?

7    A    Yes.

8    Q    265 pounds?

9    A    Yes.

10   Q    And that Mr. Howard was 5' 11"?

11   A    Yes.

12   Q    185 pounds.

13   A    Yes.

14   Q    And you pushed Mr. Howard up against the cooler, correct?

15   A    You said I pushed him?  I believe after I struck him, he

16   was backing up in that direction.  I can't be certain if I

17   pushed him or he laid against the cooler his self.  You know, I

18   just can't -- you know.

19   Q    I thought in your testimony yesterday you said that you

20   were worried for your life.

21   A    I was.

22   Q    So in order to control Mr. Howard, you pinned him up

23   against the coolers because you were trying to turn him around

24   to reach for the gun.  Wasn't that your testimony?

25   A    Well, I was just stating what you asked me.  You just said

Brown - Cross by Romero

1   now that I pinned him, and then before you asked me did I push

2   him.  So, yes, at one point I did have him pinned up against

3   the cooler.

4   Q    And it was around that time that you told Mr. Howard to

5   give you what was in his pockets, you instructed him?

6   A    Yes.  Give me -- I told him -- I was steady asking him, did

7   he have a gun, is that a gun you got in your pocket?  You know,

8   that's what I was asking him at that time.

9   Q    And then you said Mr. Howard reached for his pocket but

10  pulled marijuana out instead.

11  A    He reached -- I didn't -- I thought he reached in his

12  front -- the front area of his body, but I, you know -- that's

13  what I said.

14  Q    I'm going to direct you to Government Exhibit 2 Group Still

15  Number 10, at minute 13:30, Mr. Howard's hand is handing

16  something to you; isn't that right?

17  A    I can't see that clearly.

18  Q    And it was a bag of marijuana, correct?

19  A    Yes, I believe he handed me a bag of marijuana at that

20  time.

21  Q    So, sir, it's your testimony to this jury that 25 seconds

22  after you hit him, at around 13:05, and that you believed your

23  life was in danger, you let him reach into his pocket and hand

24  you something.

25  A    I didn't let him do anything.

Brown - Cross by Romero

1   Q   Now, at this time you also testified yesterday that
2   Mr. Howard was trying to reach for your gun as well, correct?
3           MR. HERBERT:  Objection.  Misstates the evidence.
4           THE COURT:  Overruled.  He can answer.
5   BY THE WITNESS:
6   A   I said -- I said his hand was on my gun.  His hand brushed
7   across my gun.  And he possibly could have been trying to take
8   my gun.
9   BY MS. ROMERO:
10  Q   I'm going to direct your attention to Government Exhibit 2
11  Group Still 19.
12          That's the time that you're referring to; is that
13  correct?
14  A   Correct.
15  Q   And you're not trying to protect your gun with your hand;
16  isn't that right?
17  A   Well, I believe I testified to that I had him pinned
18  against a cooler, and I created distance between me and him so
19  he can't get to my gun.  Like I said, I didn't have -- he
20  wasn't listening -- he wasn't listening to my verbal
21  directions.  He just stuck his hand out.  You know, I can't
22  control everything he do.  I was trying to.
23  Q   And when he stuck his hand out towards your gun, you
24  responded by putting your arm away from your holster.
25  A   I already had my arm back at that time.

Brown - Cross by Romero

1   Q    Now, you agree you punched Mr. Howard in the ribs around

2   this time?

3   A    In that area of his body.

4   Q    And, once again, you didn't actually try to grab his hand,

5   correct?

6   A    No.  I wanted to keep my hand free.

7   Q    To punch him?

8   A    For anything, any danger that he could have caused to me or

9   anybody else in the store.

10  Q    Now, you testified that after you hit Mr. Howard in the

11  ribs, you moved to the back of the store, correct?

12  A    Yes.

13  Q    And you did that intentionally because you wanted to get

14  away from the people in the front of the store, correct?

15  A    Yes.  I -- yes, Mr. Howard was instructing them to like --

16  excuse my language, once again -- "Fuck him up, Don't let him

17  do this to me."  They were saying -- he was saying all type of

18  things to try to rally those guys up.

19  Q    And so you moved to the back of the store, and you don't

20  search his pockets right away, correct?

21  A    Yes, I elected not to search him at that time.

22  Q    Instead, you said that he disobeyed instructions and took

23  off his earrings; is that right?

24  A    Yes.

25  Q    And you let him take off his earrings, correct?

Brown - Cross by Romero

1   A    I didn't let him do anything.  He did it on his own free

2   will.

3   Q    You didn't stop him.

4   A    No, I did not.

5   Q    And then after that, you hit him in the face again,

6   correct?

7   A    I didn't just hit him.  Like I stated yesterday, he was

8   trying to get up.  Then I struck him, and I informed him to get

9   back down in the position he was in prior to him trying to get

10  up.

11  Q    And you hit him hard, correct?

12  A    It was enough force to get him to go back down.  Yes.

13  Q    And, in fact, it's depicted in Government Exhibit 2 Group

14  Still 53 at minute 14:07, Mr. Howard is holding his jaw on the

15  floor?

16  A    I can't tell what he doing in that picture.

17  Q    Now, at this point or right around this point, you told

18  Mr. Howard to turn around?  Is that correct?

19  A    Within that time -- you know, within that time frame, yes.

20  You know, that was my instructions, for him to roll over, you

21  know, on his stomach.  Yes.

22  Q    And he did that, correct?

23  A    Yes.  At one -- some point, he did roll over on his

24  stomach.

25  Q    And you handcuffed him for a second time, correct?

Brown - Cross by Romero

1   A   Correct.

2   Q   And you testified yesterday you searched his waistband?

3   A   Yes.

4   Q   And then you searched the pocket where you saw the gun.

5   A   Yes.

6   Q   I'm going to direct your attention to Government Exhibit 2

7   Group Still 57, which depict Mr. Howard on his stomach on the

8   floor at minute 14:50.

9           And Still 58, which depicts you walking towards the

10  front of the store at minute 14:58.

11          Do you see that?

12  A   Correct.

13  Q   And you walked to the front of the store because at that

14  point you had found the gun, correct?

15  A   Correct.

16  Q   And you notified your partner.

17  A   Correct.

18  Q   And it's fair to say nobody had really moved in front of

19  the store, correct?

20          MR. HERBERT:  Objection.  Speculation.

21          THE COURT:  Sustained.

22  BY MS. ROMERO:

23  Q   When you walked to the front of the store, had the people

24  in the front of the store left or moved around?

25  A   To be honest, Attorney, I can't really answer what they

Brown - Cross by Romero

1    were doing at that time.  I mean, I wasn't in that location

2    during that time.  I was dealing with Mr. Howard and a gun and

3    other things was going on at that time, so I can't say if they

4    moved or -- or not, to be honest with you.

5    Q    Now, later that day you wrote the arrest report for

6    Mr. Howard at approximately 5:30 in the afternoon?

7    A    If that's the time on the arrest report.

8    Q    Directing your attention to the -- your signature line,

9    date and time.

10            Do you see that?  (Indicating.)

11   A    Yes.

12   Q    So you completed the report around 5:30 in the afternoon

13   that same day, correct?

14   A    Completed, yes.

15   Q    And the arrest had taken place, according to your report,

16   at approximately 1:15?

17   A    Yes.

18   Q    And it was your official duty to fill out an arrest report,

19   correct?

20   A    Yes.

21   Q    And to do so truthfully.

22   A    To the best of my recollection, yes.

23   Q    And --

24   A    It's my responsibility to fill it out to the best of my

25   recollection.

Brown - Cross by Romero

1    Q    And truthfully.

2    A    To my recollection, because sometimes when you're in --

3    sometimes when you're in a struggle and you have to go through

4    a struggle and a lot of things happen, you don't remember

5    everything event by event, so you're just basically going off

6    your recollection of what happened at that time.  So I filled

7    it out to the best of my recollection.

8    Q    But your obligation is to fill it out truthfully, correct?

9    A    To the best of my ability, yes.

10   Q    And you filled out this arrest report under penalty of

11   perjury?

12   A    Are you saying I committed perjury?  Or are you asking me

13   did I fill it out under penalty of perjury?  What are you --

14   what are you --

15   Q    My question was:  You completed this report and signed it

16   under penalty of perjury.

17            MR. HERBERT:  Judge, I'm going to object to relevance

18   of this information.

19   BY THE WITNESS:

20   A    I can't -- I can't --

21            THE COURT:  Hold on, hold on, hold on.

22            THE WITNESS:  Okay.

23            MR. HERBERT:  It doesn't go towards the charges at

24   all, perjury.

25            THE COURT:  Okay.  It's object -- the objection is

Brown - Cross by Romero

1    overruled because it goes to the element of the intent and his

2    knowledge of his statement in the report, so you can ask the

3    question.

4    BY THE WITNESS:

5    A    When you say I filled it out under perjury, are you saying

6    I committed perjury by filling out this arrest report?

7          I don't understand what you're asking me.

8    BY MS. ROMERO:

9    Q    Sir --

10   A    So I don't want to answer nothing, you know, and

11   incriminate myself.

12   Q    Sir, the question is:  You signed this arrest report under

13   penalty of perjury, correct?

14   A    That I possibly can be penalized of perjury, that's what

15   you're saying?  In so many words?  Under penalty of perjury.

16   Are you saying I committed perjury or under -- I read that

17   line -- can I read the line?

18   Q    Specifically you can read the line.  Please.

19   A    All right.  It say I hereby -- I hereby declare and affirm

20   under penalty of perjury that the facts stated herein are

21   accurate to the best of my knowledge, information, and/or

22   beliefs.

23   Q    And then you signed electronically, correct?

24   A    Correct.

25   Q    And on the day of the actual incident, you did not include

Brown - Cross by Romero

1    a number of the facts that you testified to yesterday, correct?

2    A    Well, the first line of the arrest report says the facts

3    for probable cause to arrest and to substantiate the charges

4    included, but not -- but are not limited to the following.

5         So I did list the reason for probable cause to arrest

6    pertaining to this arrest report.

7    Q    Because you arrested Mr. Howard for having marijuana,

8    correct?

9    A    Correct.

10   Q    Which is a misdemeanor.

11   A    Correct.

12   Q    You arrested Mr. Howard for not having an FOID card,

13   correct?

14   A    Correct.

15   Q    Which was a misdemeanor.

16   A    Correct.

17   Q    And you arrested Mr. Howard for having a weapon, correct?

18   A    Correct.

19   Q    Which was a felony.

20   A    Correct.

21   Q    And your testimony is you only included the information

22   that you thought you needed for those charges in this report,

23   correct?

24   A    In my testimony I say what?  Yes.  Yes.  Correct.  Correct.

25   Q    Now, it's fair to say when you acted inside the store, you

Brown - Cross by Romero

1    did so, according to you, because you believed Mr. Howard was

2    trying to take your gun, correct?

3    A    I didn't say he tried to take my gun.  I said I thought he

4    was trying to take my gun.  I mean, that -- that's -- that's a

5    big thing.  I mean, for me being a police officer, if somebody

6    hand is anywhere near my gun, brushes against it, I mean,

7    that's a big thing, so I didn't say he just deliberately tried

8    to take my gun.  I don't know what Howard's intentions were

9    when his hand brushed across my gun, but it did brush across my

10   gun.

11   Q    And you did not include that in the report, correct?

12   A    Well, the first -- the first line say the facts for

13   probable cause to arrest.  So it doesn't say that you have to

14   list every event that happened to establish probable cause for

15   arrest.

16   Q    But you did include events that don't establish probable

17   cause in this narrative, right?

18            MR. HERBERT:  I'm going to object to vagueness.

19            THE COURT:  Okay.  It's overly broad.  Rephrase.

20   Sustained.

21   BY MS. ROMERO:

22   Q    For example, you indicate in this report that Mr. Howard

23   reached towards his rear pant pocket, at which time P/O Brown

24   observed a handgun inside the above subject rear pants pocket.

25   Correct?

Brown - Cross by Romero

1    A    Right.  But those are facts to establish probable cause for
2    arrest.  That's part of the narrative of this police report to
3    establish probable cause of arrest, yes.
4    Q    Okay.  And you did not arrest Mr. Howard for aggravated
5    assault, correct?
6    A    Correct.
7    Q    You did not arrest Howard for resisting arrest, correct?
8    A    Correct.
9    Q    Instead, you arrested him for two misdemeanors and
10   possession of a firearm, correct?
11   A    Possession of a firearm.  Correct.  Yes.
12   Q    Your report does not indicate that Mr. Howard almost came
13   to blows with your partner?
14   A    Those are not facts for probable cause.
15   Q    But if Mr. Howard threatened your partner, that is a crime,
16   correct?
17             MR. HERBERT:  Objection.
18             THE COURT:  Overruled.
19   BY THE WITNESS:
20   A    To my partner, but not to me.
21   BY MS. ROMERO:
22   Q    So he gets a pass?
23             MR. HERBERT:  Objection.
24             THE COURT:  All right.  Sustained.
25   BY THE WITNESS:

545

Brown - Cross by Romero

1    A    He -- oh.  Okay.

2    BY MS. ROMERO:

3    Q    Now, you understand that these arrest reports are put on an

4    electronic system at the Chicago Police Department, correct?

5    A    Correct.

6    Q    And that after you completed this report, you -- I'm sorry,

7    at the time you completed this report, you hadn't seen the

8    video yet, correct?

9    A    Correct.  Had no knowledge.

10   Q    And after you completed the report, you testified you went

11   back to the store to continue your investigation?

12   A    I testified that I went back to do a follow-up

13   investigation.

14   Q    And you went in the evening of September 28th; is that

15   correct?

16   A    Correct.

17   Q    And it was just you and your partner?

18   A    Correct.

19   Q    And it was the same store that you thought was really

20   dangerous, correct?

21   A    The day before it was dangerous because Howard had a gun,

22   but the next day we was going to do a follow-up investigation.

23   It weren't considered to be dangerous as it appeared to when we

24   went into the store the next day.

25   Q    So when you went back into the store, you didn't write any

Brown - Cross by Romero

1    report about that investigation, did you?

2              MR. HERBERT:  Objection.  Relevance.

3              THE COURT:  I didn't hear that.  Relevance?

4              MR. HERBERT:  Relevance.

5              THE COURT:  Okay.  Overruled.

6    BY THE WITNESS:

7    A    No, I wasn't required to.

8    BY MS. ROMERO:

9    Q    And you didn't find any evidence, did you?

10             MR. HERBERT:  Objection.  Vague.

11             THE COURT:  Overruled.

12   BY THE WITNESS:

13   A    When you say "evidence," what are you consisting of?

14   BY MS. ROMERO:

15   Q    Sir, you walked in and out of the store on the evening of

16   September 28th, the day after the incident, empty-handed; isn't

17   that correct?

18   A    Correct.

19   Q    And you never wrote a report about what you did in the

20   store.

21             MR. HERBERT:  Again, Judge, I'm going to object.

22   There's no relevance to a report being required.

23             THE COURT:  Overruled.

24   BY THE WITNESS:

25   A    To the best of my knowledge, I didn't do a report that day.

Brown - Cross by Romero

BY MS. ROMERO:

Q   Your partner didn't do a report.

A   I can't speak for my partner.

Q   You didn't arrest anyone that day, correct?

A   Not in that store, I did not arrest anybody.

Q   Mr. Brown, you testified that after you found the gun, you went to the front of the store and showed it to your partner, correct?

A   Correct.

Q   And at that time, it seemed like you weren't in danger at the front of the store; is that correct?

        MR. HERBERT:  Objection.

        THE COURT:  That's a question she can ask.  Overruled.

BY THE WITNESS:

A   I felt like I was in danger -- well, I was in danger the whole time I was in the store.

BY MS. ROMERO:

Q   Okay.  And so when you walked up to the front of the store and showed your partner the gun, you felt you were still in danger.  That's your testimony?

A   Well, I mean, I was in danger.  I was in the store, I mean, seven, eight minutes.  Someone had a gun on them, and I wasn't aware.  So, I mean, at that point by them deceiving us and having us in the store that long having a gun on him, it could have been anything possibly still in the store.

Brown - Cross by Romero

1   Q   But you had searched the people in the front of the store,

2   correct?

3   A   Yes, I searched the people.

4   Q   And you searched the front of the store, correct?

5   A   Searched certain sections of the front of the store, yes.

6   Q   And you searched the back of the store, too, correct?

7   A   Certain sections.  I didn't search the whole entire store.

8   Q   And you agree the people in the front of the store were not

9   free to walk around, correct?

10  A   Correct.

11  Q   So your testimony is you still felt you were in danger by

12  the time you walked back to Mr. Howard and kicked him.

13  A   According to what Mr. Howard was saying, he was trying to

14  instruct people to -- excuse my language once again -- to fuck

15  me up, yes, you know, because sometimes guys have control of

16  other people.  They give them orders and they may act on them

17  orders or they may not.  But that's not something for me to be

18  taking lightly.

19  Q   But you testified the people he was giving orders to were

20  in handcuffs.

21  A   One of their hands was cuffed.  They wasn't totally

22  handcuffed.

23  Q   And they were handcuffed to each other.

24  A   Yes, they were.

25  Q   And they had been searched by you for weapons.

Brown - Redirect by Herbert

1   A    Exactly.  That doesn't mean they can't fight.

2        (Counsel conferring.)

3            MS. ROMERO:  I have no further questions, your Honor.

4            THE COURT:  Mr. Herbert, redirect.

5            MR. HERBERT:  Thank you.

6                        REDIRECT EXAMINATION

7   BY MR. HERBERT:

8   Q    Aldo, you were asked questions about the arrest report and

9   questions about perjury.  Do you remember those questions?  By

10  the --

11  A    Yes, yes.

12  Q    Were you ever charged with perjury?

13  A    No.

14  Q    With respect -- you were asked a lot about the movements --

15  I'm sorry, the positioning of you in relation to Howard at 20

16  different points, approximately, where you were shown the still

17  photos, correct?

18  A    Correct.

19  Q    Okay.  At any point during this incident did you see or

20  observe Howard attempt to conceal his back pocket area from

21  you?

22  A    Yes.

23  Q    Did -- did he blade his stance at any point?

24  A    Yes.

25  Q    What are you allowed to do when somebody blades their

Brown - Redirect by Herbert

1    stance?  Per the use of force policy in the police department.

2           MS. ROMERO:  Objection.

3           THE COURT:  All right.  Sustained.

4           I will allow him to answer the question as to what he

5    would do in a circumstance, but not pursuant to the policies.

6           MR. HERBERT:  Maybe I'll ask another question --

7           THE COURT:  Sure, that's fine.

8           MR. HERBERT:  -- along those lines.

9    BY MR. HERBERT:

10   Q    When somebody blades their stance, does that have any

11   impact on your threat level?

12   A    Yes.

13   Q    And as far as how you're trained, does that allow you to

14   transition to a higher threat level?

15   A    Yes.

16   Q    And does it allow you to use direct mechanical strikes at

17   that point?

18   A    Yes.

19   Q    Including punches?

20   A    Yes.

21   Q    Including kicks?

22   A    Yes.

23          MR. HERBERT:  Nothing further.

24          THE COURT:  Anything on that?

25          MS. ROMERO:  No, your Honor.

Brown - Redirect by Herbert

1          THE COURT:  Okay.  Sir, you can step down then and

2     rejoin your defense table.

3          THE WITNESS:  Thank you.

4        (Witness excused.)

5          THE COURT:  And then do you have any other witnesses

6     or evidence?

7          MR. HERBERT:  We do not, Judge.  At this point the

8     defense rests.

9        (Defense rests.)

10         THE COURT:  Okay.  So does the government have any

11    rebuttal case that it wishes to put on at this point?

12         MS. JENKINS:  No.

13         THE COURT:  Okay.  Ladies and Gentlemen, that means

14    that the evidence has been completed for the trial.

15         The lawyers and I need to go through the jury

16    instructions so that we can give you the correct statements of

17    law shortly.

18         So I'm going to give you until 1:30 for your lunch

19    break, because that way we can have everything ready.  We'll

20    begin with closing arguments when you come back from lunch.

21    All right?

22         Do not talk about the case.  No research.  No

23    electronic communication.

24         Thank you.

25         COURT SECURITY OFFICER:  All rise.

```
 1            (Jury out at 12:08 p.m.)
 2            THE COURT:  Please be seated.
 3            I'd like to do the jury instructions now so that then
 4   you have a break with the completed instructions before we
 5   begin so I can review them again.  So I need a copy.
 6            MS. JENKINS:  This is the copy sent last night.  We
 7   made changes obviously.
 8            THE COURT:  Thank you very much.  Okay.
 9            Okay.  Let's begin.  Sean, I need my instruction book
10   as well.
11            I'm going to follow along with the one that was
12   e-mailed last night, starting on page 2.  It's the members of
13   the jury instruction, and it's not objected to.
14            Anything in there that has changed since our
15   conference?
16            Okay.  My following questions, if we haven't had them
17   objected to, will just be for you to raise if anything has
18   changed throughout the trial.
19            So the second one is the charge instruction on page 3.
20            The fourth is the presumption of innocence.
21            The fifth is limiting the testimony to what you hear
22   in court.
23            And there's a definition of a stipulation in there,
24   which we did have.
25            And there's also a -- I don't need the civil one --
```

1    oh, maybe I do.  There's a reference in there.  Thank you.

2            And then the duty to object.

3            Giving -- page 6 is giving the evidence whatever

4    weight it deserves.

5            7 is circumstantial evidence.

6            8 is the number of witnesses.

7            9 is the credibility instruction.

8            10 is the instruction for an attorney interviewing in

9    preparation of trial.

10           And then 11 is a witness making statements that may be

11    inconsistent.  We did have some of that, so I think that is an

12    appropriate one to add.

13           MS. JENKINS:  Including the fact that a few of the

14    witnesses were crossed about prior oath statements --

15           THE COURT:  Yes.

16           MS. JENKINS:  -- so we have included that last

17    sentence.

18           THE COURT:  I did see that.  So that's appropriate.

19    That one was taken under advisement pursuant to the trial.  But

20    we're back to one that was not objected to, whether someone was

21    convicted of a crime is only available for credibility.

22           MS. ROMERO:  He didn't --

23           MS. JENKINS:  In fact, we can take that instruction

24    out because that pertained only to Cameron Barnes, who the

25    government did not call --

1          THE COURT:  Oh.

2          MS. JENKINS:  -- because of a medical issue.

3          THE COURT:  Did we have any evidence of anyone being

4     convicted of a crime?

5          MR. HERBERT:  No, in --

6          THE COURT:  All right.

7          MS. JENKINS:  So that Number --

8          THE COURT:  So 12 will be removed.

9          13 is Jecque Howard's arrest and that they should not

10    speculate about the outcome of the charges.  That was ruled on

11    in the conference.

12          Any objection?

13          Identification of a person, any objection?

14          MS. RUSSELL:  No.

15          THE COURT:  Okay.  The note instruction, I think we've

16    all agreed to that.

17          So then we're on page 16, which is Count One --

18          MR. HERBERT:  Judge, I'm sorry.

19          THE COURT:  The notes?

20          MS. RUSSELL:  I think they've changed --

21          MR. HERBERT:  Oh.

22          THE COURT:  Oh, did you change it?

23          MS. JENKINS:  No.  No, no, no.  I e-mailed this

24    version to your clerk last night.  This morning counsel

25    notified me that I forgot on page 16 to take out the phrase "by

1    unlawful seizure and," on the top of this page.

2              THE COURT:  Is that where we are, though?  Or are we

3    on the note instruction?

4              Miss Russell, did you have an objection to page 15?

5              MS. RUSSELL:  Oh, no, Judge.

6              THE COURT:  Oh, you didn't.

7              MS. RUSSELL:  No.

8              THE COURT:  So on page 16, I think "unlawful seizure

9    and by" should be removed --

10             MS. JENKINS:  Right.

11             THE COURT:  -- because that was removed --

12             MS. JENKINS:  Right.

13             THE COURT:  -- by the prosecution at the final

14   pretrial conference.

15             Any objection to the elements instruction as we've got

16   it listed here?

17             MR. HERBERT:  Judge, the only objection I would make

18   is that we proposed one that included the element of "and

19   resulted in bodily injury," and the indictment specifically

20   charges Mr. Brown with committing unreasonable force, including

21   punching and kicking, and in there is "and resulted in bodily

22   injury."  We would state that per the indictment that that

23   element needs to be in there.

24             THE COURT:  Right.  I thought that I ruled on this;

25   but if I didn't make it clear, because we did -- I actually

556

1    looked at the notes to the jury instruction after you all left,

2    and it very clearly states how we deal with that.  And what is

3    the charge -- what is the --

4            MS. JENKINS:  It's Section 242 is the statute number.

5            THE COURT:  Thank you.

6            MS. JENKINS:  And there is a separate instruction on

7    bodily injury.

8            The references, just for the record, in the

9    indictment -- and I believe we did discuss this at the pretrial

10   hearing -- is that references to bodily injury is a notice

11   provision that the government gave to the defendant in the

12   charging instrument in the indictment in this case.

13           The allegation is that he violated Section 242 by

14   using unreasonable force under color of law.  And because the

15   government is seeking an enhanced sentencing or maximum in this

16   case because the use of bodily injury would increase the

17   statutory maximum from one year to ten years, we're giving

18   notice in the indictment of that.  It's not an --

19           THE COURT:  Right.

20           MS. JENKINS:  -- element of the offense.

21           THE COURT:  And we discussed this briefly; but then

22   after you all left, I just opened the book.  I don't know why

23   we didn't do that when we were discussing it, because the

24   committee comment is very clear.

25           It says, "Because, however, a person who deprives

1      another of civil rights violates the law, even if no bodily

2      injury results, the appropriate way to instruct in a case in

3      which bodily injury is charged is by way of a separate

4      instruction concerning that issue, combined with a special

5      interrogatory on the verdict form, as is done in cases in which

6      narcotics quantity is at issue."

7              So we have some very direct comment on that, and

8      that's how I've set it up like this.

9              So the -- I think that the correct way is page 16.

10             Then you turn to the -- where is the bodily injury

11     one?

12             You should have a bodily injury instruction, though.

13             MS. JENKINS:  We do.  It's on page 21.

14             THE COURT:  Okay.  I think -- well, maybe that's not

15     in the right place then.  I think maybe we want to do 21 after

16     16 maybe?

17             MS. JENKINS:  We have no objection to that.

18             THE COURT:  Or maybe not.  Let's look at it for just a

19     moment.

20             So the elements comes through on page 16, in accord

21     with the book.  So your objection is overruled.

22             Then we go into definitional ones.  And we'll start

23     with "free from the use of unreasonable force," which is under

24     the Constitution.  That's 17.  You have no objection to that.

25             Then the way you determine reasonable force is on 18.

1    Right?

2            And then what color of law is is on 19.

3            And then I think 21 should be next as far as bodily

4    injury -- oh, no.  And then maybe we'll give a definition

5    about -- because "insulting or threatening words" is a separate

6    instruction that isn't really an elements instruction or

7    definitional instruction.  So I think we'll go, if there's no

8    objection -- it's the more proper way to read it.  Maybe we

9    should even put color of law before use of force.  Right?

10   Yeah.  Number 1.

11           All right.  So here's the order, folks:

12           Page 16 is the elements instruction.

13           It's followed by the definition for the first element,

14   which is on -- is currently contained on page 19 and is the

15   color of law instruction.

16           It is then page 17 follows because that is the second

17   element of the instruction, and that's the unreasonable force

18   definition.

19           That is followed by a definition of reasonable force

20   again, which goes to element two.  That's page 18.

21           And then it's followed by the bodily injury.

22           The next one is the one about "insulting or

23   threatening words."  You objected to that.

24           MS. RUSSELL:  Yes.

25           THE COURT:  And this is the one that says:  "Insulting

1  or threatening words does not justify or excuse a physical

2  assault by a law enforcement officer."

3        I've checked the case.  The case is an accurate

4  statement of the law.  So what is the objection?

5        MR. HERBERT:  I believe it would confuse the jury

6  about the elements of the case because insulting words alone

7  are not enough, but I think that if that instruction -- I don't

8  think the instruction is necessary to begin with because it's

9  not an element in the case; but, two, I think if the

10 instruction comes in, that it needs to be much clearer that

11 more than just insulting words would go into the use of force.

12       THE COURT:  The reason I don't like it is not because

13 the law is incorrect that insulting words aren't enough, but I

14 don't like the way it's kind of turned towards does not justify

15 or excuse a physical assault.

16       I think the law is more insulting or threatening words

17 are insufficient for an officer to use force or something like

18 that, as opposed to --

19       MS. JENKINS:  We are --

20       THE COURT:  We've already kind of assumed he's

21 assaulting --

22       MS. JENKINS:  Right.

23       THE COURT:  -- in this instruction.

24       MS. JENKINS:  Right.  So to the extent that adding,

25 you know, "insulting or threatening words alone" or "insulting

1    or threatening words by themselves," anything that would
2    address the concern that just the words by themselves would not
3    be sufficient.  So we could --
4            THE COURT:  Well, I agree with that.  I think that
5    helps you a little bit, but I still don't like the flipping of
6    "it doesn't justify or excuse a physical assault," because I
7    think we should be looking at it in terms of when force can be
8    used.
9            So I think it should be flipped -- shouldn't it be
10   more like "insulting or threatening words alone do not justify
11   the use of force by a law enforcement officer"?  Is that --
12           MS. JENKINS:  We have no objection to that.
13           THE COURT:  That's much more accurate.  And in the
14   affirmative as opposed to --
15           MS. JENKINS:  The negative.
16           THE COURT:  -- that he's physically assaulting him.
17   We're assuming there's a physical assault in this one, right?
18           MS. JENKINS:  So "insulting or threatening words alone
19   does not justify the use of force by a law enforcement
20   officer"?  The government --
21           THE COURT:  I think -- right.
22           MS. JENKINS:  -- has no objection.
23           THE COURT:  Does not or do not?
24           MS. JENKINS:  Do not.
25           THE COURT:  Do not.

1        MS. JENKINS:  It should be do not.

2        MR. HERBERT:  The only addition I would ask for --

3        THE COURT:  Go ahead.

4        MR. HERBERT:  -- would be:  "However, words and

5    insulting language could be used as a factor to utilize force,

6    in conjunction with" --

7        THE COURT:  Okay.  So, in other words, what you're

8    saying is insulting words -- "insulting or threatening words

9    may only be" -- "may be considered by you when determining the

10   totality of the circumstances."

11       And that goes back -- let me just look at it.

12       MS. JENKINS:  Which goes back to page 18.

13       THE COURT:  Yeah, let me go see --

14       MS. JENKINS:  So --

15       THE COURT:  Let me just go see.

16       MS. JENKINS:  So we may want to add an additional

17   factor.

18       THE COURT:  What -- I have the cleaned-up version,

19   Miss Jenkins.  What cases were we -- did I read for this?

20       MS. RUSSELL:  *Gibson v. Chicago* was one of them.

21       THE COURT:  Which one was it?

22       MS. RUSSELL:  *Gibson v. Chicago.*

23       THE COURT:  Oh, right.  Thank you.  Can I see that,

24   please?

25       (Tendered.)

1            THE COURT:  Thank you very much.

2            Do you know where it is, Ms. Russell?

3            MS. RUSSELL:  Yeah, it's -- I think it was 155, for

4    some reason.

5            THE COURT:  Okay.  Let me see if I can find it.

6        (Counsel conferring.)

7            THE COURT:  Can you tell me where?

8            MS. RUSSELL:  Yes.  Hold on, Judge.

9            THE COURT:  Sure.

10           MS. RUSSELL:  I'm almost there.

11           THE COURT:  And there's that Connor Quinn name on here

12   again.  That good Irish kid over there.

13           MS. RUSSELL:  Oh, here it is.

14           THE COURT:  Do you know where it is, Mr. Quinn?

15           MS. RUSSELL:  1518 --

16           THE COURT:  What is it?

17           MS. RUSSELL:  Also cited was civil jury instruction in

18   *United States v. Zamiar.*  Zamiar is Z-A-M-I-A-R.

19           THE COURT:  I'm try -- oh, here we go -- I was looking

20   for the pages.  Hang on.

21           MS. RUSSELL:  Sorry.  1518.

22           THE COURT:  Getting there.  Where -- I don't see it.

23           MS. RUSSELL:  I didn't see it either, Judge.

24           THE COURT:  Why don't you go get me those cases, Sean.

25           So it's the threatening or insulting words.

1       You know, we have it in so many of our civil rights

2   jury instructions, we ought to have it somewhere.

3       All right.  I'll go find it.  Let's put that one aside

4   for just a moment.  I want to get the right language from the

5   case, and we'll get it for you.  But that will be after page 21

6   will go 20, and we're going to -- I'm going to revise this, but

7   give me a moment to get the case.  It will be revised, to some

8   extent, by saying "insulting or threatening words alone do not

9   justify" -- or "do not justify the use of force against an

10  individual," but I think there might be something more.  We'll

11  see how that goes.  So hold that one in abeyance for a moment.

12      Is there an objection to page 22?

13      MS. RUSSELL:  The only thing I wanted to raise, Judge,

14  and I think in the pretrial we had discussed whether both this

15  one and another jury instruction should read specifically FBI

16  as opposed to more of a general --

17      MS. JENKINS:  So that should be a couple of pages back

18  on page 25.  It's, again, is explanation.  The Federal Bureau

19  of --

20      THE COURT:  Yeah.

21      MS. JENKINS:  -- Investigation.

22      MS. RUSSELL:  I know that we discussed whether, just

23  because the indictment specifically lists the Federal Bureau of

24  Investigation, whether our jury instructions should also mirror

25  that, as opposed to saying within any, you know, department or

1      agency.

2           I think I remember that we agreed that we could

3      include FBI just because there was then the follow-on

4      instruction --

5           THE COURT:  I think I'm lost, only because the way

6      we've done it and the way we did it is we've got the elements

7      on page 22.  We have a definition going to the second element,

8      which is our knowingly.  Then we have a definition of intending

9      to impede or obstruct, which is the third element.  And then

10     we've got a definition to the third element, which is that the

11     FBI is part of the executive branch, so that they know that

12     that is part of the jurisdiction of the United States.

13          MS. RUSSELL:  So it was in relation to 22 and 24.

14          THE COURT:  Okay.

15          MS. RUSSELL:  And this is the one that we had

16     indicated we wanted FBI to specifically be listed in this to

17     mirror the indictment, and then we discussed because the next

18     one was the definition of FBI.

19          THE COURT:  I think this is the same argument made for

20     the bodily injury, really.  It's what the indictment alleges

21     and what the evidence shows.  And there isn't a variance here.

22     This is a definition of the third element.

23          What's the government's position on that?

24          MS. JENKINS:  We proposed it because we think it's

25     appropriate, and we don't think that there's any modification

1    in any way of the charging language in the indictment.

2         The elements of the offense are that the jury must

3    find beyond a reasonable doubt that the matter was within the

4    jurisdiction of the Department of the United States.  That's an

5    element of the offense.

6         And for what this matters, I mean, of course the

7    government is not going to be arguing -- I mean, the argument

8    is going to be in closing that the agency you should be focused

9    on, Ladies and Gentlemen, is the Federal Bureau of

10   Investigation because that's what you've heard about.

11        So it's not like we're going to argue in closing some

12   sort of modification by --

13        THE COURT:  Yeah, of the --

14        MS. JENKINS:  -- saying there's some other --

15        THE COURT:  Of some other agency or something.

16        MS. JENKINS:  No, it's -- the focus is going to be on

17   the Bureau.

18        THE COURT:  Yeah, I don't see the problem.  Objection

19   is overruled.

20        Now, what about 26?  That's really my -- that's my

21   motion to dismiss the indictment -- I mean, that's -- that's my

22   ruling, which will be your main issue on appeal, I'm sure,

23   because it's unique if that happens.

24        MS. RUSSELL:  Judge, we would simply renew our

25   objection for the record --

1          THE COURT:  Sure.  Yeah, for the record, absolutely.

2   Right.

3          So on or about dates, I don't think there's any

4   objection, right?

5          MS. RUSSELL:  Correct.

6          THE COURT:  Defendant accused of a crime.  That's 28.

7   Any objection?

8          MR. HERBERT:  No.  Right?  She asked --

9          MS. RUSSELL:  Oh, I'm sorry.  No, Judge.

10         THE COURT:  No.  Okay.

11         And then punishment, of course, is not -- is not

12  objected to.

13         The foreperson and jury room direction should not be

14  objected to, I would imagine.

15         And then I have a verdict form.

16         And then the *Silvern* instruction, which is the last

17  one.

18         As far as the verdict form is concerned, because I've

19  ruled as I have on the issue regarding the interrogatory, I do

20  believe that this is the correct verdict form now.  And I know

21  that you objected to it originally because you wanted it

22  charged as just one; but based upon the comments to the jury

23  instruction, I think the one that's proposed is appropriate.

24         Do you have any other objections to it?

25         MS. RUSSELL:  No.  We would just renew our original

1    objection.

2              THE COURT:  For the record, it is.

3              MS. RUSSELL:  Thank you.

4              THE COURT:  So did I -- I actually pulled these out

5    and put them in the other.  Do you want me to give you this

6    one --

7              MS. JENKINS:  Certainly.

8              THE COURT:  -- if that would help you?

9              MS. JENKINS:  We're happy to prepare --

10             MR. HERBERT:  Judge, can I address, before you get rid

11   of that --

12             THE COURT:  Yeah.  Go ahead.  You can give it back to

13   me.  Tell me what the issue is.

14             MR. HERBERT:  It's Number 21 --

15             THE COURT:  Yes, sure.

16             MR. HERBERT:  -- that we discussed.

17             THE COURT:  Tell me.

18             MR. HERBERT:  I'll let you get there if you want,

19   Judge.

20             THE COURT:  21.

21             MR. HERBERT:  21.  Page 21.

22             THE COURT:  Oh, 21.  Hang -- I flipped it.  Yes.

23   Okay.  Go ahead.

24             MR. HERBERT:  I would just ask that since the case

25   he's -- Mr. Brown is charged with force and injury, that I

1    would just ask that the last question -- I'm sorry, the last

2    sentence include "And you should find the defendant not

3    guilty," because I think it's confusing for the jury on this.

4            THE COURT:  You don't get to this, though.

5            MS. JENKINS:  Right.

6            THE COURT:  That's not true, because you could get

7    to -- you could be guilty of the charge and then you could be

8    not guilty of bodily injury.  So that would be an inaccurate

9    statement of the law.

10           MR. HERBERT:  Okay.  I thought it was --

11           MS. JENKINS:  And the first sentence indicates -- I

12   did not mean to cut you off.

13           MR. HERBERT:  No, no, I -- my understanding was that

14   it was the actions, and since the indictment charges "and

15   bodily injury" that that is the -- that's the elements that are

16   needed to be proved.

17           THE COURT:  Yeah, I think we're going back to the same

18   issue, which I think that the jury instruction book gave us the

19   answer to very cleanly, that we charge it -- that they're

20   instructed on it first.  They could reach a conclusion today

21   that he violated but there were no injures.

22           MR. HERBERT:  Okay.

23           THE COURT:  Yeah, I think that's -- so that would be

24   overruled as well.

25           But do you want your limiting instruction?

1          What was the one that you wanted on the two -- on the

2    two women officers?  What did you think was appropriate?

3          MR. HERBERT:  I think something limiting -- limiting

4    the weight that you should give to these two witnesses with

5    respect to -- with respect to Counts Two and Three -- to the

6    reports cited in Counts Two and Three, and -- and the

7    sufficiency of information contained within those reports.

8          THE COURT:  What I'm making some -- that's their

9    job -- so there's no expert there, so they don't get the

10   special expert instruction that tells them to weigh it on their

11   own.  They're supposed to weigh it on their -- they're supposed

12   to decide what weight to give any testimony.

13         MS. JENKINS:  Right.

14         THE COURT:  You could argue, as you did before, that

15   you can't give that any -- any weight at all because she never

16   even instructed my client.  She's up there talking about what's

17   going on in the Chicago Police Department, and you heard her

18   say that she never instructed him.  I mean, that -- that's

19   argument that goes to the weight, and then they get to put the

20   weight to each piece of evidence.

21         MR. HERBERT:  Okay.

22         THE COURT:  So I won't give a special instruction.

23         Now, I'll give you my packet because I put them in a

24   different order, but I still would like to get the exact

25   language on the insulting language.

570

1     So what I'll do is once I find it, I'll e-mail it
2   to -- who is doing closing arguments?
3         MS. JENKINS:  I am.
4         THE COURT:  All right.  So who -- are you going to be
5   doing --
6         MS. JENKINS:  So she -- correct --
7         THE COURT:  All right.  So to Ms. Romero.  And to you,
8   Miss Russell?  Is that okay?  Or are you doing closing?
9         MR. HERBERT:  I'm going to do closing.
10        MS. RUSSELL:  Mr. Herbert.
11        THE COURT:  Okay.  So then -- so can I give you the
12  language for the insulting --
13        MS. RUSSELL:  Yes.
14        THE COURT:  And then I'll send it to both of you, we
15  will address it and you will be able to argue.  Don't think
16  it's the final one.  But put it in there once I decide, and
17  then if we have to change it -- so don't make multiple packets,
18  you know, for jurors or anything like that, just the cleaned-up
19  version, and then I'll give you the language.  Okay?
20        MS. RUSSELL:  Judge, I wanted to address one other
21  thing.
22        On October 16th, we had filed a supplemental proposed
23  jury instruction regarding reasonableness, and I fear that it
24  has slipped through the cracks.
25        THE COURT:  It may have.  Let me see what I've got on

1      the docket.

2            MS. JENKINS:  So it's Document Number 76.

3            THE COURT:  Thank you.  Hold on.  I've got the wrong

4      case pulled up from this morning.  Wait one moment.

5            76?

6            MS. JENKINS:  Yes.

7            THE COURT:  I think that's argument.

8            I think that the -- just for the record, the proposed

9      instruction reads:  "The calculus of reasonableness must embody

10     allowance for the fact that police officers are often forced to

11     make split-second judgments in circumstances that are tense,

12     uncertain, and rapidly evolving about the amount of force

13     that's necessary in a particular situation.  They are

14     instructed to take into account all of the circumstances when

15     making their determination of reasonableness."

16           But here we're actually changing the burden because

17     we're giving them an allowance for maybe some level of

18     unreasonableness because of the tenseness.

19           Again, this is certainly argument, that it's all a

20     matter of moments and seconds, and that's why something can be

21     reasonable or unreasonable.

22           Go ahead.

23           MR. HERBERT:  I just think that the reason we wanted

24     it proposed is since there is no testimony about what is

25     reasonable in this case, I think that the jury is entitled to

1  know that this is, in fact, the law, because we couldn't get

2  into any of the laws --

3         THE COURT:  What case are you citing for this?

4         MR. HERBERT:  United States Supreme Court *Graham*

5  *versus Connor*.

6         I think it's at the bottom there, Judge.

7         THE COURT:  Okay.  Let me hear a response, and then

8  I'll go look up the case.

9         Did you bring it in?

10        LAW CLERK:  I can get --

11        MS. JENKINS:  Your Honor, the government's position is

12  precisely what you just said.

13        This is absolutely appropriate for argument, and we

14  would not have any objection or basis even for objection.

15        They're certainly allowed to argue that the timing and

16  the split-second nature of the decision-making process should

17  be factored in to the -- to the jury's analysis, and it's only

18  the jury's analysis that counts as to what's reasonable.

19        THE COURT:  Do you have the copy of the case with you?

20        MS. RUSSELL:  I don't, Judge.

21        THE COURT:  Okay.  So she just went to go get it.

22  We'll wait just a second.

23        MR. HERBERT:  We would just argue that it is the law,

24  so the jurors obviously --

25        THE COURT:  Well, that's what I need to look.  I need

1    to look and see what it says.

2         I have a little glitch.  I have all my new equipment,

3    and then now for some reason it's telling me that I don't exist

4    on Westlaw.  Normally I just pop them up.  And it's, like,

5    saying I have the wrong user name and such.  So I had to give

6    up one thing for getting the others.  So she went to go get me

7    a copy.

8         Connor, what's your middle name?

9         MR. QUINN:  Aloysius.

10        THE COURT:  But that's a good saint name for the

11   Irish, right?  Isn't that what they did there?

12        MR. QUINN:  That's my grandpa's name, so --

13        THE COURT:  Okay.  Did they call him Al?

14        MR. QUINN:  I don't know.  I never met him.

15        THE COURT:  If you want to go, Ms. Romero, and start

16   in on that, you can, and let Miss Rodney [sic.] argue the last

17   one?  It doesn't matter to me, if you would like.

18        MS. ROMERO:  I can probably --

19        THE COURT:  Okay.  We still have 55 minutes.

20      (Tendered.)

21        THE COURT:  Thank you.  Oh, no pin cite either.  Okay.

22      (Pause in proceedings.)

23        THE COURT:  Well, it is a direct statement of law.

24   And you can see it.  It's right here.  Let me get my

25   highlighter.

 1          (Tendered.)

 2          THE COURT:  If you could give it to Miss Romero,

 3   because it's been proposed by the defense.

 4          MS. ROMERO:  Judge, and I think the response, and I

 5   think this is what Miss Jenkins said, I don't think that we

 6   disagree that it's a statement of the law, but I think that it

 7   emphasizes one particular circumstance of the totality of the

 8   circumstances and the way to look at it --

 9          THE COURT:  So I think that it would go underneath the

10   excessive force definition, which I just gave up now.  I gave

11   up my jury instructions.

12          MS. ROMERO:  I have them right here.

13          THE COURT:  So give me back the case and then let me

14   just see --

15          (Tendered.)

16          THE COURT:  Thank you.

17          MS. ROMERO:  And just one other response, Judge, too,

18   and I think because it's a statement by the Court that some of

19   the language in it I think is also probably a little bit

20   confusing in terms of "must embody allowance" and things along

21   those lines --

22          THE COURT:  Yeah, yeah, it's a little bit messy in

23   that regard.  I'll give you that much, but --

24          MS. ROMERO:  Yes.  And, Judge, if I could propose on

25   page 18, we could say "the timing of the use of force."  I

 1  mean, I think that's a correct --

 2          THE COURT:  No, I think what they want is more that in

 3  determining -- in determining defendant's use of -- "in

 4  determining the reasonableness of defendant's use of force, you

 5  are permitted to take into account that police officers are

 6  often forced to make split-second judgments in circumstances

 7  that are tense, uncertain, and rapidly evolving."

 8          I think that's what it says.

 9          I'll give the instruction.

10          Do you need me to reread it so you got it down?

11          And it would be right after the excessive force one

12  that has all the factors.  By itself.  Not with the others.

13          MS. ROMERO:  And that's fine, Judge.  Could we then

14  just modify some of the language to read consistently?

15          THE COURT:  Sure.  Let me hear what your proposal is.

16          MS. ROMERO:  And I think maybe to say, "You can also

17  consider that police officers are often forced to make" --

18          THE COURT:  Right.  Okay.  That's fine.

19          MS. ROMERO:  Yeah, the hyphenated part I think --

20          THE COURT:  I get that.

21          MS. ROMERO:  Yeah.

22          THE COURT:  That's fine.  And then you'll be able to

23  use that.  Yes.  Okay?

24          So I do think that it should not be one of -- I don't

25  think it's one of the factors because of the way -- or are you

1    putting it as a factor under the -- I think it should be -- I

2    think it should be probably in the next -- by itself, right?

3           MS. ROMERO:  And that's fine.  And I think the

4    proposal was just, "You can also consider that" --

5           THE COURT:  Yeah, okay.

6           MS. ROMERO:  As opposed to a fact or something like --

7           THE COURT:  That's fine.  I'll give it.

8           MS. RUSSELL:  Thank you, Judge.

9           MR. HERBERT:  Thank you.

10          THE COURT:  All right.  I'll see you all at 1:30.

11          MS. ROMERO:  And, Judge, just in terms of placement,

12   you want it to be the new 19, essentially.

13          THE COURT:  You know, I just handed it back.

14          MS. ROMERO:  That -- it's right after that --

15          THE COURT:  It's right after the elements where it

16   says, you know, the different factors.  By itself.  Okay?

17          MR. HERBERT:  Judge, do you have any time limits?  I

18   do not plan on exceeding any time limits --

19          THE COURT:  I don't have any time limits because I

20   only do that when I have a case where I'm assuming you're going

21   to go too long.

22          I would very much like to complete them today and have

23   the jury instructed today and not have any overlap.  So I can't

24   imagine that that should happen, any difficulty with.  Okay?

25          All right.  Have a good lunch.

1          MR. HERBERT:  Thank you.

2          LAW CLERK:  All rise.  This Court is in recess until

3     1:30.

4       (Lunch recess taken at 12:41 p.m.)

5                    C E R T I F I C A T E

6       I certify that the foregoing is a correct transcript of the

7     record of proceedings in the above-entitled matter.

8


9     /s/ GAYLE A. McGUIGAN                    April 30, 2016
10    Gayle A. McGuigan, CSR, RMR, CRR              Date
      Official Court Reporter
11                                            April 30, 2016
12    Gayle A. McGuigan, CSR, RMR, CRR              Date
      Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

1                  IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
2                        EASTERN DIVISION

3  UNITED STATES OF AMERICA,      )  Docket No. 14 CR 674-1
                           )
4              Plaintiff,   )  Chicago, Illinois
                           )  October 22, 2015
5           v.              )  1:26 p.m.
                           )
6  ALDO BROWN,               )
                           )
7              Defendant.   )

8

9                        VOLUME 4-B
          TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
10       BEFORE THE HONORABLE VIRGINIA M. KENDALL

11  APPEARANCES:

12  For the Government:     UNITED STATES ATTORNEY'S OFFICE by
                           MS. LINDSAY JENKINS
13                    MS. JESSICA ROMERO
                           Assistant United States Attorneys
14                    219 South Dearborn Street
                           5th Floor
15                    Chicago, Illinois 60604

16  For the Defendant:      LAW OFFICES OF DANIEL Q. HERBERT by
                           MR. DANIEL Q. HERBERT
17                    206 South Jefferson, Suite 100
                           Chicago, Illinois  60661
18
                           J. RUSSELL LAW LLC by
19                    MS. JENNIFER W. RUSSELL
                           206 South Jefferson, Suite 100
20                    Chicago, Illinois  60661

21

22  Court Reporter:         GAYLE A. McGUIGAN, CSR, RMR, CRR
                           Federal Official Court Reporter
23                    219 South Dearborn, Room 2318-A
                           Chicago, Illinois 60604
24                    (312) 435-6047
                           Gayle_McGuigan@ilnd.uscourts.gov
25

```
 1           (In open court outside the presence of the jury:)
 2              THE COURT:  Okay, folks.  Did everyone get the
 3    proposed language that I did?
 4              MS. RUSSELL:  Yes.
 5              THE COURT:  And so are you all fine now with this
 6    packet?
 7              MS. RUSSELL:  Yes.
 8              THE COURT:  The new one?
 9              MS. RUSSELL:  Yes.
10              THE COURT:  Okay.  And the government, are you fine
11    with this packet?
12              MS. JENKINS:  Yes, your Honor.
13              THE COURT:  Are you having trouble?
14              MS. JENKINS:  We're set.
15              THE COURT:  Okay.
16              MR. HERBERT:  We thought we were.  We're fine.  Thank
17    you.
18              THE COURT:  All right.  So then you can get 12
19    packet -- or -- yeah, 12 packets of this for the jury, okay?
20              LAW CLERK:  Yes, your Honor.
21              THE COURT:  All right.  Then we'll get them out here.
22              MS. JENKINS:  Thank you.
23              And we would ask permission for use of the monitor.
24              THE COURT:  Yes.
25              MS. JENKINS:  Thank you.
```

 1          THE COURT:  So I currently have it -- what do you want

 2     it on?  Do you want it on the computer then?

 3          MS. JENKINS:  Yes.  Thank you.

 4          THE COURT:  Prosecution PC, witness, and jury.

 5          MS. JENKINS:  Thank you.

 6          THE COURT:  Yes.

 7       (Pause in proceedings.)

 8          THE CLERK:  All rise.

 9       (Jury in at 1:35 p.m.)

10          THE COURT:  Okay, folks.  Please be seated and get

11     comfortable.

12          We are now going to proceed to the closing arguments

13     by both of the parties.

14          The way it works is that the government goes first.

15     It has the burden of proof.  The defense responds.  And then

16     the government has a rebuttal argument.

17          These are arguments.  These are not evidence.  These

18     are what the lawyers believe are the reasonable inferences you

19     can make from the evidence that you heard over the past week.

20          So let's begin.  And I'll recognize Ms. Jenkins from

21     the United States.

22          MS. JENKINS:  Thank you.

23       (Closing arguments reported but not transcribed at this

24       time.)

25          THE COURT:  Okay.  Members of the jury, I am now going

Jury Charge

1  to instruct you on the law that you must follow in deciding

2  this case.

3       Don't worry, I'm going to give each of you one of

4  these sets of instructions in the back, so just listen now.

5  Okay?  I am going to give you these instructions to have in the

6  jury room.

7       You must follow all of my instructions about the law,

8  even if you disagree with them.  This includes the instructions

9  I gave you before trial, any instructions I gave you during the

10  trial, and the instructions that I am giving you now.

11       As jurors, you have two duties:

12       Your first duty is to decide the facts from the

13  evidence that you saw and heard here in this courtroom.  This

14  is your job, not my job or anyone else's job;

15       Your second duty is to take the law as I give it to

16  you, apply it to the facts, and decide if the government proved

17  the defendant guilty beyond a reasonable doubt.

18       You must perform these duties fairly and impartially.

19  Do not let sympathy, prejudice, or fear, or public opinion

20  influence you.

21       You must not take anything that I said or did during

22  the trial as indicating that I have an opinion about the

23  evidence or about what I think your verdict should be.

24       The charges against the defendant are in a document

25  called an indictment.  You will have a copy of the indictment

Jury Charge

during your deliberations.

The first count in the indictment in this case charges that the defendant used unreasonable force while acting under color of law.

The second and third counts in the indictment charge that the defendant falsified documents in a federal investigation.

The defendant has pled not guilty to these charges.

The indictment is simply the formal way of telling the defendant what crimes he is accused of committing. It is not evidence that the defendant is guilty. It does not even raise a suspicion of guilt.

The defendant is presumed innocent of each and every one of the charges. This presumption continues throughout this case, including during your deliberations. It is not overcome unless, from all the evidence in this case, you are convinced beyond a reasonable doubt that the defendant is guilty as charged.

The government has the burden of proving the defendant's guilt beyond a reasonable doubt. This burden of proof stays with the government throughout the case.

The defendant is never required to prove his innocence. He is not required to produce any evidence at all.

You must make your decision based solely on the evidence that you saw here and heard here in my courtroom. Do

Jury Charge

not consider anything you may have seen or heard outside of
this court, including anything from the newspaper, the
television, the radio, the internet, or any other source.

The evidence includes only what the witnesses said
when they were testifying under oath, the exhibits that I
allowed into evidence, and the stipulations that the lawyers
agreed to.  A stipulation is an agreement that certain facts
are true or that a witness would have given certain testimony.

Nothing else is evidence.  The lawyers' statements and
arguments are not evidence.  If what a lawyer said is different
from the evidence as you remember it, the evidence is what
counts.  The lawyers' questions and objections, likewise, are
not evidence.

A lawyer has a duty to object if he thinks a question
is improper.  If I sustained objections to questions the
lawyers asked, you must not speculate on what the answers might
have been.

If, during the trial, I struck testimony or exhibits
from the record or told you to disregard something, you must
not consider it.

Give the evidence whatever weight you decide it
deserves.  Use your common sense in weighing the evidence, and
consider the evidence in light of your own everyday experience.

People sometimes look at one fact and conclude from it
that another fact exists.  This is called an inference.  You

Jury Charge

are allowed to make reasonable inferences, so long as they are based on the evidence.

You may have heard the terms "direct evidence" and "circumstantial evidence." Direct evidence is evidence that directly proves a fact. Circumstantial evidence is evidence that indirectly proves a fact.

You are to consider both direct and circumstantial evidence, because the law does not say that one is better than the other. It is up to you to decide how much weight to give any evidence, whether direct or circumstantial.

Do not make any decisions simply by counting the number of witnesses who testified about a certain point.

You may find the testimony of one witness or a few witnesses more persuasive than the testimony of a larger number. You need not accept the testimony of the larger number.

What is important is how truthful and accurate the witnesses were and how much weight you think their testimony deserves.

Part of your job as jurors is to decide how believable each witness was and how much weight to give each witness's testimony, including that of the defendant. You may accept all of what a witness says or part of it or none of it. Some factors you may consider include:

The intelligence of the witness;

Jury Charge

1          The witness's ability to -- and opportunity to see,
2    hear, or know the things that the witness testified about;
3          The witness's memory;
4          The witness's demeanor;
5          Whether the witness had any bias, prejudice, or other
6    reason to lie or slant the testimony;
7          The truthfulness and accuracy of the witness's
8    testimony in light of the other evidence presented;
9          And inconsistent or consistent statements or conduct
10   by the witness.
11         It is proper for an attorney to interview any witness
12   in preparation for trial.
13         You have heard evidence that before the trial a
14   witness made statements that may be inconsistent with his
15   testimony here in court.  You may consider an inconsistent
16   statement made before the trial only to help you decide how
17   believable a witness's testimony was here in court.  If an
18   earlier statement was made under oath, then you can also
19   consider the earlier statement as evidence of the truth of
20   whatever the witness said in the earlier statement.
21         You have heard evidence that Jecque Howard was
22   arrested and charged with a crime on September 27th, 2012.  You
23   should not speculate either way about the outcome of the
24   charges against Jecque Howard as a result of his arrest on that
25   day.

Jury Charge

1    You have heard testimony of an identification of a

2    person.  Identification testimony is an expression of the

3    witness's belief or impression.  In evaluating this testimony,

4    you should consider the opportunity the witness had to observe

5    the person at the time of the offense and to make a reliable

6    identification later.  You should also consider the

7    circumstances under which the witness later made the

8    identification.

9    The government must prove beyond a reasonable doubt

10   that the defendant is the person who committed the crime that

11   is charged.

12   If you have taken notes during the trial, you may use

13   them during deliberations to help you remember what happened

14   during trial.  You should only use your notes as aids to your

15   memory.  The notes are not evidence.  All of you should rely on

16   your independent recollection of the evidence, and you should

17   not be unduly influenced by the notes of other jurors.  Notes

18   are not entitled to any more weight than the memories or

19   impressions of each juror.

20   Count One of the indictment charges the defendant with

21   deprivation of rights under color of law by the use of

22   unreasonable force.  In order for you to find the defendant

23   guilty of this charge, the government must prove each of the

24   four following elements beyond a reasonable doubt:

25   First, the defendant was acting under color of law;

Jury Charge

1    Second, the defendant deprived Jecque Howard of his

2  right to be free of the use of unreasonable force by a person

3  acting under color of law, which is secured or protected by the

4  Constitution and laws of the United States;

5    Third, the defendant intended to deprive Jecque Howard

6  of these rights.  The government is not required to prove that

7  the defendant knew these rights were secured by the

8  Constitution and laws of the United States;

9    And, fourth, Jecque Howard was present in Illinois.

10    If you find from your consideration of all of the

11  evidence that the government has proved each of these elements

12  beyond a reasonable doubt, then you should find the defendant

13  guilty.

14    If, on the other hand, you find from your

15  consideration of all of the evidence that the government has

16  failed to prove any of these elements beyond a reasonable doubt

17  as to this charge, then you should find the defendant not

18  guilty.

19    A person acts under color of law when he acts in his

20  official capacity or purports or claims to act in his official

21  capacity.  Action under color of law includes the abuse or

22  misuse of the power possessed by the defendant by virtue of his

23  office or official position.

24    The rights to be free from the use of unreasonable

25  force by a law enforcement officer are rights secured by the

Jury Charge

1    Constitution and the laws of the United States.

2          You must decide whether the defendant's use of force

3    was unreasonable from the perspective of a reasonable officer

4    facing the same circumstances that the defendant faced.

5          You must make this decision based on what the officer

6    knew at the time the force was used, not based on what you know

7    now.

8          In performing this job, an officer can use force that

9    is reasonably necessary under the circumstances.

10         Factors you may consider in deciding whether the

11   defendant's use of force was unreasonable include:

12         The need for the use of force;

13         The relationship between the need for the use of force

14   and the amount of force used;

15         The extent of the victim's injuries;

16         Any efforts made by the defendant to temper or limit

17   the amount of force;

18         The severity of the crime at issue;

19         The threat reasonably perceived by the officer;

20         Whether the victim was actively resisting arrest or

21   was attempting to evade arrest by fleeing.

22         You can also consider that police officers are often

23   forced to make split-second judgments -- in circumstances that

24   are tense, uncertain, and rapidly evolving -- about the amount

25   of force that is necessary in a particular situation.

Jury Charge

1         If you find the defendant guilty of using unreasonable

2   force as charged in Count 1 of the indictment, you then must

3   determine whether the government has proven that Jecque Howard

4   suffered a bodily injury as a result of defendant's acts

5   charged in Count One.

6         The term "bodily injury" includes any of the

7   following:  A cut; an abrasion; a bruise; a burn or

8   disfigurement; physical pain; illness; impairment of a function

9   of a bodily member, organ, or mental faculty; or any other

10   injury to the body, no matter how temporary.

11         You will see on the verdict form a question concerning

12   this issue.  You should consider that question only if you have

13   found that the government has proven the defendant guilty as

14   charged in the indictment.

15         If you find that the government has proven beyond a

16   reasonable doubt that Jecque Howard suffered a bodily injury as

17   a result of the defendant's acts as charged in the indictment,

18   then you should answer that question "Yes."

19         If you find that the government has not proven beyond

20   a reasonable doubt that Jecque Howard suffered bodily injury as

21   a result of the defendant's acts, then you should answer that

22   question "No."

23         Insulting or threatening words alone do not justify

24   the unreasonable use of force by a law enforcement officer on

25   an individual.

Jury Charge

1    Counts Two and Three of the indictment charge the
2    defendant with falsifying documents in a federal investigation.
3    Count Two relates to the Chicago Police Department tactical
4    response report under Event Number 1227108076.  Count Three
5    relates to the Chicago Police Department arrest report under
6    Event Number 1227108076.  In order for you to find the
7    defendant guilty, the government must prove each of three
8    following elements for Counts Two and Three beyond a reasonable
9    doubt:
10    First, that the defendant altered, falsified, or made
11    a false entry in any record or document;
12    And that defendant did so knowingly;
13    And the defendant acted with the intent to impede,
14    instruct -- obstruct, excuse me, or influence the investigation
15    or proper administration of any matter within the jurisdiction
16    of any department or agency of the United States.
17    If you find from your consideration of all of the
18    evidence that the government has proved each of these elements
19    beyond a reasonable doubt as to the charge you are considering,
20    then you should find the defendant guilty.
21    If, on the other hand, you find from your
22    consideration of all of the evidence that the government has
23    failed to prove any of these elements beyond a reasonable doubt
24    as to the charge you are considering, then you should find the
25    defendant not guilty.

Jury Charge

1      A person acts knowingly if he realizes what he is

2  doing and is aware of the nature of his conduct and does not

3  act through ignorance, mistake, or accident.  In deciding

4  whether the defendant acted knowingly, you may consider all of

5  the evidence, including what the defendant did or said.

6      To find that the defendant intended to impede,

7  obstruct, or influence the investigation or proper

8  administration of a matter within the jurisdiction of any

9  department or agency of the United States or in relationship to

10  any such matter or case, it is not necessary for you to find

11  that the defendant was successful in impeding, obstructing, or

12  influencing the investigation.  It is only necessary that the

13  defendant tried to impede, obstruct, or influence the

14  investigation and that his effort has -- had a reasonable

15  tendency to do so.

16      The Federal Bureau of Investigation is part of the

17  executive branch of the government of the United States.

18  Matters related to investigations conducted by the Federal

19  Bureau of Investigation are within the jurisdiction of the

20  executive branch.

21      There is no requirement that the matter have been

22  pending at the time of the obstruction, but only that the acts

23  were taken in relation to or in contemplation of any such

24  matter or case.  In order to meet its burden, the government

25  does not have to prove that the defendant specifically knew

Jury Charge

that the matter was within the jurisdiction of a department or
agency of the United States.

The indictment charges that the crimes happened "on or
about" certain dates.  The government must prove that the
crimes happened reasonably close to those dates.  The
government is not required to prove that the crimes happened on
those exact dates.

The defendant has been accused of more than one crime.
The number of charges is not evidence of guilt and should not
influence your decision.

You must consider each charge and the evidence
concerning each charge separately.  Your decision on one
charge, whether it is guilty or not guilty, should not
influence your decision on any other charge.

In deciding your verdict, you should not consider the
possible punishment for the defendant who is on trial.  If you
decide that the government has proved the defendant guilty
beyond a reasonable doubt, then it will be my job to decide on
the appropriate punishment.

Now, once you are all in the jury room, the first
thing you should do is choose a foreperson, and that foreperson
should see to it that your discussions are carried on in an
organized way and that everyone has a fair chance to be heard.
You may discuss the case only when all of you are present.

Once you start deliberating, do not communicate about

Jury Charge

the case or your deliberations with anyone except other members

of the jury.  You may not communicate with others about the

case or your deliberation by any means.  This includes oral or

written communication, as well as any electronic method of

communication, such as:  Cell phone, smartphone, iPhone,

BlackBerry, computer, text messaging, instant messaging, the

internet, chat rooms, blogs, websites, or services like

Facebook, MySpace, LinkedIn, YouTube, Twitter, or any other

method of communication.  Smoke signals.

          If you need to communicate with me while you are

deliberating, send a note through the Court Security Officer.

The note should be signed by the foreperson or by one or more

members of the jury.  To have a complete record of this trial,

it is important that you do not communicate with me except by a

written note.  I may have to talk to the lawyers about your

message, so it may take me some time to get back to you, so you

may continue your deliberations while you wait for my answer.

          Please be advised that transcripts of trial testimony

are not available to you.  You must rely on your collective

memory of the testimony.

          If you send me a message, do not include the breakdown

of any votes you may have conducted.  So in other words, do not

tell me that you are 6/6 split or 8/4 or whatever it happens to

be that your vote is at that time.

          Now, I have prepared a verdict form for you.  It's

Jury Charge

1    three pages long.

2         The first page of the verdict form reads:

3         Count One:  With respect to Count 1 of the indictment,

4    we, the jury, find the defendant guilty or not guilty.  Just an

5    X in the line -- above the line that you believe the government

6    has proved beyond a reasonable doubt.

7         If you find the defendant guilty of the offense in

8    One, then you must determine whether the government has proven

9    that Jecque Howard suffered a bodily injury as a result of the

10   defendant's acts.  And if you do, then you check "Yes."  If you

11   don't, you check "No."

12        You move on to the second page of the verdict form and

13   it simply says:  With respect to Count Two of the indictment,

14   we, the jury, find the defendant guilty or not guilty.

15        And the same with respect to Count Three.

16        And then there are lines for all of your signatures.

17        When you have reached a unanimous verdict, your

18   foreperson will fill in, date, and sign the verdict form, and

19   then each of you must sign the form as well.

20        Then advise the Court Security Officer once you have

21   reached a verdict; and when you come back into the courtroom, I

22   will read the verdict aloud.

23        The verdict must represent the considered judgment of

24   each juror.  Your verdict, whether it is guilty or not guilty,

25   must be unanimous.

Jury Charge

1      You should make every effort -- every reasonable

2  effort to reach a verdict.  And in doing so, you should consult

3  with each other, express your own views, and listen to your

4  fellow jurors' opinions.  Discuss your differences with an open

5  mind.  Do not hesitate to re-examine your own views and change

6  your opinion if you come to believe it is wrong, but you should

7  not surrender your honest beliefs about the weight or effect of

8  evidence just because of the opinions of your fellow jurors or

9  just so that there can be a unanimous verdict.

10      The 12 of you should give fair and equal consideration

11  to all the evidence.  You should deliberate with the goal of

12  reaching an agreement that is consistent with the individual

13  judgment of each juror.

14      You are the impartial judges of the facts.  Your sole

15  interest is to determine whether the government has proved its

16  case beyond a reasonable doubt.

17      Okay.  Now, let me turn to an unfortunate piece of

18  news that I need to give to two of you, which is that we had

19  two alternates sitting with you.  And alternates are not

20  permitted to deliberate with the sitting jurors.  It's only a

21  jury of 12.  And those two alternates are Katey Berg and

22  Gennaro Roppo, the last two in the back row.

23      I am going to say this to you, Miss Berg and

24  Mr. Roppo:  I have had times in my career where I have had to

25  bring back an alternate juror based upon something that

occurred during deliberation, so I am going to keep you under
the same oath that I had you under when you took the oath when
you first were sworn in, which is not to talk about the case
with each other or with anyone else outside of the courtroom.
I will let you know what the verdict is when the verdict is
brought in.  But we may have to contact you and bring you back
in if that rare occurrence arises.  So until you reach that --
hear that phone call from me saying that you are excused and
what the verdict was, please do not speak about the case.  And
I'm going to ask the two of you to say goodbye to your
colleagues here, and you're going to have to gather your
belongings and leave the jury room before the rest of the
group.

So, John, let me first swear you in, and then I'll
take that next step.

Please raise your right hand.

(Oath Administered to Court Security Officer.)

THE COURT:  Okay.  Thank you, John.

If you can take the first alternates back originally,
and then the rest can join you in a minute.

(Exit Alternate Jurors Berg and Roppo.)

(Pause in proceedings.)

THE COURT:  Thank you, John.

Okay, Ladies and Gentlemen, from now on, you are going
to deliberate together as a group.  All of you must be together

1    when you have discussions.  And my normal hours for

2    deliberation are 9:00 to 5:00.

3          The first thing you do is pick your foreperson.  And

4    the first thing I would like back from the foreperson is the

5    one question, which is do you want to go beyond 5:00 today,

6    only till 6:00 is the only opportunity you have, because we go

7    down to a skeleton crew of security after 6:00, okay?  That

8    will be my question for you.

9          Otherwise, come back tomorrow between 9:00 and 5:00.

10   And you'll be eating together and staying together until you

11   reach a verdict.

12         So good luck.  Have a nice evening.

13         COURT SECURITY OFFICER:  All rise.

14     (Jury out at 4:03 p.m.)

15         THE COURT:  Okay.  Please be seated.

16         It is my practice that the government show to the

17   defense all of the exhibits that you intend to bring back to

18   the jury room, and I want on the record a statement that you

19   both agree that those are the exhibits.

20         And did you bring a computer for them?  Do they need

21   any instructions or is it self-explanatory?

22         MS. JENKINS:  They will have a computer, and it will

23   have instructions on the -- we'll make those.

24         THE COURT:  Okay.  So Miss Russell and Mr. Herbert,

25   you're free to review that computer and make sure it is clean

1     from any other materials.  Unfortunately, I have had that

2     happen.  So take a look at the computer and take a look at the

3     exhibits, and then my court reporter will stay here until that

4     affirmation that these are the exhibits.  My clerk will take

5     them back to me, and I'll give them to the Court Security

6     Officer.

7               A few minutes for them to put it together.

8               COURT SECURITY OFFICER:  Did you want to talk to the

9     alternates?

10              THE COURT:  Oh, yes.  Thank you very much.  I

11    appreciate that.

12              MS. ROMERO:  Judge, can I just raise a, what will be a

13    very collateral matter?

14              My understanding is there was a request by media to

15    get a copy of the published portions of the video in court.

16    And my understanding from the press officer in my office is

17    that we would have to ask the Court for permission before

18    complying with that request, and I was asked to do that.

19              THE COURT:  Oh.  Do you have an objection to that?

20              MR. HERBERT:  The media wants portions of the video?

21              THE COURT:  That were played in open court.

22              MR. HERBERT:  I don't know if I have any standing to

23    object; but, yes, I would prefer they not get it, but --

24              THE COURT:  I believe anything that was presented

25    during the course of the trial and played in the open courtroom

1   is for public review, this being an access to the courtroom

2   issue, and, therefore, I give you my permission to turn over

3   the video.

4           MS. ROMERO:  Thank you, Judge.

5           THE COURT:  Thank you.

6           LAW CLERK:  All rise.  This court is in recess.

7       (Judge Kendall exits courtroom.)

8       (Pause in proceedings.)

9           MS. JENKINS:  On behalf of the government, Lindsay

10  Jenkins, stating that we have reviewed the exhibits going back

11  to the jury, and we agree that it's an accurate reflection of

12  the admitted exhibits.

13          MR. HERBERT:  And for the defense, we agree as well.

14      (Proceedings concluded at 4:11 p.m.)

15                   C E R T I F I C A T E

16      I certify that the foregoing is a correct transcript of the

17  record of proceedings in the above-entitled matter.

18

19
    _/s/ GAYLE A. McGUIGAN_____        _April 30, 2016_
20  Gayle A. McGuigan, CSR, RMR, CRR                    Date
    Official Court Reporter
21                                             _April 30, 2016_
    _____        Date
22  Gayle A. McGuigan, CSR, RMR, CRR
    Official Court Reporter
23

24

25

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3  UNITED STATES OF AMERICA,    )  Docket No. 14 CR 674-1
                      )
4            Plaintiff,   )  Chicago, Illinois
                      )  October 23, 2015
5          v.          )  10:15 a.m.
                      )
6  ALDO BROWN,           )
                      )
7           Defendant.   )

8

                    VOLUME 5-A
9        TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
       BEFORE THE HONORABLE VIRGINIA M. KENDALL

10

11  APPEARANCES:

12  For the Government:     UNITED STATES ATTORNEY'S OFFICE by
                      MS. LINDSAY JENKINS
13                  MS. JESSICA ROMERO
                      Assistant United States Attorneys
14                  219 South Dearborn Street
                      5th Floor
15                  Chicago, Illinois 60604

16  For the Defendant:      LAW OFFICES OF DANIEL Q. HERBERT by
                      MR. DANIEL Q. HERBERT
17                  206 South Jefferson, Suite 100
                      Chicago, Illinois  60661
18

                      J. RUSSELL LAW LLC by
19                  MS. JENNIFER W. RUSSELL
                      206 South Jefferson, Suite 100
20                  Chicago, Illinois  60661

21

22  Court Reporter:         GAYLE A. McGUIGAN, CSR, RMR, CRR
                      Federal Official Court Reporter
23                  219 South Dearborn, Room 2318-A
                      Chicago, Illinois 60604
24                  (312) 435-6047
                      Gayle_McGuigan@ilnd.uscourts.gov
25

 1          (In open court outside the presence of the jury:)

 2              THE CLERK:  This is case 14 CR 674, USA versus Aldo

 3     Brown.

 4          (Defendant not present.)

 5              THE COURT:  Good morning.  For the record, you need to

 6     state your names as to who is here, please.

 7              MS. JENKINS:  Good morning, your Honor.  Lindsay

 8     Jenkins and Jessica Romero for the United States.

 9              MR. HERBERT:  Good morning, your Honor.  Dan Herbert

10     and Jen Russell for Aldo Brown.

11              And Aldo Brown, I just spoke to him probably three

12     minutes ago, he said he was five minutes away.  I apologize.  I

13     will say for the record that we instructed him to be here or at

14     our office at 9:00.

15              THE COURT:  Oh, good.  Okay.  Because this would be a

16     critical stage of the proceeding for him, to answer this, so

17     what we will do is we'll get started, but we don't -- we will

18     not give the note back to the jury until you take a position,

19     inform him, and he's aware of it, and he can let you know

20     whether he disagrees.

21              But the first part of the question is straightforward:

22              Could we please have a Magic Marker and a stand or

23     easel for -- easel, what does it say?

24              MS. JENKINS:  A stand or easel for easel pad.

25              THE COURT:  We got it, so we gave it to them.

1          And then the next question is:  Could we have a

2     clarification on Count One, Count Three on intent?

3          So very different questions.

4          My first instinct was just to ask them to be specific

5     about what they needed on each count and to separate it.  But I

6     will hear from the parties.

7          MS. JENKINS:  Your Honor, I believe that the

8     instructions already provide them with the information that

9     they are able to have about the definition of "intent."  And so

10    without --

11         THE COURT:  I need the instructions.

12         MS. JENKINS:  But I don't -- as I sit here, I don't

13    remember --

14       (Counsel conferring.)

15         MS. JENKINS:  In addition, I don't believe that Count

16    Three contains an "intent" element.  Count Three contains a

17    "knowingly" element.

18         MS. RUSSELL:  Which we had an instruction for.

19         MS. JENKINS:  And there's an instruction for that.

20    Count One has a --

21         THE COURT:  Sarah, I asked for the jury instructions,

22    please.

23       (Counsel conferring.)

24         MS. JENKINS:  Your Honor, based on our -- the

25    government's review of our notes on the instructions, the jury

1  was not specifically -- we did not specifically define "intent"

2  as it's used in Count One -- as it's used in the Count One

3  instruction, and I'm not -- I don't believe we're in a position

4  to provide them any more detail on "intent" other than you have

5  all the instructions on the matter.

6      (Tendered.)

7          THE COURT:  It's your case, too, folks.

8          MR. HERBERT:  Yes.  I'm sorry, Judge.  I didn't want

9  to interrupt.

10         THE COURT:  Oh, that's all right.

11         MR. HERBERT:  Judge, we would ask for a -- perhaps we

12 can provide an "intent" instruction, however that's done,

13 either through you conveying it in a note or we add an

14 additional instruction.

15         THE COURT:  Okay.  So, first of all, is it a specific

16 intent or a general intent crime for Count One?

17         So we have the "knowingly" instruction given after the

18 Counts Two and Three; but if you look at the elements, what

19 they're hung up on is clearly the third element of Count Three,

20 which is, "The defendant acted with the intent to impede,

21 obstruct, or influence."

22         And then I suppose with Count One -- oops.  It is the

23 third element of Count One as well.  "The defendant intended to

24 deprive Jecque Howard of these rights."

25         So it hasn't been defined.  And the "knowing"

1  instruction appears to go to the second element of Counts Two

2  and Three.

3       MS. JENKINS:  Correct.

4       THE COURT:  So if you think they should be given an

5  "intent" instruction, what would that read like?

6       MR. HERBERT:  There's a pattern instruction on it.

7       THE COURT:  I don't think so.

8    (Counsel conferring.)

9       MR. HERBERT:  In --

10      THE COURT:  Specific intent, general intent.

11      "The committee recommends avoiding instructions that

12  distinguish between specific intent and general intent.

13  Instead, the trial judge should give instructions that define

14  the precise mental state required by the particular offense

15  charged."

16      So, of course, "knowingly" is what is the precise

17  mental intent for charges Two and Three, but that isn't the

18  part that's hung up.  They're -- they're hung up on the third

19  element of each of those counts where it says he "intended" to

20  do something.

21      All right.  I'm going to give you each a few minutes

22  to think about this, and I'm going to do some research.

23      Don't go anywhere.  And I want your proposals when I

24  come back in ten minutes.  Okay?

25      MS. RUSSELL:  Thank you, Judge.

1       THE CLERK:  All rise.  This Court is in recess for ten

2   minutes.

3     (Recess taken from 10:24 a.m. to 10:48 a.m.)

4     (Judge Kendall enters courtroom.)

5     (Defendant present.)

6       THE COURT:  Okay.  So here's my research and my

7   analysis, and then you can tell me what you all think.

8       So in -- where did I go here?

9       So in 18 U.S.C. 242, I think the committee is trying

10   to make simplistic for the jury this concept of deprivation of

11   a right and track the statute without getting too wordy,

12   because the statute is so wordy, but the statute is a willful

13   requirement.  It states it directly.

14       And then if you go all the way back, which is what I

15   just did, to *Screws versus United States,* which is the Supreme

16   Court case back in 1945, you start following that through, I

17   believe that the concept behind this is -- or the intent of the

18   committee in writing it in this direction is to say that he

19   knew what he was doing was a violation of the law, but that he

20   did not need to know the exact law or the right that he was

21   violating.

22       And I think the reason there is, of course, you don't

23   have to have him prove that he knew the Fourth Amendment

24   incorporated through the Fourteenth or whatever, you know,

25   mumbo-jumbo he would be specifically charged with doing, but we

1   have to say he knew what he was doing was a violation of the

2   law.  But I don't think we can end it right there, because

3   that's the point with that third element saying but he's not

4   required -- they're not required to prove that he knew this

5   right was secured.

6          So I think we have to -- that would be my proposal.  I

7   think that's my clean proposal for a jury, to put a willful

8   instruction which would say:  In Count One, in the third

9   element, when it reads, quote, the defendant intended to

10  deprive the victim of this right, unquote, it means that he

11  knew what he was doing was a violation of the law, but he need

12  not know the exact law or right that he was violating at the

13  time.

14         Does anybody agree or disagree with that?

15         MR. HERBERT:  Judge, I think that's pretty good.  But

16  I looked up a case, and it comes from the notes, and I'm

17  unclear if the case was overruled or --

18         THE COURT:  Is this the Ninth Circuit or the First

19  Circuit one?  No.

20         MR. HERBERT:  This is -- I looked up this

21  *US v. Brighton*.

22         THE COURT:  I don't see that in the notes.  Where are

23  you reading that?

24         MR. HERBERT:  We have it.  It's under -- I don't know

25  if your pages --

1          THE COURT:  Are you -- you're talking about the jury

2    instruction book?

3          MR. HERBERT:  Yes.  It's under 4.08, specific/general

4    intent --

5          THE COURT:  Oh, back there.

6          MR. HERBERT:  Yeah.

7          THE COURT:  Okay.

8          MR. HERBERT:  And I was amazed at how unclear it is.

9    But, anyways, there's --

10          THE COURT:  I know.  That's why the committee chose

11    not to do this specific/general intent, willful or not, because

12    each statute has its own little nuance.

13          MR. HERBERT:  There was this *U.S. v. Brighton* case,

14    598 F.2d 1101, Seventh Circuit, and it's mentioned in here.

15    And it was a -- what type of case was it, Russ?

16       (Counsel conferring.)

17          MR. HERBERT:  Anyways -- it's a criminal case,

18    obviously.  And what they had in there was "a requirement of

19    proof not only his knowledge of likely effects but also of a

20    conscious desire to bring them to fruition or to violate the

21    law."

22          THE COURT:  Yeah.  So, so wordy.  And I think, you

23    know, "conscious fruition" and all that, I just -- "knew what

24    he was doing," right?  He knew what he was doing was a

25    violation of the law.

1          Do you disagree at all with the willful intent?

2          MS. JENKINS:  Your Honor, I apologize for returning to

3    court late.

4          I think our concern is about adding the word "k" or

5    "knowingly."  That's injecting a different standard or element.

6          THE COURT:  It's a willful -- read the elements of the

7    crime.  Willfully subjects any person.  It's willful.  It's

8    242.

9          MS. ROMERO:  Your Honor, unfortunately, I think the

10   problem is there is -- the pattern says at 4.11 that the

11   definition of willfulness should be based directly on the

12   definitional instructions for that particular offense.

13         THE COURT:  Precisely.

14         So what the committee clearly did is to say intent to

15   deprive, which is a willful intent to deprive, and then but

16   he's not required to know what specifically he was depriving

17   him of.

18         They want to know what it means to intend to deprive.

19         MS. ROMERO:  I think that that's why this is so

20   difficult, because I think we're not talking about a legal

21   question as much as -- I mean --

22         THE COURT:  Well, you are.

23         MS. ROMERO:  "Intent" is a normal word.  It's a lay

24   term.

25         MS. JENKINS:  Right.

1     MS. ROMERO:  And I think that's why we're having a
2  hard time because legally there's no --
3     MR. HERBERT:  We would disagree with that.  It's not
4  a -- it's not a lay term.  That's why there's an instruction on
5  "intent."
6     I think --
7     THE COURT:  No, there isn't.  There isn't.  It goes to
8  each statute.
9     So what you really need to do is look at the statute's
10  history, and that's what I was trying to do.
11     And there is, you know, evidence in these old cases
12  about that it is a, you know, a willful deprivation of the
13  right.  It's not a hapless one.  It's not a negligent one.
14  It's not a -- it's not a knowingly one.  It's a willfully
15  depriving him.  But not -- he doesn't have to know what exact
16  right, but just that he did so willfully.
17     That's my take on it.  It's in the statute itself.  So
18  if you have a different case or analysis, I'd love to hear it.
19     I'm going to give you time to think about this and
20  come back to me, but let's go to the second one.
21     So on Count Three, the closest we could find -- and I
22  spent a significant portion of my time on the first -- but the
23  closest we could find was an Eighth Circuit case from 2011, 657
24  F.3d 688, *U.S. v. Yielding*.  And it's directly on point with
25  1519, but it's a lot.  "We thus understand the intent element

610

 1    of the statute to encompass three possible scenarios:  A

 2    defendant acts with intent to impede, obstruct, or influence

 3    the investigation or proper administration of a federal matter;

 4    two, a defendant in contemplation of a federal matter acts with

 5    intent to impede, obstruct, or influence the investigation or

 6    proper administration of the matter; and, three, a defendant in

 7    relation to a federal matter acts with intent to impede,

 8    obstruct, or influence."

 9              So it seems like we have the second scenario, right?

10              So the intent is to impede, obstruct, or influence,

11    which is what they're defined as, right?

12              MS. ROMERO:  That's correct, Judge.  And it's page 24

13    of our instructions.  The very last sentence already provides a

14    definition that says that the defendant tried to impede,

15    obstruct, or influence, and then his efforts had a reasonable

16    tendency to do so.

17              So I think we would take the position with respect to

18    Counts Two and Three that there should not be an additional

19    instruction based on the instruction on page 24.

20              MR. HERBERT:  There's no question on Count Two, just

21    for clarification.

22              THE COURT:  No.  It's the same instruction, though --

23              MS. JENKINS:  It's the same.

24              THE COURT:  -- so -- yeah.  Yeah, I agree that I don't

25    think there's anything further that needs to be given on Three.

1      I think we have to decide what we're going to do with

2  Count One.

3      Do you have a position on Count Three?

4      MR. HERBERT:  Judge, the language that you utilized in

5  Count One, we like that.  I think it's -- it's fair.  And I

6  think that we could use it in Count Three as well.

7      THE COURT:  No, they're different -- it's a different

8  one.  It isn't -- that one is with the intent to -- I don't

9  have a willful --

10      MR. HERBERT:  Judge --

11      THE COURT:  -- element in Count Three.

12      MS. JENKINS:  Your Honor, one concern, just as you

13  were describing or responding to counsel's statement, is that

14  because we're talking about the same word in two different

15  instructions, there's some concern about whether giving an

16  additional instruction as to "intent" on Count One would

17  somehow confuse the jury as to the use of the word "intent" --

18      THE COURT:  Well, we can clear that up easily enough.

19      MS. JENKINS:  And that's fine.  Certainly we would

20  suggest that that happen if any additional instruction is given

21  on Count One, but it's just one of the government's concerns.

22      THE COURT:  All right.  I'll give you a few minutes to

23  talk about it.

24      I believe that they need an instruction on Count One,

25  because I don't think they have anything, unlike the

1    instruction they have on Count Three, which includes both

2    "knowingly" instruction for the element of the action and a

3    description of the way to intend to obstruct on Count Three.

4             So I will let you talk about it, and you can tell me

5    if I'm wrong on my analysis.

6             MS. JENKINS:  Your Honor --

7             MR. HERBERT:  Judge, before you leave, can I have you,

8    please, if you can repeat what you proposed for Count One, to

9    see if I wrote it down correctly?

10            It was the willful instruction, knew what he was --

11   did so willfully and knew what he was doing was a violation of

12   the law or violation of the Fourth Amendment.

13            THE COURT:  Since I did it off the top of my head -- I

14   would propose as to Count One and the third element, when it

15   reads, quote, the defendant intended to deprive Jecque Howard

16   of these rights, quote, it means that he knew what he was doing

17   was a violation of the law, but he need not know the exact law

18   or right he was violating.

19            That's my proposal.  But you can talk about it --

20            MS. JENKINS:  Your Honor, during the break, the

21   government is going to -- we're going to seek to get a copy of

22   the case, the following case:  *United States versus Bradley*,

23   196 F.3d 762.  I do not have copies in front of me now, but

24   we're going to get copies and --

25            THE COURT:  I have it right in front of me.

1        MS. JENKINS:  -- to the extent that that adds to the

2    analysis, but we'll be prepared to discuss that --

3        THE COURT:  I have it.  I can discuss it right now

4    with you.  I've got it.

5        MS. JENKINS:  I do not have it in front of me.

6        THE COURT:  Well --

7        MS. JENKINS:  So I would -- if it's possible, we would

8    like to discuss it after the break.

9        THE COURT:  Hurry up.  The jury is waiting.

10        THE CLERK:  All rise.  This court is in recess.

11        THE COURT:  Just before you leave, I'm sorry,

12    *United States versus Bradley*, Seventh Circuit, 1999, says:

13    "Willfulness under 242 essentially requires that the defendant

14    intend to commit the unconstitutional act, without necessarily

15    intending to do that act for the specific purpose of depriving

16    another of a constitutional right.  In other words, to act

17    willfully in the 242 sense, the defendant must intend to commit

18    an act that results in the deprivation of an established

19    constitutional right as a reasonable person would have

20    understood that right."

21        MR. HERBERT:  I think that's perfect.

22        THE COURT:  Oh, well, that -- if you want that

23    language, you can just take that language.  That's the

24    Seventh Circuit.  I made it easier.

25        MR. HERBERT:  Yeah.  Would you mind if I read that?

1          THE COURT:  Here, Tresa.  Hand it to him.

2      (Tendered.)

3          MR. HERBERT:  I'm sorry.

4      (Counsel conferring.)

5          MR. HERBERT:  I think I like yours better, your Honor.

6          The only amendment I would say to yours was a

7      violation, instead of the law, maybe of the unconstitutional

8      act.

9          I'm just worried they're going to be confused.

10     (Counsel conferring.)

11         MS. JENKINS:  And, your Honor, just reading the last

12     portion of the language that you read, the highlighted

13     language, "The defendant must intend to commit an act that

14     results in the deprivation of an established constitutional

15     right as a reasonable person would have understood it," the

16     government is comfortable with that language, which I realize

17     is not in agreement with what defense counsel just stated.

18         MR. HERBERT:  I think that's superfluous, or whatever

19     that word is, because it's already -- that's already mentioned

20     in the instructions.

21         THE COURT:  We're defining "intent" with intent.

22     That's not going to help them.  That's why I made it simpler.

23     I mean, we're going to say "intended" means he must intend to

24     commit an act?

25         MS. ROMERO:  Judge, because I think the concern is

1    that if we say that he acted willfully, the definition of

2    "willfulness" --

3            THE COURT:  But I didn't say that.

4            MS. ROMERO:  Okay.

5            THE COURT:  That's not what I said.  I said what

6    willful means is that he knew what he was doing was a violation

7    of the law.

8            MS. ROMERO:  And I think our concern is that's a

9    slightly higher standard than the one stated in *Bradley*.

10           THE COURT:  Let me go tinker with it and see if I can

11    play around with it, but I'm coming back in five minutes.  This

12    jury asked this question a long time ago.

13      (Recess taken from 11:04 a.m. to 11:22 a.m.)

14      (In open court outside the presence of the jury:)

15           THE COURT:  Please be seated.

16           I received the government's proposal -- oh, where is

17    your --

18           MS. RUSSELL:  He's getting Mr. Brown.

19      (Mr. Herbert and the defendant enter courtroom.)

20           THE COURT:  Okay.  Which is a *Screws* definition, and

21    you will have three more questions, because you have proposed

22    that as used in Count One, "intended" means that the defendant

23    acted willfully.  To show a willful deprivation of a

24    constitutional right, the government must establish that

25    defendant acted in open defiance or reckless disregard of a

1   constitutional right.  A defendant need not have been thinking

2   a con -- in constitutional terms to willfully violate the

3   Constitution -- you have definitions then for "willfully,"

4   "defiance," and "reckless disregard."  We're trying to make it

5   understandable for one term, which is the "intent" in element

6   three.

7           I'll tell you why I believe the language of *Bradley*

8   that was quoted before the break is not right.

9           "The defendant must intend to commit an act that

10  results in the deprivation of established constitutional right"

11  is wrong for this reason:

12          Just three or four lines later, that jury was

13  instructed that Bradley intended to violate those

14  constitutional rights.

15          So it can't be to commit an act that results in

16  deprivation.  It has to be an intent to violate.

17          *Screws* gives us a bit of a definition for "intent,"

18  and it might make it as simple as this:

19          "Had the purpose," that's what *Screws* says, "had the

20  purpose."

21          So what if we just say "had the purpose to deprive,"

22  and then forget all of the constitutional right language.  Say

23  "had the purpose to deprive Jecque Howard of the right to be

24  free from unreasonable force," and then it would simply be the

25  next line, "The defendant need not know the exact

1    constitutional right or law that he is intending to deprive in
2    order for him to have that purpose."
3          Something like that.
4          MR. HERBERT:  Judge, from our perspective, I don't
5    like that one.
6          I don't think "purpose" -- I'm just -- I'm hung up on
7    that word, Judge.  I liked your proposed one before the break
8    better.  I think it's -- I think "purpose" is confusing.  I
9    liked "knew what he was doing was a violation of a
10   constitutional right."
11         MS. ROMERO:  We would be fine with that, Judge.
12         THE COURT:  My very first one?
13      (Counsel conferring.)
14         THE COURT:  I have so many papers, I have to start
15   with a clean pad.  Hang on.
16         MS. ROMERO:  Judge, I have my notes, it says,
17   basically, "It means that the defendant knew what he was doing
18   was a violation of the law, but he need not know," and then I
19   think it was the language of the -- "need not know the law" or
20   whatever the constitutional amendment was.
21         THE COURT:  Now I'm thinking that "violation of the
22   law" might be too broad, because it could be state, local.  So
23   I think it needs to say, "It means that the defendant knew what
24   he was doing was a violation of constitutional right, he need
25   not know" --

1          MR. HERBERT:  Right.

2          MS. ROMERO:  Right.

3          THE COURT:  -- "what right."

4          MS. ROMERO:  Yeah.

5          MR. HERBERT:  And I guess another option, I don't know

6    if we discussed it, but how about just a note back to them that

7    it is for them to determine what --

8          THE COURT:  Well, I don't think that's helpful.

9          MR. HERBERT:  Okay.

10         THE COURT:  And the reason -- this is just my take.

11   You are -- this is your case to go to the jury.

12         I don't think it's helpful because they're hung up on

13   what "intent" is, and we didn't give them a definition.

14         So without giving them a definition, they seem to be

15   lost with what to do.

16         Maybe giving them the simplest definition like this

17   will trigger them to come back and tell us what they're hung up

18   on.  I don't know what they're hung up on.

19         So now it reads, "It means that the defendant knew

20   what he was doing was a violation of a constitutional right.

21   The defendant need not know the exact law or right he was

22   violating."

23         MR. HERBERT:  Can we put in there "at the time he did

24   it"?

25         THE COURT:  Well, we have to put in there, "In

 1   response to your question regarding clarification of intent, in

 2   Count One, colon, when it says in paragraph three, quote, the

 3   defendant intended to deprive Jecque Howard of these rights,

 4   unquote, it means that the defendant knew what he was doing was

 5   a violation of a constitutional right, and the defendant need

 6   not know the exact law or right he was violating."

 7            All right.  Are you in agreement with that?

 8            MS. ROMERO:  That's fine, Judge.

 9            MR. HERBERT:  I guess we would just ask that we put in

10   "at the time he did it."

11            THE COURT:  But that's --

12            MS. ROMERO:  Judge, for what it's worth, the

13   instruction itself --

14            THE COURT:  It says that.  Yeah.

15            MS. ROMERO:  -- refers to Count One --

16            THE COURT:  Yeah.

17            MS. ROMERO:  -- which has a particular --

18            THE COURT:  I don't think we need that.

19        (Counsel conferring.).

20            THE COURT:  Okay.  That's how I'm going to respond.

21            MS. ROMERO:  Judge, may I also suggest we do

22   specifically respond that you've already been instructed with

23   respect to --

24            THE COURT:  Yes.  Let's talk about that one.

25            So for Count Three, "As to your question regarding

1   Count Three, you have already been instructed regarding the

2   intent as to those count -- as to Count Three"?

3           MS. JENKINS:  Right.  We would agree with that.

4           MR. HERBERT:  Or it is for them to determine.

5           THE COURT:  Well, I just -- I mean, that's what

6   they're doing, so ...

7           MR. HERBERT:  I would propose:  "It is for you to

8   determine what intent means" --

9           THE COURT:  Oh, no, no, no, no, no.

10          MR. HERBERT:  I mean --

11          THE COURT:  No.  I'm the instructor of the law, not

12  them.  No, they have instructions on "intent."

13          So how did I just say that?

14          MR. HERBERT:  Actually, they don't, though, I don't

15  believe.

16          MS. ROMERO:  Yes.

17          THE COURT:  Why don't you think they don't?

18      (Counsel conferring.)

19          MR. HERBERT:  Okay.  I'm sorry.  There is.

20  "Intended."

21          MS. JENKINS:  We're referring now to Instruction 24,

22  so they've already been given the guidance on that.  So in

23  terms of what you just said, I believe --

24          MS. ROMERO:  I think it was something with respect to

25  "intent" in Count -- I don't know if we want to say Two and

```
 1          Three, because that's the --

 2                  THE COURT:  No, they didn't ask about Two.

 3                  MS. ROMERO:  Okay.  With --

 4                  THE COURT:  With respect to your question regarding

 5          "intent" --

 6                  MS. ROMERO:  In Count Three.

 7                  THE COURT:  -- in Count Three --

 8                  MS. ROMERO:  "Intent," and I would say "for Count

 9          Three has the" -- "You have already been instructed on "intent"

10          as it applies to Count Three."

11                  MS. JENKINS:  To that count.

12                  THE COURT:  Okay.  All right.  So other than your

13          objection to that you wanted to say "at the time," are you fine

14          with the instruction regarding "he knew what he was doing,"

15          that instruction?  And are you fine with this instruction with

16          respect to Count Three?

17                  MR. HERBERT:  Yes.

18                  THE COURT:  Okay.  Let me respond to them.  And don't

19          go too far.  Okay?

20                  I should have noted for the record that Mr. Brown did

21          arrive during our very first discussion.

22                  And good morning, Mr. Brown.

23                  THE DEFENDANT:  Good morning, Judge.

24                  THE COURT:  Stick around, not too far, so -- in case

25          we get more questions.  All right?
```

 1              MS. ROMERO:  Thank you.

 2              MR. HERBERT:  Thank you.

 3              MS. JENKINS:  Thank you.

 4              THE CLERK:  All rise.  This Court is in recess.

 5          (Recess taken at 11:32 a.m.)

 6                    C E R T I F I C A T E

 7      I certify that the foregoing is a correct transcript of the

 8  record of proceedings in the above-entitled matter.

 9

10
    _/s/ GAYLE A. McGUIGAN_____          _April 30, 2016_
11  Gayle A. McGuigan, CSR, RMR, CRR                 Date
    Official Court Reporter
12
    _____          _April 30, 2016_
13  Gayle A. McGuigan, CSR, RMR, CRR                 Date
    Official Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25

1                    IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
2                          EASTERN DIVISION

3  UNITED STATES OF AMERICA,     )  Docket No. 14 CR 674-1
                              )
4              Plaintiff,   )  Chicago, Illinois
                              )  October 23, 2015
5            v.            )  1:01 p.m.
                              )
6  ALDO BROWN,               )
                              )
7             Defendant.   )

8
                          VOLUME 5-B
9          TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
          BEFORE THE HONORABLE VIRGINIA M. KENDALL
10

11  APPEARANCES:

12  For the Government:      UNITED STATES ATTORNEY'S OFFICE by
                        MS. LINDSAY JENKINS
13                      MS. JESSICA ROMERO
                        Assistant United States Attorneys
14                      219 South Dearborn Street
                        5th Floor
15                      Chicago, Illinois 60604

16  For the Defendant:       LAW OFFICES OF DANIEL Q. HERBERT by
                        MR. DANIEL Q. HERBERT
17                      206 South Jefferson, Suite 100
                      Chicago, Illinois  60661
18
                        J. RUSSELL LAW LLC by
19                    MS. JENNIFER W. RUSSELL
                      206 South Jefferson, Suite 100
20                      Chicago, Illinois  60661

21

22  Court Reporter:          GAYLE A. McGUIGAN, CSR, RMR, CRR
                      Federal Official Court Reporter
23                      219 South Dearborn, Room 2318-A
                      Chicago, Illinois 60604
24                      (312) 435-6047
                      Gayle_McGuigan@ilnd.uscourts.gov
25

1      (In open court outside the presence of the jury:)

2          THE COURT:  Okay.  I received a note at 12:41 that the

3   jury reached a verdict, so we're bringing them in.

4          COURT SECURITY OFFICER:  All rise.

5      (Jury in at 1:02 p.m.)

6          THE COURT:  Okay.  Please be seated, folks.

7          It's my understanding that you've reached a verdict,

8   so could the foreperson please pass it to the Court Security

9   Officer?

10     (Tendered.)

11         THE COURT:  Thank you.

12         United States versus Aldo Brown.

13         Count One:  With respect to Count One of the

14  indictment, we, the jury, find the defendant guilty.

15         As to the bodily injury as a result of defendant's

16  acts as charged in Count One:  Yes.

17         With respect to Count Two of the indictment, we, the

18  jury, find the defendant not guilty.

19         With respect to Count Three of the indictment, we, the

20  jury, find the defendant not guilty.

21         Would any party like the jury polled?

22         MR. HERBERT:  No.

23         THE COURT:  Okay.  Thank you, folks, for your service.

24  You've been a very diligent jury.

25         Please gather your belongings.  And if you would spend

1    just one minute with me before you leave, I'd like to give you

2    a certificate of recognition for your civic duty that you

3    served and to thank you in person for your hard work.

4              Thank you.

5              COURT SECURITY OFFICER:  All rise.

6         (Jury out at 1:04 p.m.)

7              THE COURT:  Okay.  You may be seated.

8              As far as the conditions currently for release, are

9    they fine with the government for our next matter?

10             MS. ROMERO:  Yes.

11             THE COURT:  Okay.  So I will set a sentencing date,

12   please.  It would probably be the end of January or early

13   February.

14             THE CLERK:  February 3rd.

15             THE COURT:  February 3rd work for everyone?

16             MS. ROMERO:  Judge, I'm scheduled to begin a trial

17   February 1st.

18             THE COURT:  Okay.  Let me just see.

19             MS. ROMERO:  It should be about two weeks.

20             THE COURT:  Will you be going on Fridays?

21             MS. ROMERO:  It's before Judge Wood.  I'm not familiar

22   if she -- what her practice is on Fridays.

23             THE COURT:  I don't either.

24             So I'm also on trial in all of February except for

25   that first week.  So the other option would be to move into

```
 1        March and go, say, March 2nd or 3rd.

 2                MS. ROMERO:  That's fine with me.

 3                MR. HERBERT:  That's fine.  Either one.

 4                THE COURT:  Okay.  So March 2nd at 10:00 o'clock in

 5        the morning.

 6                And then any sentencing position papers shall be filed

 7        by February 17.

 8                If there's any objections or a different response, the

 9        24th, please.

10                And then if there is going to be your post-trial

11        briefing, can you get it to me in the next two weeks?

12                MR. HERBERT:  You know, Judge, we're going to have to

13        order transcripts, possibly.  I don't know if we could get --

14                THE COURT:  Okay.

15                MR. HERBERT:  -- a couple of weeks after that or --

16                THE COURT:  Okay.  So let me see what the day is.

17        It's the 23rd.  Let me go one, two, three -- I'll do it right

18        after Thanksgiving.  We'll do the 2nd of December.  Does that

19        sound good?

20                MR. HERBERT:  That sounds good.  You'll probably have

21        your --

22                THE COURT:  Okay.  So December 2nd for any

23        post-briefing -- post-trial briefing.

24                The 16th would be a response.

25                And the 23rd would be a reply.
```

1    That would give me enough time before then, the

2  sentencing, to deal with that.

3    All right.  And then the same conditions of bond -- of

4  release, the same conditions of release will apply.

5    Anything else from anyone?

6    MS. JENKINS:  Not from the government.

7    MR. HERBERT:  Nothing.

8    THE COURT:  Okay.

9    MR. HERBERT:  Thank you.

10    THE COURT:  I'll see you soon.  Thank you.

11    MS. ROMERO:  Thank you, your Honor.

12    THE CLERK:  All rise.  This court is adjourned.

13   (Proceedings concluded at 1:07 p.m.)

14          C E R T I F I C A T E

15   I certify that the foregoing is a correct transcript of the

16  record of proceedings in the above-entitled matter.

17

18
   _/s/ GAYLE A. McGUIGAN_____           _April 30, 2016_
19  Gayle A. McGuigan, CSR, RMR, CRR              Date
    Official Court Reporter
20                                           _April 30, 2016_
   _____
21  Gayle A. McGuigan, CSR, RMR, CRR              Date
    Official Court Reporter
22

23

24

25